1  Brendan Cummings (CA Bar No. 193952)
   Kassia Siegel (CA Bar No. 209497)
2  Center for Biological Diversity
   P.O. Box 549
3  Joshua Tree, CA 92252
   Phone:   (760) 366-2232; Facsimile: (760) 366-2669
4  Email:  bcummings@biologicaldiversity.org
               ksiegel@biologicaldiversity.org
5

6  Miyoko Sakashita (CA Bar No. 239639)
7  Center for Biological Diversity
   1095 Market St., Suite 511
8  San Francisco, CA 94103
   Phone:  (415) 436-9682; Facsimile: (415) 436-9683
9  Email: miyoko@biologicaldiversity.org

10
   Andrew E. Wetzler (CA Bar No. 202299)
11 Natural Resources Defense Council
   544 White Oak Place
12 Worthington, OH 43085
   Phone:  (614) 840-0891; Facsimile (415) 875-6161
13 Email:  awetzler@nrdc.org

14
   Attorneys for Plaintiffs
15

16                **UNITED STATES DISTRICT COURT FOR THE**

17                **NORTHERN DISTRICT OF CALIFORNIA**

18                        **OAKLAND DIVISION**

19
   CENTER FOR BIOLOGICAL DIVERSITY, a          CASE NO.:  C-08-1339-CW
20 non-profit corporation, NATURAL RESOURCES
   DEFENSE COUNCIL, a non-profit corporation,   PLAINTIFFS' REPLY IN SUPPORT OF
21 and GREENPEACE, INC., a non-profit           MOTION FOR SUMMARY JUDGMENT
   corporation;
22                                              **Date:** May 8, 2008
23          Plaintiffs,                         **Time:** 2:00 p.m.
                                                **Judge:**  Honorable Claudia Wilkin
24          v.                                  **Courtroom:**  Courtroom 2, 4th Floor

25
   DIRK KEMPTHORNE, United States Secretary
26 of the Interior and UNITED STATES FISH AND
   WILDLIFE SERVICE;
27
           Defendants.
28

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   ARGUMENT ............................................................................................................. 1

  A.  Defendants Concede Liability in this Case ........................................................ 1

  B.  Defendants' Excuses Cannot Justify Further Delay .......................................... 2

    1.  *Defendants' Proposed Schedule is Not Reasonable* ................................. 2

    2.  *Plaintiffs' Proposed Schedule is Reasonable and Consistent with the ESA* .............................. 6

    3.  *The Arguments of Proposed Intervenors and Amici are Unavailing* ....................................... 10

III.  CONCLUSION .......................................................................................................... 12

## **TABLE OF AUTHORITIES**

**Cases**

Center for Biological Diversity v. Kempthorne,

    No. 05-5191 JSW (N. D. Cal.) ........................................................................ 5

Center for Biological Diversity v. Norton,

    Civ. 04-4324-WHA (N.D. Cal. 2005)(Exhibit A) ................................... 5, 6

Defenders of Wildlife v. Norton,

    239 F. Supp. 2d 9 (Dist. D.C. 2002) ........................................................... 12

Environmental Defense Center v. Babbitt,

    73 F. 3d 867 (9th Cir. 1995) ........................................................... 2, 6, 7, 8

Forest Guardians v. Babbitt,

    174 F.3d 1178 (10th Cir. 1999) ...................................................................... 7

Marbled Murrelet v. Lujan,

    1992 U.S. Dist. LEXIS 14645 (W. D. Wash. 1992)…………………………………8,9

Riverbend Farms, Inc. v. Madigan,

    958 F.2d 1479 (9th Cir. 1992) ...................................................................... 9

United States v. Gotti,

    755 F. Supp. 1157 (E.D.N.Y. 1991) ......................................................... 11

**Statutes**

The Administrative Procedures Act, 5 U.S.C. § 553 ..................................... 8,9

The Endangered Species Act, 16 U.S.C. § 1531 et seq. ........................... passim

**Other Authorities**

57 Fed. Reg. 13657 (April 17, 1992) (final listing rule for Kanab ambersnail) ..................................... 10

58 Fed. Reg. 41378 (August 3, 1993) (final listing rule for two plants) ................................................. 10

59 Fed. Reg. 48136 (September 19, 1994) (final listing rule for four vernal pool species) ................... 10

63 Fed. Reg. 13134 (March 18, 1998) (final listing rule for San Peninsular bighorn sheep).................. 9

63 Fed. Reg. 51005 (September 24, 1998) (final listing rule for San Bernardino Kangaroo Rat) ............ 9

68 Fed. Reg. 13498 (March 19, 2003) (final listing rule for the Sonoma population of the California tiger
    salamander) ................................................................................................................................... 9

71 Fed. Reg. 26835 (May 9, 2006) (final listing rule for 12 Hawaiian picture wing flies) ..................... 4

71 Fed. Reg. 43926 (August 2, 2006) (MMPA regulations governing take of polar bears in the Beaufort
Sea) .............................................................................................................................................. 10

72 Fed. Reg. 30670 (June 1, 2007) (Proposed MMPA regulations governing take of polar bears in the
Chukchi Sea) ................................................................................................................................ 10

73 Fed. Reg. 3146 (January 16, 2008) (final listing rule for six foreign birds) ....................................... 5

H.R. Conf. Rep. No. 835, 97th Cong., 2nd Sess., reprinted in 1982 U.S.C.C.A.N. 2860, 2862 .............. 6

# I.    INTRODUCTION

In their response to Plaintiffs' Motion for Summary Judgment, Defendants Dirk Kempthorne, Secretary of the Interior, and the U.S. Fish and Wildlife Service, admit that they are in violation of the Endangered Species Act ("ESA") for failing to issue a final listing decision for the polar bear by the January 9, 2008 statutory deadline. Defendants also acknowledge that the binding law of this Circuit requires this Court to issue an injunction compelling them to issue a final decision by a date certain. Defendants have thus, explicitly conceded liability and Summary Judgment must be entered on behalf of Plaintiffs. Nonetheless, despite admitting their violation of law, Defendants ask this Court to countenance further unlawful delay and allow them put off protections for the polar bear for more than three additional months. Defendants have offered no valid justification for such continued foot-dragging. This Court should reject Defendants proposed "reasonable" schedule and instead order a final listing decision within one week of the hearing on this Motion. Such an order is consistent with the letter and intent of the ESA, legal and regulatory precedent, and is appropriate under the specific circumstance of this case. The polar bear has already waited far too long for the protections of the ESA to which it is legally entitled and desperately needs. It should not be required to wait any longer.

# II.    ARGUMENT

## A.    Defendants Concede Liability in this Case

While styling their response as an opposition to Plaintiffs' Motion for Summary Judgment, Defendants readily concede that they are in violation of the law. Defendants' Opposition to Plaintiffs' Motion for Summary Judgment. ("Defs' MPA") at 6. As stated in Plaintiffs opening memorandum, it is undisputed that on January 9, 2007, Defendants published in the *Federal Register* a proposed regulation listing the polar bear as "threatened" under the ESA. Defs' MPA at 6; 72 Fed. Reg. 1064. It is also undisputed that more than a year has passed since that time without the proposal being finalized or withdrawn. Nor do Defendants dispute that the publication of the proposed rule triggered a mandatory duty to take final action on the proposal within one year, and that it has failed to meet that duty. 16 U.S.C. § 1533(b)(6). See Defs' MPA at 6 ("Defendants do not dispute that, pursuant to 16 U.S.C. § 1533(b)(6), the Service was required to issue the final listing determination for the polar bear within one year of publication of the proposed rule, and that the Service did not issue the determination.").

Defendants further concede that the sole and mandatory remedy is for this Court to issue an injunction requiring them to issue the final listing determination by a date certain. Defs' MPA at 6 ("Thus, under the law of this Circuit, it is appropriate for the Court to order the Service to issue the final listing determination."). Defendants also do not challenge Plaintiffs standing or raise any other jurisdictional or procedural arguments as to why this Court can or should refrain from granting Plaintiffs' Motion. Defendants have no excuses. This Court must grant Plaintiffs' Motion for Summary Judgment and declare Defendants in violation of the ESA.

Defendants' sole argument is that, notwithstanding their willful decision to disregard the law, the Court should grant them more than two additional months to finalize the listing determination, with an additional month before the rule takes effect. As discussed below, and contrary to Defendants' assertions, this proposed schedule is far from reasonable. This Court should reject Defendants' proposed schedule and instead adopt the schedule proposed by Plaintiffs.

**B.  Defendants' Excuses Cannot Justify Further Delay**

By the time the Court hears this Motion, Defendants will have missed the statutory deadline for final action on the polar bear by four months, compounding past unlawful delays that have already delayed a final decision on protecting the polar bear by well over a year. This long delay would be further extended by Defendants' proposed schedule, under which the final listing decision will not be made until almost six months after the deadline, and any listing rule would not take effect until at least a month thereafter. Defs' MPA at 5, 10. Nevertheless, Defendants assert that their proposed schedule for completion of the listing decision as outlined in the Declaration of Assistant Secretary Lyle Laverty is "reasonable," and therefore, under <u>Environmental Defense Center v. Babbitt</u>, 73 F. 3d 867 (9th Cir. 1995), this Court should adopt their proffered schedule. Defs' MPA at 7-9. In fact, as explained below, Mr. Laverty's proposed schedule is far from reasonable, and only the most tortured reading of <u>Environmental Defense Center</u> and other applicable law could support Defendants' position.

*1.    Defendants' Proposed Schedule is Not Reasonable*

Rather than support the purported "reasonableness" of Defendants' proposed schedule, the Declaration of Assistant Secretary Lyle Laverty in fact does just the opposite; Assistant Secretary Laverty's declaration confirms that Fish and Wildlife Service's polar bear scientists finished their

listing recommendation in December 2007, and that the Service itself approved the final rule in February 2008.  Laverty Dec. ¶¶ 7-10.  At that point, all scientific evidence concerning the polar bear had already been scrutinized by the expert agency.  Any subsequent delay is clearly the responsibility of political appointees such as Assistant Secretary Laverty himself (and likely higher officials within and outside of the Department of Interior), and has no basis in the ESA or in any rationale interpretation of the concept of "reasonable."

