Richard Joseph Finn (CA Bar No. 99659)
Burnham Brown
1901 Harrison Street, 11th Floor
Oakland, CA 94612
Phone: (510) 835-6821
Fax: (510) 835-6666
Email: rfinn@burnhambrown.com

Michael A. Oropallo
Hiscock & Barclay LLP
300 South State Street
Syracuse, New York 13202-2078
Phone: (315) 425-2831
Fax: (315) 703-7367
Email: moropallo@hiscockbarclay.com

John J. Jackson
Conservation Force
3240 S I-10 Service Road W.
Suite 200
Metairie, LA 70001
Phone: (504) 837-1233
Fax: (504) 837-1145
Email: jjj@conservationforce.org

Attorneys for Interveners

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, A NON-PROFIT CORPORATION, NATURAL RESOURCES DEFENSE COUNCIL, A NON-PROFIT CORPORATION, AND GREENPEACE, INC., A NON-PROFIT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>DIRK KEMPTHORNE, UNITED STATES SECRETARY OF THE INTERIOR AND UNITED STATES FISH AND WILDLIFE SERVICE;<br><br>Defendants,<br>v.<br><br>SAFARI CLUB INTERNATIONAL FOUNDATION | No. C-08-1339-CW<br><br>**DECLARATION OF JOHN J. JACKSON, III, IN SUPPORT OF MOTION FOR RECONSIDERATION AND MODIFYING APRIL 28, 2008 ORDER FOR LIMITED PURPOSE OF ALLOWING CONTINUED IMPORT OF LAWFULLY ACQUIRED TROPHIES**<br><br>Complaint Filed: March 10, 2008 |

|     |                                              |
| --- | -------------------------------------------- |
| 1   | Third-Party Defendant,                       |
| 2   | v.                                           |
| 3   | SAFARI CLUB INTERNATIONAL AND                |
|     | SAFARI CLUB INTERNATIONAL                    |
| 4   | FOUNDATION                                   |
| 5   | Amicus,                                      |
| 6   | CONSERVATION FORCE, INC.                     |
| 7   | Intervenor.                                  |

**JOHN J. JACKSON, III, ESQ.** hereby declares as follows:

1. I am an attorney at law duly licensed to practice in the State of Louisiana and before various federal district and circuit courts.

2. I am also the President of Conservation Force, Inc.

3. There are approximately sixty constituents of Conservation Force (who have already paid thousands of dollars for their permit applications and an average of $40,000 for their hunts, approximately 2.4 million dollars) who have legally harvested trophies and who are waiting for import permits from the United States Fish and Wildlife Service ("USFWS") in order to transport those trophies into the United States.

4. On May 15, if the polar bear is listed, the listing will go into affect immediately, and, as a result, import of such lawfully obtained property will be prohibited and those skins and skulls will be illegal contraband. Conservation Force asks that this Court modify its Order to extend the effectiveness of any listing for ninety days for the limited purpose of allowing those trophy imports in order for the constituents of Conservation Force to have time to comply with the import application process.

5. Conservation Force timely filed their Motion to Intervene upon learning of petitioners'

2

DECLARATION OF JOHN J. JACKSON, III, IN SUPPORT OF MOTION FOR   NO C-08-1339-CW.
RECONSIDERATION AND MODIFYING APRIL 28, 2008
#624261/3

prayer in their Motion for Summary Judgment.[1]

6. Because Intervenor's interests are directly related to material facts and legal arguments that the Court never considered, Intervenor respectfully submits that the Court grant Intervenor leave, permit this motion for reconsideration, weigh in Intervenor's interests and extend the effectiveness of any polar bear listing by ninety-days for the limited purpose of completing the trophy import application process.

7. The import application process for polar bear has multiple stages and takes between two to four months. Attached hereto as Exhibit A is an information sheet on the polar bear importation process published by the United States Fish and Wildlife Service.

8. Upon submission of the import application, it must be published in the Federal Register for a 30-day comment period. *See* 50 CFR § 18.33 (Ironically, the listing order does not allow Intervenor's members a notice period, but the import application regulation requires them to notice others, making the existing order even more incongruous.).

9. The approval of the polar bear permit application process is conditional upon the pre-payment of $1,000.00 to the USF&WS above the importation fee of $100.00.[2] That $1,000.00 would go directly to polar bear conservation.

