Brendan Cummings (CA Bar No. 193952)
Kassia Siegel (CA Bar No. 209497)
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Phone:  (760) 366-2232; Facsimile: (760) 366-2669
Email:  bcummings@biologicaldiversity.org
        ksiegel@biologicaldiversity.org

Miyoko Sakashita (CA Bar No. 239639)
Center for Biological Diversity
1095 Market St., Suite 511
San Francisco, CA 94103
Phone:  (415) 436-9682; Facsimile: (415) 436-9683
Email:  miyoko@biologicaldiversity.org

Andrew E. Wetzler (CA Bar No. 202299)
Natural Resources Defense Council
544 White Oak Place
Worthington, OH 43085
Phone:  (614) 840-0891; Facsimile (415) 875-6161
Email:  awetzler@nrdc.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation, NATURAL RESOURCES DEFENSE COUNCIL, a non-profit corporation, and GREENPEACE, INC., a non-profit corporation; | CASE NO.:  C-08-1339-CW |
| | NOTICE RE FILING OF FIRST AMENDED COMPLAINT |
| Plaintiffs, | |
| v. | |
| DIRK KEMPTHORNE, United States Secretary of the Interior and UNITED STATES FISH AND WILDLIFE SERVICE; | |
| Defendants. | |

1    Pursuant to Federal Rule of Civil Procedure 15(a), Plaintiffs Center for Biological Diversity,

2    Natural Resources Defense Council, and Greenpeace, Inc., file concurrently with this Notice their First

3    Amended Complaint.

4    On March 10, 2008, Plaintiffs filed a Complaint against Defendants Dirk Kempthorne, United

5    States Secretary of the Interior and the United States Fish And Wildlife Service (collectively "the

6    Secretary") to compel the Secretary to comply with the non-discretionary listing provisions of the

7    Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA"), with regard to the protection of the polar

8    bear.  On April 28, 2008 this Court issued an order granting Plaintiffs' Motion for Summary Judgment

9    and found Defendants in violation of the ESA for failing to publish a final listing decision for the polar

10   bear by January 9, 2008.  See Center for Biological Diversity v. Norton, Case No. C-08-1339-CW

11   (N.D. Cal., April 28, 2008) (Order Granting Plaintiffs' Motion for Summary Judgment and Injunction,

12   Docket # 35) (hereinafter ("April 28 Order")).  The Court ordered Defendants to publish a final listing

13   determination for the polar bear by May 15, 2008, and to make any final regulation effective upon

14   publication pursuant to 5 U.S.C. § 553(d)(3).  Id. at 10.

15   On May 13, 2008, the Court issued an amended Order granting in part motions to intervene and

16   to file amicus briefs by Conservation Force and Safari Club, et al., respectively.  See Center for

17   Biological Diversity v. Norton, Case No. C-08-1339-CW (N.D. Cal., May 13, 2008) (Amended Order

18   Granting Motions to Shorten Time, Granting Safari Club's Motion for Leave to File an Amicus Brief,

19   and Granting For Limited Purposes Conservation Force's Motion to Intervene, Docket # 69),

20   hereinafter ("Amended Order")).  The Amended Order requires additional briefing from the parties

21   regarding the implications of the listing of the polar bear under the ESA on the ability of individuals to

22   import trophy-hunted polar bear carcasses from Canada.  Id. at 2.

23   While the Court has ruled on Plaintiffs' Motion for Summary Judgment, final judgment has not

24   been entered in this case and no answer or other responsive pleading has been filed by the Secretary.

25   On May 15, 2008 the Secretary published a final listing determination for the polar bear.

26   Endangered and Threatened Wildlife and Plants, Determination of Threatened Status for the Polar Bear

27   (Ursus maritimus) Throughout its Range ("Final Listing Rule"). 73 Fed. Reg. 28212.   Concurrently

28   with publishing the Final Listing Rule, the Secretary also published an "Interim Final Rule," which

1   purports to eliminate the protections of Section 9 of the ESA against "taking" polar bears, 16 U.S.C. §

2   1538, 17 C.F.R. § 17.31, which would otherwise apply absent the Interim Final Rule.

