Brendan Cummings (CA Bar No. 193952)
Kassia Siegel (CA Bar No. 209497)
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Phone:   (760) 366-2232; Facsimile: (760) 366-2669
Email:  bcummings@biologicaldiversity.org
          ksiegel@biologicaldiversity.org

Miyoko Sakashita (CA Bar No. 239639)
Center for Biological Diversity
1095 Market St., Suite 511
San Francisco, CA 94103
Phone:  (415) 436-9682; Facsimile: (415) 436-9683
Email:  miyoko@biologicaldiversity.org

Andrew E. Wetzler (CA Bar No. 202299)
Natural Resources Defense Council
544 White Oak Place
Worthington, OH 43085
Phone:  (614) 840-0891; Facsimile (415) 875-6161
Email:  awetzler@nrdc.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation, NATURAL RESOURCES DEFENSE COUNCIL, a non-profit corporation, and GREENPEACE, INC., a non-profit corporation; | CASE NO.:  C-08-1339-CW |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| DIRK KEMPTHORNE, United States Secretary of the Interior and UNITED STATES FISH AND WILDLIFE SERVICE; | |
| Defendants. | |

## I.      INTRODUCTION

1.      Plaintiffs CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, AND GREENPEACE, INC., bring this action against Defendants DIRK KEMPTHORNE, United States Secretary of the Interior and the UNITED STATES FISH AND WILDLIFE SERVICE (collectively "the Secretary") to remedy the Secretary's ongoing violation of the listing provisions of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, as well as the procedural and environmental review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, with respect to the Secretary's recent decision to list the polar bear (*Ursus maritimus*) as a threatened species under the ESA.

2.      Polar bears live only in areas of the Arctic where there is sea ice for a substantial portion of the year and are completely dependent upon sea-ice habitat for their survival.  Global warming is transforming the Arctic and rapidly eliminating the habitat the polar bear needs to survive.   Even using moderate projections of future greenhouse emissions levels, average winter temperatures are projected to rise by 18° Fahrenheit over the Arctic Ocean by the end of this century.

3.      The Arctic is melting faster than forecast.  In September, 2007, the sea ice hit a new record low, fully one million square miles below the average minimum sea-ice extent of the past several decades.  Alarmingly, there was less ice in the Arctic in 2007 than more than half of the world's leading climate models project for 2050.  Some scientists now believe that the Arctic could be ice free in the summer as early as 2013.

4.      Polar bear populations are already declining due to global warming.  Individual polar bears have drowned, starved, and even resorted to cannibalism as global warming transforms the Arctic.  The U.S. Geological Service ("USGS") projects that two thirds of the world's polar bears will be extinct by 2050 if "business as usual," emissions trends continue, and that the world's remaining bears will face an over 40% risk of extinction by century's end.  The USGS projections may be overly optimistic, as they are based on modeling results of sea-ice decline that have underestimated the ice loss to date.

5.      Polar bears are threatened by other factors as well, including but not limited to

proliferating oil and gas development in their habitat, high levels of organochloride and other pollution in the Arctic, and overhunting and poaching in some areas in Russia, Canada, and Greenland.

6.    On March 10, 2008, Plaintiffs filed a Complaint against the Secretary for failing to make a final determination about whether to list the polar bear as a threatened or endangered species under the ESA in response to Plaintiffs' petition to list the bear. Center for Biological Diversity v. Norton, Case No. C-08-1339-CW (Complaint for Declaratory and Injunctive Relief, Docket # 1).

7.    On April 28, 2008, this Court issued an order granting Plaintiffs' Motion for Summary Judgment, finding Defendants in violation of the ESA and ordered the Secretary to publish a final listing determination for the polar bear by May 15, 2008, and to make any final regulation effective upon publication pursuant to 5 U.S.C. § 553(d)(3). Center for Biological Diversity v. Norton, Case No. C-08-1339-CW (N.D. Cal., April 28, 2008) (Order Granting Plaintiffs' Motion for Summary Judgment and Injunction, Docket # 35) (hereinafter "April 28 Order") at 10.).

8.    On May 14, 2008, the Secretary announced issuance of a final rule listing the polar bear as a threatened species.  This rule was published in the Federal Register on May 15, 2008.  See Endangered and Threatened Wildlife and Plants, Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout its Range, 73 Fed. Reg. 28212-28303 (May 15, 2008) ("Final Listing Rule").

9.    At the same time that the Secretary published the Final Listing Rule he also issued separate regulations, pursuant to Section 4(d) of the ESA, which purport to authorize the widespread incidental take of polar bears.  73 Fed. Reg. 28306-28318 (Endangered and Threatened Wildlife and Plants, Special Rule for the Polar Bear) (May 15, 2008) ("4(d) Rule").  The 4(d) Rule also purports to exempt all greenhouse gas emitting projects from the ambit of Section 7 of the ESA.

10.    The 4(d) Rule issued by the Secretary was finalized and made effective without any advanced public notice of, or an opportunity to comment on the rule, in violation of the APA.  The 4(d) Rule was also published without any of the environmental analysis required by NEPA.

11.    Plaintiffs first petitioned to list the polar bear under the ESA because the species needs the full protection of the Act in order to survive.  The Secretary has denied the species of these necessary protections.

12.    Plaintiffs now seek judicial relief declaring that the 4(d) Rule promulgated by the Secretary violates the APA, and NEPA.    Plaintiffs also ask the Court to vacate the 4(d) Rule authorizing take of polar bears.[1]

## II.    JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT

13.    The Court has jurisdiction over this action pursuant to 16 U.S.C. §§ 1540(c) & (g) (action arising under the ESA and citizen suit provision), 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 702 (APA), and 28 U.S.C. § 1361 (Mandamus).  The relief sought is authorized by 28 U.S.C. §§ 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), 16 U.S.C. § 1540(g) and 5 U.S.C. § 701-706.

