1  RONALD J. TENPAS
   Assistant Attorney General
2  United States Department of Justice
   Environment & Natural Resources Division
3  JEAN E. WILLIAMS, Chief
   LISA LYNNE RUSSELL, Assistant Chief
4  KRISTEN BYRNES FLOOM, Trial Attorney (DC Bar No. 469615)
   United States Department of Justice
5  Environment & Natural Resources Division
   Wildlife and Marine Resources Section
6  Benjamin Franklin Station, P.O. Box 7369
   Washington, DC 20044-7369
7  Telephone: (202) 305-0340
   Facsimile: (202) 305-0275
8  Kristen.Floom@usdoj.gov

9  Attorneys for Defendants

10

11                  UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
12                      OAKLAND DIVISION

13 CENTER FOR BIOLOGICAL            )  Case No. C-08-1339 (CW)
   DIVERSITY, et al.,               )
14                                  )
           Plaintiffs,              )
15                                  )
      vs.                           )
16                                  )
   DIRK KEMPTHORNE, United States   )
17 Secretary of the Interior, and UNITED )
   STATES FISH AND WILDLIFE         )
18 SERVICE,                         )
                                    )
19         Defendants.              )
   _____)

20         DEFENDANTS' SECOND SUPPLEMENTAL BRIEF ON
21           IMPORTATION OF POLAR BEAR TROPHIES

22         At the June 17, 2008 initial case management conference in the captioned case, the Court

23 directed Defendants to file additional briefing on the issue of whether provision may be made for

24 the import of trophies from polar bears sport-hunted in Canada.  Specifically, the Court inquired

25 as to whether Defendants have discretion to grant a waiver under the Marine Mammal Protection

26
27 Act ("MMPA") to permit the import of such trophies and, alternatively, what would be the effect

28

of a Court order requiring Defendants to allow importation of the trophies.  The Court further

inquired as to whether Defendants are aware of any other means by which they could allow the

importation of sport-hunted trophies from Canada.

## I.    THE COURT LACKS JURISDICTION TO REACH THE ISSUE OF IMPORTATION OF POLAR BEAR TROPHIES IN THIS CASE.

As previously argued, Defendants believe that the Court has no jurisdiction in this suit –

a challenge under the Endangered Species Act ("ESA") to Defendants' failure to make a final

listing determination for the polar bear and to the agency's issuance of a rule under ESA Section

4(d) – to order Defendants to issue permits under the MMPA to allow importation of polar bear

trophies sport-hunted in Canada.  As explained in Defendants' Supplemental Brief on

Importation of Polar Bear Trophies, Dkt. No. 81 (May 27, 2008) ("First Trophy Brief"), the

Court lacks jurisdiction to reach the issue of trophy importation in this case.  See id. at 2-4.  This

case is governed by the citizen suit provision of the ESA, which limits the permissible relief to

an order requiring the Secretary of the Interior ("Secretary") to perform a nondiscretionary act

under the ESA.  See id. Trophy Brief at 2-3.  See also 16 U.S.C. § 1540(g).  The Court's

jurisdiction under the ESA does not extend to permits for the importation of polar bear trophies,

which are governed by a completely different statute that is not at issue in this case.

Further, the MMPA provides the sole remedy for challenging the denial or issuance of a

permit for importation of polar bear trophies sport-hunted in Canada.  See 16 U.S.C. §

1374(d)(6).  Under the MMPA, notice of all permits issued or denied must be published in the

Federal Register within 10 days of the issuance or denial.  Id. at § 1374(d)(5).  Any applicant or

any party opposed to the issuance or denial may then seek judicial review of the determination

within 60 days of the date on which the permit was issued or denied.  Id. at § 1374(d)(6)

(specifying that challenge must be filed in "the United States district court for the district

wherein the applicant for a permit resides, or has his principal place of business, or in the United States District Court for the District of Columbia"). Thus, the MMPA provides the sole jurisdictional basis for a court to review a determination by the U.S. Fish and Wildlife Service ("Service") to deny an application under 16 U.S.C. § 1374(c)(5) for import of a sport-hunted polar bear trophy from Canada. If the Service denies the applications submitted by members of Conservation Force ("Intervenor"), Intervenor may seek judicial review of the denial pursuant to the MMPA.

## II.    DEFENDANTS LACK DISCRETION TO GRANT A WAIVER PERMITTING IMPORT OF THE TROPHIES AT ISSUE IN THIS CASE.

As Defendants explained in their First Trophy Brief, the MMPA's restrictions on the importation of depleted species preclude the importation of sport-hunted polar bear trophies from Canada and prohibit the Service from issuing any permit to allow such importation. See Dkt. No. 81 at 4-6. See also Memorandum from Solicitor, U.S. Department of the Interior to Director, U.S. Fish and Wildlife Service (May 23, 2008) (attached hereto as Exhibit 1).[1/]

---

[1/] In its June 5, 2008 reply brief, Intervenor argues that section 1371(a)(3)(B) of the MMPA does not preclude such importations because the restriction on depleted species "that 'no importation may be made of any such mammal' clearly relates back to a mammal that was considered 'depleted' when taken. . ." and the polar bear trophies at issue were taken before the species gained depleted status. See Reply of Intervenor Conservation Force In Support Of Its Motion To Extend The Effective Date Of The Polar Bear Listing For The Limited Purpose Of Importing Trophies (Dkt. No. 93) at 3 (emphasis in original). Intervenor's interpretation is incorrect. The restriction under section 1371(a)(3)(B) preventing importation of any depleted mammal is independent of the restriction on issuing permits for the take of depleted species. 16 U.S.C. § 1371(a)(3)(B) ("no permit may be issued for the taking of any marine mammal which has been designated by the Secretary as depleted, and no importation may be made of any such mammal") (emphasis added). Not every importation involves authorization of the taking. If the restriction only qualified the limitation on issuing take permits, the absolute restriction on the importation of depleted marine mammals would not be given full force and effect. If Congress had wanted to limit the scope of the moratorium language to the issuance of permits for the importation of depleted marine mammals, it could have easily replicated the language it used for the taking of such mammals. Instead, it chose explicitly to ban all importation that falls outside the narrow exceptions set out in Section 1371(a)(3)(B).