Given that the Alaska Regional Office of the Service transmitted its draft final listing determination to the Service's Washington Office on December 14, 2007 (Laverty Dec. ¶ 7), there is no reason the Service could not have complied with the January 9, 2008 statutory deadline.  The unprecedented level of public comments and the USGS reports which Assistant Secretary Laverty claims provided the basis for missing the deadline, were considered by the Service months ago and incorporated into the December 14, 2007 draft final listing determination.  <u>Compare</u> Laverty Dec. ¶ 6 ("The Service had to analyze and prepare responses to the information provided in the public comments and incorporate the USGS information into the draft final determination.") with Laverty Dec. ¶ 8 ("Given the complexity of the legal and scientific issues, the need to review approximately 670,000 public comments, the extended comment periods for consideration of the USGS reports, and the need to conduct a thorough and complete analysis, the Service was unable to complete its work by January 9, 2008, one year from publication of the proposed rule.").  To the degree that the large number of public comments and the detail and complexity of the USGS reports placed a heavy burden on the Service, Service scientists in the Alaska Regional Office performed admirably and completed their analysis of that information in mid-December, several weeks before the statutory deadline.  Defendants' decision to violate the law then, cannot be blamed on the public comments, the USGS reports, or the Alaska Office of the Service; it falls squarely on the Washington Office of the Service and the Department of Interior.

On January 7, 2008, the Director of the Service announced that Defendants would miss the impending statutory deadline but would finalize the decision within thirty days.  Laverty Dec. ¶ 8.  The Service, in effect, consciously chose to violate the law.  Even this unilateral and unjustified thirty-day extension was apparently not sufficient for the Service, and thirty days came and went with no final

1   listing determination made.  Nevertheless, on February 15, 2008, a working group of Service staff and

2   lawyers from the Department of Interior's Office of the Solicitor concluded their review and revision to

3   the listing determination, and on February 22, 2008, the Director of the Service approved the listing

4   package.  Laverty Dec. ¶ 9-10.

5          The Director of the Service's approval of the listing determination on February 22, 2008, after

6   six extra weeks of review and edits by Service staff and lawyers from the Office of the Solicitor, should

7   have been the end of the matter, and the final determination should have been submitted for publication

8   in the *Federal Register*.  Unfortunately, as the Court and all parties are aware, such was not the case,

9   and illegal delay continued after the listing package left the Service.

10         The most telling aspect of Assistant Secretary Laverty's declaration is what is missing from it.

11  In Paragraph 10, Assistant Secretary Laverty acknowledges receipt of the final listing package from the

12  Service on February 22, 2008.  However, in Paragraph 11, Laverty states that "I have *today* asked the

13  Solicitor to ensure that the listing determination meets all statutory and regulatory requirements."

14  (emphasis added).  The declaration is signed April 16, 2006.  Assistant Secretary Laverty provides no

15  explanation for why he waited almost two months from receipt of the listing determination from the

16  Service until he directed his Solicitor to "ensure that the listing determination meets all statutory and

17  regulatory requirements."  Laverty Dec. ¶11. Given the Solicitor *already* participated in drafting the

18  very determination that reached Assistant Secretary Laverty's desk on February 22, 2008, there is no

19  justification for further review by the Solicitor, nor can the purported need for *ten addition weeks* of

20  such "review" rationally be considered part of a "reasonable" schedule.

21         Moreover, even if the polar bear listing rule is in fact unusually complex compared to previous

22  listing rules, the Washington Office of the Service, the Solicitor's Office, and the Secretary still had an

23  entire year from the date of the proposed rule as contemplated by the statute to prepare for that

24  complexity, and to respond to it.  Defendants' failure to better budget their time cannot justify delaying

25  protection for the polar bear.  Nor can they reasonably say they were too busy working on other

26  statutory mandates to focus on the polar bear rule; the polar bear was the *only* species proposed for

27  listing by the Service in 2007, and the Service has not listed a *single* domestic species in the nearly two

28

1  years that Dirk Kempthorne has been Secretary of Interior.[1] Defendants' failure to finalize the polar

2  bear listing rule has only been precluded by their own intransigence, not an excessive workload.

3      The Court should also note that this is not the first delay in processing Plaintiffs' petition to list

4  the polar bear under the ESA. The Petition to list the polar bear was first filed in February of 2005.

5  Although the ESA thus required Defendants to make an initial finding on the petition within ninety

6  days of the Petition, 16 U.S.C. § 1533(b)(3)(A), and to either determine that listing the polar bear

7  under the ESA was not warranted or to propose a regulation for protection of polar bears under the

8  statute no later than February 16, 2006, 16 U.S.C. § 1533(b)(3)(B), Defendants missed each of these

9  deadlines, forcing Plaintiffs to file a lawsuit. Center for Biological Diversity v. Kempthorne, No. 05-

10 5191 JSW (N.D. Cal.). It was only in response to this litigation that Defendants agreed to a date certain

11 to issue its "12-month" finding for the polar bear. The failure of Defendants to respect the mandatory,

12 nondiscretionary, deadlines set forth by Congress has thus already caused the polar bear to forgo the

13 statutory protections to which it is entitled for well over a year. That prejudice should not now be

14 compounded by allowing Defendants an additional ten weeks of further delay.

15     Moreover, Defendants' previous behavior regarding requests for additional time to complete

16 listing rules for other species also calls into question the true reasons for the current delay. In Center

17 for Biological Diversity v. Norton, Civ. 04-4324-WHA (N.D. Cal. 2005) (attached as Exhibit A), the

18 court found that Defendants had misrepresented the reasons for seeking an extension of a final listing

19 deadline, and rather than use the extra time to analyze disputed factual issues as previously stated to the

20 court, used the time to redraft the rule to make it less protective of the species.

21         On May 14, 2004, the day before the deadline for issuing the final rule, FWS filed a
22     motion to extend the deadline by six months. Without an extension, the version of the
       rule that FWS intended to publish the next day dealt solely with the Central California
23     salamander. *While FWS argued that it needed the extension to resolve a factual
       discrepancy* over the extent of any decrease in grazing land for the Central California
24     tiger salamander, *it is now evident, upon review of the transcript of the hearing and the
       administrative record, that FWS was simply buying time* to draft a final rule that also

25

_____

26 [1] The last domestic species listing by the Service was a rule protecting 12 Hawaiian picture wing flies
   on May 9, 2006, prior to Dirk Kempthorne's appointment as Secretary. 71 Fed. Reg. 26835. A
27 different branch of the Service, which handles foreign listings, finalized an overdue listing
   determination for six foreign birds on January 16, 2008. 73 Fed. Reg. 3146. No other listings have
28 occurred under Secretary Kempthorne's tenure.

_____

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT                                          5
OF MOTION FOR SUMMARY JUDGMENT                                          C-08-1339-CW

incorporated the down-listing of the Santa Barbara County and Sonoma County tiger salamander populations.

Id. at 6-7.  It is not unreasonable to assume that a similar dynamic is at play with regard to the polar bear.

In sum, the evidence Defendants put forth to somehow make their conscious choice to violate the law appear reasonable does no such thing. Defendants proposed schedule should be rejected as unreasonable.[2]

> 2.    *Plaintiffs' Proposed Schedule is Reasonable and Consistent with the ESA*

As discussed in Plaintiffs' opening memorandum, given that the Service has already completed its final listing determination, and that there is no valid justification for continued delay, Plaintiffs request that this Court order Defendants to make and publish in the *Federal Register* a final listing determination for the polar bear within seven days of the hearing on this Motion.  Such an order would be consistent with Congressional intent, caselaw in this and other Circuits, and is clearly reasonable under the circumstances.

In 1982, Congress explicitly amended the ESA to remove Defendants' ability to decide how quickly to list species and to "replace the Secretary's discretion with mandatory, non-discretionary duties."  H.R. Conf. Rep. No. 835, 97th Cong., 2nd Sess., reprinted in 1982 U.S.C.C.A.N. 2860, 2862. Defendants thus should not be permitted to resurrect the Secretary's "discretion" under the ESA to delay listing decisions by simply ignoring its mandatory duties, as it has done here, and then arguing for further extensions in federal court.  See also Center for Biological Diversity v. Norton, 304 F.Supp. 2d 1174, 1180 (D. Ariz. 2003) ("The mandatory language of the ESA does not support Defendant's suggestion that the ESA allows the Secretary to comply with statutory duties at his or her convenience, or that a heavy workload of the agency may excuse compliance.")

---

[2] While Plaintiffs believe that Assistant Secretary Laverty's declaration provides no basis for a finding that Defendants' proposed schedule is reasonable, in the event the Court is inclined to give credence to Laverty's justification for Defendants' proposed schedule, Plaintiffs would request that the Court order Laverty to appear at the scheduled hearing on Plaintiffs' Motion for Summary Judgment and be subject to cross-examination under oath.

Defendants rest their entire argument for several months of further delay on an out-of-context sentence from <u>Environmental Defense Center v. Babbitt</u>, 73 F.3d 867 (9th Cir. 1995). In <u>Environmental Defense Center</u>, 73 F.3d at 869, the plaintiffs sought to enforce the ESA's listing deadline for the California red-legged frog notwithstanding the fact that Congress had imposed a spending moratorium on listing decisions. The district court issued an injunction requiring prompt finalization of the rule. However, the Ninth Circuit found that the spending moratorium precluded the Secretary from finalizing the listing rule and remanded the decision to the district court with instructions to delay setting a deadline "until a reasonable time after appropriated funds are made available, the time to be specified by the district court." <u>Id</u>. at 872.

The facts of <u>Environmental Defense Center</u> are unique in that, unlike the present case, the Secretary was precluded from taking action on the listing proposal by the Congressional spending moratorium. As such, an immediate injunction was inappropriate. The Tenth Circuit summed up the limited holding of <u>Environmental Defense Center</u> as follows:

> [W]e accept the clear statement by the Ninth Circuit in that case that had the spending moratorium not been in effect at the time that the court rendered its decision, it would have affirmed the district court order compelling agency action. This conclusion is bolstered by the district court's disposition on remand. After a remand hearing held only 10 days after the congressional spending moratorium was lifted, the district court ordered the Secretary to "complete the listing of the red-legged frog" within two weeks. <u>See Environmental Defense Ctr. v. Babbitt</u>, CV-95-2867-R (C.D. Cal. May 6, 1996)

<u>Forest Guardians v. Babbitt</u>, 174 F.3d 1178, 1188-89 (10th Cir. 1999). If anything, the short schedule imposed in <u>Environmental Defense Center</u> on remand supports Plaintiffs' proposed schedule far more than it does the extended schedule proposed by Defendants. The Tenth Circuit reached a similar conclusion, and in giving remand instructions in an ESA deadline case, adopted an "as soon as possible" standard, citing the two week schedule of <u>Environmental Defense Center</u>:

> For guidance, we refer the district court to the proceedings in <u>Environmental Defense Center v. Babbitt</u>, 73 F.3d 867 (9th Cir. 1995). There, in a case decided during the moratorium, the Ninth Circuit held that the Secretary violated his nondiscretionary duties to take final action on the California red-legged frog, but remanded to the district court to specify the time for compliance with the ESA after appropriated funds became available. <u>See id</u>. at 872. At a hearing which took place only 10 days after the moratorium was lifted, the district court ordered the Secretary to list the red-legged frog within 14 days.