10. The revenue from the import process has funded the conservation of the bear in one of the most successful polar bear conservation programs in the world, providing revenue and incentives through IUCN and the Polar Bear Specialty Group, and working with native populations and Canadian authorities to develop a specialized category of hunting that ultimately limits the take of female bears, has resulted in reduced cannibalism among young males, and has contributed to the overall conservation of the species.

---

[1] Note to Intervenor's prejudice, Petitioners did not even include a prayer in their Complaint for making the listing effective immediately upon publication in the Federal Register.

[2] That money is dedicated to expenditure in Russia on polar bear conservation (16 USC 1374). The sum is believed to have exceeded 1 million dollars in direct conservation funding. Note, there is no provision for anything

11. The American hunters have paid $32,000 to $50,000.00 per hunt plus approximately $5,000.00 in miscellaneous expenses, for a total of about $56,000.00 per hunter.

12. Under USF&WS regulation, the hunters are only permitted to import their trophies from pre-approved areas within the Northwest Territories and Nunavut, Canada.

13. By dismissing Intervenor's motion to intervene as moot, the Court failed to take into account that there are a number of people who will be adversely affected by any listing that is made effective immediately on May 15 without 30 to 90 days notice.

14. Many constituents of Intervenor are in the middle of their permit importation approval process for their lawfully obtained trophies.

15. There are approximately sixty people (many who have already paid for their permit applications) who have legally harvested trophies and who are waiting for import permits or are in the process of filing permits with the USFWS in order to transport those trophies into the United States.[3]

16. On May 15, if the polar bear is listed, under the Court's Order the listing will go into affect immediately, and, as a result, the import of such lawfully obtained property will be prohibited.[4]

17. It is to be noted that the polar bears at issue here are already dead. Denying the hunters the right to bring their trophies into the United States will not affect the present population of the polar bear. Moreover, the revenue from the hunters has funded the conservation of the bear in the most successful polar bear conservation program in the world. The hunting is considered "conservation hunting" by the IUCN and Canadian authorities because of its contribution to polar bear conservation. Foreign species (these bear) have no equal benefit under the ESA, i.e.,

---

comparable for foreign species under the ESA should the bear be listed as a threatened or endangered species.
[3] Under the 50 CFR §§ 18.30 and 18.33, these permit applications must be published in the Federal Register for thirty days in advance of their issuance.
[4] The Marine Mammal Protection Act that prohibits the import of marine mammals (such as polar bear) if they are

4

listing will cause a net loss to the bear. Those that have taken these bear in March, April and May have helped conserve the bear more than anyone in the world. We are the "Ducks Unlimited" of the polar bear.

18. Additionally, having not been granted Intervenor status, Intervenor could not respond to Petitioners' reply brief's unfounded allegations that the hunters had sufficient notice.

19. Intervenor's members purchased their hunts years in advance. Most, if not all of those hunts this spring (March, April, May) were paid for in advance.

20. Had the rule been made in timely fashion in January and had it listed a particular population, most of the hunters would have been refunded their money. They were prejudiced by the delay more than anyone.

21. Moreover, the Defendant's published proposal to list the bear confused and misled the public to believe that the listing would not necessarily prevent the import of trophies from approved areas. Attached hereto as Exhibit B is copy of 50 CFR Part 17.

22. Petitioner's comment in their Reply Brief was incorrect to suggest that Intervenors took a "gamble." Intervenors were lead to believe that imports would not be prohibited (and in most instances were contractually obligated years in advance, but could have been refunded had the bear been listed timely, January 2008).

23. The Defendant's permit division has now informed Intervenor that it will cease the import permitting process on the date of the Final Rule due to the Court's existing Order.

24. Defendant's counsel has been contacted and takes "no position on" this motion. Petitioners oppose it.

---

listed as threatened, 16 USC 1362(1)(c).

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 8, 2008

_____
John J. Jackson, III



**U.S. Fish & Wildlife Service**

# Importing Your Polar Bear Sport-hunted Trophy

**Do I need a permit?**
Yes, the polar bear *(Ursus maritimus)* is protected under the Marine Mammal Protection Act (MMPA) and the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). Polar bears may be sport-hunted in Canada only in Nunavut and the Northwest Territories. After you have taken a bear and before you import the trophy, you need to obtain a CITES export permit from the Canadian Management Authority and a MMPA import permit from this office.