3          In response to the Secretary's actions, on May 15, 2008, Plaintiffs filed with the Secretary a

4   notice of intent to sue pursuant to the citizen suit provisions of ESA, 16 U.S.C. § 1540(g).  Sixty Day

5   Notice of Intent to Sue Over Violations of Section 4 of the Endangered Species Act; Failure to List the

6   Polar Bear as an Endangered Species and Designate Critical Habitat and Unlawful Authorization of

7   Take of Polar Bears (May 15, 2008, herinafter "Notice Letter") (attached as Exhibit A).  Plaintiffs'

8   Notice Letter details the Secretary's violations of the ESA by, among other things, failing to use the

9   best available science in determining that polar bears were "threatened" rather than "endangered" in all

10  or parts of their range; failing to designate critical habitat for the polar bear concurrently with the Final

11  Listing Rule, 16 U.S.C. § 1533(a)(3)(A)(i); and issuing the Interim Final Rule in contravention of the

12  requirements of the ESA, 16 U.S.C. § 1533(d).  While not required to do so, the notice letter also

13  informed the Secretary that he had violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551

14  et seq., by promulgating the Interim Final Rule without providing for public notice and comment, and

15  the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., by failing to comply with

16  NEPA's environmental review provisions.

17         Some of Plaintiffs' new Claims regarding the Secretary's violations of law are properly brought

18  pursuant to the citizen suit provision of the ESA, and may require 60-days notice prior to being brought

19  before this Court.  Other claims are brought pursuant to the judicial review provisions of the APA.

20  Plaintiffs' First Amended Complaint includes only those claims for which no notice under 16 U.S.C. §

21  1540(g) is required.  Specifically, Plaintiffs challenge the Secretary's violations of the APA and of

22  NEPA.  Plaintiffs will seek to amend their Complaint following the running of the 60-days notice

23  period to add additional Claims brought under the citizen suit provisions of the ESA as outlined above

24  and in their Notice Letter.

25         Additionally, while this Court has granted summary judgment on Plaintiffs' Claim for Relief in

26  their original Complaint concerning the Secretary's failure to comply with the listing deadlines of the

27  ESA, as final judgment has not yet been entered, Plaintiffs retain this claim and the factual allegations

28  underlying it in their First Amended Complaint.  Plaintiffs' Second Claim for Relief concerns the

1   Secretary's violations of the APA in promulgating the Interim Final Rule without providing for notice

2   and comment.  Plaintiffs' Third Claim for Relief concerns the Secretary's violations of the NEPA and

3   the APA in promulgating the Interim Final Rule without preparing an Environmental Assessment or

4   Environmental Impact Statement pursuant to NEPA.

5        According to the initial case management scheduling order in this case (Docket # 3), a case

6   management conference is scheduled for June 17, 2008.  A case management statement is due on June

7   10, 2008.  Because time is of the essence in all efforts to protect threatened and endangered species,

8   Plaintiffs will attempt to work with Defendants to develop a schedule for the rapid resolution of all

9   claims in this case.

10

11  DATE: May 16th, 2008                    Respectfully Submitted,

12

13                                          By: /s/ Kassia Siegel _____

14                                          Brendan Cummings (CA Bar No. 193952)
                                            Kassia Siegel (CA Bar No. 209497)
15                                          Center for Biological Diversity
                                            P.O. Box 549
16                                          Joshua Tree, CA 92252
                                            Phone:  (760) 366-2232; Facsimile: (760) 366-2669
17                                           Email:  bcummings@biologicaldiversity.org
                                                    ksiegel@biologicaldiversity.org
18

19                                          Miyoko Sakashita (CA Bar No. 239639)
                                            Center for Biological Diversity
20                                          1095 Market St., Suite 511
                                            San Francisco, CA 94103
21                                          Phone:  (415) 436-9682; Facsimile: (415) 436-9683
                                            Email:  miyoko@biologicaldiversity.org
22

23                                          Andrew E. Wetzler (CA Bar No. 202299)
                                            Natural Resources Defense Council
24                                          544 White Oak Place
                                            Worthington, OH 43085
25                                          Phone:  (614) 840-0891; Facsimile (415) 875-6161
                                            Email:  awetzler@nrdc.org
26

27                                          Attorneys for Plaintiffs

28

# Exhibit A

Exhibit A





May 15, 2008

**SENT VIA HAND DELIVERY AND FACSIMILE**

The Honorable Dirk Kempthorne
Secretary of the Interior
18th and C Streets, NW
Washington, D.C.  20240
Facsimile: (202) 208-6956

Mr. H. Dale Hall, Director
United States Fish and Wildlife Service
1849 C Street, NW, Room 3256
MailStop 3238 MIB
Washington, DC 20240-0001
Facsimile: (202) 208-6965