14.    Venue is proper in the Northern District of California pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) as this civil action is brought against an agency of the United States and officers and employees of the United States acting in their official capacities and under the color of legal authority, as at least one Plaintiff is incorporated in this judicial district, as all Plaintiffs maintain offices in this judicial district, and as no real property is involved in this action.

15.    Pursuant to Local Rules 3-5(b) and 3-2(c) and (d), assignment of this case to the San Francisco or Oakland Division is appropriate because Plaintiffs are located in San Francisco County.

16.    By written notice sent to Defendants DIRK KEMPTHORNE and U.S. FISH AND WILDLIFE SERVICE and received by facsimile and Federal Express delivery on January 9, 2008, Plaintiffs informed Defendants of the violations set forth in their Complaint filed March 10, 2008, more than sixty days prior to the filing of the Complaint, as required by the ESA.  16 U.S.C. § 1540(g).  By written notice to Defendants DIRK KEMPTHORNE and U.S. FISH AND WILDLIFE SERVICE both

---

[1] In addition to violating the APA and NEPA, both the 4(d) Rule and the Final Listing Rule also violate the ESA.  First, by classifying the polar bear as a "threatened," rather than "endangered," species in all or a portion of its range, the Secretary ignored the best available scientific information.  Second, the Secretary violated the ESA by failing to designate "critical habitat" for the polar bear.  Finally, the Secretary violated the ESA when he erroneously found that issuing a 4(d) rule that allows for the widespread incidental take of polar bears was "necessary and advisable to provide for the conservation" of the species.  On May 15, 2008, Plaintiffs filed with the Secretary a notice of intent to sue pursuant to the citizen suit provisions of the ESA, 16 U.S.C. § 1540(g). Plaintiffs will seek to amend their Complaint following the running of the 60 days notice period to add additional claims brought under the citizen suit provisions of the ESA as outlined above and in their Notice Letter.

hand-delivered and sent by facsimile May 15, 2008, Plaintiffs informed Defendants of additional violations of the ESA stemming from the Secretary's issuance of the Final Listing Rule and 4(d) Rule, to the degree required by the ESA.  16 U.S.C. § 1540(g).

17.    An actual, justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

18.    Plaintiffs have no adequate remedy at law.  The Secretary's continuing failure to comply with the ESA, NEPA, and the APA will result in irreparable harm to the polar bear, to Plaintiffs and Plaintiffs' members, and to the public.  No monetary damages or other legal remedy can adequately compensate Plaintiffs, their members, or the public, for this harm.

19.    Plaintiffs and their members are adversely affected or aggrieved by federal agency action and are entitled to judicial review of such action within the meaning of the ESA and the APA. The Secretary's failure to comply with the ESA's mandates prevents the full implementation of measures to protect polar bears pursuant to the ESA.  Without the substantial protections of the ESA, polar bears are more likely to continue to decline and become extinct.  Plaintiffs are therefore injured because their use and enjoyment of polar bears and their habitat described below is threatened by the decline and likely extinction of the bears.  The Secretary's failure to comply with the ESA, NEPA, and APA has also resulted in informational and procedural injury to Plaintiffs.  These are actual, concrete injuries to Plaintiffs, caused by the Secretary's failure to comply with the ESA, NEPA, and the APA, and their implementing regulations.  The relief requested will fully redress those injuries.

20.    The federal government has waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

## III.    PARTIES

21.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit 501(c)(3) corporation with offices in San Francisco, Joshua Tree, and San Diego, California; Phoenix and Tucson, Arizona; Pinos Altos, New Mexico; Portland, Oregon; and Washington, D.C.  The Center for Biological Diversity works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is actively involved in species and habitat protection issues throughout the western United States, including protection of Arctic wildlife in

general and the polar bear in particular. The Center has over 40,000 members throughout the United States and the world.

22.    Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, Inc. ("NRDC") is a national environmental advocacy group.  The NRDC is registered to do business in California and maintains offices in San Francisco, Los Angeles, Washington, D.C., New York City, Chicago, Illinois and Beijing, China.  Through advocacy, education, litigation, and other efforts, NRDC works to preserve threatened and endangered wildlife across the United States and around the world, including Arctic wildlife in general and the polar bear in particular.  The NRDC has over 550,000 members nationwide, over 100,000 of whom reside in the State of California

23.    Plaintiff GREENPEACE, INC. ("Greenpeace") is a California non-profit corporation with offices in San Francisco and elsewhere.  Its mission is to raise public awareness of environmental problems and promote changes that are essential to a green and peaceful future.  There are approximately 250,000 current Greenpeace members in the United States. Since the 1980's, Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to advocate for serious cuts in greenhouse gas emissions through local, national and global action.  For the past decade, Greenpeace has campaigned on the causes and impacts of climate change in the Arctic, including the impacts on polar bears and other species who are threatened by continued Arctic warming.

24.    Plaintiffs' members and staff include individuals with varying interests in polar bears and their habitat ranging from scientific, professional, and educational to recreational, aesthetic, moral, and spiritual interests.  Further, Plaintiffs' members and staff enjoy, on an on-going basis, the biological, scientific, research, education, conservation, recreational and aesthetic values of the Arctic region inhabited by this species.  Plaintiffs' staff and members observe and study polar bears and their habitat, and derive professional, scientific, educational, recreational, aesthetic, inspirational, and other benefits from these activities and have an interest in preserving the possibility of such activities in the future.  An integral aspect of the Plaintiffs' members' use and enjoyment of polar bears is the expectation and knowledge that the species is in its native habitat.  For this reason, the Plaintiffs' use and enjoyment of polar bears is entirely dependent on the continued existence of healthy, sustainable

1    populations in the wild.  Plaintiffs bring this action on their own behalf and on behalf of their adversely

2    affected members and staff.