In addition, the only logical reading of this Section is that it prohibits importation of any specimen

Although the MMPA provides a waiver process, the Secretary lacks discretion to grant a waiver

to allow the import of sport-hunted trophies from polar bears that were killed and for which an

import permit application had already been filed prior to the publication of the final listing rule

for the polar bear, for the reasons set forth below.[2]

The MMPA includes a provision permitting the Secretary to waive the requirements of

16 U.S.C. § 1371 to allow the importation of any marine mammal product if the Secretary finds

that "the taking of such marine mammal is in accord with sound principles of resource protection

and conservation" set forth in the MMPA.  16 U.S.C. § 1371(a)(3)(A).  Any waiver of the

moratorium must be consistent with the policies and purposes of the statute.  See 16 U.S.C. §

1371(a)(3)(A) ("The Secretary . . . is authorized . . . to determine when, to what extent, if at all, .

of a depleted species, not just specimens that were depleted at the time of taking.  If the restriction only
qualified the limitation on issuing take permits it would be superfluous because importation, by definition,
cannot occur until after the animal has been taken.  If the species were depleted at the time of taking, the
Service could not grant a permit to take the animal in the first instance and thus clearly could not authorize
the importation.  In other words, if there is no take in the first place (because the provision prohibits the
Service from authorizing it), there will be no importation into the United States to further prohibit.  This
interpretation is consistent with the strict protective measures for depleted species adopted by Congress in
Section 1371(a)(3)(B).  Once a species is listed as an endangered or threatened species under the ESA, or
the Secretary by separate rule-making has found that the species is below its optimum sustainable
population level, authorizations for activities such as take and importation are no longer available except
for extremely limited purposes such as scientific research or enhancement of the survival or recovery of the
species.  See id. at §§ 1371(a)(3)(B), 1372(b)(3).

[2]The Court's May 13, 2008 Order, Dkt. No. 69, referred to trophies for which a permit application
had been filed as of April 28, 2008, the date of the Court's order granting summary judgment in
this case.  However, Defendants' view is that the relevant date is May 15, 2008, when the final
rule listing the polar bear as threatened was published in the Federal Register with an immediate
effective date, pursuant to the Court's order.  See 73 Fed. Reg. 28,212 (May 15, 2008).  It was on
May 15, 2008 that the polar bear became a depleted species under the MMPA, precluding import
of sport-hunted trophies.  See id. at 28,242 ("[U]nder the MMPA, the polar bear will be
considered a 'depleted' species on the effective date of this listing.  As a depleted species, imports
could only be authorized under the MMPA if the import enhanced the survival of the species or
was for scientific research.  Therefore, authorization for the import of sport-hunted trophies
would no longer be available under section 104(c)(5) of the MMPA.").

. . it is compatible with this Act to waive the requirements of this section. . . .").  However, the

MMPA expressly limits the Secretary's discretion to grant a waiver where the marine mammal

at issue is depleted.  16 U.S.C. § 1371(a)(3)(B).  In the case of a depleted species, the Secretary

may not allow importation "[e]xcept for scientific research purposes, photography for

educational or commercial purposes, or enhancing the survival or recovery of [the] species or

stock. . . ."  Id.  The polar bear became a depleted species as of May 15, 2008, when the final

listing rule was issued with an immediate effective date.  See 16 U.S.C. § 1362(1) (any species

listed as threatened or endangered under the ESA is depleted for purposes of the MMPA).

The restrictions for depleted species under Section 1371(a)(3)(B) serve as a specific

limitation on the general waiver authority under Section 1371(a)(3)(A), as well as a limitation to

the exceptions to the moratorium that can be authorized under Section 1371(a).  The Secretary

has the authority to waive the moratorium by regulation, but only "in accordance with sections

1372, 1373, 1374, and 1381 of [the MMPA] permitting and governing such taking and

importing, in accordance with such determinations."  Id. at § 1371(a)(3)(A).  Nothing in the

waiver provision overrides the restrictions elsewhere in the Act, including the prohibitions under

Section 1372 or the restrictions under Section 1371(a)(3)(B).  As noted by the original drafters,

"[s]hould a decision to make an exception to allow taking or importation pursuant to the Federal

Act be made by the Secretary, then the sections of the Act on prohibitions, regulations, and

permits will apply."  S. Rep. 92-863 at 7 (June 15, 1972).  An example of waiver of the

moratorium "might be permission for the importation of a marine mammal product not

specifically prohibited in section 102."  Id. (emphasis added).  Thus, the plain language of the

MMPA and the legislative history indicate that any waiver must be consistent with the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

prohibitions under section 1372, the restrictions of Section 1371(a)(3)(B), the permitting

requirements of section 1374, and the formal rulemaking requirements under section 1373.

Under Section 1373, "[r]egulations prescribed to carry out this section with respect to

any species or stock of marine mammals must be made on the record after opportunity for an

agency hearing on both the Secretary's determination to waive the moratorium pursuant to

section 1371(a)(3)(A) of this title and on such regulations. . . ." 16 U.S.C. § 1373(d). For any

regulations issued under section 1373 of the MMPA, the Secretary must ensure that the activity

"will not be to the disadvantage of those species and population stocks and will be consistent

with the purposes and policies set forth in section 1361 of this title." Id. at § 1373(a).