1  Forest Guardians v. Babbitt, 174 F.3d at 1190

2      In their opening brief, Plaintiffs cited the case Marbled Murrelet v. Lujan, 1992 U.S. Dist.

3  LEXIS 14645 (W. D. Wash. 1992) as instructive on remedy.  In Marbled Murrelet the Court ordered

4  the Secretary to complete the listing rule for the murrelet within three days of the Court's order.

5  Without explaining how or why, Defendants assert that Marbled Murrelet is inconsistent with the Ninth

6  Circuit's subsequent decision in Environmental Defense Center. Defs' MPA at 8.  Presumably,

7  Defendants believe that the short timeline the district court in Marbled Murrelet gave the Secretary to

8  finalize its listing rule for the murrelet was not reasonable.  Nevertheless, the Secretary was able to

9  complete the listing rule in compliance with the court deadline.  As in Marbled Murrelet, in this case

10  "the Secretary's task should be assisted markedly by the fact that a final rule has already been drafted"

11  by the relevant Service field office.  Id.  According to the Laverty declaration, the final rule for the

12  polar bear left the Alaska regional office on December 14, 2007, and was fully vetted and approved by

13  the Director of the Service on February 22, 2008.  There is simply nothing left to do that would prevent

14  Defendants from issuing the final listing determination within a week.

15      In sum, in light of the fact that there is no lawful reason for continued delay in issuing a final

16  listing determination for the polar bear, Plaintiffs respectfully request that this Court order Defendants

17  to publish the final determination within seven days of the hearing on this motion.  Such an order is

18  consistent with the nearly identical Marbled Murrelet case as well as Environmental Defense Center

19  and other district court rulings regarding overdue listing determinations under the ESA.

20      In Plaintiffs' opening brief, Plaintiffs also requested that this Court order any final listing rule

21  for the polar bear be made effective immediately upon publication pursuant to 5 U.S.C. § 553(d)(3)

22  rather than after a thirty-day delay.  Defendants object to this, arguing that a thirty-day delay is

23  "appropriate," and that further delay will not harm the polar bear.  Defs' MPA at 10. Defendants are

24  wrong on both counts.

25      Again, Marbled Murrelet is precisely on point, with the court finding that the Secretary's illegal

26  delay of a final ESA listing decision constitutes "good cause" for waiving the thirty-day period before

27  the final rule would become effective:

28

Finally, it was brought to the court's attention during oral argument that under the APA, 5 U.S.C. § 553(d), a rule is normally not effective until thirty days after the date of publication. However, an exception is available under § 553 (d)(3) if 'otherwise provided by the agency for good cause found and published with the rule.' *The court finds that, in view of the unlawful delay which has already occurred in complying with the ESA, a final determination by the Secretary to list the tri-state murrelet population as threatened should be accompanied by an agency waiver for good cause of the 30-day delay in the effective date of the determination.*

992 U.S. Dist. LEXIS 14645 (emphasis added).

Defendants cite to <u>Riverbend Farms, Inc. v. Madigan</u>, 958 F.2d 1479, 1485 (9th Cir. 1992) to explain the importance of a standard thirty-day delay in the effective date of a rule under 5 U.S.C. § 553(d). However, Defendants neglect to point out that Ninth Circuit in <u>Riverbend</u> explained that the thirty-day delay is regularly and easily waived, and in fact such a waiver was justified in that very case. <u>Id</u>. at 1485 (finding that "APA contains two good cause exceptions" and that good cause to waive the thirty-day requirement "is the easiest to justify" and, similarly, that "good cause more easily found as to 30-day waiting period").

Moreover, the relief Plaintiffs seek is no different than what Defendants have themselves done many times before. Defendants have on multiple occasions invoked 5 U.S.C. § 553(d)(3) and waived the thirty-day period before a final ESA listing rule becomes effective, making the rule effective upon publication.[3] This Court should do the same here and require Defendants to make a final listing regulation for the polar bear effective upon publication in the *Federal Register.*

In arguing against waiver of the waiting period, Defendants assert that "a waiting period will have a negligible effect on the status of the polar bear," because the "species is adequately protected in the short-term by the Marine Mammal Protection Act ('MMPA')." While the MMPA provides important protections to the polar bear, these protections are simply not comparable to those of the ESA. The primary protection of the MMPA is the statute's prohibition against "take." 16 U.S.C. §

---

[3] <u>See</u>, <u>e.g.</u> 68 Fed. Reg. 13498 at 13519 (March 19, 2003) (final listing rule for the Sonoma population of the California tiger salamander); 63 Fed. Reg. 51005 at 51016 (September 24, 1998) (final listing rule for San Bernardino Kangaroo Rat); 63 Fed. Reg. 13134 at 13149 (March 18, 1998) (final listing rule for San Peninsular bighorn sheep); 59 Fed. Reg. 48136 at 48148 (September 19, 1994) (final listing rule for four vernal pool species); 58 Fed. Reg. 41378 at 41382 (August 3, 1993) (final listing rule for two plants); 57 Fed. Reg. 13657 (April 17, 1992) (final listing rule for Kanab ambersnail).

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT                                    C-08-1339-CW

1371.  This prohibition is similar to the ESA's prohibition on "take."  16 U.S.C. § 1538.  However, unlike the ESA, the MMPA provides no requirement to designate and protect critical habitat or to develop and implement recovery plans.  Perhaps most important in the short-term, the MMPA does not contain any provisions akin to the requirement of Section 7 of the ESA, 16 U.S.C. § 1536, which require federal agencies to ensure through consultation with the Service that their actions do not jeopardize the continued existence of listed species.  Numerous federal actions occur in, or affect, polar bears and their habitat, and would, if the bear were ESA-listed, be subject to the substantive and procedural requirements of Section 7.

The harm the polar bear is suffering as a result of Defendants' failure to list under the ESA is not just conjectural.  For example, on February 6, 2008, the Department of Interior offered oil and gas leases on millions of acres of polar bear habitat in federal waters of the Chukchi Sea.  See 73 Fed. Reg. 209 (January 2, 2008)(notice announcing February 6, 2008 lease sale).  If the polar bear had been listed by the January 9, 2008 statutory deadline, the Chukchi Sea lease sale could not have occurred absent compliance with Section 7 consultation on the impacts of the action on the polar bear.  Similarly, Defendants are poised to issue regulations under the MMPA that would in essence exempt all oil industry operations in the Chukchi Sea from the take prohibition of the MMPA.  See 72 Fed. Reg. 30670 (June 1, 2007) (Proposed MMPA regulations regarding polar bears in Chukchi Sea).  These regulations would also be subject to ESA consultation if the polar bear were listed under the ESA. Finally, unlike the ESA, the MMPA provides no citizen-suit provision, so enforcement is left entirely to the discretion of the Service, meaning, unfortunately for the bear, that the paper-protections that the MMPA provides remain largely unimplemented and unenforced on the ground (and ice). See, e.g. 71 Fed. Reg. 43926 at 43927 (August 2, 2006) (MMPA regulations governing take of polar bears in the Beaufort Sea)("A lapse in authorization occurred from March 29, 2005, until publication of this rule, during which industry was liable for take of any polar bear and walrus.").  In sum, contrary to Defendants' assertions, the failure to timely finalize the listing rule for the polar bear has resulted, and is likely to continue to result in actual harm to the species.

3.    *The Arguments of Proposed Intervenors and Amici are Unavailing*

Several organizations representing trophy hunters have either moved to intervene or to file an

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT

1  *amicus* brief in this case.  See Dkt # 29 (Motion to Intervene by Conservation Force); Dkt # 19 (Motion

2  for Leave to File Amicus Brief by Safari Club International, *et al.*).[4]  The arguments presented by these

3  organizations are either redundant to those proffered by Defendants themselves, or are irrelevant to the

4  narrow deadline issue currently before the Court.

5        Fundamentally, both the Safari Club and Conservation Force are simply opposed to the listing

6  of polar bears under the ESA under any circumstances.  Safari Club's brief consists largely of arguing

7  that Defendants' proposed timeline is reasonable since polar bears are not really threatened, or at most,

8  there is a sufficient dispute in the science justifying continued delay.  Safari Club focuses on the fact

9  that the ESA contains a provision allowing Defendants to invoke a six-month delay in issuing a final

10  listing decision if there is a "substantial disagreement" in the science.  Notably, Defendants never

11  invoked this provision, and in fact, the Director of the Service in announcing the listing delay explicitly

12  stated that the agency was not claiming any such "substantial disagreement" in the science.  In short,

13  Safari Club's argument is premised on a statutory exemption that Defendants themselves acknowledge

14  does not apply.  Their wish for further delay is simply not reason for adopting Defendants' proposed

15  schedule.

16        Conservation Force's brief runs even farther afield than Safari Club's.  Half of the brief is taken

17  up by assertions that global warming is not really occurring, and therefore the polar bear cannot

18  possibly be endangered.  Conservation Force also argues that because Defendants are late in finalizing

19  the polar bear listing rule, by definition the listing rule must be withdrawn.  This argument has no basis

20

---

21  [4] Intervenor-Applicant Conservation Force has noticed their motion for intervention for June 12, 2008.
Given that this is after the noticed hearing on Plaintiffs' Motion for Summary Judgment, Plaintiffs

22  anticipate that Conservation Force's motion will be dismissed as moot. Under the local rules, Plaintiffs'
opposition brief is due May 22, 2008. In the event the intervention motion is not rendered moot by the

23  Court's order on summary judgment, Plaintiffs will likely oppose the intervention on the grounds that,

24  *inter alia*, Conservation Force can have no legally protectable interest in Defendants' continued
violation of the law.  See Fed. R. Civ. P. 24(a).  Proposed *Amici* Safari Club International *et al.* have

25  properly noticed their motion so that it can be considered prior to the hearing on Plaintiffs' Motion for
Summary Judgment.  While Plaintiffs believe that Safari Club's *amicus* brief does not meet the relevant

26  standards for an amicus brief (see, e.g. United States v. Gotti, 755 F. Supp. 1157, 1158-59 (E.D.N.Y.

27  1991) (rejecting *amicus curiae* application for its failure to provide an "objective, dispassionate, neutral
discussion of the issues")), Plaintiffs do not object to Safari Club's filing of an *amicus* brief so long as

28  their participation in this case is limited to such.