**How does the law apply to my bear taken before February 18, 1997?**
If you sport hunted a polar bear before February 18, 1997, you may apply for an import permit regardless of which population in what then comprised the Northwest Territories you took the bear. You will need to show the bear was legally taken.

**How does the law apply to my bear taken after February 18, 1997?**
The MMPA was amended to allow for the issuance of permits to import sport-hunted trophies when the U.S. Fish and Wildlife Service has made the following determinations for polar bears taken on or after February 18, 1997:

- The applicant legally took the animal while hunting in Canada.

- Canada has a monitored and enforced sport-hunting program consistent with the purposes of the International Agreement on the Conservation of Polar Bears.

- Canada has a sport-hunting program based on scientifically sound quotas ensuring maintenance of the affected population stock at a sustainable level.

- Export from Canada and subsequent import into the United States are consistent with CITES, and not likely to contribute to the illegal trade in bear parts.

In addition, the MMPA prohibits import of marine mammals pregnant, near term, or nursing at the time of take.

**What populations have been approved for the import of polar bear trophies by permit?**
Southern Beaufort Sea, Northern Beaufort Sea, M'Clintock Channel (only for bears lawfully taken on or before May 31, 2000), Viscount Melville Sound, Western Hudson Bay, Lancaster Sound, and Norwegian Bay are approved.

**What about the M'Clintock Channel population?**
Bears sport hunted in this population after May 31, 2000, the close of the 1999/2000 Canadian hunting season, will not be eligible for import. The Service announced an interim ban on the import of these bears under an emergency rule published on January 10, 2001, in response to new information which indicates this population has severly declined. The Service published a final rule on October 5, 2001, adopting the emergency interim rule as final. The ban will remain in effect until it is determined that this population is once

again sustainable. For a copy of the rules, visit our homepage at http://international.fws.gov/.

**What about the other populations?**
At this time, the Service has not approved Gulf of Boothia, Queen Elizabeth Island, Foxe Basin, Baffin Bay, Kane Basin, Southern Hudson Bay, and Davis Strait. As substantial new scientific or management data become available, the Service will evaluate, after consultation with the Marine Mammal Commission and opportunity for public comment, whether a population can be approved.

**What steps should I take to import a polar bear trophy?**
1. Legally take a polar bear in Canada. If taken on or after February 18, 1997, the bear must be from an approved population. The Service will not be able to finish processing an application until after the polar bear is taken and all information is available for the Service to make the required findings, i.e., the bear was legally hunted, the gall bladder and its contents were destroyed, etc.

2. Apply for an import permit from this office using the official application form and pay the $25 standard processing fee. Upon notification of approval, submit the $1,000 permit issuance fee. The permit will be mailed to you upon receipt of the issuance fee.

3. Obtain a CITES export permit from the Management Authority in Canada. You must present the CITES permit to Canadian Customs to be validated upon export.

4. Check the expiration dates on your import and export permits before having the trophy shipped. You could lose your trophy if it enters the United States after your permits have expired. Import permits are valid for one year. Canada's export permits are valid for 30 days.

5. Import the trophy through a U.S. port designated for wildlife. Exception to the designated port requirement is only available for full mounts, and only if you have obtained a separate port exception permit from the appropriate U.S. Regional Law Enforcement office. You cannot use the international mail to import your trophy.

6. Contact a Service wildlife inspector at the designated port at least 48 hours prior to arrival of your trophy to arrange for trophy inspection, clearance, and tagging. The polar bear skull can be imported but should be sufficiently cleaned to allow the inspector to mark it with permanent ink. You will need to provide the original import and export permits, as well as a completed Declaration for Importation or Exportation of Fish or Wildlife (Form 3-177, obtained at the port) to the Inspector.

**Why do I have to pay a permit issuance fee?**
Congress specifically wrote the law so the Service would use issuance fee funds to develop and implement cooperative research and management programs to conserve polar bears in Alaska and Russia. The fee was set at $1,000 to produce sufficient revenue to implement the conservation provisions in the MMPA.