RE:  Sixty Day Notice of Intent to Sue Over Violations of Section 4 of the Endangered
      Species Act; Failure to List the Polar Bear as an Endangered Species and Designate
      Critical Habitat and Unlawful Authorization of Take of Polar Bears

Dear Mr. Kempthorne and Mr. Hall:

      We write on behalf of the Center for Biological Diversity ("the Center"), NRDC (Natural
Resources Defense Council), and Greenpeace, Inc. (collectively, the "Conservation Groups") to
inform you of our intent to commence an action against the Secretary of the Interior, the U.S.
Department of the Interior, the Director of the U.S. Fish and Wildlife Service, and the U.S. Fish
and Wildlife Service (collectively, "the Secretary") for violations of the Endangered Species Act,
16 U.S.C. §§1531-1544 ("ESA"), and the Administrative Procedure Act, 5 U.S.C. §§ 551-559
("APA").  This letter is provided to you pursuant to the 60-day notice requirement of the ESA's
citizen suit provision.  16 U.S.C. § 1540(g)(2).[1]

---

[1] Noticing parties under 16 U.S.C. §1540(g) need not wait 60 days from the date of the notice letter to seek judicial
intervention where there is "an emergency posing a significant risk to the well-being of any species of fish or
wildlife or plants." 16 U.S.C. § 1540(g)(2)(C).  The Conservation Groups believe that this exception applies in this
instance, as the Final Rule and accompanying 4(d) Rule purport to authorize activities, otherwise prohibited by the
ESA, that will result in harm to polar bears.  The polar bear, facing rapid climate change and the disappearance of its
habitat as well as disturbance from industrial activities and oil spills, is clearly faced with an emergency posing a
significant risk to its well-being in the absence of full ESA protection.  Additionally, violations of law actionable
under the Administrative Procedures act ("APA") and National Environmental Policy Act ("NEPA") do not require
60 days notice prior to suit.

On May 14, 2008, the Secretary announced issuance of a final rule listing the polar bear as a threatened species. Endangered and Threatened Wildlife and Plants, Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout its Range ("Final Rule"). This rule was published in the Federal Register on May 15, 2008. 73 Fed. Reg. 28212. While the Secretary's recognition that polar bears face extinction because of the threat that global warming poses to its sea-ice habitat is an important first step towards providing meaningful conservation measures for polar bears around the world, the Final Rule is legally deficient. First, despite a clear requirement that it do so, the Secretary did not designate "critical habitat" for polar bears concurrently with the listing, instead stating that "critical habitat is not determinable at this time." Second, the Secretary listed the polar bear as a "threatened" species rather than an "endangered" species, despite the fact that the species clearly meets the definition of, and merits the higher level of protection for, an endangered species. Third, the Interim Final Section 4(d) Rule (73 Fed. Reg. 28306) and other language in the final rule purporting to reduce protections to the polar bear is arbitrary, capricious, contrary to the ESA, and otherwise unlawful. These legal violations are detailed further below.

## I.    Legal Background

Congress passed the Endangered Species Act ("ESA") to conserve endangered and threatened species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b). The Supreme Court's review of the ESA's "language, history, and structure" convinced the Court "beyond a doubt" that "Congress intended endangered species to be afforded the highest of priorities." Tennessee Valley Authority v. Hill, 437 U.S. 153, 174 (1978). As the Court found, "the plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." Id. at 184.

The ESA requires the Secretary of Interior to determine whether any species is "endangered" or "threatened," and only those species that have been listed as "endangered" or "threatened" receive protection under the ESA. 16 U.S.C. § 1533(a). A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

No matter how imperiled a species might be, it does not receive any protection under the ESA until it is officially listed as threatened or endangered. As a result, Congress aptly described Section 4 of the ESA, 16 U.S.C. §1533, the section that sets out the process for listing a species, as "[t]he cornerstone of effective implementation of the Endangered Species Act ...." S. Rep. No. 418, 97th Cong., 2d Sess. at 10; see also H. Rep. No. 567, 97th Cong., 2d Sess. at 10.