3         25.    Defendant DIRK KEMPTHORNE, United States Secretary of the Interior, is the highest

4    ranking official within the Department of Interior and, in that capacity, has ultimate responsibility for

5    the administration and implementation of the ESA with regard to the polar bear, and for compliance

6    with all other federal laws applicable to the Department of the Interior.  He is sued in his official

7    capacity.

8         26.    Defendant UNITED STATES FISH & WILDLIFE SERVICE ("the Service") is a

9    federal agency within the Department of Interior authorized and required by law to protect and manage

10   the fish, wildlife and native plant resources of the United States, including enforcing the ESA.  The

11   Service has been delegated authority by the Secretary of Interior to implement the ESA for the polar

12   bear, including responsibility for making decisions and promulgating regulations, including proposed

13   and final listing and critical habitat decisions and the processing of petitions for such listings.

14   **IV.    LEGAL BACKGROUND**

15       **A.    The Endangered Species Act**

16        27.    The ESA is a federal statute enacted to conserve endangered and threatened species and

17   the ecosystems upon which they depend.  16 U.S.C. § 1531(b).  The ESA "is the most comprehensive

18   legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley

19   Authority v. Hill, 437 U.S. 153, 180 (1978).  The Supreme Court's review of the ESA's "language,

20   history, and structure" convinced the Court "beyond a doubt" that "Congress intended endangered

21   species to be afforded the highest of priorities." Id. at 174.  As the Court found, "the plain intent of

22   Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever

23   the cost." Id. at 184.

24        28.    The ESA protects species listed as either "endangered" or "threatened" by the Secretary.

25   A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its

26   range." 16 U.S.C. § 1532(6).  A species is "threatened" if it is "likely to become an endangered species

27   within the foreseeable future." 16 U.S.C. § 1532(20).

28        29.    The term "species" is defined broadly under the ESA to include "any subspecies of fish

or wildlife or plants and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532 (16). A distinct population segment ("DPS") of a vertebrate species can be protected as a "species" under the ESA even though it has not formally been described as a "species" in the scientific literature. A species may be composed of several DPSs, some or all of which warrant listing under the ESA.

30. Once a species is listed, an array of statutory protections applies. For example, Section 7 requires all federal agencies to "insure" that their actions neither "jeopardize the continued existence" of any listed species nor "result in the destruction or adverse modification" of its "critical habitat." 16 U.S.C. § 1536(a)(2). Critical habitat is defined in Section 3 of the ESA as: "(i) the specific areas within the geographical area occupied by a species, at the time it is listed in accordance with the [ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) that may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by a species at the time it was listed....upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A).

31. Additionally, ESA Section 9 and its regulations further prohibit, among other things, "any person" from intentionally "taking" listed species or "incidentally" taking listed species without a permit from the Service. 16 U.S.C. §§ 1538(a)(1)(B) & 1539; 50 C.F.R § 1731. There are two exceptions to Section 9's take prohibitions. First, Section 10 of the ESA permits a non-federal entity to "take" listed species incidental to an otherwise lawful activity only after obtaining an Incidental Take Permit. 16 U.S.C. § 1539. Second, a federal agency may take listed species only in accordance with an Incidental Take Statement issued pursuant to a Section 7 consultation. 16 U.S.C. §§ 1536(b)(4) and 1536(o)(2). In either case, the Service must first conclude that the taking will not jeopardize the species and must set forth terms and conditions that must be followed to minimize and mitigate the impacts of the taking. 16 U.S.C. §§ 1536(b)(4) and 1539.

32. However, none of these protections come into force until a species is officially listed as threatened or endangered under the ESA.

33. In order to ensure the timely protection of species, Congress set forth the listing process described below. The process includes mandatory, non-discretionary deadlines for the three required

1  findings that the Secretary must meet, so that species in need of protection do not languish in

2  administrative purgatory.  The three required findings, described below, are the 90-day finding, the 12-

3  month finding, and the final listing determination.

4      34.    Any interested person can begin the listing process by filing a petition to list a species

5  with the Secretary.  16 U.S.C. § 1533 (b)(3)(A); 50 C.F.R. § 424.14(a).

6      35.    Upon receipt of a petition to list a species, the Secretary has 90 days "to the maximum

7  extent practicable," to make a finding as to whether the petition "presents substantial scientific or

8  commercial information indicating that the petitioned action may be warranted."  16 U.S.C § 1533

9  (b)(3)(A); 50 C.F.R. § 424.14 (b)(1).  If the Secretary finds that the petition presents substantial

10  information indicating that the listing may be warranted, the Secretary then publishes in the Federal

11  Register a "90 day finding and commencement of status review."  16 U.S.C. § 1533(b)(3)(A).

12      36.    Upon issuing a positive 90-day finding, the Secretary must then conduct a full review of

13  the status of the species.  50 C.F.R. § 424.14.  Upon completion of this status review, and within 12

14  months from the date that he received the petition, the Secretary must make one of three findings: (1)

15  the petitioned action is not warranted; (2) the petitioned action is warranted; or (3) the petitioned action

16  is warranted but presently precluded by other pending proposals for listing species, provided certain

17  circumstances are present.  16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14 (b)(3).  This second

18  determination is known as a "12-month finding."  This deadline is mandatory. There is no mechanism

19  by which the Secretary can extend the deadline for the finding.