Section 1361 clearly indicates that the fundamental purpose of the MMPA is to maintain

species at optimum sustainable population ("OSP")[3] or, if they are currently below OSP – such

as a species listed as endangered or threatened under the ESA – to ensure that management

decisions will operate to return the species to OSP. Id. at § 1361(2) (species and stocks "should

not be permitted to diminish below their optimum sustainable population" and "[f]urther

measures should be immediately taken to replenish any species or population stock which has

already diminished below that population"). See also H.R. Rep. No. 97-228, at 16, reprinted in

1981 U.S.S.C.A.N. 1458, 1466 ("species that are listed under the [ESA] are, a fortiori, not at

their optimum sustainable population and, therefore, should be considered depleted").

Congress further stated that "it should be the goal to obtain an optimum sustainable population

---

[3] OSP is defined as "the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." 16 U.S.C. § 1362(9).

1    keeping in mind the carrying capacity of the habitat." Id. at § 1361(6).[4]  It is therefore consistent

2    with Congress' purpose for the Act that it would not allow waiver of the moratorium for a

3    depleted species.  This limitation on waiver of the moratorium is confirmed by Section

4    1373(d)(2).  Under this provision, the Secretary must publish and make available to the public "a

5    statement of the expected impact of the proposed regulations on the [OSP] of such species or

6    population stock."  Id. at § 1373(d)(2).  This confirms Congress' intent that waiver of the

7    moratorium is not available for a depleted species.

8

9    **III.    THE LEGAL EFFECT OF A COURT ORDER REQUIRING DEFENDANTS TO**
     **ALLOW THE IMPORTATION OF SPORT-HUNTED POLAR BEAR**
10   **TROPHIES.**

11        The Court indicated that it may choose to order Defendants to allow the importation of

12   sport-hunted polar bear trophies.  As stated above, Defendants believe that such an order would

13   exceed the Court's jurisdiction in this case.  Further, even if the Court had jurisdiction to reach

14   this issue, it would be improper for the Court to order Defendants to issue import permits.

15   Rather, the Court should allow the Service to consider the permit applications submitted to the

16   agency and exercise its discretion to grant or deny the applications.  See INS v. Ventura, 537

17   U.S. 12, 16 (2002) ("Generally speaking, a court . . . should remand a case to an agency for

18   decision of a matter that statutes place primarily in agency hands.").  Any applicant who is

19

20

21

22

23

24   _____

     [4]  This purpose was reiterated by the district court in Committee for Humane Legislation, Inc. v.
25   Richardson, 414 F. Supp. 297 (D.D.C. 1976), aff'd 540 F.2d 1141 (D.C. Cir. 1976), which held that the
     National Marine Fisheries Service ("NMFS") violated the MMPA when it issued regulations for the taking
26   of porpoises under Section 1373.  See id. at 311-312.  Construing the phrases "will not be to the
     disadvantage" of the species and "is otherwise consistent with the purposes and policies of the MMPA" the
27   court found that the statute requires an agency to determine that any activity authorized under Section 1373
     is consistent with the statutory goal of achieving OSP for the species.  Id. at 309-310.
28

1   denied a permit may then properly seek judicial review of the Service's decision under Section

2   1374(d) of the MMPA.

3       If the Court ordered the agency to waive the moratorium and issue regulations allowing

4

5   importation under Sections 1371(a)(3)(A) and 1373, those regulations would be subject to the

6   potential legal infirmities explained above.  Such regulations could also be exposed to liability

7   under the Administrative Procedure Act ("APA").  Further, the MMPA requires that such

8   regulations be issued in consultation with the Marine Mammal Commission ("MMC"),  a

9

10  separate federal agency not within the Department of the Interior.  See 16 U.S.C. § 1373(a).  The

11  MMC may contend that the moratorium cannot be waived for a depleted species, and oppose the

12  waiver.

13      If the Court ordered the agency to issue importation permits under Section 1374(c)(5),

14

15  those permits would be subject to attack because, as explained in Defendants' First Trophy

16  Brief, any importation of a depleted species is limited to scientific research, photography for

17  educational or commercial purposes, or enhancement of the survival or recovery of the species

18  (the provision that allows for incidental take does not apply to this situation, which only involves

19

20  importation).  See First Trophy Brief at 4-6.  Section 1374(d)(2) requires the Secretary to publish

21  a notice in the Federal Register of permit applications under Section 1374 and provide an

22  opportunity for public comment. To the extent the Court ordered the Service to issue a permit

23  under Section 1374(c)(5) without such process, the issuance of the permit could be challenged

24  under the procedural requirements of the MMPA (as well as the substantive standards as

25

26  explained above).  When a permit is issued under Section 1374, a notice is published in the

27  Federal Register, see 16 U.S.C. § 1374(d)(5), so issuance of any permit would be public

28

knowledge.  Thus, Defendants would face potential challenges by third parties.  As noted above, the MMPA authorizes suits by "any party opposed to" a permit issued by the Secretary.  See id. at § 1373(d)(6).  Thus, any interested party could bring a lawsuit challenging the permits on the grounds that they were unlawful for the reasons set forth above.

If the Court were to order persons who have submitted applications to import sport-hunted polar bears from Canada to apply for a waiver of the moratorium, the agency may have to deny those applications.  Under the MMPA implementing regulations, any applicant for a waiver of the moratorium "must demonstrate that any . . . importation of any marine mammal under such proposed regulations and waiver would be consistent with the act."  50 C.F.R. § 18.73.  For the reasons set forth above, Defendants lack discretion to grant a waiver for a depleted species, and thus the applicants are likely unable to make such a showing.