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT                    C-08-1339-CW

in law or logic. Conservation Force also is very concerned about the listing rule going into effect before its members either complete their hunts for polar bears or receive permits to import their trophies. Again, this argument is misplaced. Apparently, several members of Conservation Force took the gamble that they could rely on Defendants illegal decision to not finalize the listing rule until sometime this summer, and therefore paid some amount of money for the privilege of shooting a polar bear in Canada this spring, expecting to be able to import the trophies into the U.S. prior to a final ESA listing decision. Now, worried that they may not be able to import their trophies before the listing is finalized and the importation rules change, they seek to delay the effective date of the listing. Such unwise and self-interested reliance on Defendants' illegal delay is simply is not sufficient reason to justify further delay in finalizing the long-overdue listing determination for the polar bear. As with Safari Club, the arguments of Conservation Force must be rejected.

## III.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment and order Defendants to make, and to publish in the *Federal Register*, a final listing determination for the polar bear under the ESA within 7 days of the Court's hearing on this Motion. Plaintiffs also request that this Court order any final listing rule for the polar bear be made effective immediately upon publication pursuant to 5 U.S.C. § 553(d)(3).[5]

---

[5] In the event the Court considers Defendants schedule to be reasonable, or otherwise chooses to allow Defendants additional time to complete the listing decision, Plaintiffs respectfully request that the Court enjoin Defendants from issuing any permits, leases or other authorizations that "may affect" the polar bear and which would be subject to consultation if the polar bear were timely listed. See, e.g. Defenders of Wildlife v. Norton, 239 F. Supp. 2d 9, 25 (Dist. D.C. 2002) (Issuing injunction prohibiting Secretary from allowing agency actions to occur in lynx habitat absent formal consultation until critical habitat is designated).

1    DATE: April 24, 2008                    Respectfully Submitted,

2

3                                            By:  /s/Brendan Cummings

4                                            Brendan Cummings (CA Bar No. 193952)
                                             Kassia Siegel (CA Bar No. 209497)
5                                            Center for Biological Diversity
                                             P.O. Box 549
6                                            Joshua Tree, CA 92252
7                                            Phone:  (760) 366-2232; Facsimile: (760) 366-2669
                                             Email:  bcummings@biologicaldiversity.org
8                                                    ksiegel@biologicaldiversity.org

9                                            Miyoko Sakashita (CA Bar No. 239639)
10                                           Center for Biological Diversity
                                             1095 Market St., Suite 511
11                                           San Francisco, CA 94103
                                             Phone:  (415) 436-9682; Facsimile: (415) 436-9683
12                                           Email:  miyoko@biologicaldiversity.org

13                                           Andrew E. Wetzler (CA Bar No. 202299)
14                                           Natural Resources Defense Council
                                             544 White Oak Place
15                                           Worthington, OH 43085
                                             Phone:  (614) 840-0891; Facsimile (415) 875-6161
16                                           Email:  awetzler@nrdc.org

17                                           Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CENTER FOR BIOLOGICAL DIVERSITY,
a non-profit corporation, and
ENVIRONMENTAL DEFENSE CENTER, a
non-profit corporation,

          Plaintiffs,

  v.

U.S. FISH & WILDLIFE SERVICE, and
GALE A. NORTON, Secretary of the Interior,

          Defendants.
   and

COUNTY OF SANTA BARBARA, et al.,

          Applicants for Intervention.
_____/

No. C 04-04324 WHA

**ORDER (1) GRANTING
IN PART PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT, (2) GRANTING
IN PART DEFENDANTS'
CROSS-MOTION FOR
SUMMARY JUDGMENT,
AND (3) REMANDING
IN PART TO FWS**

**INTRODUCTION**

     In this environmental case, the Center for Biological Diversity and the Environmental

Defense Center seek protection for the California tiger salamander. Plaintiffs bring this action

pursuant to the Endangered Species Act of 1973, 16 U.S.C. 1531 *et seq.,* against Defendants

Gale Norton, Secretary of the Interior, and the United States Fish and Wildlife Service

("FWS"). Certain parties have been granted intervention as defendants. This order sustains the

agency action in part and vacates it in other respects, as set forth below.

**STATEMENT**

The California tiger salamander (*Ambystoma Californians*) is an amphibian. It is large and stocky with a broad, rounded snout. It has small eyes with black irises that protrude from its head. Its back and side are black with white or yellow spots or bars. Its belly varies between white or yellow to a variegated pattern of white or yellow and black. Adults reach an average length of eight inches. Historically, the California tiger salamander has inhabited the coastal ranges in the Santa Rosa area of Sonoma County, southern San Mateo County south to San Luis Obispo County, and the vicinity of northwestern Santa Barbara. Three populations are at issue: California tiger salamanders in (i) Santa Barbara County, (ii) Sonoma County, and (iii) elsewhere in Central California (69 Fed. Reg. 47214 (2004)).

The habitat of the California tiger salamander includes vernal pools and seasonal and perennial ponds and surrounding upland areas in grassland and oak savannah plant communities from sea level to about 3600 feet. California tiger salamanders mate in vernal pools and similar waters. The females lay their eggs in the water. Females attach their eggs singly, or, in rare circumstances, in groups of two to four, to twigs, grass stems, vegetation or debris. The eggs hatch in ten to fourteen days. The hatched larvae are aquatic. This stage lasts three to six months, the time it takes for a seasonal pool to dry up. The larvae will perish if a site dries up before they complete metamorphosis. Amphibian larvae must grow to a critical minimum body size before they can metamorphose to the terrestrial stage. The longer the period in the vernal pool, the larger the larvae grow and the more likely they will survive. Lifetime reproductive success is low. Many California tiger salamanders breed only once in a lifetime with an average of eleven metamorphic offspring. Less than five percent of the metamorphic offspring become breeding adults (*ibid*).

While vernal pools have been an essential element of its breeding habitat, where vernal pools have been destroyed, the California tiger salamander also uses other waters, such as stock ponds, for breeding. Constructed as water sources for cattle, sheep, horses, and other livestock, stock ponds are now important breeding habitat for the California tiger salamander. In order, however, for the stock ponds to be suitable for breeding, they must be maintained. For

United States District Court

For the Northern District of California

1    example, natural soil erosion on the bank edges and the presence of bullfrogs and fish impede

2    the California tiger salamander's ability to breed (*id.* at 47216).

3         After breeding, adults leave the water and return to small burrows in surrounding

4    uplands made by ground squirrels, gophers and other mammals.  Similarly, metamorphosed

5    juveniles leave the breeding sites in the late spring or early summer and migrate to upland

6    habitats.  The upland habitat of the California tiger salamander consists of grassland savannah

7    or grasslands with scattered oak trees and scrub or chaparral.  The California tiger salamander

8    co-habitats in the burrows with the small mammals, as stated.  Studies show that active

9    ground-burrowing rodent populations are required to sustain the salamanders.

10                    *          *          *

11         This case is but one chapter in a history of litigation and rule-promulgating regarding the

12   California tiger salamander.  Dr. H. Bradley Shaffer, a leading scientific expert on the

13   California tiger salamander, petitioned FWS in 1992 to list the California tiger salamander as

14   "endangered" throughout its range.  The following year, Dr. Shaffer requested that FWS list the

15   California tiger salamanders in Sonoma and Santa Barbara counties on an emergency basis.

16   FWS published a twelve-month finding on Dr. Shaffer's petition finding that the listing of the

17   California tiger salamander throughout its range in California was "warranted but precluded" by

18   more paramount concerns (Cen CTS FR 15720-15722).[1]

19         Six years later, in 2000, FWS promulgated an emergency rule designating the California

20   tiger salamander in Santa Barbara County as "endangered" (65 Fed. Reg. 3096 (2000)).  In the

21   same rule, FWS determined that the Santa Barbara salamander should be designated as a

22   "distinct population segment ('DPS')," as defined in the ESA (*id*. at 3106-7).  On March 19,

23   2003, FWS extended the protections of the emergency listing, issuing a final rule designating

24   Santa Barbara County distinct population of the California tiger salamander as "endangered"

25   (65 Fed. Reg. 57242).

26

27   ───────────────

28        [1] This order adopts the citation system used in the administrative record.  Cen CTS, SBC CTS and SC CTS refer to the Central California, Santa Barbara County and Sonoma County tiger salamander, respectively. FR and PR refer to the final rule and proposed rule, respectively.

United States District Court
For the Northern District of California

1          After FWS listed the Santa Barbara County tiger salamander "endangered" but not the

2   Sonoma County tiger salamander, the Center for Biological Diversity sued in an earlier action

3   in this Court (C-02-0558 WHA (N.D. Cal)), to compel the agency to protect the species in

4   Sonoma County and throughout the remainder of its range.  In June 2002, the Court approved a

5   consent decree setting deadlines for FWS:  (1) to determine whether the Sonoma salamander

6   warranted an emergency listing, (2) to submit for publication in the Federal Register a proposed

7   rule to list the California tiger salamander throughout its remaining range in California on or

8   before May 15, 2003, and (3) to make a final determination on the proposed rule by May 15,

9   2004 (Consent Decree, Docket No. 58 at 4).

10          In response, FWS listed Sonoma County distinct population as an "endangered" species

11   on an emergency basis and proposed to list it as "endangered" permanently (67 Fed. Reg. 28648

12   (2002)).  In March 2003, FWS listed the Sonoma County distinct population segment as

13   "endangered" (68 Fed. Reg. 13498 (2003)).  To fully satisfy the consent decree, FWS had to

14   determine the listing of the Central California tiger salamander as well, which it did in the

15   agency action at issue now.  As explained below, however, in doing so, FWS used the occasion

16   to down-list the Sonoma County and Santa Barbara County tiger salamanders.

17          In response to the "endangered" listings in Santa Barbara and Sonoma counties, a

18   coalition of public agencies, home builders, agricultural and labor interests challenged the

19   listing in the United States District Court for the Eastern District of California *(Home Builders*

20   *Association of Northern California, et al. v. Williams*, No. S-04-0345 LEK GG (E.D. Cal)).

21   CBD intervened in *Home Builders* as a defendant.  The suit alleged that California tiger

22   salamanders in Santa Barbara and Sonoma counties had been unlawfully listed, contending that

23   the populations did not comprise valid "distinct populations segments."  *Home Builders* was

24   eventually dismissed as moot in light of the rule at issue herein, referred to for convenience as

25   the "2004 rule."