**How long will it take to get an import permit?**
The estimated processing time is 60-90 days. The MMPA requires the receipt of applications be published in the **Federal Register** (with a 30-day public comment period). You can reduce processing time by ensuring your application is complete and that your polar bear is from an approved population.

**What parts of the polar bear can be imported?**
You can import for personal use parts that are traditionally considered to comprise a trophy, including the hide, skull, teeth, claws, baculum, other bones, rugs, and full mounts. You must import all parts of a single trophy at the same time. Internal organs cannot be imported. Articles made from the specimen such as clothing, curio or jewelry cannot be imported or created from imported parts. Polar bear hides purchased in Canada or received as gifts cannot be imported.

---

**U.S. Fish & Wildlife Service
International Affairs
Division of Management Authority**
4401 N. Fairfax Drive, Room 700
Arlington, VA 22203
703/358-2104 or 800/358-2104
Fax 703/358-2281
e-mail: managementauthority@fws.gov
http://international.fws.gov
http://permits.fws.gov

Fall 2003



Tuesday,
January 9, 2007

Part II

## Department of the Interior

Fish and Wildlife Service

50 CFR Part 17
Endangered and Threatened Wildlife and Plants; 12-Month Petition Finding and Proposed Rule To List the Polar Bear (Ursus maritimus) as Threatened Throughout Its Range; Proposed Rule

final, we will then consider whether to propose the designation of critical habitat.

**Available Conservation Measures**

Conservation measures provided to species listed as endangered or threatened under the Act include recognition, recovery actions, requirements for Federal protection, and prohibitions against certain activities. Recognition through listing results in public awareness and conservation actions by Federal, State, and local agencies, private organizations, and individuals. The Act provides for possible land acquisition and cooperation with the States and requires that recovery actions be carried out for listed species. The protection required of Federal agencies and the prohibitions against taking and harm are discussed below.

Section 7(a) of the Act, as amended, requires Federal agencies to evaluate their actions with respect to any species that is listed as endangered or threatened and with respect to its critical habitat, if any is designated. Regulations implementing this interagency cooperation provision of the Act are codified at 50 CFR part 402. Section 7(a)(4) requires Federal agencies to confer informally with us on any action that is likely to jeopardize the continued existence of a species proposed for listing or result in destruction or adverse modification of proposed critical habitat. If a species is subsequently listed, section 7(a)(2) requires Federal agencies to ensure that activities they authorize, fund, or carry out are not likely to jeopardize the continued existence of the species or destroy or adversely modify its critical habitat. If a Federal action may affect a listed species or its critical habitat, the responsible Federal agency must enter into formal consultation with us under the provisions of section 7(a)(2) of the Act.

Several Federal agencies are expected to have involvement under section 7 of the Act regarding the polar bear. The National Marine Fisheries Service may become involved, such as in instances if joint rule making for the incidental take of marine mammals is undertaken. The Environmental Protection Agency may become involved through its permitting authority for the Clean Water Act. The U.S. Army Corps of Engineers may become involved through its responsibilities and permitting authority under section 404 of the Clean Water Act and through future development of harbor projects. The MMS may become involved through administering their programs directed toward offshore oil and gas development. The Denali Commission may be involved through its potential funding of fuel and power generation projects. The U.S. Coast Guard may become involved through their deployment of icebreakers in the Arctic Ocean.

The listing of the polar bear would subsequently lead to the development of a recovery plan for this species. Such a plan will bring together Federal, State, local agency, and private efforts for the conservation of this species. A recovery plan establishes a framework for interested parties to coordinate activities and to cooperate with each other in conservation efforts. The plan will set recovery priorities, identify responsibilities, and estimate the costs of the tasks necessary to accomplish the priorities. It will also describe site-specific management actions necessary to achieve the conservation of the polar bear. Additionally, pursuant to section 6 of the Act, we would be able to grant funds to the State of Alaska for management actions promoting the conservation of the polar bear.