Once a species is listed under the ESA, an array of statutory protections applies. For example, Section 7 requires all federal agencies to "insure" that their actions neither "jeopardize the continued existence" of any listed species nor "result in the destruction or adverse modification" of its "critical habitat." Id. at § 1536(a)(2). Other provisions require the Service to designate "critical habitat" for listed species, Id. at §1533(a)(3), require the Service to "develop and implement" recovery plans for listed species, Id. at §1533(f), authorize the Service to acquire

land for the protection of listed species, <u>Id.</u> at §1534, and make federal funds available to states to assist in their efforts to preserve and protect threatened and endangered species, <u>Id.</u> at §1535(d).

In addition, the "take" of all endangered species is prohibited by the statute, <u>Id.</u> at § 1538(a), and the Secretary has applied this prohibition to all threatened species by regulation. 50 C.F.R. § 17.31(a). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Under certain circumstances, the Secretary may issue regulations under Section 4(d) of the ESA that authorizes activities that result in the take of threatened species that could not be authorized for endangered species. Any such "Section 4(d) Rule" must, however, provide for the conservation of the species at issue.

Section 4 sets forth a detailed process by which the Secretary of Interior adds to the list of threatened and endangered species. 16 U.S.C. §1533. The listing process can begin either by citizen petition or by internal agency processes. In either case, strict timelines apply once the process is initiated. In most cases, as here, the process begins when a petition for listing is received by the Secretary. 16 U.S.C. §1533(b)(3)(A).

Upon receipt of a petition to list a species under the ESA, the Secretary must determine whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." <u>Id.</u> The Secretary must make this initial, "90-Day Finding," "[t]o the maximum extent practicable, within 90 days after receiving the petition." <u>Id.</u> If the Secretary determines that the petition presents substantial information that a listing may be warranted, it must "promptly commence a review of the status of the species" to determine whether listing is (1) warranted, (2) not warranted, or (3) warranted but precluded by other pending proposals that require immediate attention. 16 U.S.C. § 1533(b)(3)(B). This finding, known as the "12-Month Finding," is due "within 12 months after receiving a petition." <u>Id.</u> The Secretary has no discretion to extend the time allotted for the 12-Month Finding.

If the 12-Month Finding concludes that listing is warranted, the Secretary must promptly publish a proposed rule to list the species in the Federal Register. 16 U.S.C. § 1533(b)(3)(B)(ii). Within one year of publication of the proposed rule, the Secretary "shall publish in the Federal Register" the final listing determination. 16 U.S.C. §§ 1533(b)(6)(A). At this point, the Secretary must publish a final rule listing the species, publish a withdrawal of the proposal or, in the rare instance where there is substantial disagreement about scientific data, delay a final determination for up to six months to solicit more scientific information. 16 U.S.C. §§ 1533(b)(6)(A)(i) & 1533(b)(6)(B)(i).

In making all listing determinations, the Secretary must consider five statutory listing criteria: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1). If a species meets the definition of threatened or endangered because it is imperiled by any *one or more* of these five factors, the Secretary *must* list the species. 16 U.S.C. § 1533(1). The Secretary must base

all listing determinations "solely on the basis of the best scientific and commercial data available." <u>Id.</u> at § 1533(b)(1)(A).

Congress amended Section 4 of the ESA in 1978 to mandate that, when the Secretary lists a species as endangered or threatened, the agency generally must also concurrently designate critical habitat for that species. Section 4(a)(3)(A)(i) of the ESA now states that, "to the maximum extent prudent and determinable," the Secretary:

> shall, concurrently with making a determination . . . that a species is an endangered species or threatened species, designate any habitat of such species which is then considered to be critical habitat . . . .

16 U.S.C. § 1533(a)(3)(A)(i); <u>see also</u> <u>id.</u> at § 1533(b)(6)(C).

Critical habitat is defined in Section 3 of the ESA as: "(i) the specific areas within the geographical area occupied by a species, at the time it is listed in accordance with the [ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) that may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by a species at the time it was listed....upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A). "Conservation," in turn, means recovery of these species "to the point at which the measures provided pursuant to this chapter are no longer necessary." <u>Id.</u> at § 1532(3).

The ESA generally requires that critical habitat designation take place concurrently with listing because critical habitat provides important protection for imperiled species beyond that provided by listing alone. Pursuant to Section 7(a)(2) of the ESA, federal agencies must insure through consultation with the Secretary that any action they authorize, fund, or carry out will not "jeopardize the continued existence of any [listed] species." <u>Id.</u> at § 1536(a)(2). For species with critical habitat, each federal agency must additionally guarantee that its actions will not "result in the destruction or adverse modification" of that habitat. <u>Id.</u> Thus, while the Section 7(a)(2) duty not to "jeopardize the continued existence" of listed species helps to ensure their survival, the critical habitat duty allows these species to recover so that they may eventually be delisted.