20      37.    If the Secretary finds in the 12-month finding that the listing of the species is warranted,

21  then he must publish in the Federal Register a proposed rule, for public comment, to list such species as

22  endangered or threatened.  16 U.S.C. § 1533(b)(5).

23      38.    Within one year of the publication of a proposed rule to list a species, the ESA requires

24  the Secretary to publish a final listing determination in the Federal Register.  16 U.S.C. §

25  1533(b)(6)(A).  At such time, the Secretary must either list the species or withdraw the proposal.  16

26  U.S.C. § 1533(b)(6)(A)(i).

27      39.    When the Secretary lists a species as endangered or threatened, he generally must also

28  designate critical habitat for that species.  Section 4(a)(3)(A)(i) of the ESA states that, "to the

1  maximum extent prudent and determinable," the Secretary: "shall, concurrently with making a

2  determination . . . that a species is an endangered species or threatened species, designate any habitat of

3  such species which is then considered to be critical habitat . . . ." 16 U.S.C. § 1533(a)(3)(A)(i); see also

4  id. at § 1533(b)(6)(C).

5      40.    As described above, a species may be listed as either "threatened" or "endangered"

6  under the ESA. The primary regulatory distinction between these two classifications relates to the

7  applicability of Section 9's prohibition on take. The ESA directly applies Section 9's prohibitions only

8  to species listed as "endangered." 16 U.S.C. § 1538. However, Section 4(d) requires the Secretary to

9  promulgate "protective regulations" where the agency deems them "necessary and advisable to provide

10  for the conservation of such species," including regulations that apply any or all of the prohibitions of

11  Section 9 to species listed as "threatened" 16 U.S.C. § 1533(d). Accordingly, the Secretary has

12  promulgated a blanket regulation pursuant to Section 4(d) that, absent a separate species-specific rule,

13  prohibits all take of threatened species. 50 C.F.R. § 17.31(a). Because of this, the prohibitions of

14  Section 9 and the processes for exemption from such prohibitions through an Incidental Take Permit or

15  an Incidental Take Statement generally apply to both threatened and endangered species.

16      41.    The Secretary has, however, in some instances, such as with the polar bear in this case,

17  promulgated species-specific Section 4(d) rules exempting certain activities from the general take

18  prohibition contained in 50 C.F.R. § 17.31(a). See 50 C.F.R. § 17.40(q) (4(d) Rule for polar bear). For

19  such species, an activity fitting within the take exemption is deemed to not violate Section 9 and no

20  Incidental Take Permit or take authorization pursuant to an Incidental Take Statement is required for

21  the activity. Such an exemption, however, is only available if the species is listed as "threatened." If

22  the species is listed as "endangered," take can only be permitted through an Incidental Take Permit or

23  Incidental Take Statement.

24      **B.    The Administrative Procedure Act**

25      42.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., provides general

26  rules governing the issuance of proposed and final regulations by federal agencies. Fundamental to the

27  APA's procedural framework is the requirement that, absent narrow circumstances, a federal agency

28  publish as a proposal any rule that it is considering adopting, and allow the public the opportunity to

1  submit written comments on the proposal.  5 U.S.C. § 553.

2      43.    A "rule" is defined by the APA as "the whole or a part of an agency statement of general

3  or particular applicability and future effect designed to implement, interpret, or prescribe law or policy

4  or describing the organization, procedure, or practice requirements of an agency…" 5 U.S.C. § 551(4).

5      44.    Specifically, the APA provides that all federal agencies must provide "general notice" of

6  any "proposed rule making" to the public by publication in the Federal Register.  The publication must,

7  at a minimum, include "(1) a statement of the time, place, and nature of public rule making

8  proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the

9  terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C.

10  § 553(b).

11      45.    In addition, the APA requires that "the agency shall give interested persons an

12  opportunity to participate in the rule making through submission of written data, views, or arguments

13  with or without opportunity for oral presentation. After consideration of the relevant matter presented,

14  the agency shall incorporate in the rules adopted a concise general statement of their basis and

15  purpose."  5 U.S.C. § 553(c).

16      46.    An agency may only short circuit the public notice and comment requirements of the

17  APA if it finds, "for good cause," that "notice and public procedure thereon are impracticable,

18  unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B).

19      **C.    The National Environmental Policy Act**

20      47.    NEPA is "our basic national charter for protection of the environment."  40 C.F.R. §

21  1500.1(a).  It was enacted in 1970 to put in place procedures to insure that, before irreversibly

22  committing resources to a project or program, federal agencies "encourage productive and enjoyable

23  harmony between man and his environment," "promote efforts which will prevent or eliminate damage

24  to the environment," and "enrich understanding of the ecological systems and natural resources

25  important to the Nation."  42 U.S.C. § 4321.

26      48.    Fundamentally, NEPA seeks to guarantee that: (1) agencies take a "hard look" at the

27  environmental consequences of their actions before these actions occur by ensuring that the agency

28  carefully considers detailed information concerning significant environmental impacts; and (2)

1    agencies make the relevant information available to the public so that it may also play a role in both the

2    decision making process and the implementation of that decision.  <u>See</u>, <u>e.g.</u> 40 C.F.R. § 1500.1.

3        49.    NEPA and the regulations promulgated thereunder by the Council on Environmental

4    Quality ("CEQ") require that all federal agencies, including the Service, must prepare an environmental

5    impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human

6    environment." 42 U.S.C. § 4332(2)(C); <u>see</u> <u>also</u> 40 C.F.R. § 1501.4.