## CONCLUSION

For the foregoing reasons, and those stated in Defendants' First Trophy Brief, the Court lacks jurisdiction to order Defendants to issue permits under the MMPA to allow importation of polar bear trophies sport-hunted in Canada.  Further, the Secretary lacks discretion to grant a waiver under the MMPA to allow the import of such trophies.  If the Court were to order Defendants to issue importation permits under Section 1374 of the MMPA, those permits would be subject to challenge for the reasons explained above.

Respectfully submitted this 24th day of June, 2008.

RONALD J. TENPAS
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
JEAN E. WILLIAMS, Chief
LISA LYNNE RUSSELL, Assistant Chief

/s/ Kristen Byrnes Floom
KRISTEN BYRNES FLOOM, Trial Attorney
DC Bar No. 469615
United States Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
Benjamin Franklin Station, P.O. Box 7369
Washington, DC 20044-7369
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Kristen.Floom@usdoj.gov

Attorneys for Defendants

1

## CERTIFICATE OF SERVICE

2

3      I hereby certify that a copy of Defendants' Second Supplemental Brief on Importation of
Polar Bear Trophies was submitted to the Court electronically on this 24th day of June, 2008 for
4      filing and service on the following parties:

5      Kassia Siegel
ksiegel@biologicaldiversity.org
6

7      Brendan Cummings
bcummings@biologicaldiversity.org
8

9      Miyoko Sakashita
miyoko@biologicaldiversity.org

10

11     Attorneys for Plaintiffs

12     I further certify that, on this 24th day of June, 2008, a copy of Defendants' Second
13     Supplemental Brief on Importation of Polar Bear Trophies was sent via first-class mail, postage
prepaid, to:

14

15     Andrew E. Wetzler
Natural Resources Defense Council
16     544 White Oak Place
Worthington, OH 43085
17

18     Attorney for Plaintiffs

19

20                                            /s/ Kristen Byrnes Floom
Kristen Byrnes Floom
21

22

23

24

25

26

27

28

**EXHIBIT ONE**



# United States Department of the Interior

## OFFICE OF THE SOLICITOR

MAY 2 3 2008

M-37015

Memorandum

To:        Director, U.S. Fish and Wildlife Service

From:      Solicitor

Subject:   Legal Implications Affecting the Importation of Sport-hunted Polar Bears from
           Canada Resulting from the Listing of the Polar Bear as a Threatened Species
           under the Endangered Species Act

## I.    INTRODUCTION

Since 1994, the Marine Mammal Protection Act (MMPA) has authorized the Secretary of the
Interior (Secretary) to issue permits that allow importation into the United States of polar bear
parts taken in sport hunts in Canada, provided that specific requirements are met. Marine
Mammal Protection Act of 1972 § 104(c)(5), 16 U.S.C. § 1374(c)(5) (2000). The Secretary has
delegated this permitting authority to the Director of the U.S. Fish and Wildlife Service (Service
or FWS). *See* 242 DM 1.

On January 9, 2007, the Service issued a proposed rule to list the polar bear as a threatened
species throughout its range, including Canada and the United States, under the Endangered
Species Act (ESA). Twelve-Month Petition Finding and Proposed Rule To List the Polar Bear
(*Ursus maritimus*) as Threatened Throughout Its Range, 72 Fed. Reg. 1064 (Jan. 9, 2007). On
May 14, 2008, the Secretary announced his decision to accept the recommendation to list the
polar bear as a threatened species under the ESA. On May 15, 2008, the Service published the
final rule listing the polar bear as threatened throughout its range. Determination of Threatened
Status for the Polar Bear (*Ursus maritimus*) Throughout Its Range, 73 Fed. Reg. 28212 (May 15,
2008) (to be codified at 50 C.F.R. § 17.11(h)).

You have requested my opinion on how listing the polar bear as a threatened species under the
ESA affects the Service's ability to authorize importation of sport-hunted polar bears from
Canada under the MMPA.

II.    ANALYSIS

    A.    Authorizing Importation Under the MMPA of Sport-hunted Polar Bears Taken in
          Canada

In 1994, Congress amended the MMPA to authorize the Service to issue permits for the
importation of polar bear parts (other than internal organs) taken in sport hunts in Canada by
applicants who can show that they legally harvested the bear from an approved population.
MMPA § 104(c)(5)(A).  The Service must find that (1) Canada has a monitored and enforced
sport-hunting program consistent with the purposes of the Agreement on the Conservation of
Polar Bears, Nov. 15, 1973, 27 U.S.T. 3918, 13 I.L.M. 13; (2) Canada has a sport-hunting
program based on scientifically sound quotas that ensure the maintenance of the affected polar
bear stock[1] at a sustainable level; (3) the export from Canada and import into the United States
are consistent with the Convention on International Trade in Endangered Species of Wild Fauna
and Flora (CITES) and other international agreements; and (4) the export from Canada and
import into the United States are not likely to contribute to illegal trade in bear parts.  *Id.* §
104(c)(5)(A)(i) - (iv).  The statute also calls for charging a fee for these permits, with the
collected funds to be used for cooperative research and management programs for the
conservation of polar bears in Alaska and Russia.  *Id.* § 104(c)(5)(B).

In February 1997, the Service published regulations detailing its implementation of the new
MMPA provision.  *See* 50 C.F.R. § 18.30 (2007).  The Service found that Canada's polar bears
comprise 12 populations; six of these populations are currently approved as having monitored
and enforced sport-hunting programs that meet the requirements of the MMPA.[2]  Consistent with
the statutory fee provision, the Service imposed a $1,000 conservation fee for each importation,
in addition to the standard permit processing fee, to be used for polar bear cooperative research
and management programs.  *Id.* § 18.30(g)(2).

---

[1] "Stock" or "population stock" is defined in the MMPA to mean "a group of marine mammals of the same
species or smaller taxa in a common spatial arrangement that interbreed when mature."  MMPA § 3(11).