26          The 2004 rule (1) eliminated the separate DPS status for Sonoma and Santa Barbara

27   counties and effectively merged them into a single range-wide species in California, (2) listed

28   the single range-wide species as "threatened," thus eliminating the "endangered" listing for the

United States District Court

For the Northern District of California

1   Santa Barbara County and Sonoma County DPSs, and (3) included a so-called Section 4(d) rule

2   exempting routine ranching activities from the definition of a "taking" of the California tiger

3   salamander.  While the 2004 rule was supposed, under the consent decree, to address only the

4   Central California tiger salamander, it ended up revisiting the entire species, including the

5   Santa Barbara and Sonoma populations and down-listing their protection.

6        Here is the detailed history.  The California/Nevada operations office of FWS generated

7   multiple drafts of the proposed rule.  All of the drafts proposed "threatened" status for the

8   California tiger salamander range-wide except for the Santa Barbara and Sonoma DPSs, which

9   had been already been listed as "endangered."  On April 30, 2003, the regional office proposed

10  this version to officials at the Department of the Interior in Washington.  On May 14, 2003,

11  one day before the listing deadline, the Department of Interior responded with a revised draft

12  that listed the Central California distinct population segment of the California tiger salamander

13  as "threatened" and, for the first time, proposed to down-list the Sonoma and Santa Barbara

14  tiger salamander from "endangered" to "threatened" (Cen CTS PR 1382–1524).  After

15  additional edits were made by Assistant Secretary of the Interior, Craig Manson, the proposed

16  rule, which included the proposed down-listing, was published in the Federal Register (68 Fed.

17  Reg. 28648 (May 23, 2003)).[2]

18       Following publication of the proposed rule, the regional FWS office solicited peer

19  review, public comment and convened its own internal scientific review team.  Plaintiffs state

20  that "all scientific evidence before the agency weighed against reclassification" (Pl. Brief at 23).

21  While the record does not support this sweeping statement, it is true that after evaluation and

22  analysis, the scientific review team's drafts of the final rule opposed any down-listing of the

23  Sonoma County and Santa Barbara County salamanders.  In a memorandum dated May 6, 2004,

24  the listing officer of the California/Nevada operations office notified the Secretary of the

25  Interior that the proposed final rule listed the Central California tiger salamander as

26  "threatened" but deferred any decision on the Sonoma County and Santa Barbara County tiger

27

28       [2] Craig Manson, is the Assistant Secretary for Fish, Wildlife, and Parks at the U.S. Department of the
     Interior, located in Washington D.C.  In his capacity as Assistant Secretary, he is responsible to the Secretary of
     the Interior for the administration of the Endangered Species Act (Manson Decl. ¶ 1).

1   salamander, stating "we are also preparing a notice to open another comment period on the

2   proposed down-listing of the Sonoma and Santa Barbara distinct populations segments and on a

3   proposal to consolidate the three DPSs into a single range-wide listing, should the two DPSs be

4   down-listed" (Cen CTS FR 8863).

5          The Department of the Interior, however, did not wish to defer the decision on the

6   Sonoma and Santa Barbara down-listing.  In an email sent four days before the deadline for the

7   final rule, Assistant Deputy Secretary of the Interior Julie MacDonald directed the scientific

8   review team to "prepare the final rule to list one 'threatened' population of the CTS,

9   encompassing Central, Santa Barbara, and Sonoma, down-list the Santa Barbara and Sonoma

10  populations and remove the DPS designation" (Cen CTS FR 9011).  It is clear from the record

11  that the scientific review team rushed to respond to the Department of the Interior's new

12  directive by the deadline (Cen CTS FR 9493).  In an internal email to the scientific review team

13  working on the draft of the final rule, the assistant manager stated, "[The Assistant Deputy

14  Secretary of the Interior's] highest priority is to consolidate the various listings into one

15  range-wide listing . . . it [has become] apparent that this is going to require a fair amount of

16  work, and I am not sure how good a job we can do in that time" (Cen CTS FR 9495).

17         On May 14, 2004, the day before the deadline for issuing the final rule, FWS filed a

18  motion to extend the deadline by six months.  Without an extension, the version of the rule that

19  FWS intended to publish the next day dealt solely with the Central California salamander

20  (Cen CTS FR 9637, 9959).  While FWS argued that it needed the extension to resolve a factual

21  discrepancy over the extent of any decrease in grazing land for the Central California tiger

22  salamander, it is now evident, upon review of the transcript of the hearing and the

23  administrative record, that FWS was simply buying time to draft a final rule that also

24  incorporated the down-listing of the Santa Barbara County and Sonoma County tiger

25  salamander populations.

26         The Court extended the deadline six weeks to resolve the purported factual issue of

27  whether there was a fourteen percent decrease in grazing versus a one percent increase in

28  grazing land regarding the Central California tiger salamander (No. C02-00558 WHA, June 14,

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    2004 Order at 1). The ensuing email correspondence, however, from the Department of the

2    Interior to the regional office clearly set forth a directive that had little to do with analyzing the

3    factual discrepancies and analysis of the data in front of the agency; rather, upon being granted

4    an extension, the Assistant Deputy Secretary of the Interior immediately gave a directive to the

5    scientific review team to draft a rule that down-listed all three populations to "threatened"

6    "per [Assistant Secretary Craig] Manson's previous instruction" (Cen CTS FR 10189).

7         The final rule was published on August 4, 2004. The issue regarding the percentage of

8    grazing land proved inconsequential. While the final rule included an analysis of this issue, it

9    concluded that "while the majority of these newly created grazing areas may have some utility"

10   for the tiger salamander populations . . . "they do not offset the loss of the portion of grazing

11   lands that [was] suitable habitat for the California tiger salamander habitat" (60 Fed.

12   Reg. 47213).

13        More importantly, the final rule reclassified the Santa Barbara and Sonoma salamanders

14   from "endangered" to "threatened," eliminated their separate listings as DPSs, and listed the

15   California tiger salamander range-wide as "threatened." Pursuant to Section 4(d), which allows

16   such relaxed provisions for a "threatened" status, the rule also exempted routine ranching

17   activities from the "take" prohibitions under Section 9.

18        This action commenced on October 13, 2004. Plaintiffs allege that FWS failed to

19   comply with Endangered Species Act, the Administrative Procedures Act and the National

20   Environmental Policy Act.[3]

21        On May 30, 2005, the Court permitted the following entities to intervene in the present

22   action as defendants: County of Santa Barbara, County of Sonoma, Rohnert Park, Santa Rosa,

23   Blochman Union School District, Burbank Housing Development Corporation, Coalition of

24   Labor, Agriculture and Business of Santa Barbara County, Cobblestone Homes, Inc.,

25   Grower-Shipper Vegetable Association of Santa Barbara and San Luis Obispo Counties,

26

27        [3] Plaintiffs also challenged FWS's failure to designate a "critical habitat" for the California tiger
     salamander in Sonoma and Central California; however, on February 3, 2005, the Court approved the parties'
28   stipulated settlement and consent decree dismissing the "critical habitat" claim (Dkt. No. 26).

United States District Court
For the Northern District of California

1    North Coast Builders Exchange, Northern California Engineering Contractors Association,

2    Santa Maria Valley Chamber of Commerce and Santa Rosa Chamber of Commerce.

3         Twelve of the intervenors were plaintiffs in *Home Builders*.  Intervenors argued that

4    they would suffer "economic and other injuries" if Plaintiffs prevailed in reinstating the rules

5    they had previously sued to overturn.  Generally, they alleged that if the previous rules were

6    reinstated, development and construction projects would be halted, delayed or increased in cost,

7    and significant areas of land and the use of such land would be impacted.

8         Plaintiffs have now moved for summary judgment.  In response, FWS concedes that

9    based on review of plaintiffs' claims and the administrative record (Def. Mot. 6):

10             [it] has determined that it would be appropriate to reevaluate the
               reclassification of the Santa Barbara and Sonoma populations from
11             "endangered" to "threatened" and the elimination of those
               populations' DPS status.  (Manson Decl. 3).  In retrospect, FWS
12             did not adequately explain the basis for its decision to reclassify
               the two populations (*id.*).
13

14        The federal defendants request a voluntary partial remand of the final rule to allow FWS

15   to revisit:  (1) its decision to eliminate the distinct populations segment status of the Sonoma

16   and Santa Barbara populations of the California tiger salamander, (2) its decision to reclassify

17   those populations from the status of "endangered" to "threatened," and (3) the application of the

18   special rule exempting routine ranching activities from the "taking" provision of the Sonoma

19   and Santa Barbara populations.  The federal defendants argue that the portion of the final rule

20   regarding the Central California tiger salamander and the Section 4(d) rule is valid.  During any

21   remand, which they estimate will take 20.5 months, the federal defendants request that the

22   Court permit the 2004 rule to remain in effect.  Intervenors join the federal defendants but raise

23   the threshold questions of ripeness and standing.

24        To support their position, FWS has submitted a declaration of Mr. Craig Manson,

25   Assistant Secretary for Fish, Wildlife and Parks at the Department of the Interior.  At the

26   hearing on the summary judgment motions, held on August 4, 2005, plaintiffs were permitted to

27   cross-examine Secretary Manson inasmuch as the declaration was outside the administrative

28   record.

8

United States District Court

For the Northern District of California

In summary, this order sustains jurisdiction and standing.  On the merits, this order holds that neither the classification of the salamander in Central California as "threatened" nor the Section (4)(d) rule as it applies to the Central California salamander is arbitrary and capricious. On the other hand, this order vacates (1) the elimination of the designation of "distinct population segments" for the Santa Barbara County and Sonoma County salamanders and (2) the down-listing of the Santa Barbara County and Sonoma County salamanders.  This vacatur is based on deficiencies in the administrative record and is without prejudice to any renewed administrative proceedings on the same subject.

## ANALYSIS

This order first addresses the threshold issues of standing and ripeness and then addresses the validity of the 2004 rule within the framework of the Endangered Species Act and the Administrative Procedures Act.

**1.    JUDICIABILITY.**

**A.    Standing**.

The intervenors claim that plaintiffs lack standing to sue under the ESA and the APA. This order disagrees.  Standing involves two inquiries.  *First*, a court must ask whether a plaintiff has suffered injury to satisfy the "case or controversy" requirement of Article III.  To satisfy the case and controversy requirement of Article III standing, a plaintiff "must show that: (1) he has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt. Sys., Inc.*, 528 U.S. 167, 180–81 (2000).

*Second*, in addition to Article III standing requirements, courts often impose additional jurisdictional limitations, referred to as "prudential" standing principles.  This non-constitutional inquiry is satisfied when a particular plaintiff has been granted a right to sue by a specific statute under which he or she brings suit. *Cetacean Comty. v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004).  A plaintiff's grievance must fall within the "zone of interests" of

United States District Court

For the Northern District of California

1   that statute.  The question is "whether the interest sought to be protected by the complainant is

2   arguably within the "zone of interests" to be protected or regulated by the statute or

3   constitutional guarantee in question."  *Ass'n of Data Processing Service Org., Inc. v. Camp*,

4   397 U.S. 150, 153 (1970).