Section 9 of the Act, except as provided in sections 6(g)(2) and 10 of the Act prohibits take and import into or export out of the United States of listed species. The Act defines take to mean harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or to attempt to engage in any such conduct. However, the Act also provides for the authorization of take and exceptions to the take prohibitions. Take of listed species by non-Federal property owners can be permitted through the process set forth in section 10 of the Act. For Federally funded or permitted activities, take of listed species may be allowed through the consultation process of section 7 of the Act. The Service has issued regulations (50 CFR 17.31) that generally afford to species listed as threatened the prohibitions that section 9 of the Act establishes with respect to species listed as endangered. Furthermore, Section 4(d) of the Act provides that a special rule can be tailored to provide for the conservation of a particular threatened species. In that case, the general regulations for some of the section 17.31 prohibitions may not apply to that species. A special rule may be developed that contains specific prohibitions or exemptions, as necessary and appropriate to conserve that species.

The Act provides for an exemption for Alaska Natives in section 10(e) that allows any Indian, Aleut, or Eskimo who is an Alaskan Native who resides in Alaska to take a threatened or endangered species if such taking is primarily for subsistence purposes and the taking is not accomplished in a wasteful manner. Further, if it is determined that such taking materially and negatively affects the threatened or endangered species, regulations regarding taking may be prescribed. Non-edible by-products of species taken pursuant to section 10(e) may be sold in interstate commerce when made into authentic native articles of handicrafts and clothing. It is illegal to possess, sell, deliver, carry, transport, or ship any such wildlife that has been taken illegally. Further, it is illegal for any person to commit, to solicit another person to commit, or cause to be committed, any of these acts. Certain exceptions to the prohibitions apply to our agents and State conservation agencies.

The Act provides for the issuance of permits to carry out otherwise prohibited activities involving threatened or endangered wildlife under certain circumstances. Regulations governing permits are codified at 50 CFR 17.22, 17.23, and 17.32. Such permits are available for scientific purposes, to enhance the propagation or survival of the species, and for incidental take in the course of otherwise lawful activities provided that certain criteria are met. For threatened species, permits are also available for zoological exhibitions, educational purposes, or special purposes consistent with the purposes of the Act. Requests for copies of the regulations on listed species and inquiries about prohibitions and permits may be addressed to the Endangered Species Coordinator, U.S. Fish and Wildlife Service, 1011 East Tudor Road, Anchorage, Alaska 99503.

It is our policy, published in the **Federal Register** on July 1, 1994 (59 FR 34272), to identify, to the maximum extent practicable at the time a species is listed, those activities that would or would not likely constitute a violation of section 9 of the Act and associated regulations at 50 CFR 17.31. The intent of this policy is to increase public awareness of the effects of the listing on proposed and ongoing activities within a species' range.

For the polar bear we have not yet determined which, if any, provisions under section 9, provided these activities are carried out in accordance with existing regulations and permit requirements, would apply. Some permissible uses or actions have been identified below:

(1) Possession, delivery, or movement, including interstate transport of authentic native articles of handicrafts and clothing made from polar bears that were collected prior to the date of

publication in the **Federal Register** of a final regulation adding the polar bear to the list of threatened species;

(2) Sale, possession, delivery, or movement, including interstate transport of authentic native articles of handicrafts and clothing made from polar bears that were taken and produced in accordance with section 10(e) of the Act;

(3) Any action authorized, funded, or carried out by a Federal agency that may affect the polar bear, when the action is conducted in accordance with an incidental take statement issued by us under section 7 of the Act;

(4) Any action carried out for scientific research or to enhance the propagation or survival of polar bears that is conducted in accordance with the conditions of a 50 CFR 17.32 permit; and

(5) Any incidental take of polar bears resulting from an otherwise lawful activity conducted in accordance with the conditions of an incidental take permit issued under 50 CFR 17.32. Non-Federal applicants may design a habitat conservation plan (HCP) for the species and apply for an incidental take permit. HCPs may be developed for listed species and are designed to minimize and mitigate impacts to the species to the greatest extent practicable.

We believe the following activities could potentially result in a violation of section 9 and associated regulations at 50 CFR 17.31 with regard to polar bears, however, possible violations are not limited to these actions alone:

(1) Unauthorized killing, collecting, handling, or harassing of individual polar bears;

(2) Possessing, selling, transporting, or shipping illegally taken polar bears or their parts;

(3) Unauthorized destruction or alteration of the denning, feeding, resting, or habitats used for travel that actually kills or injures individual polar bears by significantly impairing their essential behavioral patterns, including breeding, feeding or sheltering; and,

(4) Discharge or dumping of toxic chemicals, silt, or other pollutants (i.e., sewage, oil, pesticides, and gasoline) into the marine environment that actually kills or injures individual polar bears by significantly impairing their essential behavioral patterns, including breeding, feeding or sheltering.