The ESA also mandates that in making a critical habitat determination, the Secretary shall make such determination "on the basis of the best scientific data available." 16 U.S.C. § 1533(b)(2). In those situations where critical habitat is not determinable at the time of final listing, the Secretary must conduct additional necessary research, and issue a final determination of critical habitat <u>no later than one additional year</u> from the date the final listing determination is due. 16 U.S.C. § 1533(b)(6)(C)(ii).[2]

---

[2] The Secretary may only find that it is "not prudent" to designate critical habitat for a species where designating critical habitat would either increase the degree of threat to a species or would not be beneficial to the species. 50 C.F.R. § 424.12(a)(1)(i)-(ii) (1996). As Congress made clear when it passed the ESA, *it only intended the Secretary to invoke the "not prudent" exception to designating critical habitat in " rare circumstances."* H.R.Rep. No. 95-1625 at 17 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9467. <u>See</u> <u>Natural Resources Defense Council v. U.S. Dept. of the Interior</u>, 113 F.3d 1121, 1126 (9th Cir. 1997).

II.    **The Polar Bear Listing Process and the Secretary's Violations**

The petition to list the polar bear as a threatened species ("Petition") was filed on February 16, 2005, and received by the Secretary on February 17, 2005. On December 15, 2005, the Conservation Groups sued the Secretary for failure to make the required 90-Day Finding on the Petition. Center for Biological Diversity v. Kempthorne, Civ. 05-5191 JSW (N. Dist. Cal.) The Secretary issued a positive 90-day finding on February 9, 2007. A Settlement Agreement and Consent Decree was then entered in Center for Biological Diversity v. Kempthorne requiring the Secretary to issue a 12-Month Finding by December 27, 2007. On January 9, 2007, the Secretary published a proposed rule to list the polar bear as a threatened species under the ESA. Proposal to List the Polar Bear as a Threatened Species (72 Fed. Reg. 1064-1099). Publication of the final listing determination was therefore required one year of January 9, 2007. 16 U.S.C. §§ 1533(b)(6). The final listing determination and critical habitat designation was not published in the Federal Register on January 9, 2008. On March 10, 2008 the Conservation Groups sued the Secretary for failing to issue the final listing determination. Center for Biological Diversity v. Kempthorne, Civ. 08-1339 CW (N. Dist. Cal.) On April 28, 2008 the Court issued an order granting the Conservation Groups' motion for summary judgment and ordering the Secretary publish a final listing rule in the Federal Register by May 15, 2008.

.
On May 14, 2008, the Secretary issued a final rule listing the polar bear as a threatened species, failing to designate any polar bear critical habitat, and purporting to reduce the protections the polar bear would otherwise receive via an accompanying Interim Final Section 4(d) Rule and other language. Those rules were published in the Federal Register on May 15, 2008. 73 Fed. Reg. 28212; 73 Fed. Reg. 28306.

A.    **Failure to List the Polar Bear as an Endangered Species**

As the Conservation Groups made clear in their most recent comments to the Fish and Wildlife Service, of the wealth of data that has accumulated since February, 2005, shows that the polar bear must be listed as an endangered species. Most importantly, the melting of the Arctic sea ice on which polar bears depend has now accelerated far beyond that predicted by any of the leading climate models. In 2007 the Arctic sea ice hit a shocking new minimum, fully one million square miles below the average minimum sea ice extent between 1979-2000. There was less ice in the Arctic in September, 2007, than more than half the models project for 2050. The polar bear is also being impacted earlier and more intensely by the warming and melting than had previously been predicted. Five of the world's polar bears populations are now classified as declining by the International Union for the Conservation of Nature's ("IUCN") Polar Bear Specialists Group, and instances of polar bears drowning, starving, and resorting to cannibalism have been documented.

The United States Geological Survey ("USGS") significantly advanced the understanding of sea-ice loss and its implications for polar bears in a series of reports produced at the Service's request to assist in the listing process. See, e.g., Amstrup, S.C. et al. 2007. Forecasting the

Range-wide Status of Polar Bears at Selected Times in the 21st Century.  U.S. Geological Survey Administrative Report.  U.S. Geological Survey, Reston, VA ("Amstrup, et al. 2007").