7        50.    The fundamental purpose of an EIS is to force the decision-maker to ensure that the

8    policies and goals defined in NEPA are infused into the actions of the federal government.  40 C.F.R.

9    § 1502.1.   An EIS analyzes the potential environmental impacts, alternatives and mitigation

10   opportunities for major federal actions.

11       51.    An EIS must provide a detailed statement of: (1) the environmental impact of the

12   proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed

13   action be implemented; (3) alternatives to the proposed actions; (4) the relationship between local

14   short-term uses of the environment and the maintenance and enhancement of long-term productivity;

15   and (5) any irreversible and irretrievable commitments of resources that would be involved in the

16   proposed action should it be implemented.  42 U.S.C. § 4332(C).

17       52.    An EIS must "inform decision-makers and the public of the reasonable alternatives

18   which would avoid or minimize adverse impacts or enhance the quality of the human environment."

19   40 C.F.R. § 1502.1.  NEPA also requires federal agencies to analyze the direct, indirect, and cumulative

20   impacts of the proposed action. 40 C.F.R. §§ 1508.7 & 1508.8.  In addition to alternatives and impacts,

21   NEPA requires agencies to consider mitigation measures to minimize the environmental impacts of the

22   proposed action.  40 C.F.R. § 1502.14 (alternatives and mitigation measures); 40 C.F.R. § 1502.16

23   (environmental consequences and mitigation measures).

24       53.    An agency may first prepare a detailed Environmental Assessment ("EA") to determine

25   whether the project <u>may</u> significantly affect the environment and requires a full EIS.  42 U.S.C.

26   § 4332(2)(C); 40 C.F.R. § 1508.9.  An EA is "a concise public document" that serves, among other

27   things, to "provide sufficient evidence and analysis for determining whether to prepare an

28   environmental impact statement or a finding of no significant impact."  <u>Id</u>.  As with any document

1    prepared under NEPA, an environmental assessment is intended to "ensure that environmental

2    information is available to public officials and citizens before decisions are made and before actions are

3    taken." 40 C.F.R. § 1500.1(b).

4        54.    Significance is based upon the "intensity" and "context" of the action.  40 C.F.R. §

5    1508.27.  "Context" refers to the geographic and temporal scope of the agency action and the interests

6    affected. Id. § 1508.27(a).  "Intensity" addresses the severity of the impacts.  Id. § 1508.27(b).  Factors

7    relevant to intensity include: the degree to which the effects on the quality of the human environment

8    are likely to be highly controversial; the degree to which the action may adversely affect an endangered

9    or threatened species or its critical habitat; the presence of "uncertain impacts or unknown risks;"

10   whether the action is "related to other actions with individually insignificant but cumulatively

11   significant effects;" and whether the project "threatens a violation" of other laws.  Id. at § 1508.27(b).

12       55.    If after preparing and EA, the agency determines an EIS is not required, the agency must

13   provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a

14   Finding of No Significant Impact or "FONSI."  40 C.F.R. §§ 1501.4, 1508.9 & 1508.13.

15   **V.    FACTUAL BACKGROUND**

16       **A.  Polar Bears in a Warming Arctic**

17       56.    There are nineteen currently-recognized polar bear populations distributed throughout

18   the Arctic.  These populations can be found within the jurisdiction of 5 countries:  the United States (in

19   Alaska), Canada, Denmark (in Greenland), Norway, and Russia.  Worldwide polar bear abundance was

20   most recently estimated at 20,000-25,000 bears.

21       57.    Polar bears are marine mammals and are completely dependent upon Arctic sea ice for

22   survival.  Polar bears need sea ice as a platform from which to hunt their primary prey of ice-dependent

23   seals, to make seasonal migrations between the sea ice where they feed and their terrestrial denning

24   areas, and to find mates.  Some polar bears even give birth to their cubs in snow dens on top of the

25   drifting sea ice.  Because polar bears can only hunt effectively when on the ice, when forced onto land

26   either by the seasonal retreat of the sea ice in some areas or to give birth to their cubs, polar bears

27   generally undergo a time of near complete fasting.

28       58.    The earth's climate is warming due to society's production of greenhouse pollution,

primarily from the combustion of fossil fuels for energy.  The primary greenhouse pollutants include carbon dioxide, methane, nitrous oxide, and black carbon.  Increasing concentrations of greenhouse gases cause the earth's atmosphere to retain a greater proportion of the sun's energy, warming the earth's climate much like the interior of a greenhouse.  The average air temperature at the surface of the earth has increased by 1.3° Fahrenheit (0.74° C) over the past century, and the rate of warming over the past 50 years is nearly twice that of the past century.  Despite this accelerating warming trend, the melting of the world's glaciers, sea ice, and land-based ice sheets, many other ominous signs, and dire warnings from climate scientists, anthropogenic greenhouse gas emissions are still increasing each year.

59.    For a number of reasons, the Arctic has experienced greater and more rapid warming than the temperate regions.  Average winter temperatures in some areas of Alaska have risen by over 9° Fahrenheit since 1949.  Even using moderate projections of future greenhouse gas emissions levels, average winter temperatures are projected to rise by 18° Fahrenheit over the Arctic Ocean by the end of this century.

60.    As a result of the warming, Arctic sea ice is melting very rapidly.  In 2007 the Arctic sea ice hit a new record minimum, fully one million square miles below the average minimum sea ice extent between 1979 and 2000.  There was less ice in the Arctic in September, 2007 than more than half of the world's leading climate models project for 2050.  Some scientists now say summer sea ice could disappear entirely as early as 2012.