[2] Approved populations as of May 2008 include the Southern Beaufort Sea, Northern Beaufort Sea,
Viscount Melville Sound, Western Hudson Bay, Lancaster Sound, and Norwegian Bay.  50 C.F.R. § 18.30(i)(1).
Bears that were lawfully taken on or before May 31, 2000, from the M'Clintock Channel population may also be
imported.  *Id.*

2

B.    Depleted Species Under the MMPA

1.    Definition of "Depleted"

The MMPA applies to species that qualify as "marine mammals," and the statutory definition of "marine mammal" specifically references polar bears. *See* MMPA § 3(6). Thus, the MMPA's standard provisions, including prohibitions, authorizations, and use by Alaska Natives, currently have applied to the polar bear since 1972. But the MMPA also provides the more protective status of "depleted" for marine mammal species or stocks that meet certain criteria. A species or stock is "depleted" if (1) the Service, in consultation with the Marine Mammal Commission, determines that the species or stock is below its optimum sustainable population;[3] (2) a State to which management authority for the species has been transferred determines that a species or stock is below its optimum sustainable population;[4] or (3) the species or stock is listed as an endangered species or threatened species under the ESA. *Id.* § 3(1). Therefore, with its listing as a threatened species under the ESA, the polar bear automatically obtained "depleted" status under the MMPA by operation of law. Once a marine mammal species or stock has depleted status, certain additional provisions apply, two of which are relevant to authorizing the importation of sport-hunted polar bears from Canada.

2.    Section 101(a)(3)(B) of the MMPA

Section 101(a) of the MMPA established a moratorium on the taking and importation into the United States of marine mammals and marine mammal products unless one of the specified exceptions applies. These exceptions include, among other things, the issuance of permits for taking or importation for scientific research, public display, or enhancement of the survival or recovery of the species or stock; incidental take in the course of commercial fishing or other activities; and take to deter a marine mammal from damaging personal property or endangering personal safety. *See id.* § 101(a)(1), (2), (4), (5). The specified exceptions also include the issuance of permits under section 104 to authorize the importation of sport-hunted polar bear trophies from Canada, as described above. *See id.* § 101(a)(1). However, section 101(a)(3)(B) narrows the purposes for which permits and authorizations may be issued under the moratorium for depleted species. Section 101(a)(3)(B) provides:

> *Except for scientific research purposes, photography for educational or commercial purposes, or enhancing the survival or recovery of a species or stock as provided for in paragraph (1) of this subsection, or as provided for under paragraph (5) of this subsection,* during the moratorium no permit may be issued for the taking of any marine mammal *which has been designated by the Secretary*

---

[3] The Service has not made a finding that the polar bear is below its optimum sustainable population.

[4] No State has management authority for an FWS marine mammal species under section 109 of the MMPA.

*as depleted*, and *no importation may be made of any such mammal*[5] (emphasis added).

While section 101(a) provides that the Service may authorize importation for a variety of purposes for nondepleted marine mammals, the purposes for which importation can be authorized for marine mammals from depleted species or stocks is more limited. It is noteworthy that polar bear parts taken during sport hunts in Canada are not included in the list of purposes for which importation permits can be issued for marine mammals from depleted species or stocks under section 101(a)(3)(B).

> 3.    Section 102(b) of the MMPA

Separate from the moratorium on taking and importation established under section 101(a), section 102 of the MMPA lists prohibited acts, as well as certain exceptions to the prohibitions. For example, subject to certain exceptions, it is unlawful under section 102 for any person subject to the jurisdiction of the United States to take any marine mammal on the high seas or in waters or on lands under the jurisdiction of the United States or for any person to use any port, harbor, or other place under the jurisdiction of the United States to take or import marine mammals or marine mammal products. *See id.* §§ 102(a)(1), (2). Section 102 is substantially aligned with the exceptions provided under the moratorium. The section begins by expressly exempting the authorizations available under sections 101 (the moratorium) and 104 (permitting provisions), among others, from the prohibitions. *See id.* § 102(a).

Section 102 also contains additional restrictions for certain specified activities, including an additional restriction on importation if the marine mammal is from a species or stock that has been designated as depleted. Section 102(b) provides:

> *Except pursuant to a permit for scientific research, or for enhancing the survival or recovery of a species or stock . . .* , it is unlawful to import into the United States any marine mammal if such mammal was –
>
> (1)    pregnant at the time of taking;
>
> (2)    nursing at the time of taking, or less than eight months old, whichever occurs later;
>
> (3)    *taken from a species or population stock which the Secretary has, by regulation published in the Federal Register, designated as a*

---

[5] "Marine mammal" is defined to include any live animal but also includes any part of a marine mammal, including "its raw, dressed, or dyed fur or skin." *See id.* § 3(6).

4

> *depleted species or stock*; or

> (4)  taken in a manner deemed inhumane by the Secretary.

> Notwithstanding the provisions of paragraphs (1) and (2), the Secretary may issue
> a permit for the importation of a marine mammal, if the Secretary determines that
> such importation is necessary for the protection or welfare of the animal
> (emphasis added).

While importation can be authorized in general under the MMPA for a variety of purposes,
section 102(b) restricts importation to scientific research or enhancement of the survival or
recovery of the species or stock if the marine mammal originates from a species or stock that has
depleted status.  Importation of polar bear parts taken during sport hunts in Canada is not
included in the list of exceptions to section 102(b).