5     Where an organization brings suit, there is yet another layer of analysis.  An

6   organization has standing to bring suit on behalf of its members when (a) its members would

7   otherwise have Article III standing to sue in their own right; (b) the interest it seeks to protect

8   are germane to the organization's purposes; and (c) neither the claim asserted nor relief

9   requested requires the participation of individual members.  *Hunt v. Washington State Apple*

10  *Adver. Comm'n*, 432 U.S. 333, 343 ( 1997).  In environmental cases, members have suffered an

11  injury in fact by showing that he has an aesthetic or recreational interest in a particular place, or

12  animal, or plant species, that interest is impaired by defendants' conduct, and that the injury will

13  likely be redressed by a favorable decision.  *Ecological Rights Found. v. Pacific Lumber Co.*,

14  230 F.3d 1141, 1147 (9th Cir. 2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

15    Here, CBD and EDC, as associations, have standing to bring this action.  *First*, their

16  members have Article III standing to bring this action in their own right.  The declarations of

17  group members indicate that they have an aesthetic, recreational and psychological interest in

18  observing California tiger salamanders (Blaker Decl. Docket No. 12, Holmgren Decl. Docket

19  No. 49, Wright Decl. Docket No. 13).  The 2004 rule down-lists the California tiger salamander

20  from "endangered" to "threatened," which decreases the protection afforded the Santa Barbara

21  and Sonoma California tiger salamanders by permitting "takes" under the Section 4(d) rule.

22  The decreased protection impairs the members' ability to observe California tiger salamanders

23  — which is an injury in fact.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992).

24    Intervenors contest this point, arguing that "threatened" status affords the California

25  tiger salamanders the same protections as "endangered" status and that the Section 4(d) rule is a

26  "net conservation benefit and a net positive on [p]laintiffs' ability to view the CTS"

27  (Int. Reply. 3).  This order disagrees.  Some of the activities, now sanctioned by the

28  Section 4(d) rule, may harm the California tiger salamander or so FWS has found.  For example,

United States District Court

For the Northern District of California

1    in its previous rule listing the Santa Barbara salamander as "endangered," FWS stated that

2    plowing and discing can alter the upland habitats of the salamander and kill salamanders

3    outright (65 Fed. Reg. 57252 (2000)).  In its previous emergency listing of the Sonoma tiger

4    salamander as "endangered," FWS stated that introducing fish in stock ponds reduces growth

5    and survival of the salamander (67 Fed. Reg. 47736 (2002)).

6    With regard to prudential considerations, plaintiffs fit squarely in the "zone of interests"

7    for both the ESA and the APA.  The ESA includes a citizen suit provision which broadly states

8    "any person may commence a civil suit on his own behalf . . . against the Secretary where there

9    is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title

10   which is not discretionary with the Secretary."  16 U.S.C. 1540(g).[4]  The Supreme Court has

11   held that the breadth of this provision in referring to "any person" negates the applicability of

12   the "zone of interests" test to actions brought under the ESA.  *Bennett v. Spear*, 520 U.S. 154,

13   164 (1997).  The APA, by its own terms, provides a right to judicial review of all "final agency

14   action for which there is no other adequate remedy in court."  5 U.S.C. 706.  With respect to

15   ESA claims brought under the APA, the question is whether plaintiffs' claims are arguably

16   protected by the ESA.  *Bennett*, 520 U.S. at 174.  There is no doubt that the overall purpose of

17   CBD and the EDC — to advance species preservation — is the same as the aim of the ESA.

18   Plaintiffs satisfy the remaining elements necessary for standing as an association.  As

19   discussed above, their members would otherwise have standing to sue in their own right.  In

20   addition, the interests at stake are germane to the purpose of the CBD and EDC: to save the

21   species from extinction.  Finally, CBD and EDC, as shown during this litigation, are capable of

22   litigating this case vigorously without member participation.

23   **B.    Ripeness.**

24   Intervenors also claim that the case is not ripe for review and that this Court lacks

25   jurisdiction to decide the matter.  Again, not so.  In order to determine whether a claim is ripe

26   for judicial review two factors need to be evaluated:  (1) the fitness of the issue for judicial

27

28   [4] This action arises, in part, under the ESA's citizen suit provision, 16 U.S.C. 1540(g) (Pl. Reply 16). The citizen suit provision expressly authorizes judicial review of agency listing decisions. 16 U.S.C. 1450(g)(1). Accordingly, plaintiffs complied with the necessary notice requirements.

United States District Court

For the Northern District of California

1  decision and (2) the hardship to the parties of withholding court consideration.  An

2  administrative action is fit for judicial review if the agency action is final and the issues raised

3  are "purely legal." *Assiniboine & Sioux Tribes v. Bd. of Oil and Gas*, 792 F.2d 782, 789

4  (9th Cir. 1986).

5       Plaintiffs' claims are ripe.  *First*, FWS' decision to down-list the Sonoma and

6  Santa Barbara tiger salamander from "endangered" to "threatened" is fit for review.  The 2004

7  rule is published in the Federal Register as a "final rule."  Whether FWS properly promulgated

8  the 2004 rule is a purely legal issue.  *Second*, plaintiffs would be prejudiced by withholding

9  consideration, as the Sonoma and Santa Barbara populations have been down-listed to

10  "threatened," a listing that affords the tiger salamanders – which are close to extinction — less

11  protection.

12       **2.    ENDANGERED SPECIES ACT.**

13       Having found that a number of species of fish, wildlife, and plants in the United States

14  had become extinct "as a consequence of economic growth and development untempered by

15  adequate concern and conservation," Congress passed the Endangered Species Act in 1973.

16  16 U.S.C. 1531(a)(1).  The purpose of the ESA is to conserve "endangered" and "threatened"

17  species and the ecosystems upon which they depend and to provide a program for the

18  conservation of such "endangered" species and "threatened" species.  16 U.S.C. §1531(b).

19       **A.    Definition of DPS.**

20        Under the ESA the term "distinct population segment" is used to define "species:"  The

21  term "species" includes any subspecies of fish or wildlife or plants, and any *distinct population*

22  *segment* of any species of vertebrate fish or wildlife which interbreeds when mature.  16 U.S.C.

23  1532(16).  Since Congress did not define the term "distinct population segment," FWS and the

24  National Marine Fisheries Services jointly promulgated the *DPS Policy* to ensure consistency in

25  their respective DPS designations.  61 Fed. Reg. 4722 (1996).  The *DPS Policy* was designed to

26  provide different levels of protection to different populations of the same species.  *See*

27  *Defenders of Wildlife v. Dept. of Interior*, 354 F. Supp. 2d 1156, 1170 (D. Ore. 2005).

28

12

United States District Court

For the Northern District of California

1    Under the *DPS Policy,* a DPS must be discrete and significant in relation to the species

2    to which it belongs (61 Fed. Reg. 4725 (1996)).  A population is discrete, in part, if "[it] is

3    markedly separated from other populations of the same taxon as a consequence of physical,

4    physiological, ecological, or behavior factors" (*ibid.*).  If the population is discrete, FWS then

5    considers the "biological and ecological significance" of the populations to the taxon to which it

6    belongs (61 Fed. Reg. at 4724, 4725).  FWS determines the significance of a discrete population

7    by considering the following non-exclusive factors (61 Fed. Reg. 4725):

8        (1)    persistence of the discrete population segment in an ecological

9    setting unusual or unique for the taxon;

10       (2)    evidence that loss of the discrete populations segment would result

11   in a significant gap in the range of a taxon;

12       (3)    evidence that the discrete population segment represents the only

13   surviving natural occurrence of a taxon that may be more abundant elsewhere as

14   an introduced population outside its historic range; or

15       (4)    evidence that the discrete population segment differs markedly

16   from other populations of the species in its genetic characteristics.

17   The ESA and the DPS Policy require FWS to base decisions to list or down-list a DPS on the

18   statutorily prescribed listing factors in Section 4(a)(1).  16 U.S.C. 1533(a); 61 Fed. Reg. 4725.

19   **B.    "Endangered" versus "Threatened."**

20   The ESA requires the Secretary of the Interior, through his designee, FWS, to determine

21   whether any species is "endangered" or "threatened."  16 U.S.C. 1533.  A species is

22   "endangered" if "is in danger of extinction throughout all or a significant portion of its range."

23   16 U.S.C. 1532(6).  A species is "threatened" if it is likely to become an "endangered" species

24   within the foreseeable future throughout all of or a significant portion of its range.  16 U.S.C.

25   1532(20).

26

27

28

13

United States District Court

For the Northern District of California

1            FWS must make its determination as to whether a species is "threatened" or

2  "endangered" based on the following factors (16 U.S.C. 1533 (a)(1)):

3                (A)      present or "threatened" destruction, modification, or curtailment of

4             its habitat or range;

5                (B)      overutilization for commercial, recreational, scientific, or

6             education purposes;

7                (C)      disease or predation;

8                (D)      inadequacy of existing regulatory mechanisms; or

9                (E)      other natural or manmade factors affecting its continued existence.

10           Determinations of whether a species is "endangered" or "threatened" must be based

11  "solely on the basis of the best scientific and commercial data available . . . after conducting a

12  review of the status of the species . . . without reference to the possible economic or other

13  impacts of such determination."  FWS applies these same five listing factors to determine

14  whether threats to a species have decreased enough to warrant down-listing. 16 U.S.C.

15  1533(b)(1)(A); 50 C.F.R. 424.11(b).

16            A designation of "endangered" triggers a broad scope of protection in the form of

17  prohibitions, including prohibiting "takes" under Section 9 of the ESA.  16 U.S.C. 1538.  The

18  term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or

19  to attempt to engage in any such conduct.  16 U.S.C. 1532 (19).  The Secretary of the Interior

20  has interpreted the term "harm" to cover "significant habit modification or degradation where it

21  actually kills or injures wildlife by significantly impairing essential behavioral patterns,

22  including breeding, feeding or sheltering."  50 C.F.R. 17.3 (2000).  Upon application by an

23  individual, however, FWS may authorize a "take" of a species that is incidental on a

24  case-by-case basis.  16 U.S.C. 1539(a).

25            A designation of "threatened" triggers Section 4(d) of the ESA. 16 U.S.C. 1533(d).

26  Section 4(d) states that "whenever any species is listed as a threatened species . . . Secretary

27  shall issue such regulations as he deems necessary and advisable to provide for the conservation

28  of threatened species." 16 U.S.C. 1533(d).  In accordance with Section 4(d), FWS long ago

United States District Court

For the Northern District of California

1    promulgated a rule applying full extension of the protective regulations afforded to

2    "endangered" species under Section 9 of the ESA to "threatened" species, subject to later

3    case-by-case modifications.  50 C.F.R. 17.31 (1978).

4        The Section 4(d) rule in question carved out exceptions to the scope of a "taking."

5    Specifically, the Section 4(d) rule exempted livestock ranching activities on private or tribal

6    lands from the "take" prohibitions under Section 9 of the Act, 16 U.S.C. 1538 (69 Fed. Reg.