We will review other activities not identified above on a case-by-case basis to determine whether they may be likely to result in a violation of 50 CFR 17.31. We do not consider these lists to be exhaustive and provide them as information to the public. You may direct questions regarding whether specific activities may constitute a violation of the Act to the Field Supervisor, U.S. Fish and Wildlife Service, Fairbanks Fish and Wildlife Field Office, 101 12th Avenue, Box 110, Fairbanks, Alaska 99701.

Furthermore, the Act, similar to the MMPA, provides an exception to the prohibitions of take and import for Alaska Natives. These exceptions are based on the social, cultural and economic role marine mammals have played, and continue to play, in the lives of Alaska Natives. However, under both the Act and the MMPA, the Service, if warranted, may prescribe limitations on the taking or import of marine mammals by Alaska Natives. Should this proposed rule become final the Service will take such action, if appropriate, to ensure that any harvest of polar bears by Alaska Natives does not materially and negatively affect the species.

Regarding ongoing importation of polar bear trophies taken from approved populations in Canada into the United States, we anticipate conducting an evaluation of the merits of continuing the presently authorized imports. Under the MMPA Section 102—Prohibitions [Importation of pregnant or nursing animals; depleted species which includes those listed as threatened or endangered under the ESA] it is unlawful to import into the United States any marine mammal if the mammal was taken from a species or population stock that the Secretary has, by regulation published in the **Federal Register**, designated as a depleted species or stock. The exception to the general prohibition is under a permit for scientific research, or under a permit for enhancing the survival or recovery of a species or stock, issued under section 104(c) of the MMPA.

### Peer Review

In accordance with our joint policy published in the **Federal Register** on July 1, 1994 (59 FR 34270), and based on our implementation of the Office of Management and Budget's Final Information Quality Bulletin for Peer Review, dated December 16, 2004, we will seek the expert opinions of at least five appropriate and independent specialists regarding the science in this proposed rule. The purpose of such review is to ensure that our warranted finding and proposed rule are based on scientifically sound data, assumptions, and analyses. We will send copies of this proposed rule to these peer reviewers immediately following publication in the **Federal Register**. We will invite these peer reviewers to comment, during the public comment period, on the specific assumptions and conclusions regarding the proposed listing. We will consider all comments and information received during the comment period on this proposed rule during preparation of a final rulemaking. Accordingly, the final decision may differ from this proposal.

### Clarity of the Rule

Executive Order 12866 requires agencies to write regulations that are easy to understand. We invite your comments on how to make this proposal easier to understand including answers to questions such as the following: (1) Is the discussion in the **SUPPLEMENTARY INFORMATION** section of the preamble helpful in understanding the proposal? (2) Does the proposal contain technical language or jargon that interferes with its clarity? (3) Does the format of the proposal (groupings and order of sections, use of headings, paragraphing, etc.) aid or reduce its clarity? What else could we do to make the proposal easier to understand? Send a copy of any comments that concern how we could make this rule easier to understand to: Office of Regulatory Affairs, Department of the Interior, Room 7229, 1849 C Street, NW., Washington, DC 20240. You may also e-mail the comments to this address: *Exsec@ios.doi.gov*.

### Executive Order 13211

On May 18, 2001, the President issued Executive Order 13211 on regulations that significantly affect energy supply, distribution, and use. Executive Order 13211 requires agencies to prepare Statements of Energy Effects when undertaking certain actions. The Service believes that the past record of cooperation demonstrated by oil and gas industry in complying with terms of Letters of Authorization through the Incidental Take program, Section 101(a)(5) of the Marine Mammal Protection Act, as well as active participation in monitoring the effects of exploration, production, and development activities on polar bears serves as a sound conservation practice. While the Service believes that the incidental take program will continue to operate effectively to result in a negligible affect to polar bears from industrial activities in the future, continued vigilance and compliance will be necessary for protection of the species. In addition, added protections afforded through Section 7 consultation required under the Act provide additional assurances to the protection of the species. This rule is not expected to significantly affect energy supplies, distribution, or use. Therefore, this action is not a significant energy action