The USGS conducted polar bear population modeling based on 10 climate models that most accurately simulate future ice conditions.  The USGS used the Intergovernmental Panel on Climate Change ("IPCC") A1B "business as usual" scenario of future emissions to run the climate models.  In the A1B scenario, atmospheric carbon dioxide concentrations reach 717 parts per million by 2100.  These sea-ice projections were used in a number of applications, including in a Bayesian Network model developed by the USGS to most accurately project the future range-wide status of the polar bear.  The results are disturbing.

The USGS projects that two-thirds of the world's polar bears will be extinct by 2050, including all of the bears in Alaska (Amstrup et al. 2007).  The "good news" is that polar bears *may* survive in the high Canadian Archipelago and portions of Northwest Greenland through the end of this century.  However, their extinction risk is still extremely high: over 40% in the Archipelago and over 70% in Northwest Greenland (Amstrup et al. 2007: Table 8).

Moreover, the USGS emphasizes repeatedly that because all of the available climate models have to date underestimated the actual observed sea-ice loss, the assessment of risk to the polar bear may be conservative.   Perhaps most worrisome is the observation that part of an area in the Canadian Archipelago expected to provide an icy refuge for the polar bear in 2100 lost its ice in the summer of 2007 (Amstrup et al. 2007).

The Secretary unlawfully classified the polar bear as a "threatened" species, despite the fact that the best available science indicates that the polar bear should be listed as "endangered" throughout its range.  In so doing, the Secretary violated the law in ways including, but not limited to, failing to use the best available science, relying upon an unreasonable interpretation of the "foreseeable future," and allowing political considerations to improperly influence the listing process.

The Secretary has also improperly and unlawfully concluded that threats including oil and gas development, oil spills, pollution, and overhunting of polar bears do not threaten the species with extinction.  While global warming is the primary threat to the polar bear, these other factors also threaten the species with harm and direct mortality and contribute to the extinction risk.  These threats do not exist in a vacuum, but rather along with the severe and rapid changes from global warming, and impact the polar bear in cumulative and synergistic ways with the warming and melting of the Arctic.  The Secretary's conclusion that the polar bear is not threatened by these factors was arbitrary, capricious, and unlawful.

Having decided not to list the polar bear as endangered throughout its range, the Secretary also unlawfully failed to properly address whether the polar bear is endangered throughout a "significant portion of its range," and whether one or more distinct population segments of the polar bear should be listed as endangered.  The Conservation Groups reminded the Secretary of his independent duty to make this determination, and explicitly requested it in their Petition. Distinct population segments that should have been examined include each of the 19 polar bear populations as well as groupings of those populations based on the Seasonal Ice,

Divergent Ice, Convergent Ice, and Canadian Archipelago ecological regions defined by the USGS. The best available science clearly dictates that some our all of these populations comprise distinct population segments and/or constitute a significant portion of the species' range. The Secretary, in contravention of the best available science, his own policies governing the listing of distinct population segments, and governing case law, unlawfully concluded that none of these populations were "discrete" and therefore none were eligible for listing as a "species" under the ESA. The best available science also clearly and conclusively demonstrates that many of these populations, including all polar bears in Alaska, are presently in danger of extinction and therefore meet the criteria for listing as endangered under the ESA. Moreover, even if these populations are not "discrete" under the DPS policy, they clearly comprise a significant portion of the species' range, and presently meet the definition of "endangered" in those areas. The Secretary's failure to list as endangered, at a minimum, polar bears in the Seasonal Ice and Divergent Ice ecoregions, or to adequately and rationally explain why he failed to list these bears as endangered is also arbitrary, capricious, and contrary to the ESA. <u>Defenders of Wildlife v. Norton</u>, 258 F.3d 1136, 1146 (9th Cir. 2001).

In short, the best available evidence demonstrates that polar bears are now an endangered species, because they are in danger of extinction through all or a significant portion of their range. If future emissions meet or exceed the A1B scenario, the eventual extinction of polar bears is virtually guaranteed, as extinction risk will exceed 40% even in the high Canadian Archipelago in 2100, and warming will continue after 2100.

It is not, however, too late to save polar bears from extinction. If we greatly reduce greenhouse gas pollutants including carbon dioxide, methane, and black carbon, and also protect polar bears from other threats they face in addition to global warming, the species can still be successfully conserved. It is thus crucial for the Secretary to give polar bears the full protection they deserve, by conferring on them the proper "endangered" status, because our window of opportunity to act soon enough to save them is rapidly closing.