61.    Polar bears cannot survive the loss of their sea-ice habitat.  As early as 1972, scientists noted that the polar bear could be adversely impacted by warming via changes in the sea ice and snow cover.  Canadian researchers were the first to document changes in polar bear parameters such as declining body condition, lowered reproductive rates, and reduced cub survival in the Western Hudson Bay population throughout the late 1980's and early 1990's.  Over the next decade and beyond, polar bear experts Dr. Ian Stirling and Dr. Andrew Derocher and their colleagues have continued to document the relationships between climate, sea ice, and polar bear physiological and demographic parameters.  In 2004 these researchers concluded that "it is unlikely that polar bears will survive as a species if the sea ice disappears completely as has been predicted by some."  Even short of complete

disappearance of sea ice, these scientists predicted a cascade of impacts to polar bears from global warming that will affect virtually every aspect of the species' existence, in most cases leading to reduced body condition and consequently reduced reproduction or survival:

a.      The timing of ice formation and break-up will determine how long and how efficiently polar bears can hunt seals.  A reduction in the hunting season caused by delayed ice formation and earlier break-up will mean reduced fat stores, reduced body condition, and therefore reduced survival and reproduction.

b.      Reductions in sea ice will in some areas result in increased distances between the ice edge and land.  This will make it more difficult for female bears that den on land to reach their preferred denning areas.  Bears will face the energetic trade-off of either leaving the sea ice earlier when it is closer to land or traveling further to reach denning areas.  In either case, the result is reduced fat stores and likely reduced survival and reproduction.

c.      Reductions in sea-ice thickness and concentration will likely increase the energetic costs of traveling, as moving through fragmented sea ice and open water is more energy intensive than walking across consolidated sea ice.

d.      Reduced sea-ice extent will likely result in reductions in the availability of ice-dependent prey such as ringed seals, as prey numbers decrease or are concentrated on ice too far from land for polar bears to reach.

e.      Global warming will likely increase the rates of human/bear interactions, as greater portions of the Arctic become more accessible to people and as polar bears are forced to spend more time on land waiting for ice formation.  Increased human/bear interactions will almost certainly lead to increased polar bear mortality.

f.      The combined effects of these impacts of global warming on individual bears' reproduction and survival are likely to ultimately translate into impacts on polar bear populations.  Impacts will be most severe on female reproductive rates and juvenile survival.  In time, reduction in these key demographic factors will translate into population declines and extirpations

62.     Polar bears are already suffering from these and other impacts due to global warming.

The Western Hudson Bay polar bear population has declined by 22% — from 1,194 bears in 1987 to 935 bears in 2004. The researchers attribute this decline to "increased natural mortality associated with earlier sea ice breakup and to the continued harvest of approximately 40 polar bears per year, which at some point ceased to be sustainable" and found no support for alternative explanations. Scientists predict that the more northerly polar bear populations will experience declines similar to those observed in Western Hudson Bay.

63. The Southern Beaufort Sea population is also declining due to global warming. The population was estimated at 1,800 bears in 1986 and at 1,526 bears between 2001 and 2006. The Southern Beaufort Sea population has also experienced statistically significant declines in cub survival, cub skull size, and adult male weight and skull size, the same types of declines observed in Western Hudson Bay prior to the population decline.

64. Other impacts have been observed as well, including polar bears that have starved to death, and several instances of polar bear cannibalism, apparently motivated by food stress. Researchers with the U.S. Minerals Management Service observed the carcasses of four bears that had drowned in the Beaufort Sea during a period of high winds and rough seas in September 2004. Because these scientists were able to observe only a relatively small area during their aerial surveys, they estimate via spatial extrapolation that 27 bears may have died during this time period. These scientists predict that drownings could increase as the sea ice continues to retreat, and warn of "rather serious population-level implications."

65. Not surprisingly, given the serious impacts polar bears are already suffering, the future is bleak for this species. In September 2007, the U.S. Geological Service ("USGS") released a report conducted as part of the ESA listing process which addressed the future status of polar bears. The USGS divided the world's polar bears into four ecological regions based on sea-ice conditions as follows: (1) the seasonal ice ecoregion which includes Hudson Bay, and occurs mainly at the southern extreme of the polar bear range, (2) the archipelago ecoregion in the high Canadian Arctic, (3) the divergent ice ecoregion where ice is formed and then advected away from near-shore areas, and (4) the convergent ice ecoregion where sea ice formed elsewhere tends to collect against the shore. The USGS found that under a "business as usual" greenhouse gas emission scenario, polar bears will be extinct in

the seasonal ice and divergent ice ecoregions by 2050.  These areas support two-thirds of the world's polar bears, and all of the bears in Alaska.  The USGS found that polar bears may persist longer in the archipelago and convergent ice ecoregions, but the extinction risk is still extremely high: an over 75% chance of extinction in the convergent ice ecoregion and over 40% chance of extinction in the archipelago region.

66.    Perhaps most disturbingly, the dire projections of the USGS may be overly optimistic, because the climate model projections of future sea-ice conditions on which they are based all project a much slower melting trend than what is actually occurring.  The actual observed melting trend has exceeded that projected by any of the models.  None of the climate models projected the record low minimum sea-ice extent in 2007, and in fact there was less ice in the Arctic in 2007 than more than half of the models project for 2050.

67.    Polar bears are threatened by other factors as well, including high levels of organochloride pollution (such as PCBs), mercury, and other toxins in the Arctic that bioconcentrate and bioaccumulate in polar bear tissue.  Polar bears are threatened by the proliferation of oil and gas development in their habitat, which can disrupt denning, feeding, and other behaviors, and which also poses a risk of harmful oil spills.  Despite past successes in controlling formerly widespread overhunting, polar bears are hunted at unsustainable harvest levels in some areas of Canada and Greenland and illegal poaching continues to be a problem in Russia.  Polar bears will be exposed to increasing human activity, such as shipping, that occurs as a result of decreasing Arctic sea ice.  Many of these threats will interact with global warming in cumulative and synergistic ways, further heightening the threat to polar bears.