> 4.  Application of sections 101(a)(3)(B) and 102(b) to the importation of
> sport-hunted polar bear trophies if polar bears acquire depleted status

> a.  Statutory scheme

A plain-language reading of both section 101(a)(3)(B) and section 102(b) demonstrates that
Congress did not intend to allow the importation of sport-hunted polar bear trophies from Canada
if polar bears acquired depleted status.  While the section 101(a) moratorium and the section 102
prohibitions differ somewhat in the acts to which they apply, both broadly restrict specific,
identified acts that negatively affect marine mammals: take and importation under the
moratorium; take, importation of certain categories of marine mammals; and transport, purchase,
sale, and possession of marine mammals taken in violation of the statute under section 102.  Both
sections then provide specific exceptions to the restrictions and allow otherwise prohibited acts
to be authorized only if the proposed activity qualifies as one of the listed, approved purposes.
Thus, section 101(a)(1) provides that permits may be issued under section 104 for certain specific
purposes, including "for importation of polar bear parts . . . taken in sport hunts in Canada."
While section 102 does not specifically list the importation of polar bear parts taken during sport
hunts in Canada, it references the exceptions provided under sections 101 and 104 of the MMPA,
which allow the Service to issue permits for the importation of sport-hunted polar bear trophies
from Canada.  *See id.* § 102(a).

After establishing the moratorium and prohibitions and providing exceptions, both sections then
place additional restrictions on the allowable uses of depleted marine mammals.  Section
101(a)(3)(B) limits the issuance of permits for, and the importation of, depleted species under the
moratorium to scientific research, photography for educational or commercial purposes,
enhancement of the survival or recovery of a species or stock, or take incidental to conducting
another activity.  Section 102(b) prohibits importation into the United States of any marine
mammal taken from a species or stock with depleted status unless the importation is for scientific

5

research or enhancement of the survival or recovery of a species or stock. In its approach to marine mammal conservation, Congress chose to construct a statute that consists of specific, enumerated prohibited acts, and then lists specific, enumerated exceptions under which certain types of activities are exempt or can be authorized, with specific additional restrictions for depleted species. Of the listed purposes for which importation can be authorized for depleted species under section 101(a) or section 102, neither section 101(a)(3)(B) nor section 102(b) includes polar bear parts taken during a sport hunt in Canada.

> b.    Depleted status determination and ESA listing

Theoretically someone might argue, however, that neither section 101(a)(3)(B) nor section 102(b)(3) apply to polar bears because they obtained their depleted status through the ESA listing process. As described in section 1 above, a species or stock acquires depleted status if it is listed as an endangered species or threatened species under the ESA. *See id.* § 3(1)(C). But a species or stock can also acquire depleted status if the Service or a State to which management authority for the species has been transferred determines that it is below its optimum sustainable population level. *See id.* § 3(1)(A), (B). Since 1988, section 115 of the MMPA has laid out the process for making depletion findings, whether at the agency's initiative or by public petition, which includes rule-making through notice in the *Federal Register* and an opportunity for public comment. *Id.* § 115(a).

Section 101(a)(3)(B) applies to species that have "been designated by the Secretary as depleted" and section 102(b) applies to species "which the Secretary has, by regulation published in the Federal Register, designated as a depleted species." It could be argued, therefore, that these limitations apply only to species that have obtained their depleted status under the process described in sections 3(1)(A) and 115(a) of the MMPA – those determined by the Service through rule-making to be below their optimum sustainable population level – and not to species that are depleted due to their listing as threatened or endangered species under the ESA. Section 102(b) in particular refers to species "which *the Secretary has, by regulation published in the Federal Register*, designated as a depleted species or stock." *Id.* § 102(b)(3) (emphasis added).

However, we have historically interpreted sections 101(a)(3)(B) and 102(b) as applying to all depleted species, regardless of how they received their depleted status. The Service has a number of marine mammal species that it manages as "depleted" species or stocks under the MMPA (manatees, southern sea otters, the southwest Alaska distinct population segment of northern sea otters), all of which obtained their depleted status through their listing under the ESA.[6] The Service has consistently applied the provisions in the MMPA for depleted species, including other provisions in sections 102 and 104, to all depleted species without regard to how the

---

[6] The Service has never designated a species as depleted other than through an ESA listing action, although it has received at least one petition to do so in the 36-year history of the MMPA. That petition, to designate the Alaska stock of sea otters as depleted, was denied, and the Service ultimately listed one stock of northern sea otters in Alaska as threatened under the ESA.

species obtained its depleted status. This interpretation is reflected in the agency's regulations, which provide that, except for certain indicated purposes, it is unlawful to import into the United States any endangered or threatened marine mammal or any specimen taken from a depleted stock. *See* 50 C.F.R. § 18.12(c).[7] Thus, this regulatory provision, which interprets the section 102(b) prohibition, includes both species that acquired their depleted status through the ESA listing process and acquired their depleted status through the separate designation process.

Our interpretation is supported by the plain language of the MMPA. The ESA directs the Secretary of the Interior to determine whether any species qualifies as an endangered species or a threatened species under the statute. *See* Endangered Species Act of 1973 § 4(a)(1), 16 U.S.C. § 1533(a)(1) (2000). The ESA also requires that determinations of endangered and threatened status be through proposed and final rule-makings published in the *Federal Register. See id.* §§ 4(b)(5), (6). Marine mammals that are listed as endangered species or threatened species under the ESA therefore meet the requirements of having received their depleted designation by the Secretary and by regulation published in the *Federal Register,* as called for in sections 101(a)(3)(B) and 102(b) of the MMPA.

Our long-standing interpretation is also consistent with the legislative history of the MMPA. In 1971, the House of Representatives passed H.R. 10420 as the first step in what became the MMPA. The House bill introduced the concept of "depleted" status and defined depletion to mean "any case in which the number of individuals . . . has declined to a significant degree over a period of years and, if that decline were to continue, would result in that species or population stock being threatened with extinction." H.R. REP. NO. 92-707, at 2. The House emphasized that its concept of "depleted" was intended to be broader than that of "endangered" under the Endangered Species Conservation Act of 1969. *Id.* at 22, *reprinted in* 1972 U.S.C.C.A.N. 4144. The House bill also included a prohibition nearly identical to the current section 102(b) prohibition. The primary difference was that the House prohibition specifically included not only marine mammals taken from a species or stock designated as depleted but also those "endangered." *Id.* at 3. The House Report emphasized that this prohibition would make it illegal to import certain marine mammals, including those "taken from a species or stock which has been *designated by the appropriate Secretary as depleted or endangered.*" *Id.* at 23 (emphasis added).