7    47241).  Routine ranching activities included, but were not limited to, livestock grazing,

8    stock-pond maintenance, and measures to control burrowing rodents near stock ponds and other

9    water bodies (Cen CTS FR 12612-12616).  The rule specifically prohibited certain ranching

10   activities highly detrimental to the tiger salamander such as the use of fumigants to kill

11   burrowing rodents and the introduction into stock ponds of non-native biological organisms that

12   may prey on the tiger salamander (69 Fed. Reg. 47243-44).

13                   **C.    Notice Requirement.**

14       FWS cannot issue a final rule implementing any listing "determination, designation, or

15   revision" without first publishing a proposed rule in the Federal Register at least 90 days before

16   the effective date of the final rule and complying with the other notice requirements.  16 U.S.C.

17   1533(b)(5).  Contrary to intervenors' statement of the law, the notice requirements of Section 4

18   are applicable to DPS designations as well as listings.  *Defenders of Wildlife v. DOI*,

19   354 F. Supp. 2d 1156, 1170 (D. Or. 2004).

20                   **D.    Standard of Review.**

21       Review of administrative decisions involving the ESA is governed by Section 706 of the

22   Administrative Procedure Act.  *See e.g., Nat'l. Ass'n. of Home Builders v. Norton*, 340 F.3d

23   835, 841 (9th Cir. 2003).  The parties agree that under Section 706, a "reviewing court

24   shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be

25   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or

26   "without observance of procedure required by law."  5 U.S.C. 706(2)(A)(D).  *Idaho Farm*

27   *Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401 (9th Cir. 1995).  To determine whether an agency

28   has violated the arbitrary and capricious standard, a court must determine whether the agency

                                    15

1    articulated a "rational connection between the facts found and the choice made." *Motors*

2    *Vehicles Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

3           While the APA demands considerable deference to agency decisions, an agency's

4    decision is arbitrary and capricious if "the agency has relied on factors which Congress has not

5    intended it to consider, entirely failed to consider an important aspect of the problem, offered an

6    explanation for its decision that runs counter to the evidence before the agency, or is so

7    implausible that is could not be ascribed to a difference in view or the product of agency

8    expertise." *Ibid.*  A district court may uphold a decision of "less than ideal clarity if the

9    agency's path may reasonably be discerned."  The reviewing court should not attempt itself to

10   make up for such deficiencies by supplying a reasoned basis for the agency's action that the

11   agency has not given. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

12                                    *          *          *

13          Applying the foregoing, this order holds that (1) the portion of the 2004 rule relating to

14   Central California tiger salamander was neither arbitrary nor capricious, (2) NEPA is

15   inapplicable to the promulgation of a Section 4(d) rule, and (3) the portion of the 2004 rule

16   relating to the Santa Barbara and Sonoma tiger salamanders must be vacated.

17                     ***(1)     Central California Tiger Salamander.***

18          This order sustains the entirety of the 2004 rule regarding the Central California tiger

19   salamander.  *First*, the designation of the Central California tiger salamander as "threatened," is

20   sustained.  *Second*, this order holds that the Section 4(d) rule was neither arbitrary nor

21   capricious or otherwise unlawful as applied to the Central California tiger salamander.

22                          **(a)     "Threatened" Status.**

23          Plaintiffs do  not challenge the listing of "threatened" for the California tiger

24   salamander.  FWS properly noticed the rule.  The proposed rule included a summary of the data

25   upon which the proposed rule was based, a showing of the relationship of the data and the

26   proposed rule, and a summary of the factors affecting the Central California tiger salamander.

27   In addition, the final rule included an analysis of the five factors outlined in Section 4(a).

28

United States District Court

For the Northern District of California

1    There is a clear connection between the analysis and the final determination of "threatened" for

2    the Central California tiger salamander.

3    **(b)      Section 4(d) Rule.**

4         Plaintiffs do challenge the Section 4(d) rule applied to the Central California tiger

5    salamander.  Plaintiffs argue that the Section 4(d) rule does "more harm than good" by

6    permitting routine ranching activities that may eliminate salamanders (Pl. Supp. 1).  This,

7    however, is not the applicable standard.  The question is whether the record includes a rational

8    connection between the evidence and rule permitting routine ranching activities to continue.

9    This order holds that it does.

10        In the final rule, FWS articulated two reasons in support of the rule.  *First*, FWS argued

11   "easing the general take prohibitions . . . may encourage continued responsible land uses that

12   provide an overall benefit to the species" (69 Fed. Reg. 47241).  *Second*, FWS stated that

13   "stock ponds on livestock ranches for breeding [that] appear to be a critical link in the

14   conservation and recovery of the species" (69 Fed. Reg. 47241).  The agency's rationale is

15   discernible.  The rationale is that development has destroyed the vernal pools historically used

16   by the salamanders.  Salamanders have migrated to stock ponds in response.  To preserve the

17   stock ponds, the rule seeks to cooperate with ranchers to permit ongoing ranching activity so as

18   to preserve ranch land (and thus the stock ponds) rather than providing incentives to sell the

19   land to developers.  No doubt, plaintiffs would like to see more restrictive ranching practices.

20   But the agency did expressly prohibit two specific types of ranching practices: the introduction

21   of non-native biological organisms that may prey on the tiger salamander into stock ponds and

22   fumigants used to kill burrowing rodents.  Where to draw the line is for the agency to decide,

23   not plaintiffs.  So long as the agency has drawn the line within the zone of reasonableness in

24   light of the statutory goals, its policy choice must be sustained.

25        While this order holds that the Section 4(d) rule is neither arbitrary nor capricious with

26   regard to the Central California tiger salamander, this order does not suggest that if the

27   down-listing of the Sonoma and Santa Barbara populations were upheld after further

28   administrative proceedings, then the current Section 4(d) rule would automatically pass muster

United States District Court
For the Northern District of California

17

1     as to those DPSs.  In that case, the agency and the Court would need to analyze the specifics as

2     to those populations.

3                              *(2)      NEPA.*

4          Plaintiffs argue that FWS violated the National Environmental Project Act by adopting

5     the Section 4(d) rule without preparing an environmental impact statement.  NEPA requires

6     federal agencies to prepare a environmental impact statement for "major Federal actions

7     significantly affecting the quality of the human environment."  42 U.S.C. 4332(2)(c).  This

8     order holds that defendants are entitled to summary judgment on the NEPA claim.

9          On recommendation from the Council of Environmental Quality, FWS determined that

10    "Section 4 listing actions are exempt from NEPA as a 'matter of law'" (48 Fed. Reg. 49244

11    (1983)).  A reviewing court is obliged to defer to a federal agency's interpretation of its own

12    statute where Congress has been silent or ambiguous, as long as the agency's interpretation,

13    though perhaps not the one the court would have chose, is at least reasonable enough.

14    *Chevron U.S.A. v. National Resources Defense Council*, 467 U.S. 837, 840 (1984).  This Court

15    must defer to CEQ's view that NEPA is inapplicable to Section 4 actions.  Section 4(d), of

16    course, is within the scope of the Section 4 listing actions — it is only triggered upon the listing

17    of a species as "threatened" pursuant to the substantive and procedural requirements of

18    Section 4.  Accordingly, this order holds that FWS was not required to prepare an

19    environmental impact statement prior to issuing the Section 4(d) rule in question.

20         ESA has its own statutory standards and framework for determining a listing of

21    "threatened" and the concurrent Section 4(d) rule.  The Secretary's determination that a species

22    is "threatened" must be based on the "best scientific and commercial data available to him" as

23    applied to the five statutorily defined factors. 16 U.S.C. 1533(a)(1); 16 U.S.C. 1533 (b)(1)(A).

24    NEPA would, if applicable, confuse matters by overlaying its own independent matrix.  *See*

25    *Pacific Legal Foundation v. Andrus*, 657 F.2d 829, 836 (6th Cir. 1981).  Furthermore, the

26    opportunity for public comment, which is part of promulgation for a listing under the ESA,

27    ensures that information regarding how a listing impacts the public and the environment is part

28

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   of the decision-making process.  Therefore, it would make no sense to overlay the NEPA

2   scheme on top of Section 4.

3        Plaintiffs cite *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996), to support its position.

4   *Ramsey* is distinguishable.  In *Ramsey*, the Ninth Circuit held that the National Marine Fisheries

5   Service must comply with NEPA prior to issuing an incidental take statement pursuant to

6   Section 7 of the ESA.  *Ramsey* held that the incidental take statement was the functional

7   equivalent of a permit.  *Ramsey*, 96 F.3d at 445.  This order holds, in contrast, that a

8   Section 4(d) rule is not the functional equivalent of a permit.  The issuance of a permit under

9   the ESA entails a wholly different set of procedures than the issuance of a Section 4(d) rule.

10  *Compare* 16 U.S.C. 1533(d) *with* 16 U.S.C. 1539(a).

11                    **(3)      *Sonoma and Santa Barbara Populations***

12                    **(a)      DPS.**

13       On the other hand, FWS's elimination of DPS status for the tiger salamander in

14  Sonoma County and Santa Barbara County was, on the record before the agency, arbitrary and

15  capricious, for the following reasons.

16       *First*, FWS did not properly notice a proposal to eliminate the DPS status.  To the

17  contrary, the proposed rule emphasized the distinctiveness of the populations stating that the

18  Central California tiger salamander would be listed as its own DPS as the Sonoma and

19  Santa Barbara populations had previously been (68 Fed. Reg. 28652) (emphasis added):

20              There is *no* evidence of natural interchange of individuals between
                the Sonoma County and Santa Barbara County populations with
21              the Central California tiger salamander . . .  Therefore, the best
                available genetic data (Shaffer and Trenhamn 2002) for California
22              tiger salamanders indicate that the Central California tiger
                salamander *is distinct from* the Sonoma County and Santa Barbara
23              DPSs.

24   The proposed rule went on to state (*id.* at 28653):

25              Because the population segment appears to meet both the
                discreteness and significance criteria of our DPS policy, we
26              propose that the Central California tiger salamander constitutes a
                DPS that qualifies for consideration for listing.

27
    The final rule, however, did a countermarch.  It eliminated all DPSs.  It merged the three
28
    populations into a single range-wide species.  This was the *opposite* of the proposed rule.

                                            19

United States District Court
For the Northern District of California

1   No substantive rationale was given for the change. Eliminating the DPSs effectively decreased

2   the protection of the salamanders as a whole; the larger the range, the more widely distributed

3   the salamanders, the less likely an analysis of the range as a whole would ever result in a

4   determination of "endangered." *See Defenders of Wildlife v. DOI*, 354 F. Supp. 2d 1156, 1172

5   (Dist. Or. 2005).