**B. Failure to Designate Critical Habitat for the Polar Bear**

The Secretary has also violated the ESA by failing to designate critical habitat for the polar bear. The proposed rule stated

> …in general the identification of specific physical and biological features and specific geographic areas for consideration as critical habitat is complicated and the future values of these habitats may change in a rapidly changing environment. The polar sea ice provides an essential conservation function for the key life history functions for hunting, feeding, travel, and nuturing [sic] cubs. That essential habitat is projected to be significantly reduced within the next 45 years, and some projections forecast complete absence of sea ice during summer months in shorter time frames. A careful assessment of the designation of critical marine areas will require additional time and evaluation. In addition, near-shore and terrestrial habitats may qualify as critical habitat; however a careful assessment will require additional time and evaluation. Therefore, there is a degree of uncertainty at this time as to which specific areas in Alaska might be essential to

the conservation of the species and thus meet a key aspect of the definition of critical habitat.  Consequently, the designation of critical habitat for the polar bear is not determinable at this time…If the listing of the polar bear becomes final, we will then consider whether to propose the designation of critical habitat."

72 Fed. Reg. 1096-1097.

The final listing rule similarly stated that designation of critical habitat was "not determinable":

> While information regarding important polar bear life functions and habitats associated with these functions has expanded greatly in Alaska during the past 20 years, the identification of specific physical and biological features and specific geographic areas for consideration as critical habitat is complicated, and the future values of these habitats may change in a rapidly changing environment. Arctic sea ice provides a platform for critical life-history functions, including hunting, feeding, travel, and nuturing cubs. That habitat is projected to be significantly reduced within the next 45 years, and some models project complete absence of sea ice during summer months in shorter timeframes.
>
> A careful assessment of the designation of marine areas as critical habitat will require additional time to fully evaluate physical and biological features essential to the conservation of the polar bear and how those features are likely to change over the foreseeable future. In addition, near-shore and terrestrial habitats that may qualify for designation as critical habitat will require a similar thorough assessment and evaluation in light of projected climate change and other threats. Additionally, we have not gathered sufficient economic and other data on the impacts of a critical habitat designation. These factors must be considered as part of the designation procedure. Thus, we find that critical habitat is not determinable at this time.

> This is unacceptable and contrary to the statutory mandate.

Polar bear critical habitat is clearly determinable.  The Secretary's regulations provide that "[c]ritical habitat is not determinable when one or both of the following situations exist: (i) Information sufficient to perform required analyses of the impacts of the designation is lacking, or (ii) The biological needs of the species are not sufficiently well known to permit identification of an area as critical habitat."  50 C.F.R. § 424.12(a)(2).  Here, the Secretary has more than enough information to propose critical habitat for the polar bear.  Detailed information on the habitat needs of polar bears, including types and distribution of sea ice, location of maternal dens, and prey distribution, have all been provided to the Secretary by Conservations Groups, the available published literature, and the USGS reports discussed above.  Similarly, the Secretary has more than sufficient information to analyze the impacts of designating critical habitat. Further delay in designating critical habitat is unlawful.

### C.  Unlawfully Authorizing Take of Polar Bears

In association with the Final Rule, the Secretary also purports to reduce protections to the polar bear through an Interim Final Section 4(d) ("4(d) Rule"), which authorizes activities that would otherwise be prohibited by the ESA and its implementing regulations.  16 U.S.C. § 1538(a); 50 C.F.R. § 17.31.  As a threshold matter, the 4(d) Rule is invalid because the polar bear must be listed as an endangered, not as a threatened species, and therefore the Secretary has no discretion to reduce the protections provided by Section 9 of the ESA.  Moreover, even could the polar bear be lawfully listed as threatened, the 4(d) Rule promulgated by the Secretary is arbitrary, capricious, contrary to the ESA, and otherwise unlawful.

A rule promulgated pursuant to ESA Section 4(d) must be "necessary and advisable to provide for the conservation" of the species. 16 U.S.C. § 1533(d). See, e.g., Sierra Club v. Clark, 755 F.2d 608, 612-13 (8th Cir. 1985) (Secretary's discretion to issue regulations under ESA Section 4(d) "is limited by the requirement that the regulations he is to issue must provide for the conservation of threatened species" (emphasis in original)); State of Louisiana, ex rel. Guste v. Verity, 853 F.2d 322, 332-33 (5th Cir. 1988). "Conservation" is defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which" ESA protection is no longer required. 16 U.S.C. § 1532(3).  The term "conservation" includes ensuring a species' survival and promoting its recovery. Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service, 378 F.3d 1059, 1070 (9th Cir. 2004). The Secretary's authority to promulgate a 4(d) rule authorizing take of polar bears is therefore limited to those measures that are "necessary and advisable" to provide for the survival and recovery of the species.