**B.  Procedural History**

68.    Plaintiffs' Petition to list the polar bear as a threatened species was submitted on February 16, 2005 and received by the Secretary on February 17, 2005.  The 154-page Petition detailed the ways in which global warming and other factors threaten the polar bear with extinction.

69.    Section 4(b)(3) of the ESA and its implementing regulations required the Secretary to respond to the Petition by making an initial determination within ninety days of receiving the petition "to the maximum extent practicable." 16 U.S.C § 1533 (b)(3)(A).

70.    The Secretary did not respond to the Petition within 90 days as required by law.  When the Secretary had still not responded after ten months, Plaintiffs filed an action on December 15, 2005 to compel a response.  Center for Biological Diversity v. Kempthorne, No. 05-5191 JSW (N. Dist. Cal.)

71.    Subsequently, the Secretary issued a 90-day finding on the Petition to list the polar bear on February 9, 2006.  71 Fed. Reg. 6745.  In the 90-day finding, the Secretary found that the Petition presented substantial information showing that listing of the polar bear may be warranted under the Endangered Species Act, initiated a status review for the species, and solicited public comment for a period of 60 days.  Id.

72.    Because the Secretary delayed the 90-day finding until nearly one year had passed from receipt of the Petition, the Secretary then failed to meet the one year deadline for issuance of the 12-month finding.  A consent decree was entered in Center for Biological Diversity I that required the Secretary to issue the required 12-month finding by December 27, 2006.

73.    On December 27, 2006, the Secretary announced a proposed rule to list the polar bear throughout its range as a threatened species.  The proposed rule was published in the Federal Register on January 9, 2007.  72 Fed. Reg. 1064-1099.  Publication of the final listing determination and critical habitat designation was therefore required by January 9, 2008.  16 U.S.C. § 1533(b)(6).  The final listing determination was not published in the Federal Register on January 9, 2008.  Plaintiffs filed this action on March, 10, 2008, to compel the issuance of a final rule, and moved for summary judgment on April 2, 2008.

74.    On April 28, 2008 this Court issued an order granting Plaintiffs' Motion for Summary Judgment, finding Defendants in violation of the ESA for failing to publish a final listing decision for the polar bear by January 9, 2008.  See April 28 Order at 5.  The Court directed Defendants to publish a final listing determination for the polar bear by May 15, 2008, and to make any final regulation effective upon publication pursuant to 5 U.S.C. § 553(d)(3).  Id. at 10.

75.    On May 15, 2008, the Secretary published the Final Listing Rule, listing the polar bear as a threatened species throughout its range.  73 Fed. Reg. at 28212.

76.    Having classified the polar bear as a threatened, rather than an endangered species, the Secretary then issued a regulation pursuant to Section 4(d) of ESA, which authorizes activities that

1    harm polar bears and would otherwise be prohibited by Section 9 of the ESA and its implementing

2    regulations. 73 Fed. Reg. 28306-28318; 40 C.F.R. § 17.40(q).

3        77.    While stating that issuing the 4(d) Rule is "necessary and advisable to provide for the

4    conservation of the polar bear," 73 Fed. Reg. 28315 (emphasis added), in reality the 4(d) Rule reduces

5    the protections the polar bear would otherwise receive.

6        78.    Under the ESA "conservation" is defined as follows:

7        The terms "conserve", "conserving", and "conservation" mean to use and the use of all
         methods and procedures which are necessary to bring any endangered species or
8        threatened species to the point at which the measures provided pursuant to this chapter
         are no longer necessary. Such methods and procedures include, but are not limited to, all
9        activities associated with scientific resources management such as research, census, law
         enforcement, habitat acquisition and maintenance, propagation, live trapping, and
10       transplantation, and, in the extraordinary case where population pressures within a given
         ecosystem cannot be otherwise relieved, may include regulated taking.
11

12   16 U.S.C. § 1532(3).

13       79.    The 4(d) rule does not provide for the conservation of the polar bear.

14       80.    For example, the 4(d) Rule exempts any activity harming, harassing or killing a polar

15   bear from the take prohibitions of the ESA so long as the activity is permitted under the Marine

16   Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 et seq.

17       81.    Moreover, the 4(d) Rule contains a blanket exemption, allowing the unrestricted

18   incidental take of polar bears from all activities outside of Alaska:  73 Fed. Reg. 28318; 50 C.F.R. §

19   17.40(q)(4) ("None of the prohibitions in § 17.31 of this part apply to any taking of polar bears that is

20   incidental to, but not the purpose of, carrying out an otherwise lawful activity within any area subject to

21   the jurisdiction of the United States except Alaska.").

22       82.    Additionally, in a section of the 4(d) Rule entitled "Consultation under Section 7 of the

23   ESA," the Secretary alleges that federal agencies approving major sources of greenhouse gas emissions

24   need not consider the impact of those emissions on the polar bear, nor take steps to reduce them.  73

25   Fed. Reg. 28312-28313.

26       83.    In short, the 4(d) Rule adds no additional protections for the polar bear, but only

27   exempts most or all of the protections otherwise provided by Section 9 and 50 C.F.R. § 17.31 for the

28   species.