In 1972, the Senate passed its marine mammal conservation bill, S. 2871, which contained both a moratorium and a set of prohibitions. The Senate bill also adopted the concept of "depletion" and defined the term in a manner similar to that in the House bill, but also included any case where

---

[7] Section 18.12(c) lists exceptions provided under subpart C of part 18, section 18.31, and section 18.32. The regulations governing importation of polar bear trophies taken during sport hunts in Canada are found at subpart D of part 18, and therefore are not included in the list of allowable exceptions.

7

the number of animals "is at such a level that . . . such species or stock is threatened with extinction." Marine Mammal Protection Act of 1972, S. 2871, 92d Cong. § 3(1) (1972). The Senate bill then went on to include language in the moratorium similar to that currently found in section 101(a)(3)(B), but explicitly included both endangered and depleted species: "Except for scientific purposes . . . during the moratorium no permit may be issued for the taking of any marine mammal which is classified as belonging *to an endangered species* pursuant to the Endangered Species Conservation Act of 1969 [citation omitted] *or has been designated by the Secretary as depleted,* and no importation may be made of any such mammal." *Id.* § 101(a)(3)(B) (emphasis added). The Senate Report emphasized that during the moratorium, except for research purposes, permits should not be issued for "any marine mammal classified as an endangered species or as depleted." S. REP. NO. 92-863, at 14.

The Senate bill also included prohibition language similar to that now found at section 102(b) and nearly identical to that found in the House bill, except the House bill prohibited importation of any species or stock "which the Secretary has, by regulation published in the Federal Register, designated as a depleted or endangered species or stock" while the Senate bill applied to a species or stock "which the Secretary has, by regulation published in the Federal Register, designated as a depleted species or stock or which has been listed as an endangered species under the Endangered Species Conservation Act of 1969." *See* H.R. REP. NO. 92-707, at 3; S. 2871 § 102(b)(3). Thus, both bills specifically included both endangered species and depleted species in their prohibition language. The Senate Report explained that the prohibition on importation would include animals "taken from a species or stock which has been *designated by the Secretary as depleted or from a species which is listed as endangered.*" S. REP. NO. 92-863, at 15 (emphasis added). Ultimately a committee of conference reconciled the two bills, adopting provisions consistent with the intent of both bills. *See* Pub. L. No. 92-522, 86 Stat. 1027.

In 1981, Congress amended the definition of "depleted" to its current form and amended sections 101(a)(3)(B) and 102(b) to strike the references to endangered or threatened species. *See* Pub. L. No. 97-58, 95 Stat. 979. The Committee Report provided no explanation for the amendments to sections 101(a)(3)(B) or 102(b). But they noted regarding the amendment to the definition of "depleted" that "species that are listed under the [ESA] are, a fortiori, not at their optimum sustainable population and, therefore, should be considered depleted." H.R. REP. NO. 97-228, at 16, *reprinted in* 1981 U.S.C.C.A.N. 1458, 1466. Therefore, although it is not clear why the specific references to endangered species were deleted from sections 101(a)(3)(B) and 102(b) in 1981, the legislative history shows that the House and the Senate have consistently intended for the limiting language in both provisions to apply to species or stocks that acquire their depleted status both through the agency designation process and through listing as an endangered or threatened species under the ESA.

Therefore, I conclude that the plain language and the legislative history of the MMPA demonstrate that Congress did not intend to allow the continued importation of sport-hunted polar bear trophies from Canada under section 104(c)(5) regardless of whether polar bears acquired depleted status through a section 115 determination or listing as a threatened species

8

under the ESA.[8]

      C.    Authorizing Importation of Polar Bear Parts From Canada Under Other Provisions of the MMPA

Although I conclude that the limiting language of sections 101(a)(3)(B) and 102(b) means that threatened polar bear trophies sport hunted in Canada cannot be imported into the United States under section 104(c)(5), polar bear parts may continue to be imported under one of the exceptions listed in sections 101(a)(3)(B) and 102(b), provided that all legal standards are met. Both sections specify that their restrictions for depleted species do not apply to permits for scientific research or for enhancement of the survival or recovery of the species or stock.[9] MMPA §§ 101(a)(3)(B), 102(b). Nothing in the legislative history indicates that Congress' addition of section 104(c)(5) in 1994 was intended to be the exclusive means of authorizing the importation of polar bear parts from Canada that also qualify under a different provision.

Thus, polar bears and polar bear parts from Canada may continue to be imported into the United States regardless of depleted status if the stringent requirements for research or enhancement are met.[10] A permit to authorize importation for scientific research may be issued if the "taking is required to further a bona fide scientific purpose." *Id.* § 104(c)(3)(A); *see also id.* § 3(22) (definition of "bona fide research"), 50 C.F.R. § 18.31 (regulations for issuance of scientific research permits, including issuance criteria). Permits for enhancing the survival or recovery of a species or stock may be issued, after consultation with the Marine Mammal Commission and

---

[8] Nothing in this opinion affects the importation of sport-hunted polar bear trophies under section 104(c)(5)(D) of the MMPA. That paragraph provides a grandfather clause for issuance of permits for polar bears that were legally harvested in Canada prior to February 18, 1997. It specifically states that "The Secretary shall issue such permits without regard to . . . sections [101] and [102] of this title." *See* MMPA § 104(c)(5)(D). The sections referenced in the sentence contain the additional restrictions on importation of depleted species: sections 101(a)(3)(B) and 102(b). Therefore Congress' direction to issue such permits "without regard to" these restrictions provides a narrow exception to the general restrictions on importation of depleted species and allows the Service to issue permits and allow the importation of sport-hunted trophies from polar bears that were hunted prior to February 18, 1997, provided that all other requirements are met.