6        *Second*, the decision to eliminate the DPS status was arbitrary and capricious, at least on

7   the present record. Prior to the publication of the 2004 rule, FWS had already designated the

8   Sonoma and Santa Barbara California tiger salamanders as "distinct population segments."

9   FWS found that the populations in Santa Barbara and Sonoma counties *were* "discrete" and

10  "biologically and ecologically significant" to the species because the loss of this population

11  would "result in the loss of a significant genetic entity and the curtailment of the range of the

12  species as a whole" (65 Fed. Reg. 57242; 68 Fed. Reg. 13498).

13       The final rule was bereft of any analysis. It stated in a conclusory fashion: "having

14  determined that the Santa Barbara and Sonoma populations have the same listing status as the

15  taxon as a whole, we are removing these populations as separately listed DPSs" (69 Fed. Reg.

16  47241). The prior finding of discreteness was ignored. The prior finding of biological and

17  ecological significance was ignored. Brute force and *ipse dixit* were substituted without even a

18  semblance of agency reasoning.

19       FWS's response to comment 46 in the final rule is illustrative (69 Fed. Reg. 47228):

20          Comment 46: Numerous commentators stated that the Service
            failed to demonstrate that the Santa Barbara or Sonoma
21          populations of California tiger salamander satisfy the discreteness
            or significance criteria of the [*DPS Policy*]. Other commentators
22          contended that available scientific information on the genetics of
            the California tiger salamander indicated a significant degree of
23          genetic distinction of the Santa Barbara or Sonoma County
            populations . . ."
24
            FWS's response: In this rule, we list the California tiger
25          salamander as "threatened" throughout its range, and eliminate the
            separate listings for the Santa Barbara and Sonoma populations.
26
27  FWS's response was clearly non-responsive. FWS now acknowledges as much by now asking

28  for a remand to create a better record. For the foregoing reasons, this order finds that the final

United States District Court

For the Northern District of California

1   rule with regard to the elimination of the DPS designation for the Sonoma and Santa Barbara

2   tiger salamander was both substantively and procedurally flawed.

3                              **(b)     Down-listing.**

4          Contrary to plaintiffs' contention, this order finds that FWS did adequately notice, albeit

5   cursorily, down-listing the Santa Barbara and Sonoma County DPSs by stating in the preamble

6   of the proposed rule, "we propose reclassifying these populations as threatened" (68 Fed. Reg.

7   28648).

8          On the other hand, as plaintiffs argue, neither the final rule nor the record indicate any

9   discernible path regarding *why* FWS eventually down-listed the populations.  Unlike the former

10  rules listing the Santa Barbara and Sonoma populations as "endangered" species, the 2004 rule

11  did not analyze the five listing factors in 16 U.S.C. 1533(a)(1) with regard to down-listing the

12  California tiger salamander in Sonoma and Santa Barbara counties, let alone explain why the

13  five-factor test had changed in its application (69 Fed. Reg. 47240).  The only explanation

14  provided by FWS regarding the down-listing is the conclusory comment that "analysis of the

15  species range-wide has shed additional light on the status of the Santa Barbara and Sonoma

16  populations" (*id.* at 47241).  There was no scientific evidence cited for down-listing the Sonoma

17  and Santa Barbara tiger salamanders in the final rule.  The only additional information that was

18  offered in the 2004 rule refers to "new information [that] suggests that additional locations of

19  occupied salamander habitat exist in these areas" (69 Fed. Reg. 47321).  The agency did not

20  provide any scientific evidence to explain the extent of "new information" nor does the rule

21  develop a correlation between this "new information" and down-listing.

22         FWS's own scientific review team strongly supported the "endangered" status of the

23  Sonoma and Santa Barbara populations.  After issuing the proposed rule raising the issue of

24  down-listing the California tiger salamander, the team met periodically, beginning in 2003, to

25  review the scientific data, as it related to the proposed reclassification.  At a meeting regarding

26  the final rule in December 2003, the team was asked to rank the overall likelihood of extinction

27  of the Santa Barbara and Sonoma salamanders on a scale from "very low" to "very high."  In

28  response, the team ranked the likelihood of extinction of the Sonoma County salamander as

United States District Court
For the Northern District of California

1    "very high" and the Santa Barbara County salamander as "high or very high" (Cen CTS

2    FR 11826).  When asked to rank the species as "endangered" or "threatened," *all* members of

3    the team designated the Santa Barbara and Sonoma salamander as "endangered;" all six

4    members ranked their confidence in an "endangered" listing as "very high" for the Sonoma

5    County DPS and, with regard to the Santa Barbara County DPS, five members ranked their

6    confidence in an "endangered" listing as "high" and one member ranked his confidence as "very

7    high" (Cen CTS FR 11829).

8          Independent scientific opinion from outside of FWS also opposed reclassification.  The

9    following comment by Dr. Bradley underscored the problem (Cen CTS FR 2354-2355):

          In a truly bizarre addition to the generally excellent proposed rule,
          the final pages of the document suggests down-listing the Santa
          Barbara and Sonoma County DPSs from "endangered" to
          "threatened."  Included in this proposed down-listing is to apply
          the special rule exemption to normal ranching as outlined above.
          This critically important change is given about one page of text,
          references no science that has been added since these two DPSs
          were listed, and provides virtually no sound reason why it should
          be taken seriously . . . Santa Barbara and particularly Sonoma are
          absolutely critical.  There is no room to maneuver, because both
          DPSs are on the brink of extinction.

16         Finally, the twists and turns between May 2003 and July 2004 showcase the irregularity

17   involved.  The scientific review team decided against down-listing the Sonoma and Santa

18   Barbara salamander.  It did so after considering and analyzing the proposed rule for the year-

19   long comment period.  Nonetheless, they were overruled and directed to eliminate the DPS and

20   down-list the species.  A revised rule was then drafted on a compressed schedule.  Internal

21   memorandums indicate that the scientific review team struggled to draft a rule to draw a

22   discernible path from their own scientists' analysis to the ordained outcome.  A memorandum of

23   a telephone conversation from a staff member with Julie MacDonald stated that, "Julie thinks

24   Central, SB and Sonoma should be un-DSP'd [and] SB [and] Sonoma are not significant (even

25   though genetics state otherwise)" (SC CTS 4154).  An internal email circulated to the team

26   regarding the final rule stated, "[regarding] what we are doing, and the explanation for it, these

27   things are highly nuance . . . how we describe what we did, and why, is still being crafted; it is a

28   very sensitive topic for the Department" (Cen CTS FR 10896).

United States District Court
For the Northern District of California

1    This is not to suggest that the Secretary of Interior has no role in the ultimate decision. If

2 the Secretary wants to re-assess the evidence, he may choose to, but, in doing so, he must set

3 forth a discernible rationale.

4    Intervenors attempt to supply a rationale. They argue that the down-listing of the

5 salamander populations was based on the "best scientific and commercial data available"

6 because in 2004 there was new evidence of a far greater number of breeding ponds (Def. Brief

7 at 20). The record, however, indicates that as early as September of 2003, during the comment

8 period of the proposed rule, the regional CTS team was already aware of the additional breeding

9 ponds of both the Santa Barbara and Sonoma populations (Cen CTS FR 11848, 11849, 11854

10 (record of 46 breeding ponds for the SB salamander), Cen CTS FR 11829 (record of 36 breeding

11 ponds for the Sonoma salamander); yet, the scientific review team, in analyzing the threats to the

12 Santa Barbara salamander continued to rank the populations as "endangered" (*supra* at 22-23).

13 This post-hoc suggestion does not withstand scrutiny.

14    For the foregoing reasons, this order holds that FWS's down-listing of the Santa Barbara

15 and Sonoma County DPSs was arbitrary and capricious and must be set aside.

16    **3.    RELIEF.**

17    Having decided that a portion of the final 2004 Rule is invalid, the Court now turns to the

18 issue of relief. The question is whether to *vacate* the rule (in part) or *retain* the rule pending the

19 agency's decision upon remand. If the rule is vacated, the prior "endangered" status will be

20 revived as to the Santa Barbara and Sonoma counties.

21    Ordinarily, when a regulation is not promulgated in compliance with the APA, the

22 regulation is invalid. *See Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1405

23 (9th Cir. 1995). Therefore, "vacatur of an unlawful agency rule normally accompanies a

24 remand." *Alsea Valley Alliance v. Department of Commerce*, 358 F.3d 1181, 1185 (9th Cir.

25 2004). An exception to this rule exits when equity demands. For example, in *Idaho Farm*

26 *Bureau Federation*, the Ninth Circuit declined to vacate an invalid "endangered" listing because

27 vacating the rule would eliminate protection for the species, which was on the brink of

28 extinction. *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

23

United States District Court

For the Northern District of California

1    Courts have identified the following factors controlling the equitable decision to vacate

2  or retain the defective rule during remand:

3        (1)    the consequences of invalidating or enjoining the agency action.

4        (2)     potential prejudice to those who will be affected by maintaining

5    the status quo.

6        (3)    the magnitude of the administrative error and how extensive and

7    substantive it was.

8        (4)    the purposes of the substantive statute under which the agency was

9    acting.

10  *See e.g., Natural Res. Def. Council v. Dept. of Interior*, 275 F. Supp. 2d 1136, 1144 (C.D. Cal.

11  2002) (citations omitted).

12    Contemplating these factors, this order holds that the 2004 rule should be vacated.  The

13  parties appear to agree that there would be little on-the-ground impact of ranching activities after

14  a vacatur.  There is, for example, no evidence that the "endangered" listing of the Santa Barbara

15  and Sonoma salamanders curtailed any ranching in those counties during the period of time that

16  they were listed as "endangered" (Pl. Supp. 4).  Any rancher, moreover, may seek an incidental

17  take permit pursuant to Section 9.  In the Court's view, a return to "endangered" status in these

18  two counties will not prejudice the ranching activities in those counties.  Finally, the irregular

19  way in which the down-listing occurred counsels in favor of vacatur.  It would be unseemly for a

20  court to leave in place a rule that was so riddled with error.  Also, for these reasons (and that the

21  agency had ample time to properly evaluate its listing decision), it would be unseemly to allow a

22  voluntary remand as requested by the agency.

23

24

25

26

27

28

24

United States District Court
For the Northern District of California

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED AND GRANTED IN PART and defendants' cross-motion for summary judgment is DENIED AND GRANTED IN PART, as follows:

1.    The 2004 rule, including the Section 4(d) relief, is sustained as to all but the Sonoma and Santa Barbara DPSs.  This part of the rule remains effective.

2.    As to the Santa Barbara and Sonoma DPSs, the 2004 rule is vacated without prejudice to any new rule-making concerning them.  In the meantime, the prior "endangered" listing of the Santa Barbara and Sonoma DPSs shall apply.

3.    The matter is remanded to the agency for any further rulemaking and the Court will retain jurisdiction over any review thereof.

**IT IS SO ORDERED.**

Dated:  August 18, 2005.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

25