The Interim Final 4(d) Rule exempts all activities that take polar bears from the ESA's prohibitions so long as such activities are consistent with the existing statutory requirement of the MMPA and CITES, including activities that will lead to harm to and death of polar bears. In other words, the 4(d) Rule completely eviscerates the protections of Section 9 and 50 C.F.R. § 17.31 that would apply to the bear absent the rule.  The Final Rule provides no rational justification for eliminating these protections, and doing so cannot possibly be construed as "necessary and advisable" to provide for the survival and recovery of the polar bear.

The Secretary also violated the National Environmental Project Act (42 U.S.C. § 4331 et seq., "NEPA") and the Administrative Procedure Act 5 U.S.C. § 551 et seq., "APA") by failing to prepare an Environmental Impact Statement for the 4(d) Rule and by making the 4(d) rule effective immediately.  All federal agencies must prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment."[3] 42 U.S.C. § 4332 (2)(C); see also 40 C.F.R. § 1501.4. Congress has directed that

---

[3] An agency may first prepare a detailed Environmental Assessment ("EA") to determine whether the project may significantly affect the environment and requires a full EIS.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9.  If the EA shows that the proposed action will have no significant impact, the agency may issue a finding of no significant impact ("FONSI") and then execute the action. 40 C.F.R. § 1508.13. If however, the EA shows that the proposed activity will have a significant impact, the federal agency must prepare an EIS before proceeding with the proposed activity. 42 U.S.C. § 4332(2)(C).

NEPA be interpreted to apply to all federal actions "to the fullest extent possible." 42 U.S.C. § 4332; Jones v. Gordon, 792 F.2d 821, 826 (9th Cir. 1986). The promulgation of an ESA Section 4(d) rule authorizing the otherwise prohibited take of a threatened species is a "major Federal action significantly affecting the quality of the human environment." The Secretary could not lawfully promulgate this 4(d) Rule for the polar bear, even were the rule otherwise lawful, prior to full NEPA compliance. Moreover, the Secretary's decision to toss aside notice and comment for the 4(d) rule runs afoul of the requirements of the APA. Dispensing with public comment is only allowed if such comment is "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(B). None of those criteria are present here.

## III.    Conclusion

The Secretary's failure to comply with the ESA's mandates deprives polar bears of statutorily mandated protection vitally necessary for their survival. The Secretary's violations frustrate the intent of the ESA, because the likelihood of survival and recovery of the species is reduced due to continued harm to the species from global warming, oil and gas development, and other threats.

The members and staff of the Conservation Groups are vitally concerned about and actively involved in the protection of polar bears and their habitat. The Conservation Groups' members and staff engage in recreational, aesthetic and scientific activities involving this species and its Arctic habitat, including observing and attempting to observe polar bears. The Conservation Groups, their members, and staff are injured by the Secretary's violations, and those injuries would be remedied if the Secretary (1) lists the polar bear as "endangered," and withdraws the 4(d) Rule and other unlawful language referenced above; and (2) promptly designates critical habitat for the species in accordance with the statute.

Thank you for your consideration of these urgent issues. We hope that the Secretary will act promptly to remedy the violations described above. Please contact Kassie Siegel at (760) 366-2232 x302 if you would like to discuss these matters further.

Sincerely,

Kassie R. Siegel,
Climate, Air, and Energy Program Director
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA  92252
(760) 366-2232 x302

May 15, 2008
Page 10 of 11

_____
Andrew E. Wetzler, Senior Attorney
Natural Resources Defense Council
544 White Oak Place
Worthington, OH  43085
(614) 840-0891

_____
John W. Passacantando, Executive Director
Greenpeace
702 H St., Suite 300 NW
Washington, DC 20001
(202) 462-1177


CC:

Mr. Tom Melius, Regional Director
U.S. Fish & Wildlife Service
Alaska Regional Office
1011 East Tudor
Anchorage, AK 99503
Facsimile:  (907) 786-3495


May 15, 2008
Page 11 of 11