84.    The 4(d) Rule issued by the Secretary was finalized and made effective as an "interim final rule" without any advance public notice of, or an opportunity to comment on the rule.  The Secretary found that allowing public comment prior to the rule taking effect  would be "contrary to the public interest" because "immediate implementation of the interim special rule has the advantage of providing a conservation benefit to polar bears that is unavailable under the general threatened species provisions in section 17.31 and 17.32."

85.    The 4(d) Rule was also published without any of the environmental analysis and public participation opportunities required by NEPA.

86.    The polar bear will not receive the full protections of the ESA it needs and is legally entitled to until the 4(d) Rule is vacated.

## VI.  CLAIMS FOR RELIEF

### First Claim for Claim

### (Failure to Make a Final Listing Determination for the Polar Bear)

### [Violation of the ESA]

87.    Plaintiffs reallege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

88.    The Secretary's failure to timely make a final listing determination for the polar bear is a violation of the ESA and its implementing regulations.  16 U.S.C. §§ 1533(b)(6 & 1540(g).  The Secretary's failure to perform his mandatory, non-discretionary duty also constitutes agency action "unlawfully withheld or unreasonably delayed" within the meaning of the APA, 5 U.S.C. § 706(1).  Additionally, and/or alternatively, the Secretary's failure to comply with this provision is arbitrary and capricious, an abuse of discretion, not in accordance with law, and a failure to observe proper procedure under the APA, 5 U.S.C. § 706(2).

### Second Claim for Relief

### (Failure to Provide for Notice of and Comment on the 4(d) Rule)

### [Violations of the APA]

89.    Plaintiffs reallege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

90.     The 4(d) Rule constitutes a "rule" within the meaning of §§ 551 and 553 of the APA.

91.     The Secretary's rule making, which resulted in the promulgation of the 4(d) Rule, was conducted without any publication of a general notice of proposed rule making in the Federal Register and without any opportunity for interested persons to participate in the rule making process, as required by § 553 (b) and (c) of the APA.

92.     The Secretary's determination that advanced publication of a proposed 4(d) Rule and providing the public with an opportunity to participate in the 4(d) Rule rulemaking process was either impracticable, unnecessary, or contrary to the public interest was arbitrary, capricious, and not in accordance with law, as required by § 706(2) of the APA, and is subject to judicial review thereunder. 5 U.S.C. §§ 701 through 706.

### Third Claim for Relief

### (Failure to Prepare an Environmental Impact Statement or Environmental Assessment in

### Violation of NEPA and its Implementing Regulations

### [Violations of NEPA and APA]

93.     Plaintiffs reallege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

94.     The Secretary's promulgation of the 4(d) Rule authorizing take of polar bears is a major federal action significantly affecting the quality of the human environment.

95.     The Secretary's failure to prepare an EA or an EIS for the promulgation of the 4(d) Rule authorizing take of polar bears is a violation of NEPA, 42 U.S.C. § 4321 et seq.

96.     The Secretary's failure to prepare an EA or an EIS for the promulgation of the 4(d) Rule authorizing take of polar bears as required by NEPA is arbitrary, capricious, and not in accordance with law as required by Section 706(2) of the APA, and is subject to judicial review thereunder.  5 U.S.C. §§ 701 through 706.

97.     The Secretary's failure to prepare an EA or an EIS for the promulgation of the 4(d) Rule authorizing take of polar bears as required by NEPA constitutes agency action that is unreasonably delayed and/or unlawfully withheld as provided by § 706(1) of the APA, and is subject to judicial review thereunder.  5 U.S.C. §§ 701 through 706.

## VII.    PRAYER FOR RELIEF

For the reasons stated above, Plaintiffs respectfully requests that the Court grant the following relief:

1.    Consistent with the Court's April 28 Order, declare that the Secretary's failure to publish a final listing determination for the polar bear by January 9, 2008 violated the ESA;

2.    Declare that the Secretary's promulgation of the 4(d) Rule authorizing take of polar bears without providing general notice of, or an opportunity for interested persons to participate in the 4(d) Rule rulemaking process violated the procedural requirements of the APA and is unlawful;

3.    Declare that the Secretary's failure to prepare an Environmental Assessment or Environmental Impact Statement analyzing the potential environmental impacts of, and alternative to, the 4(d) Rule violated NEPA and is unlawful;

4.    Vacate the 4(d) Rule and remand it to the Secretary until such time as the Secretary has conducted review in compliance with NEPA and has complied with the procedural requirements of the APA;

5.    Award Plaintiffs their costs of litigation, including reasonable attorneys fees under the citizen suit provision of the ESA and/or the Equal Access to Justice Act; and

6.    Grant Plaintiffs such other relief as the Court deems just and proper.


DATE: May 16, 2008                          Respectfully Submitted,

                                            By:   /s/ Kassia Siegel
                                            _____
                                            Brendan Cummings (CA Bar No. 193952)
                                            Kassia Siegel (CA Bar No. 209497)
                                            Center for Biological Diversity
                                            P.O. Box 549
                                            Joshua Tree, CA 92252
                                            Phone:   (760) 366-2232; Facsimile: (760) 366-2669
                                            Email:   bcummings@biologicaldiversity.org
                                                      ksiegel@biologicaldiversity.org

                                            Miyoko Sakashita (CA Bar No. 239639)
                                            Center for Biological Diversity

1

2

3

1095 Market St., Suite 511
San Francisco, CA 94103
Phone:  (415) 436-9682; Facsimile: (415) 436-9683
Email:  miyoko@biologicaldiversity.org

4

5

6

7

Andrew E. Wetzler (CA Bar No. 202299)
Natural Resources Defense Council
544 White Oak Place
Worthington, OH 43085
Phone:  (614) 840-0891; Facsimile (415) 875-6161
Email:  awetzler@nrdc.org

8

Attorney for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28