[9] Importation of marine mammals for purposes of public display may also be authorized by the Service under section 104(c)(2) of the MMPA. However, because public display is not listed as one of the allowable purposes under either section 101(a)(3)(B) or section 102(b), these provisions also preclude the importation of polar bears for public display now that the species is listed as threatened under the ESA.

[10] Polar bears are also listed under Appendix II of CITES, and therefore all CITES requirements would also have to continue to be met prior to importation of polar bears or polar bear parts into the United States. Prior to export from Canada, the Canadian government must issue a CITES export permit finding that the polar bear was not obtained in contravention of any Canadian law for the protection of fauna and flora and that the export would not be detrimental to the survival of the species. *See* Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, art. IV(2), 27 U.S.T. 1087, 993 U.S.T.S. 243. Although no CITES import permit would be issued by the Service, a valid Canadian CITES export permit must be presented upon import. *Id.* art. IV(4).

after notice and opportunity for public comment, if the Service has determined that the taking or importation (1) "is likely to contribute significantly to maintaining or increasing distribution or numbers necessary to ensure the survival or recovery of the species or stock" and (2) is consistent with any conservation plan or recovery plan. MMPA § 104(c)(4)(A). If no conservation plan or recovery plan exists, the activity must be consistent with the Service's evaluation of "actions required to enhance the survival or recovery of the species or stock in light of the factors that would be addressed in a conservation plan or recovery plan."[11]  *Id.*  Whether the importation of polar bear parts from Canada would meet the statutory and regulatory criteria for either scientific research or enhancement of the survival or recovery of the species or stock could be specifically addressed based on facts provided by the Service.[12]

>    D.    Relationship Between the MMPA and Section 4(d) of the ESA

You have further asked about the relationship between section 4(d) of the ESA and authorizing the importation of sport-hunted polar bear trophies from Canada under the MMPA.  For threatened species, section 4(d) of the ESA allows the Service to craft species-specific prohibitions and authorizations that the Service determines are "necessary and advisable to provide for the conservation of [the] species."

But a section 4(d) rule does not affect existing legal requirements or restrictions under the MMPA, including the additional restrictions for depleted species discussed above.  An applicant seeking authorization to import a sport-hunted polar bear from Canada must comply with the requirements of both statutes.[13]  Even if there were a conflict between the ESA and the MMPA, the ESA specifically provides that "except as otherwise provided in this Act, no provision of [the ESA] shall take precedence over any more restrictive conflicting provision of the [MMPA]."

---

[11] The statute provides the sole standards for MMPA enhancement permits.  The Service has no regulations on the issuance of permits for enhancing the survival or recovery of a species or stock.

[12] While no party has challenged the adequacy of an agency's enhancement findings under the MMPA, there has been one case under the ESA where plaintiffs argued that issuing import permits for sport-hunted argali sheep (a threatened species found in central Asia) under an enhancement finding violated sections 2, 4, and 10 of the Act.  *See Fund for Animals v. Norton*, 295 F. Supp. 2d 1 (D.D.C. 2003).  This case was dismissed for lack of standing.  *Id.*  The plaintiffs in *Fund for Animals* relied on decisions by other courts finding that authorizing the lethal take of a threatened species within the United States is limited by the definition of "conservation" in the ESA.  *See* ESA § 3(3); *see also Sierra Club v. Clark*, 577 F. Supp. 783 (D. Minn. 1984), *aff'd* 755 F.2d 608 (8th Cir. 1985), *Fund for Animals v. Turner*, No. 91-2201, 1991 WL 206232 (D.D.C. 1991).

[13] Section 9(c)(2) of the ESA currently provides an exemption from standard ESA importation requirements for threatened species that are listed under Appendix II of CITES, provided that certain criteria are met.  The taking and export of the specimen must not be contrary to CITES, and all applicable provisions of CITES must be met; all reporting and other import requirements under the section 9 of the ESA must be met; and the importation must not be made in the course of a commercial activity.  Because the polar bear is listed in Appendix II of CITES, and is listed as threatened under the ESA, the section 9(c)(2) exemption would apply.  Nonetheless, all applicable requirements under the MMPA must still be met.

ESA § 17. Therefore, an ESA 4(d) rule plays no role in determining whether importation of sport-hunted polar bear trophies from Canada can be authorized under the MMPA and does not modify any of the requirements of the MMPA.

III.    CONCLUSION

I conclude that Congress did not intend to allow the importation of sport-hunted polar bear trophies from Canada under section 104(c)(5) of the MMPA if polar bears were listed as a threatened species or endangered species under the ESA. The Service may authorize the importation of polar bear parts from Canada under an MMPA scientific research permit or a permit for the enhancement of the survival or recovery of the species or stock if the importation meets all statutory and regulatory requirements.[14]

This opinion was prepared with the assistance of Holly Wheeler of the Branch of Fish and Wildlife, Division of Parks and Wildlife.

David Longly Bernhardt

---

[14] Nothing in the Executive Order on Facilitation of Hunting Heritage and Wildlife Conservation affects this conclusion. *See* Exec. Order No. 13443, 72 Fed. Reg. 46,537 (Aug. 20, 2007). This Executive Order addresses hunting opportunities on United States' public lands and calls for cooperation with State and tribal governments and other stakeholders. This legal opinion is limited to considering authorizing the importation of polar bears whose harvest and habitat management is regulated solely under Canadian law.

11