RONALD J. TENPAS, Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
JEAN E. WILLIAMS, Chief
LISA L. RUSSELL, Assistant Chief
KRISTEN BYRNES FLOOM, Trial Attorney
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, DC 20044-7369
Telephone: (202) 305-0340
Facsimile: (202) 305-0275

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DIRK KEMPTHORNE, Secretary of the Interior, and the U.S. FISH AND WILDLIFE SERVICE, <br><br> Defendants <br><br> and <br><br> ALASKA OIL AND GAS ASSOCIATION, <br><br> Defendant-Intervenors <br><br> and <br><br> ARCTIC SLOPE REGIONAL CORP., <br><br> Defendant-Intervenors. | Civ. No. 08-1339 CW <br><br> **FEDERAL DEFENDANTS' MOTION TO TRANSFER AND MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Date: October 9, 2008 <br> Time: 2:00 p.m. <br> Judge: Hon. Claudia Wilken |

Fed. Defs' Mot. to Transfer
Case No. 08-1339 CW

**NOTICE OF MOTION**

PLEASE TAKE NOTICE THAT, on October 9, 2008, at 2:00 p.m., before the Honorable Claudia Wilken, United States District Judge, 1301 Clay Street, Oakland, California, in Courtroom 2 on the 4th Floor, Federal Defendants Dirk Kempthorne, Secretary of the Interior, and the U.S. Fish and Wildlife Service, by and through their undersigned attorneys, will move this Court to transfer this case to the U.S. District Court for the District of Columbia. For the reasons set forth in the accompanying Memorandum of Points and Authorities, the interests of justice will be best served by transferring this case to the District of Columbia because there are two recently filed actions in that district challenging the same agency actions at issue in this case. The District of Columbia cases may not be transferred to the Northern District of California because venue would not be proper in this District. Thus, to avoid duplicative litigation and the potential for inconsistent judgments, Federal Defendants respectfully request that the Court transfer this case to the District of Columbia pursuant to 28 U.S.C. § 1404.

Plaintiffs have indicated that they will oppose this motion. Defendant-Intervenor Alaska Oil and Gas Association has indicated that it will not oppose this motion. Defendant-Intervenor Arctic Slope Regional Corporation has indicated that it will take no position on this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ 1

**BACKGROUND** ................................................................................................. 1

**I.    STATUTORY BACKGROUND** ............................................................. 1

    A.    The Endangered Species Act ................................................ 1

    B.    The National Environmental Policy Act .............................. 4

    C.    The Administrative Procedure Act ....................................... 5

    D.    The Marine Mammal Protection Act ................................... 7

**II.   FACTUAL BACKGROUND** ..................................................................... 8

**ARGUMENT** ....................................................................................................... 11

    A.    This Action Could Have Been Brought in the

        District of Columbia ............................................................ 12

    B.    The Balance Of The Section 1404(a) Factors Weigh Strongly In

        Favor Of Transferring This Case to the District Of Columbia ........... 14

**CONCLUSION** ................................................................................................... 19

### TABLE OF AUTHORITIES

CASES                                                                          PAGE

Carolina Cas. Co. v. Data Broad. Corp., 158 F. Supp. 2d 1044 (N.D. Cal. 2001) .................... 18

Center for Biological Diversity v. Kempthorne, Case No. 07-0894 EDL, 2007 WL 2023515 (N.D. Cal. July 12, 2007) ................................................................................................................. 13

Continental Grain Co. v. Barge FBL-585, 364 U.S. 19 (1960) ................................. 11

Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834 (9th Cir. 1986) ........................ 11

Flowers Industries v. FTC, 835 F.2d 775 (11th Cir. 1987) ........................................ 14

FTC v. Cephalon, Inc., 551 F. Supp. 2d. 21 (D.D.C. 2008) ......................................... 15

Guthy-Renker Fitness, LLC v. Icon Health & Fitness, Inc., 179 F.R.D. 264 (C.D. Cal. 1998) ................................................................................................................. 16

Hernandez v. Union Pac. RR. Co., No. 04-04899 JW, 2005 WL 396614 (N.D. Cal. Feb. 18, 2005) ....15

In re Medrad, Inc., 215 F.3d 1341 (Fed. Cir. 1999) ................................................... 15

Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180 (1952) .............................. 11

Kleppe v. Sierra Club, 427 U.S. 390 (1976) ............................................................... 4

Mamani v. Bustamante, 547 F. Supp. 2d 465 (D. Md. 2008) .......................................... 15

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) ......................................... 4

McCrary v. Gutierrez, No. 06-cv-0086, 2006 WL 1748410 (E.D. Cal. June 23, 2006) ........... 18

Pacific Car and Foundry Co. v. Pence, 403 F.2d 949 (9th Cir.1968) ........................................ 18

Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981) ..................................................... 11

Reuben H. Donnelley Corp. v. Federal Trade Comm'n, 580 F.2d 264 (7th Cir. 1978) ....................................................................................... 12 , 16 , 17

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989) ......................................... 5

Saleh v. Titan Corp., 361 F. Supp. 2d 1152 (S.D. Cal. 2005) .................................................. 17

<u>Salmon River Concerned Citizens v. Robertson</u>, 32 F.3d 1346 (9th Cir. 1994) ........................ 5

<u>Securities Investor Protection Corp. v. Vigman</u>, 764 F.2d 1309 (9th Cir. 1985) ...................... 11

<u>Sierra Club v. Flowers</u>, 276 F. Supp. 2d 62 (D.D.C. 2003) .......................................... 18

<u>Stewart Org. v. Ricoh Corp.</u>, 487 U.S. 22 (1988) ................................................ 12

<u>Trout Unlimited v. Lohn</u>, No. 06-CV-904, 2006 WL 2927737
(W.D. Wash. Oct. 10, 2006) ........................................................................ 18

<u>Trout Unlimited v. U.S. Dep't of Agriculture</u>, 944 F. Supp. 13 (D.D.C. 1996) ........................ 18

<u>Van Dusen v. Barrack</u>, 376 U.S. 612 (1964) ...................................................... 12

<u>Vermont Yankee Nuclear Power Corp. v. NRDC</u>, 435 U.S. 519 (1978) .................................... 5

<u>Wilderness Soc'y v. Babbitt</u>, 104 F. Supp. 2d 10 (D.D.C. 2000) .................................... 13

<u>Williams v. United States</u>, Case No. 01-0024 EDL, 2001 WL 1352885
(N.D. Cal. Oct. 23, 2001) ...................................................................... 13, 16


<u>STATUTES</u>                                                                              <u>PAGE</u>

5 U.S.C. § 551 .................................................................................... 1
5 U.S.C. § 551(4) ............................................................................... 5 , 6
5 U.S.C. § 702 .................................................................................... 6


16 U.S.C. § 1361 ................................................................................. 1
16 U.S.C. § 1362 ................................................................................. 7
16 U.S.C. § 1362(12)(A) ...................................................................... 6, 7
16 U.S.C. § 1371(a)(4)(A) .................................................................... 7 -10
16 U.S.C. § 1531 ................................................................................. 1
16 U.S.C. § 1531(b) .............................................................................. 1
16 U.S.C. § 1532(5)(A) .......................................................................... 4
16 U.S.C. § 1532(6) .............................................................................. 2
16 U.S.C. § 1532(15) ............................................................................. 2
16 U.S.C. § 1533(a)(1) ........................................................................... 2
16 U.S.C. § 1533(a)(3) ........................................................................... 3
16 U.S.C. § 1533(b) .............................................................................. 2
16 U.S.C. § 1533(b)(1)(A) ........................................................................ 2

16 U.S.C. § 1533(b)(3)(A) ........................................................................ 3
16 U.S.C. § 1533(b)(3)(B) ........................................................................ 3
16 U.S.C. § 1533(b)(6)(A) ........................................................................ 3
16 U.S.C. § 1536 ........................................................................................ 1

28 U.S.C. 1391(e)(1) .................................................................................. 12
28 U.S.C. § 1391(e) .......................................................................... 12 , 16 , 17
28 U.S.C. § 1404 .......................................................................................
28 U.S.C. § 1404(a) ............................................................ 11 , 12 , 16 , 17 , 19

42 U.S.C. § 4321 ...................................................................................... 1
42 U.S.C. § 4332(C) ................................................................................ 4

## REGULATIONS                                                            PAGE

40 C.F.R. § 1500.1 .................................................................................... 4
40 C.F.R. § 1501.4 .................................................................................... 4
40 C.F.R. § 1508.13 .................................................................................. 5
40 C.F.R. § 1508.9(a)(1) ..................................................................... 4 , 5

50 C.F.R. § 17.31 ...................................................................................... 10

# I.  INTRODUCTION

Plaintiffs in this case challenge the U.S. Fish and Wildlife Service's ("Service") final rule listing the polar bear as a threatened species throughout its range.  See 73 Fed. Reg. 28,212 (May 15, 2008) ("Final Rule").  Plaintiffs allege that the Final Rule violates the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq., the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., the National Environmental Policy Act, 42 U.S.C. § 4321, et seq. ("NEPA"), and the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361 et seq.  As discussed below, the interests of justice will be best served by transferring this case to the District of Columbia because: (1) there are two recently filed actions in the District of Columbia challenging the Final Rule, and those cases may not be transferred to the Northern District of California because venue would not be proper in this District; and (2) the Northern District of California has no meaningful ties to this case.

## BACKGROUND

## I.    STATUTORY BACKGROUND

### A.    The Endangered Species Act

The ESA was enacted in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . ." 16 U.S.C. § 1531(b).  Once a species is listed as endangered or threatened, statutory prohibitions help ensure the survival and recovery of the species.  See, e.g., 16 U.S.C. § 1536 (federal agencies' duty to avoid jeopardizing listed species); § 1538 (prohibitions against take of listed species).  An endangered species is "in danger of extinction throughout all or a significant portion of its range" while a

threatened species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(6), (20).

The ESA delegates authority to determine whether to list a species as endangered or threatened to the Secretaries of Commerce and Interior.[1/]  Pursuant to Section 4(a)(1) of the ESA, the Secretary must determine whether a species is threatened or endangered due to one or more of five factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1).  The Secretary must make his decision whether to list a species

> solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

16 U.S.C. § 1533(b)(1)(A).

The Secretary may make this determination on his own initiative through the "candidate process" or in response to a petition from an interested person.  See 16 U.S.C. § 1533(a)(1), (b)(3)(A).  A petition to list or delist triggers a series of statutory deadlines for making findings as to whether the species warrants listing.  16 U.S.C. § 1533(b).  Within 90 days after receiving a

---

[1/]    Depending on the species in question, the "Secretary" referred to in the language of the Act may be the Secretary of the Interior or the Secretary of Commerce. 16 U.S.C. § 1532(15). The Secretary of the Interior has jurisdiction over the polar bear. The Service is the agency within the Department of the Interior with delegated responsibility for administering the ESA with respect to those species within Interior's jurisdiction.

petition to list or delist a species, the Secretary is required, "to the maximum extent practicable," to make a finding as to whether the petition presents substantial scientific or commercial information indicating that the listing may be warranted ("90-day finding"). 16 U.S.C. § 1533(b)(3)(A). The Secretary is required to publish this finding in the <u>Federal</u> <u>Register</u>. <u>Id.</u>  If the Secretary finds that substantial information indicates that listing or delisting may be warranted, he then has one year from the receipt of the petition to undertake a status review to determine if a listing or delisting action is warranted ("12-month finding"). 16 U.S.C. § 1533(b)(3)(B).  If the Secretary determines that the listing or delisting is warranted, he must publish a notice in the <u>Federal</u> <u>Register</u> that includes the complete text of a proposed rule to implement the action. 16 U.S.C. § 1533(b)(3)(B)(ii).  The Secretary must act on a proposed rule within one year of the date of its publication. 16 U.S.C. § 1533(b)(6)(A).  At that point, he may promulgate a final rule, withdraw the proposed rule if he finds that there is not sufficient evidence to justify the proposed rule, or extend the one-year period for consideration by not more than six months if he finds that there is "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned . . . ." 16 U.S.C. § 1533(b)(6)(B)(I).

The ESA also requires the Service to designate critical habitat concurrently with a determination that a species is threatened or endangered, to the maximum extent prudent and determinable. 16 U.S.C. § 1533(a)(3). Critical habitat is statutorily defined as:

> (I) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

### B.    The National Environmental Policy Act

Under settled authority, if an agency determines that its proposed action will significantly affect "the quality of the human environment," NEPA generally requires the agency to prepare an environmental impact statement ("EIS").  However, where the proposed action does not significantly affect the environment, NEPA does not require an EIS. 42 U.S.C. § 4332(C); see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 372, 375-376, 377 n. 23, 378 (1989) (EIS required if proposed action "would be environmentally 'significant'") (emphasis added); Kleppe v. Sierra Club, 427 U.S. 390, 394 (1976).

The Council on Environmental Quality ("CEQ") has issued regulations governing agency compliance with NEPA.  40 C.F.R. § 1500.1.  The CEQ regulations provide that agencies may prepare an environmental assessment ("EA") to determine whether a proposed action would precipitate a significant impact on the environment necessitating an EIS.  40 C.F.R. § 1501.4.  These regulations define an EA as "a concise public document . . . that serves to [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1) (emphasis added).  Under this standard, an agency need not prepare an EIS if, on the basis of "sufficient evidence" and related analysis, it concludes in an EA and corresponding finding of no significant impact

Fed. Defs' Mot. to Transfer
Case No. 08-1339 CW                - 4 -

("FONSI") that its proposed action would not significantly affect the environment.  Id.; 40 C.F.R. § 1508.13.

NEPA imposes only procedural requirements and does not dictate a substantive environmental result.  Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1355-56 (9th Cir. 1994).  The dominant purpose of the statute is to ensure that federal agencies consider the environmental consequences of their proposed actions in advance of a final decision. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-351 (1989); Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978).

**C.     The Administrative Procedure Act**

The APA sets forth the standards governing federal agencies in issuing proposed and final rules and regulations.  A "rule" is defined as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. . . ."  5 U.S.C. § 551(4).  Federal agencies must provide public notice of a proposed rule making through publication in the Federal Register and permit an opportunity for public comment on the proposal. See id. at § 553.  The publication must include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  Id. at § 553(b).  The agency must allow interested persons to submit "written data, views, or arguments" and must include in the final rule "a concise general statement of [its] basis and purpose."  Id. at § 553(c).  The provisions regarding public notice and comment on proposed rules do not apply "when the agency for good cause finds (and

Fed. Defs' Mot. to Transfer
Case No. 08-1339 CW          - 5 -

incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Id. at § 553(b)(B).

A substantive rule must be published not less than 30 days before its effective date, unless: (1) the substantive rule grants an exemption or relieves a restriction; (2) the rule is interpretive or a statement of policy; or (3) the agency finds that there is good cause to waive the 30-day effective date, and publishes the basis for that finding with the rule. Id. at § 553(d).

The APA provides a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute. . . ." 5 U.S.C. § 702. Review is limited to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court. . . ." Id. at § 704. The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . .," or "without observance of procedure required by law. . . ." Id. at § 706(2)(A), (D).

**D.    The Marine Mammal Protection Act**

Congress enacted the MMPA in 1972 to address concerns over the decline of marine mammal populations.  Like the ESA, administration of the MMPA is divided between the Department of the Interior and the Department of Commerce.  The Secretary of Commerce has jurisdiction over sea lions, whales, porpoises, and seals and the Secretary of the Interior has jurisdiction over all other marine mammals, including polar bears.  16 U.S.C. § 1362(12)(A).  The MMPA, among other things, establishes a general "moratorium" prohibiting the taking or

Fed. Defs' Mot. to Transfer
Case No. 08-1339 CW          - 6 -

importation of marine mammals or marine mammal products, unless a specified exception applies.  Id. § 1371(a); see also id. § 1362(8) (defining "moratorium"); id. § 1371(a)(1) - (a)(6) (describing exceptions); id. § 1373 (authorizing regulations on take and importation).  The term "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."  16 U.S.C. § 1362 (13).

One exception permits deterrence of marine mammals to protect private and public property or personal safety.  The take prohibitions do not apply to the use of deterrence measures by: (1) the owner of fishing gear to prevent damage to the gear; (2) the owner of private property to prevent damage to such property; (3) any person to prevent a marine mammal from endangering personal safety; or (4) a government employee to prevent damage to public property, provided that, in each instance, the measures do not result in the death or serious injury of a marine mammal.  16 U.S.C. § 1371(a)(4)(A).  The MMPA directs the Secretary to publish in the Federal Register a list of guidelines for use in safely deterring marine mammals, and provides that deterrence actions consistent with such guidelines shall not be a violation of the statute.  Id. at § 1371(a)(4)(B).

## II.    FACTUAL BACKGROUND

On May 15, 2008, the Service issued a final rule listing the polar bear as a threatened species throughout its range.  See 73 Fed. Reg. 28,212 (May 15, 2008) ("Final Rule").  The Final Rule examines in detail the threats to the polar bear and its habitat that led the Service to find that the species is likely to become endangered within the foreseeable future.  See id. at 28,253-28,293.  On the same day, the Service issued an interim final rule under ESA Section 4(d) providing measures for the conservation of the polar bear.  73 Fed. Reg. 28,306 (May 15, 2008)

Fed. Defs' Mot. to Transfer
Case No. 08-1339 CW                    - 7 -

1
2
3
4
5
6
7

("4(d) Rule"). The 4(d) Rule provides, <u>inter alia</u>, that if an activity is authorized or exempted under the MMPA and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), no additional authorization is required to conduct the activity. <u>Id.</u> The 4(d) Rule also sets forth the Service's determination that, for purposes of consultation under Section 7 of the ESA, there is currently no way to determine how greenhouse gas emissions from a specific Federal action may affect listed species, including the polar bear. <u>Id.</u> at 28,313.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

On May 16, 2008, Plaintiffs filed a First Amended Complaint for Declaratory Judgment and Injunctive Relief, Dkt. No. 76, adding claims challenging the Final Rule under the APA (failure to provide for notice and comment on the 4(d) Rule) and NEPA (failure to prepare an EIS or EA for the 4(d) Rule). In an accompanying notice, Plaintiffs indicated that they would seek to amend their complaint a second time to add claims under the ESA, after the running of the statutory 60-day notice period. Notice Re Filing of First Amended Complaint, Dkt. No. 75 (May 16, 2008), at 3. On July 16, 2008, Plaintiffs filed a Second Amended Complaint for Declaratory Judgment and Injunctive Relief, Dkt. No. 126 ("Sec. Am. Compl."), adding claims alleging that Federal Defendants violated the ESA by: (a) failing to classify the polar bear as endangered; (b) failing to designate critical habitat; (c) issuing a 4(d) Rule that fails to foster conservation of the polar bear; and (d) failing to promulgate a list of measures for nonlethal deterrence of polar bears pursuant to the MMPA. Sec. Am. Compl. at 33-38. Plaintiffs seek, <u>inter alia</u>, an order remanding the Final Rule to the Secretary (leaving the threatened listing in place pending promulgation of a new rule), and vacating and remanding the 4(d) rule to the Secretary. <u>Id.</u> at 39.

24
25
26
27
28

The Court has entered the following schedule in this matter:

September 15, 2008:   Federal Defendants file answer to Second Amended Complaint
September 29, 2008:   Federal Defendants file administrative record
October 30, 2008:     Plaintiffs file motion for summary judgment
November 26, 2008:    Federal Defendants file opposition and any cross-motion
December 4, 2008:     Defendant-Intervenors file oppositions and any cross-motions
December 11, 2008:    Plaintiffs file reply and opposition to any cross-motion
December 18, 2008:    Federal Defendants and Defendant-Intervenors file replies
January 8, 2009:      Hearing on cross-motions

See Order Granting in Part Motions for Leave to Intervene by Alaska Oil and Gas Association and Arctic Slope Regional Corporation, at 9 (Aug. 13, 2008) (Dkt. No. 139).

On August 4, 2008, the State of Alaska filed a lawsuit in the U.S. District Court for the District of Columbia challenging the Final Rule on other grounds. See State of Alaska v. Kempthorne et al., Case No. 08-1352 EGS (D.D.C.). The State of Alaska alleges that Federal Defendants violated the ESA by: (a) failing to base the listing determination on the best available science; (b) failing to give sufficient weight to efforts by Alaska and foreign nations to protect the polar bear; (c) failing to summarize the data on which the Final Rule is based and show the relationship between the data and the Final Rule; (d) failing to adequately consider whether the polar bear is likely to become endangered throughout all or a significant portion of its range; and (e) failing to adequately justify adopting regulations inconsistent with Alaska's recommendation. Complaint for Declaratory Judgment and Injunctive Relief, Case No. 08-1352 (D.D.C.), Dkt. No. 1, at 12-17 (attached hereto as Exhibit 1). Alaska further alleges that Federal Defendants violated the MMPA and/or APA by: (a) failing to provide notice of and an opportunity for public comment on the determination that the polar bear is a "depleted" species under the MMPA; (b) failure to respond to significant public comments on the polar bear listing; and (c) issuing a Final

1     Rule that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with

2     law.  Id. at 17-19.  Alaska seeks, inter alia, injunctive relief setting aside the May 15, 2008 Final

3     Rule and enjoining Federal Defendants from enforcing the threatened status determination for the

4     polar bear.  Id. at 20.

5             On August 27, 2008, several associations filed a separate action against Federal

6     Defendants in the District of Columbia challenging the 4(d) Rule.  See American Petroleum Inst.

7     v. Kempthorne, Case No. 08-1496 EGS (D.D.C.).  Plaintiffs in that case argue that paragraph

8     (q)(4) of the 4(d) Rule – providing that none of the prohibitions in 50 C.F.R. § 17.31 apply to

9

10    incidental takings of polar bears in any area subject to the jurisdiction of the United States, with

11    the exception of Alaska – is arbitrary and capricious because it subjects activities in Alaska to

12    more onerous regulations without a scientific basis.  See Complaint, Case No. 08-1496 (D.D.C.),

13

14    Dkt. No. 1, at 10-11 (attached hereto as Exhibit 2).  The plaintiffs ask the district court to uphold

15    the listing rule and the 4(d) Rule, with the exception of paragraph q(4).[2]

16

17

18

19

20

21

22    2/       A third action which relates to the Final Rule is pending in the District of Columbia.  In Safari
      Club Int'l v. Kempthorne, Case No. 08-881 EGS (D.D.C.), the plaintiffs seek to set aside the portion of
23    the Final Rule concluding that "'authorization for the import of sport-hunted trophies would no longer be
      available under section 104(c)(5) of the [Marine Mammal Protection Act ("MMPA")].'" Complaint for
24    Declaratory and Injunctive Relief, Case No. 08-881, Dkt. No. 1, at ¶ 1 (attached hereto as Exhibit 3),
      quoting 73 Fed. Reg. 28,242.  The claims in Safari Club relate only to that narrow aspect of the Final
25    Rule, and do not overlap with the claims in this action.  All three lawsuits in the District of Columbia
      have been assigned to the same judge.
26

27

28    Fed. Defs' Mot. to Transfer
      Case No. 08-1339 CW                           - 10 -

**ARGUMENT**

The Court has authority to transfer this case pursuant to 28 U.S.C. § 1404(a), which provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). "The idea behind § 1404(a) is that where a 'civil action' to vindicate a wrong – however brought in a court – presents issues . . . that make one District Court more convenient than another, the trial judge can, after findings, transfer the whole action to the more convenient court." Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 26 (1960). The statute identifies three factors for courts to consider in determining whether to transfer a case: (a) the convenience of parties; (b) the convenience of witnesses; and (c) the interests of justice. 28 U.S.C. § 1404(a). In addition, the Ninth Circuit has directed courts to consider the plaintiff's choice of forum. See Securities Investor Protection Corp. v. Vigman, 764 F.2d 1309, 1317 (9th Cir. 1985). Although the plaintiff's choice of forum "should rarely be disturbed," transfer is appropriate where the balance of the foregoing factors "is strongly in favor of the defendants." Id.

The decision whether to transfer under section 1404(a) is committed to the sound discretion of the district court and should be exercised in light of all the circumstances of a case. Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986); Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257 (1981); Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 184-85 (1952). Whether venue should be transferred in any given case depends on an "individualized, case-by-case consideration of convenience and fairness." Stewart Org. v. Ricoh

Corp., 487 U.S. 22, 29 (1988) (citation omitted).  The only prerequisite to the Court's exercise of discretion is the requirement that the new forum be a district or division where the case "might have been brought."  28 U.S.C. § 1404(a).

A.    **This Action Could Have Been Brought in the District of Columbia.**

The "threshold consideration" for a transfer under Section 1404(a) is whether the action "could have been brought" in the transferee district.  See, e.g., Van Dusen v. Barrack, 376 U.S. 612, 616-17 (1964).  Under Section 1391(e), which governs suits against the federal government, venue is proper in the judicial district where: "(1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action."  28 U.S.C. § 1391(e).

Here there is no question that the lawsuit could have been brought in the U.S. District Court for the District of Columbia.  The only two named defendants in the action – Dirk Kempthorne, Secretary of the Interior, and the Service – reside in Washington, D.C. for venue purposes.  For purposes of venue under 28 U.S.C. 1391(e)(1), the residence of a federal officer is the place where he or she performs his or her official duties.  See Reuben H. Donnelley Corp. v. Federal Trade Comm'n, 580 F.2d 264, 266, n.3 (7th Cir. 1978) ("The residence of a federal officer has always been determined by the place where he performs his official duties.").  Secretary Kempthorne performs his official duties in Washington, D.C., where the headquarters of the Department of the Interior is located.  Likewise, the headquarters of the Service is located in Washington D.C.  See Williams v. United States, Case No. 01-0024 EDL, 2001 WL 1352885, at *1 (N.D. Cal. Oct. 23, 2001) (Secretary of Interior and other federal officers and agencies

Fed. Defs' Mot. to Transfer
Case No. 08-1339 CW                    - 12 -

reside in Washington, D.C.); Center for Biological Diversity v. Kempthorne, Case No. 07-0894 EDL, 2007 WL 2023515, at *3 (N.D. Cal. July 12, 2007) (same).

Further, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Columbia. The Final Rule was signed by the Secretary of the Interior in Washington, D.C., see 73 Fed. Reg. 28,303, and the Secretary briefed the public on his decision in Washington, D.C. See May 14, 2008 Press Release, available at www.fws.gov/home/ feature 2008/polarbear012308/pdf/DOI_polar_bears_news_release.pdf. See also The Wilderness Soc'y v. Babbitt, 104 F. Supp. 2d 10, 14 (D.D.C. 2000) (court considered Secretary of the Interior's signing of decision and briefing the public in the District of Columbia significant ties to the forum for purposes of transfer inquiry). Accordingly, it is clear that this action could have been brought in the U.S. District Court for the District of Columbia.

**B.      The Balance Of The Section 1404(a) Factors Weigh Strongly In Favor Of Transferring This Case to the District Of Columbia.**

In this case the relevant factors – convenience of the parties and the interests of justice – weigh strongly in favor of transfer to the District of Columbia.[3] Plaintiffs allege that venue is proper in the Northern District of California because, inter alia, "at least one Plaintiff resides in this judicial district." Sec. Am. Compl. at ¶ 17.[4] However, litigating in Washington, D.C. would

---

[3]      Because this case will be decided on the basis of an administrative record, there will be no witnesses. Thus the second factor, the convenience of witnesses, is not relevant here.

[4]      Presumably Plaintiffs rely on the presence of Greenpeace, Inc. ("Greenpeace") in this District for venue purposes. Greenpeace maintains an office in San Francisco, California, see http://www. greenpeace.org/usa/about/ contact (visited August 26, 2008), and is incorporated in the State of California. See http://kepler.sos.ca.gov/corpdata/ShowAllList?QueryCorpNumber=C1598128 (visited August 26, 2008).

Neither of the other two Plaintiffs resides in the Northern District of California for venue

Fed. Defs' Mot. to Transfer
Case No. 08-1339 CW                      - 13 -

not be a hardship for Plaintiffs, as all three organizations maintain offices there.  See http://www.nrdc.org/about/ (NRDC); http://www.biological diversity.org/about/contact/index.html (CBD); http://www.greenpeace.org/usa/about/contact (Greenpeace).

Further, the interests of justice weigh heavily in favor of transfer to the District of Columbia in light of the recently filed lawsuits challenging the same Final Rule and 4(d) Rule at issue in this case.  The August 4, 2008 lawsuit filed by the State of Alaska challenges the same Final Rule that Plaintiffs challenge in this action, and will be based on the same administrative record.  The August 27, 2008 lawsuit filed by the American Petroleum Institute and other plaintiffs challenges the 4(d) Rule.  It is clear that there is a possibility of inconsistent judgments if the lawsuits proceed separately.

In this lawsuit, Plaintiffs seek remand of the Final Rule to the Secretary, with the threatened listing left in place pending promulgation of a new rule.  See Sec. Am. Compl. at 39.  By contrast, the State of Alaska seeks an order setting aside the Final Rule, and enjoining Federal Defendants from enforcing the threatened status determination for the polar bear.  See Exhibit 1

---

purposes.  According to the website for the Center for Biological Diversity ("CBD"), its "Main Office" is at an address in Tucson, Arizona, although it maintains a "Field Office" in San Francisco, California.  See http://www.biologicaldiversity.org/about/contact/index.html (visited August 26, 2008).  CBD is incorporated in the State of Arizona.  See http://starpas.azcc.gov/scripts/cgiip.exe/WService=wsbroker1/names-detail.p?name-id=F10373886&type=CORPORATION (visited August 26, 2008).  The Natural Resources Defense Council ("NRDC") is headquartered in New York, and also maintains a "Regional Office" in San Francisco.  See http://www.nrdc.org/about/ (visited August 26, 2008).  NRDC is incorporated in the State of New York.  See http://appsext8.dos.state.ny.us/corp_public/ CORPSEARCH.ENTITY_INFORMATION?p_nameid=341042&p_corpid=288527&p_entity_name=%6E%61%74%75%72%61%6C%20%72%65%73%6F%75%72%63%65%73%20%64%65%66%65%6E%73%65%20%63%6F%75%6E%63%69%6C&p_name_type=%41&p_search_type=%42%45%47%49%4E%53&p_srch_results_page=0 (visited August 26, 2008).  Thus, CBD and NRDC reside for venue purposes in Arizona and New York, respectively.  See Flowers Industries v. FTC, 835 F.2d 775, 777 (11th Cir. 1987) (residence of corporation for purposes of 28 U.S.C. § 1391(e) is its state of incorporation).

at 20.  Plaintiffs' own motion to intervene in the District of Columbia lawsuit demonstrates the presence of common issues in both lawsuits that could lead to duplicative litigation and inconsistent judgments.  See Case No. 08-1352 (D.D.C.), Dkt. No. 6 (Aug. 15, 2008) (attached hereto as Exhibit 4):

> For example, [Alaska] challenges the scientific data on which the Secretary based his final listing decision, alleging that it does not warrant listing the polar bear under the ESA. . . .  If [Alaska] succeeded in this claim, it would not only strip the polar bear of needed and warranted protections, as explained in the Final Listing Rule, but could also affect [Plaintiffs'] claim that the science supports an endangered, rather than threatened listing.  This is a claim currently being litigated in the Northern District of California.

Exhibit 4 at 17.

There is also a risk of inconsistent judgments with respect to the 4(d) Rule.  In this lawsuit Plaintiffs seek vacatur of the 4(d) Rule in its entirety.  See Sec. Am. Compl. at 39.  By contrast, plaintiffs in the American Petroleum Institute lawsuit seek an order vacating only a limited portion of the 4(d) Rule, but upholding the remainder of the Rule.  See Exhibit 2 at 11.

The possibility of inconsistent judgments is a significant factor weighing in favor of transfer.  See, e.g., FTC v. Cephalon, Inc., 551 F. Supp. 2d 21, 29 (D.D.C. 2008); Mamani v. Bustamante, 547 F. Supp. 2d 465, 474 (D. Md. 2008).  "Where two actions involve common issues of law and fact, the 'interest of justice' considers the feasibility of their consolidation so that inconsistent verdicts are avoided."  Hernandez v. Union Pac. RR. Co., No. 04-04899 JW, 2005 WL 396614, at *3 (N.D. Cal. Feb. 18, 2005) (citing A.J. Indus., Inc. v. U.S. Dist. Ct., 503 F.2d 384, 389 (9th Cir. 1974)).  See also In re Medrad, Inc., 215 F.3d 1341 (Fed. Cir. 1999) (upholding district court's order transferring action pursuant to 28 U.S.C. § 1404(a) "to avoid duplicative litigation and prevent the possibility of inconsistent judgments").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Although the first-filed lawsuit is generally the preferred venue where two similar cases are proceeding concurrently, see Guthy-Renker Fitness, LLC v. Icon Health & Fitness, Inc., 179 F.R.D. 264, 269 (C.D. Cal. 1998), here equitable considerations justify departure from this rule. First, no substantive proceedings have occurred yet with respect to Plaintiffs' Second Amended Complaint, filed on July 16, 2008. As noted supra, the administrative record is due on September 29, 2008, and Plaintiffs' opening brief is due on October 30, 2008. Second, equity weighs in favor of transferring this case because the cases filed in the District of Columbia cannot be transferred to this District, as this is not a district where the lawsuits "might have been brought." See 28 U.S.C. § 1404(a).

With respect to the lawsuit filed by the State of Alaska, because the plaintiff does not reside in the Northern District of California venue would have to be predicated on either the residence of Federal Defendants or the site of the events giving rise to the claim. See 28 U.S.C. § 1391(e). Federal Defendants do not reside in this District. It is well settled that venue does not lie in every judicial district where a federal agency may have offices. See Reuben H. Donnelley, 580 F.2d at 267 ("There is nothing in the statute or its legislative history which suggests that Congress also sought to allow a federal agency to be sued Eo nomine wherever it may maintain an office. To the contrary, the wording of the statute itself precludes such an expansive interpretation"); Williams v. United States, 2001 WL 1352885 at *1 (same). Rather, venue predicated on the naming of a federal agency or officer as a defendant must be either in Washington D.C. or where the local federal official responsible for the decision-making resides. Reuben H. Donnelley, 580 F.2d at 266, n.3. Here, the rule was drafted in Alaska, see 73 Fed.

Fed. Defs' Mot. to Transfer
Case No. 08-1339 CW                    - 16 -

Reg. 28,212, and signed in Washington, D.C.  See id. at 28,303.  Nor would venue lie in the Northern District based on the location of the events or omissions giving rise to the claim.

Similarly, none of the plaintiffs in the American Petroleum Institute lawsuit reside in the Northern District of California.[5/]  Thus, that action could not have been filed in this District. Because neither of the lawsuits pending in the District of Columbia may be transferred to this District pursuant to 28 U.S.C. § 1404(a), and there is a risk of inconsistent judgments if the lawsuits proceed separately, the interests of justice would best be served by transferring this case to the District of Columbia.

In this case Plaintiffs' choice of forum is outweighed by the risk of inconsistent judgments.  Plaintiffs' choice of forum is entitled to little or no deference here because the Northern District of California has no meaningful ties to the challenged decision.  Transfer of a case is particularly appropriate when plaintiffs file a case in a forum with little or no connection to the decision and events at issue.  See Saleh v. Titan Corp., 361 F. Supp. 2d 1152, 1157 (S.D. Cal. 2005) ("numerous courts have given less deference to the plaintiff's choice of forum where

---

[5/]    The plaintiffs in American Petroleum Institute are incorporated in Washington, DC, Delaware, or New York.  See http://mblr.dc.gov/corp/lookup/status.asp?id=7406 (visited September 2, 2008) (American Petroleum Institute) (DC); http://mblr.dc.gov/corp/lookup/status.asp?id=6874 (visited September 2, 2008) (Chamber of Commerce of the United States of America) (DC); https://sos-res.state.de.us/tin/controller (visited September 2, 2008) (National Mining Association) (DE); http://appsext8.dos.state.ny.us/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_nameid=35585&p_corpid=29094&p_entity_name=%6E%61%74%69%6F%6E%61%6C%20%61%73%73%6F%63%69%61%74%69%6F%6E%20%6F%66%20%6D%61%6E%75%66%61%63%74%75%72%65%72%73&p_name_type=%41&p_search_type=%42%45%47%49%4E%53&p_srch_results_page=0 (visited September 2, 2008) (National Association of Manufacturers of the United States of America) (NY); http://appsext8.dos.state.ny.us/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_nameid=36817&p_corpid=30028&p_entity_name=%61%6D%65%72%69%63%61%6E%20%69%72%6F%6E%20%61%6E%64%20%73%74%65%65%6C%20%69%6E%73%74%69%74%75%74%65&p_name_type=%41&p_search_type=%42%45%47%49%4E%53&p_srch_results_page=0 (visited September 2, 2008) (American Iron and Steel Institute) (NY).  All plaintiffs have their headquarters or principal places of business in Washington, DC.  See Exhibit 2 at ¶ 5.

the action has little connection with the chosen forum."); <u>Sierra Club v. Flowers</u>, 276 F. Supp. 2d 62, 67 (D.D.C. 2003) (deference to plaintiff's choice of forum mitigated where the forum has "no meaningful ties to the controversy and no particular interest in the parties or subject matter."); <u>McCrary v. Gutierrez</u>, No. 06-cv-0086, 2006 WL 1748410, *3 (E.D. Cal. June 23, 2006) (although plaintiff's choice of venue is ordinarily entitled to deference, such deference is "'substantially reduced where. . . the forum lacks a significant connection to the activities alleged in the complaint'") (quoting <u>Carolina Cas. Co. v. Data Broad. Corp.</u>, 158 F. Supp. 2d 1044, 1048 (N.D. Cal. 2001)); <u>Trout Unlimited v. Lohn</u>, No. 06-CV-904, 2006 WL 2927737, *3 (W.D. Wash. Oct. 10, 2006) (although "some deference must be accorded to plaintiffs' choice of forum. . . this deference is reduced when 'the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter.'") (quoting <u>Pacific Car and Foundry Co. v. Pence</u>, 403 F.2d 949, 954 (9th Cir.1968))  Moreover, "the showing defendants must make is lessened when ... transfer is sought to the forum with which plaintiffs have substantial ties and where the subject matter of the lawsuit is connected to that state." <u>Trout Unlimited v. U.S. Dep't of Agriculture</u>, 944 F. Supp. 13, 17 (D.D.C. 1996) (citations omitted).  As noted <u>supra</u>, all three plaintiff organizations maintain offices in Washington, D.C., and the Final Rule has significant ties to that District.  Under these circumstances, Plaintiffs' choice of forum is insufficient to outweigh the benefits of adjudicating these lawsuits in one forum.  Thus, the Court should exercise its discretion to transfer this case to the District of Columbia.

**CONCLUSION**

For the foregoing reasons, the Court should grant Federal Defendants' motion to transfer this case to the District of Columbia pursuant to 28 U.S.C. § 1404(a).

Respectfully submitted this 2nd day of September, 2008.

> RONALD J. TENPAS, Assistant Attorney General
> U.S. Department of Justice
> Environment & Natural Resources Division
> JEAN E. WILLIAMS, Chief
> LISA L. RUSSELL, Assistant Chief
> KRISTEN BYRNES FLOOM, Trial Attorney
> Wildlife & Marine Resources Section
> Ben Franklin Station, P.O. Box 7369
> Washington, DC 20044-7369
> Telephone: (202) 305-0340
> Facsimile: (202) 305-0275
>
> *Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing FEDERAL DEFENDANTS' MOTION TO TRANSFER to be filed electronically with the Clerk of Court through ECF, on September 2, 2008 and that ECF sent an e-notice of the electronic filing to the following recipients:

Arctic Slope Regional Corporation (renetatro@ttsmlaw.com)

Defenders of Wildlife (ahawley@defenders.org)

Safari Club International (dburdin@safariclub.org)

Safari Club International Foundation (dburdin@safariclub.org)

Andrew Elsas Wetzler (awetzler@nrdc.org)

Andrew McAleer Hawley (ahawley@defenders.org)

Brendan R. Cummings (bcummings@biologicaldiversity.org)

Brian Paul Segee (bsegee@defenders.org)

Douglas Scott Burdin (dburdin@safariclub.org)

J. Michael Klise (jmklise@crowell.com)

James Jeffries Goodwin (jeffriesgoodwin@gmail.com)

Jason T. Morgan (jtmorgan@stoel.com, lastevens@stoel.com, sea_docket@stoel.com)

Jean E. Williams (jean.williams@usdoj.gov)

Jeffrey M. Feldman (feldman@frozenlaw.com)

Jeffrey W. Leppo (jwleppo@stoel.com, jashore@stoel.com, sea_docket@stoel.com)

Kassia Rhoades Siegel (ksiegel@biologicaldiversity.org)

Kevin M. Cuddy (cuddy@frozenlaw.com)

Kristen Byrnes Floom (Kristen.Floom@usdoj.gov, EFILE_WMRS.ENRD@usdoj.gov)

Michael A. Oropallo (moropallo@hiscockbarclay.com)

Miyoko Sakashita (miyoko@biologicaldiversity.org)

Paul Lionel Yanosy, Jr. (pyanosy@sidley.com, mclemens@sidley.com)

Rene Pierre Tatro (renetatro@ttsmlaw.com, kroberts@ttsmlaw.com)

Richard J. Finn (rfinn@burnhambrown.com, ncutright@burnhambrown.com)

1    Seth D. Hilton (sdhilton@stoel.com, lastevens@stoel.com, pspring@stoel.com,
     sac_calendar@stoel.com)

2

3         I further certify that, on this 2nd day of September, 2008, a copy of the foregoing

4    Stipulation to Extend Time was sent via electronic mail to:

5

6    John J. Jackson , III (jjw-no2@att.net)

7

8    DATED:   September 2, 2008

9

10                                  /s/ Kristen Byrnes Floom

11                             Kristen Byrnes Floom, Trial Attorney

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    Fed. Defs' Mot. to Transfer
      Case No. 08-1339 CW                    - 21 -

# EXHIBIT ONE

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF ALASKA,<br>1031 W. 4th Avenue, Suite 200<br>Anchorage, AK  99501<br><br>      Plaintiff,<br><br>        v.<br><br>DIRK KEMPTHORNE, in his official capacity<br>as the Secretary of the United States<br>Department of the Interior, H. DALE HALL,<br>in his official capacity as the Director of the<br>United States Fish and Wildlife Service, and<br>UNITED STATES FISH AND WILDLIFE<br>SERVICE,<br>1849 C Street, N.W.<br>Washington, D.C.  20240<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>CIVIL ACTION NO.:<br><br>_____ |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiff State of Alaska ("Alaska" or the "State") brings this action to challenge the listing by the United States Fish and Wildlife Service (the "Service") of the polar bear as "threatened" throughout its range under the Endangered Species Act ("ESA"). 16 U.S.C. §§ 1531–1544. *See Determination of Threatened Status for the Polar Bear Throughout its Range, Final Rule*, 73 Fed. Reg. 28212–28303 (May 15, 2008) (the "Final Rule").

2.     Alaska brings this action under (1) Section 11(g)(1)(C) of the ESA, 16 U.S.C. § 1540(g)(1)(C), to address the Defendants' failure to perform duties under ESA Section 4, 16

U.S.C. § 1533; (2) Section 115(a)(1) of the Marine Mammal Protection Act ("MMPA"), 16

U.S.C. § 1383b(a)(1), to address the Defendants' failure to perform duties thereunder; and (3) the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to address Defendants' failure to

comply with legal requirements not otherwise actionable under the ESA or under the MMPA.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question jurisdiction), 16 U.S.C. § 1540(g) (Endangered Species Act citizen suit provision), and

5 U.S.C. §§ 702, 706 (Administrative Procedure Act).

4.      Alaska satisfied the written notice requirement of the Endangered Species Act

citizen suit provision. 16 U.S.C. § 1540(g)(2). Over 60 days ago, by letter dated May 23, 2008,

Alaska gave written notice to the Service and the individually named Defendants of the

government's failure to perform certain duties under 16 U.S.C. § 1533.

5.      An actual, justiciable controversy now exists between Alaska and the Defendants,

and the requested relief is proper under 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 701–706, and 16

U.S.C. § 1540(g).

6.      The federal government has waived sovereign immunity in this action pursuant to

5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

7.      Alaska has exhausted all administrative remedies.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because this action is

brought against officers of agencies in the United States in their official capacities and the

Service. Further, actions and decisions challenged by this lawsuit were made in substantial part

in the District of Columbia. Alaska maintains an office in this District.

2

Case 1:08-cv-01339-EGS Document 15-2 Filed 08/04/2008 Page 3 of 21

## PARTIES

### Plaintiff

9.      Alaska is a sovereign state, which has an interest in the management,

conservation, and regulation of all wildlife and other natural resources within its jurisdiction,

including the polar bear and its habitat. Alaska Const. Art. VIII, §§ 1, 2, 4; Alaska Stat. §

16.05.020. Alaska participates in the direct management of its wildlife resources through its

Departments of Fish and Game, Natural Resources, and Environmental Conservation. The

Alaska Comprehensive Wildlife Conservation Strategy, approved by the Service, contains

affirmative conservation measures, including international agreements and cooperation with

other government agencies through research, monitoring, and conservation practices designed to

protect and conserve the polar bear and avoid the need for the species to be listed under the ESA.

The Alaska Coastal Management Program (Alaska Stat. §§ 46.39, 46.40) includes statewide

standards found at Alaska Admin. Code tit. 11, § 112 which embody the State's policy direction

for natural resource development and conservation in the coastal zone, and which form the basis

for developing a project's consistency determination under that Program. These standards

govern the uses and activities and resources and habitats that are part of a proposed project, and

include specific standards for habitat and subsistence, both of which are considered during

consistency reviews.

10.      Alaska is also responsible for the welfare of its citizens. The Service's listing of

the polar bear as a threatened species will have a significant adverse impact on Alaska because

additional regulation of the species and its habitat under the ESA will deter activities such as

commercial fisheries, oil and gas exploration and development, transportation, and tourism

within and off-shore of Alaska. Many Alaskans rely on these activities for employment, and the

State and its municipalities rely on tax and royalty revenues from these activities and related commerce to provide services for their citizens.

11.     Municipal governments (which are political subdivisions of the State of Alaska under Alaska Stat. §§ 29.04.010, 29.04.020) located on or near coastal areas within the range of the polar bear, will be adversely affected by the listing because the listing and resulting regulatory measures will interfere with the municipalities' efforts to provide public services to Alaska residents and impact their land use planning, platting, and regulatory activities.

12.     Alaska has standing to bring this action, and the challenged agency decisions are final and ripe for review by this Court.

## Defendants

13.     Defendant Dirk Kempthorne is the Secretary of the United States Department of the Interior ("DOI") and is being sued in his official capacity.  The Secretary is responsible for the administration of the ESA and signed the Final Rule.

14.     Defendant H. Dale Hall is the Director of the United States Fish and Wildlife Service and is being sued in his official capacity.  The Director is responsible for the administration and the implementation of the ESA.

15.     Defendant United States Fish and Wildlife Service is a federal agency within the DOI and is the agency within the DOI that has been delegated the responsibility for implementing the ESA.  Polar bears are marine mammals within the jurisdiction of the DOI and the Service.  Hereafter the Defendants shall be referred to collectively as the "Service."

## LEGAL BACKGROUND

A.    **Endangered Species Act**

16.    Section 4(a) of the ESA requires the Secretary of the Interior to determine by regulation whether species of fish, wildlife,  or plants are "threatened" or "endangered" under specified criteria, and if so, to list such species as threatened or endangered as appropriate. Section 4(a) also requires the Secretary to designate by regulation "critical habitat" for such listed species to the maximum extent prudent and determinable.  16 U.S.C. § 1533.  Regulations concerning listing determinations and critical habitat designations must be promulgated in accordance with the requirements of Section 4(b) of the ESA.

17.    The Secretary's authority to determine "threatened" status for a species, 16 U.S.C. § 1533(a), does not "confer discretion to ignore the required procedures of decisionmaking." *Bennett v. Spear*, 520 U.S. 154, 172 (1997).  The duty to make a "threatened" determination must be based

> solely on the basis of the best scientific and commercial data available to him
> after conducting a review of the status of the species and after taking into account
> those efforts, if any, being made by any State or foreign nation, or any political
> subdivision of a State or foreign nation, to protect such species, whether by
> predator control, protection of habitat and food supply, or other conservation
> practices, within any area under its jurisdiction or on the high seas.

16 U.S.C. § 1533(b)(1)(A).

18.    To list a species, the Secretary must find that one or more of the five statutory listing factors are present:  (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) over utilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.  16 U.S.C. § 1533(a)(1).

19.     If the Secretary determines that designating a species as endangered or threatened is warranted, he must publish the determination in the Federal Register, along with the complete text of a proposed regulation to implement such a determination. *See* 16 U.S.C. § 1533(b)(5).

20.     Under Section 4(d), when a species is listed as threatened, the Secretary shall issue "such regulations as he deems necessary and advisable to provide for the conservation of the species." 16 U.S.C. § 1533(d).

21.     Any publication in the Federal Register of a final regulation listing a species as threatened under the ESA must include a summary of the data upon which the regulation is based and must show the relationship of the data to the regulation. *See* 16 U.S.C. § 1533(b)(8).

22.     Under Section 4(i) of the ESA, if "a State agency … files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments … [the Secretary shall] submit to the State agency a written justification for [the] failure to adopt regulations consistent with the agency's comments or petition." 16 U.S.C. § 1533(i).

23.     Section 11(g) of the ESA provides that "any person may commence a civil suit on his own behalf … against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under [Section 4] which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C).

24.     Section 10(e) of the ESA provides for regulation by the Secretary of subsistence hunting of threatened and endangered species by Alaska Natives. *See* 16 U.S.C. § 1539(e).

**B.     Marine Mammal Protection Act**

25.     The MMPA prohibits the take and importation of marine mammals, including the polar bear, 16 U.S.C. §§ 1362(6), 1371, and provides for protection of habitat and collection of

6

biological information.  The MMPA provides for the regulation of hunting, including subsistence

hunting of marine mammals by Alaska Natives.  *See* 16 U.S.C. § 1371(b).

26.     The MMPA provides for certain prohibitions in regard to species or stocks that

are "depleted."  For purposes of the MMPA, "the term 'depletion' or 'depleted' means any case

in which –

> (A) the Secretary, after consultation with the Marine Mammal Commission and the
> Committee of Scientific Advisors on Marine Mammals established under subchapter III
> of this chapter, determines that a species or population stock is below its optimum
> sustainable population; (B) a State, to which authority for the conservation and
> management of a species or population stock is transferred under section 1379 of this
> title, determines that such species or stock is below its optimum sustainable population;
> or (C) a species or population stock is listed as an endangered species or a threatened
> species under the Endangered Species Act of 1973 [16 U.S.C. § 1531 et seq.].

16 U.S.C. § 1362(1).

27.     Section 115(a)(1) of the MMPA further requires that in "any action by the

[Service] to determine if a species or stock should be designated as depleted," the Service "shall

only make such a determination by issuance of a rule, after notice and opportunity for public

comment and after a call for information," and such determination shall be based on "the best

scientific information available."  16 U.S.C. § 1383b(a)(1).  A depleted stock determination must

be based on "the best scientific information available."  16 U.S.C. § 1383b(a)(2).

28.     Section 115(a)(2) of the MMPA further requires that prior to making a depleted

stock determination, the Secretary must publish in the Federal Register "a call to assist the

Secretary in obtaining scientific information from individuals and organizations concerned with

the conservation of marine mammals, from persons in any industry which might be affected by

the determination, and from academic institutions.  In addition, the Secretary shall utilize, to the

extent the Secretary determines to be feasible, informal working groups of interested parties, and

other methods to gather the necessary information."  16 U.S.C. § 1383b(a)(2).

**C.      Administrative Procedure Act**

29.      The APA provides for judicial review of final agency action by persons "aggrieved" by such action.  5 U.S.C. § 702.  The APA also provides standards applicable when a federal agency proposes and adopts final rules and regulations.  5 U.S.C. §§ 553, 551(4).  Specifically, agencies must provide "general notice" of any "proposed rule making" to the public through publication in the Federal Register.  That notice must include "(1) a statement of the time, place, and nature of the public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b).  Agencies proposing rules are required by 5 U.S.C. § 553(c) to respond to significant public comments on that rulemaking.

30.      Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

## FACTUAL BACKGROUND

**A.      The Polar Bear**

31.      Polar bears (*Ursus maritimus*) are considered marine mammals and are found throughout the ice covered seas in the Northern hemisphere.  Polar bears are adapted to living on sea ice, and seasonally may spend significant time on land.

32.      Polar bears now number 20,000–25,000 worldwide (*see* 73 Fed. Reg. at 28215) as compared to 8,000–10,000 in 1965–1970.  The Chukchi Sea, Southern Beaufort Sea, and Northern Beaufort Sea subpopulations, the three subpopulations associated with Alaska and

United States Territory, and shared with Russia (Chukchi Sea) and Canada (Southern and Northern Beaufort Sea), are estimated at 4,700 polar bears collectively. *See* 73 Fed. Reg. at 28217. The Southern Beaufort Sea subpopulation, found along the North Slope of Alaska and ranging into western Canada, and the Chukchi Sea subpopulation, found from western Alaska to Wrangel Island and eastern Siberia are most closely associated with Alaska. The current world-wide population has not significantly declined in recent years. This overall stability is also reflected in the most recent publication of the International Union for Conservation of Nature and Natural Resources ("IUCN") Polar Bear Specialists Group which reports that some subpopulations have declined, others have increased, and some remain stable.

33. Polar bears existed during and survived through prior Arctic warming periods including the Last Interglacial (115,000–140,000 years before present), and the Holocene Thermal Maximum (4,000–12,000 years before present). There was also a warming period during the Medieval Period (950–1300 A.D.).

34. Polar bears are important for subsistence purposes to Alaska Natives and the subsistence harvest of polar bears is provided for in the ESA and MMPA. Other hunting has not been permitted in the United States since the enactment of the MMPA in 1972. The MMPA provides significant conservation measures to protect polar bears.

35. The worldwide distribution of polar bears has been characterized as consisting of a number of different population groupings for management purposes. For example, the United States Geological Survey ("USGS") has identified four ecoregion populations, while the IUCN describes the bear as comprising nineteen subpopulations worldwide.

36. The Final Rule recognizes nineteen subpopulations of polar bear for management and research purposes. *See* 73 Fed. Reg. at 28215.

37.    Neither the nineteen subpopulations of polar bears worldwide described by the IUCN, nor the four ecoregion populations described by USGS, could reasonably be considered to represent distinct population segments.  Because of ranging behavior, particularly of male polar bears, and resulting gene flow, subpopulations are neither distinct nor significant. Similarly, the ranging behavior of polar bears may prevent the loss of summer habitat from the Southern extreme of its range from representing loss of a significant portion of the range of the polar bear even if the modeling was accepted as a reasonable projection of likely future conditions.

**B.    Listing Decision**

38.    In response to a petition to list the polar bear under the ESA submitted by the Center for Biological Diversity, the Service published in the Federal Register on January 9, 2007, its 12-month petition finding that listing was warranted and its proposed to rule to list the polar bear as threatened.  *See* 72 Fed. Reg. 1064-1099 (Jan. 9, 2007) ("Proposed Rule").  The decision to propose listing the polar bear as threatened was based on the determination that "the polar bear is threatened by habitat loss and inadequate regulatory mechanisms to address sea ice recession." *See* 72 Fed. Reg. at 1095.

39.    On April 9, 2007, Alaska provided comments in response to and in disagreement with the Proposed Rule.  Alaska provided the Service with, among other relevant information, scientific and commercial data supporting a determination that listing the polar bear was not warranted under the two listing factors (A and D) being considered by the Service.  Alaska provided the Service with (1) detailed data on sea ice predictions indicating that the Service's analysis of the threatened destruction, modification, or curtailment of polar bear habitat reflected a "worst case" scenario instead of being properly limited to a "likely" scenario; and (2) detailed

data on regulatory mechanisms, including conservation programs within Alaska and the international community, which have resulted in a sustainable worldwide polar bear population.

40.     The USGS published nine reports on September 7, 2007, and made them available for public comment. The reports purported to demonstrate that the species may become threatened in the future and that its range may be reduced in the future at its southern boundaries.

41.     On October 22, 2007, in response to the USGS reports, Alaska through supplemental comments reaffirmed its disagreement with the technical basis for the Proposed Rule.

42.     On May 15, 2008, the Secretary published the Final Rule determining threatened status for the polar bear under the ESA, 73 Fed. Reg. 28212-28303, and also published separate regulations pursuant to Section 4(d) of the ESA. 73 Fed. Reg. 28306-28318 (May 15, 2008).

43.     In the Final Rule, the Service opined "[b]ased upon the best available scientific and commercial information, that polar bear habitat–principally sea ice–is declining throughout the species' range, that this decline is expected to continue for the foreseeable future [45 years], and that this loss threatens the species throughout all of its range." 73 Fed. Reg. at 28212.

44.     The Service made the determination to list the polar bear as threatened based on Factors A and D–the present or threatened destruction, modification, or curtailment of the polar bear's habitat or range and the inadequacy of existing regulatory mechanisms. *See* 73 Fed. Reg. at 28292-93.

45.     The Service found that under Factor A, the ongoing and projected loss of the polar bear's sea ice habitat threatened the species throughout its range. According to the Service, productivity, abundance, and availability of ice seals–the polar bear's primary prey–would be diminished by the loss of sea ice, and polar bears would be required to expend more energy to

11

obtain food. Also, access to traditional denning areas would be affected, which would result in a reduced population. *See* 73 Fed. Reg. at 28292.

46. Under Factor D, the Service determined that regulatory measures existed at the regional, national, and international level, these mechanisms are adequate to address actual and potential threats to polar bears from direct take, disturbance by humans, and incidental or harassment take. *See* 73 Fed. Reg. at 28293. However, the Service took a broad approach and found that the existing mechanisms were inadequate because they were not effective in "counteracting the worldwide growth of" greenhouse gases. *Id.*

47. Five weeks after the Final Rule, Alaska received, through the Office of the Governor, a letter dated June 23, 2008, from Director Hall purporting to respond to the comments Alaska submitted on April 9 and October 22, 2007, regarding the Proposed Rule and the USGS Polar Bear Reports.

## FIRST CLAIM FOR RELIEF
### (Violation of the ESA–Failure to Make Listing Based on Best Science)

48. Alaska incorporates by reference each of the allegations in paragraphs 1 through 47.

49. Section 4 (b)(1)(A) requires that the Service make its listing determinations based "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species." 16 U.S.C. § 1533(b)(1)(A).

50. The Service failed to make the listing polar bear determination based on "the best scientific and commercial data available." Specifically, among other things, the Service failed to:

(a) consider the best scientific data available regarding whether the polar bear is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range;

(b) establish, based on the best scientific data available, the "foreseeable future" relevant to its listing determination, and instead relied on an arbitrary 45-year period as the "foreseeable future";

(c) consider the best scientific data available demonstrating that climate systems have a high level of natural variability and climate change models are unreliable beyond about a decade;

(d) consider the best scientific data available regarding the currently healthy status of the species, and instead assumed without reliable scientific data that the species as a whole is in decline or facing direct immediate threats;

(e) consider the best scientific data available to support computer modeling to accurately predict impacts to the polar bear from seasonal ice loss, and instead relied on unreasonable modeling assumptions, uncertain variables, and incomplete information to make predictions regarding seasonal ice loss and carrying capacity;

(f) consider the best scientific data available which projected overall declines in carrying capacity of only "10 to 22% from present levels by year 45, 22-32 % from present levels by year 75, and 20-37% from present levels by year 100," and which projected declines in optimal habitat loss at only 23-40% at 100 years, according to a 2007 USGS report; and

(g) consider the best scientific data available demonstrating the ability of polar bears to adapt and survive changing climate conditions as demonstrated by their survival through prior warming periods.

51.     The Service's failure to consider and make its listing determination based on the "best scientific data available" within the meaning of Section 4(b)(1)(A), 16 U.S.C. § 1533(b)(1)(A), entitles Alaska to the relief requested below.

### SECOND CLAIM FOR RELIEF
**(Violation of the ESA–Failure to Consider State Efforts)**

52.     Alaska incorporates by reference each of the allegations in paragraphs 1 through 51.

53.     Section 4(b)(1)(A) requires that the Service make its listing determinations "after taking into account those efforts … being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species." 16 U.S.C. § 1533(b)(1)(A). Specifically, the Service failed to consider the substantial conservation efforts, programs, and regulatory mechanisms implemented by the State of Alaska, its political subdivisions, and within and among foreign nations and the United States which have contributed to increases in polar bear numbers world-wide to 20,000-25,000 from 8,000-10,000 in 1965-1970.

54.     The Service's failure to adequately consider substantial efforts being made by Alaska; foreign nations; and political subdivisions of Alaska and of foreign nations; to protect the polar bear violates Section 4(b)(1)(A), 16 U.S.C. § 1533(b)(1)(A), entitling Alaska to the relief requested below.

### THIRD CLAIM FOR RELIEF
**(Violation of the ESA–Failure to Summarize and Show Relationship of Data)**

55.     Alaska incorporates by reference each of the allegations in paragraphs 1 through 54.

14

56. Under Section 4(b)(8), the Service must summarize the data on which the regulation is based and show the relationship of such data to the final regulation. 16 U.S.C. § 1533(b)(8).

57. The Service in the Final Rule failed to disclose, summarize, and show relationships of data to the final regulation with respect to modeling methodology and assumptions, and the results of such modeling relating to biological and seasonal ice loss models used to predict decrease in habitat and carrying capacity.

58. The Service's failure to summarize the modeling methodology, assumptions, and data generated from modeling and to show the relationship of such data to the final regulation violates Section 4(b)(8), 6 U.S.C. § 1533(b)(8), entitling Alaska to the relief requested below.

### FOURTH CLAIM FOR RELIEF
**(Violation of ESA–Failure to Make Determination Based on Range)**

59. Alaska incorporates by reference each of the allegations in paragraphs 1 through 58.

60. Section 3(20) defines a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future *throughout all or a significant portion of its range*." 16 U.S.C. § 1532(20) (emphasis added).

61. In the Final Rule, the Service failed to consider whether the polar bear is likely to become an endangered species throughout all or a significant portion of its range given available information regarding the overall stability of "subpopulations" of polar bears worldwide and the ranging behavior, particularly of male polar bears, resulting in healthy gene flow.

62. The Service's failure to adequately consider whether the polar bear is likely to become an endangered species throughout all or a significant portion of its range entitles Alaska to the relief requested below.

## FIFTH CLAIM FOR RELIEF
### (Violation of ESA——Failure to Provide Adequate Justification to State Agency for Adopting Regulations Inconsistent with State Agency's Recommendation)

63.     Alaska incorporates by reference each of the allegations in paragraphs 1 through 62.

64.     Section 4(i) requires the Secretary to submit written justification to the State if a State agency files comments disagreeing with a proposed regulation and the Secretary issues a final regulation in conflict with the comments. 16 U.S.C. § 1533(i).

65.     Both sets of comments filed by Alaska in response to the Proposed Rule and the USGS Polar Bear Reports disagreed with all or part of the proposed listing regulation to list the polar bear as threatened throughout its range.

66.     In this instance, Alaska received only a post hoc response from Defendant Hall *five* weeks after the Service's promulgation of the final listing rule, which purported to respond to Alaska's comments and criticisms of the Final Rule.

67.     Defendant Hall's post hoc response did not adequately provide the required "written justification for [the Service's] failure to adopt regulations consistent with the [Alaska state] agency's comments or petition." 16 U.S.C. § 1533(i). For example, Defendant Hall's letter failed adequately to explain or justify the Service's determinations regarding polar bear adaptability during warming periods and in extensive ice-free conditions. Nor did it adequately explain or justify the Service's conclusions regarding the impact of a maximum decrease of less than 25% in optimal habitat carrying capacity over 45 years on species survival, or address the adequacy of remaining habitat to support polar bear survival as a species. These and other failures to respond to points raised in Alaska's comments concerning future habitat trends and

species survival impair Alaska's ability to respond to the polar bear listing and to identify and perform actions for the conservation of the polar bear.

68.     The Service's failure to justify its adoption of regulations inconsistent with the State's comments further harms Alaska's ability to regulate and manage its natural resources generally, including its lands, waters, fisheries, wildlife, and mineral reserves.

69.     The Service's failure to justify its adoption of regulations inconsistent with Alaska's comments to the Proposed Rule and the USGS Reports violates Section 4(i), 16 U.S.C. § 1533(i), entitling Alaska to the relief requested below.

### SIXTH CLAIM FOR RELIEF
### (Violation of the APA and MMPA–
**Failure to Provide Notice and Allow Public Comment of Depletion Determination)**

70.     Alaska incorporates by reference each of the allegations in paragraphs 1 through 69.

71.     The MMPA requires that in "any action by the [Service] to determine if a species or stock should be designated as depleted," the Service "shall only make such a determination by issuance of a rule, after notice and opportunity for public comment and after a call for information;" and such determination shall be based on "the best scientific information available." 16 U.S.C. § 1383b(a).

72.     The APA also requires "general notice" of any "proposed rule making" to be published in the Federal Register, an opportunity for public comment, and an agency response to public comments. 5 U.S.C. § 553(b),(c).

73.     To the extent the Final Rule is deemed to be a "designation" of the polar bear as a "depleted species" within the meaning of the MMPA, the Service failed to give the public adequate notice and an opportunity to comment on this aspect of the Final Rule. The public

notice on the Proposed Rule did not sufficiently identify the depleted species designation as an issue, and thus failed to solicit full and meaningful public comment. Nor did the Service make a "call for information," as that term is used in 16 U.S.C. § 1383b(a)(2), or otherwise employ the procedures outlined in that Section as applicable to depleted species designations.

74. The Service did not ask for comments on, and the rulemaking did not consider, whether the polar bear is "below its optimum sustainable population," as required for the designation of a species as "depleted." 16 U.S.C. § 1362(1).

75. The Service's failure to provide public notice and an opportunity to submit public comment, and to respond to public comment on the Service's depletion determination violates the MMPA, 16 U.S.C. § 1383b(a), and the APA, 5 U.S.C. § 553(b),(c), entitling Alaska to the relief requested below.

**SEVENTH CLAIM FOR RELIEF**
**(Violation of the APA–**
**Failure to Respond to Significant Comments)**

76. Alaska incorporates by reference each of the allegations in paragraphs 1 through 75.

77. The APA requires an opportunity for public comment, and an agency response to significant public comments. 5 U.S.C. § 553(b),(c).

78. Alaska submitted, and the Secretary failed to adequately consider, incorporate, or respond to, detailed scientific and commercial information indicating that listing the polar bear was unwarranted.

79. The Secretary also failed to consider and adequately respond to the information submitted to it documenting that Alaska and foreign nations have made significant efforts to

protect polar bear habitat and to reduce any potential effects from climate change to the bear and its habitat.

80.     The Service's failure to respond to significant comments submitted by Alaska violates the APA, 5 U.S.C. § 553(b),(c), entitling Alaska to the relief requested below.

## EIGHTH CLAIM FOR RELIEF
### (Violation of the APA–
### Arbitrary and Capricious, Abuse of Discretion, Not in Accordance with Law)

81.     Alaska incorporates by reference each of the allegations in paragraphs 1 through 80.

82.     The Service's conduct in issuing the Final Rule, as described in preceding Claims for Relief was arbitrary and capricious, constituted an abuse of discretion, and was otherwise not in accordance with law.

83.     Under the APA, this Court has authority to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and to set aside an agency decision "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Alaska is therefore entitled to the relief requested below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment providing the following relief:

1. Declare that Defendants violated the ESA, MMPA, and the APA;

2. Declare that Defendants' actions, as set forth above, are arbitrary and capricious, an abuse of discretion, and not in accordance with law;

3. Vacate and set aside the Final Rule of May 15, 2008;

4. Enjoin Defendants from relying on or enforcing the threatened status determination under the ESA for the polar bear;

5. Enjoin Defendants from relying on or enforcing the depleted status determination under the MMPA for the polar bear;

6. Award Alaska its attorneys' fees and costs incurred in bringing and maintaining this action pursuant to Section 11(g) of the ESA, 28 U.S.C. § 2412, and the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable authorities; and

7. Grant Plaintiff such other and further relief as the Court may deem necessary and appropriate.

Respectfully submitted this ___4TH___ day of August, 2008.

HOLLAND & HART LLP


By: _____

    Craig D. Galli (D.C. Bar No. 414395)
    Holland & Hart LLP
    60 E. South Temple, Suite 2000
    Salt Lake City, UT 84111-1031
    Telephone: (801) 799-5800
    Facsimile: (801) 364-9124
    Email: cgalli@hollandhart.com

    William G. Myers III (D.C. Bar No. 408573)
    Holland & Hart LLP
    101 S. Capitol Boulevard, Suite 1400
    Boise, Idaho 83702-2527
    Telephone: (208) 342-5000
    Facsimile: (208) 343-8869
    Email: wmyers@hollandhart.com


TALIS J. COLBERG
ATTORNEY GENERAL


By: _____

    Bradley E. Meyen (Alaska Bar No. 8506067)
    Assistant Attorney General
    Department of Law
    1031 W. 4th Avenue, Suite 200
    Anchorage, AK 99501
    Telephone: 907-269-5100
    Facsimile: 907-279-2834
    Email: brad.meyen@alaska.gov

    Attorneys for Plaintiff State of Alaska

3893017_5.DOC

**EXHIBIT TWO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN PETROLEUM INSTITUTE,<br>1220 L Street, N.W.<br>Washington, D.C. 20005,<br><br>CHAMBER OF COMMERCE OF<br>THE UNITED STATES OF AMERICA,<br>1615 H Street, N.W.<br>Washington, D.C. 20062,<br><br>NATIONAL MINING ASSOCIATION,<br>101 Constitution Ave, N.W.<br>Suite 500 East<br>Washington, D.C. 20001-2133,<br><br>NATIONAL ASSOCIATION OF MANUFACTURERS,<br>1331 Pennsylvania Ave., N.W.<br>Washington, D.C. 20004,<br><br>and<br><br>AMERICAN IRON AND STEEL INSTITUTE,<br>1140 Connecticut Ave., N.W., Suite 705<br>Washington, D.C. 20037<br><br>        Plaintiffs,<br><br>        v.<br><br>DIRK KEMPTHORNE, Secretary of the United States<br>Department of the Interior, H. DALE HALL, Director<br>of the United States Fish and Wildlife Service, and<br>UNITED STATES FISH AND WILDLIFE SERVICE,<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>        Defendants. | Civil Action No. _____ |

## COMPLAINT

## INTRODUCTION

1.      Plaintiffs the American Petroleum Institute ("API"), the Chamber of Commerce of the United States of America ("the Chamber"), the National Mining Association ("NMA"), the National Association of Manufacturers ("NAM"), and the American Iron and Steel Institute ("AISI") (collectively "the Associations") bring this action under Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, seeking review of a particular provision of a final agency action by Defendants, Dirk Kempthorne, Secretary of the United States Department of Interior ("Secretary"), H. Dale Hall, Director of the United States Fish and Wildlife Service ("Director"), and the United States Fish and Wildlife Service ("FWS").  On May 15, 2008, FWS promulgated a rule listing the polar bear as a "threatened" species under the Endangered Species Act ("ESA").  *See* 73 Fed. Reg. 28211 (May 15, 2008) (the "Listing Rule"). The Associations are *not* challenging the Listing Rule.  On May 15, 2008, under ESA Section 4(d), Defendants published in the Federal Register an Interim Final Special Rule amending 50 C.F.R. § 17.40 by adding a new paragraph (q).  73 Fed. Reg. 28306 (May 15, 2008) (hereinafter the "4(d) Rule").  The Associations are challenging a discrete provision of only one paragraph of the 4(d) Rule – the discriminatory carve-out of operations in Alaska from an exemption provided to operations in all other states in paragraph (q)(4) of 50 C.F.R. § 17.40 (hereinafter the "Alaska Gap").  The Associations are not challenging the remainder of the 4(d) Rule or the general exemption provided in paragraph (q)(4), both of which they believe were properly issued under the ESA in light of the Listing Rule.  Further, the Associations are not challenging the Guidance published by the FWS, which interprets the 4(d) Rule.  *See* May 14, 2008, Fish and Wildlife Service Memorandum, *Expectations for Consultations on Actions that Would Emit Greenhouse Gases* ("FWS Guidance").  Thus, the Associations seek an order holding unlawful and vacating

the Alaska Gap in paragraph (q)(4) of the 4(d) Rule, 50 C.F.R.  § 17.40(q)(4), and remanding that limited portion of the 4(d) Rule for correction of this deficiency.

2.     The Listing Rule identifies polar bears as a "threatened species" based on FWS's determination that global climate change, resulting from increased concentrations of greenhouse gases in the planetary atmosphere, threaten to injure polar bears' habitat by reducing polar ice. Under the ESA and its accompanying regulations, the "threatened species" designation presumptively triggers Section 9 of the ESA, which would require an FWS permit for activities that constitute an "incidental taking" of the designated species. FWS, however, also determined that climate change is a worldwide phenomenon, resulting from the combination of greenhouse gas emissions across the globe.  Accordingly, FWS determined that neither climate change, nor any effect of climate change, can be traced to particular activities in particular locations.  On that basis, FWS accompanied its Listing Rule with the 4(d) Rule, which generally exempts greenhouse gas emitting activities from Section 9 requirements to which they might otherwise be subject.

3.     But in a sharp contradiction with FWS's own determination that climate-change-based effects on polar bears cannot be traced to emission activities in any particular location, the 4(d) Rule *excludes* Alaska from the Section 9 exemption.  The Alaska Gap thus exposed Alaska operations to increased permitting burdens and/or the risk of enforcement by Government authorities and citizen suits – risks that operations elsewhere in the United States do not face and that are contrary to FWS's own determinations about the nature and effects of global climate change.  The Associations therefore are challenging the Alaska Gap as an irrational exercise of administrative authority that discriminates against Alaska operations.

3

## JURISDICTION

4.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).  The Court has the authority to grant the relief sought herein pursuant to 28 U.S.C. § 2201 and 5 U.S.C. §§ 705, 706.

## VENUE

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) in that Defendants Dirk Kempthorne and H. Dale Hall are officers or employees of the United States who are being sued in their official capacity as the Secretary of the United States Department of Interior and the Director of the FWS, who both reside in the District of Columbia.  Venue also is proper because Defendant United States Department of Interior is an agency of the United States that has its headquarters in the District of Columbia.  Defendant FWS is an agency of the United States responsible for implementing programs and regulations to protect endangered and threatened species under the ESA and that has its headquarters in the District of Columbia.  All of the Defendants are residents of the District of Columbia and all or virtually all of the activities giving rise to this action occurred in the District of Columbia.  Finally, API and the Chamber are incorporated in the District of Columbia and all of the Plaintiffs have their headquarters or principal places of business in the District of Columbia.

## PARTIES

6.      Plaintiff API is a nationwide, non-profit trade organization representing over 400 corporate members engaged in all aspects of the oil and gas industry, including production, refining, distribution, and marketing throughout the United States, including in Alaska.  API is incorporated in and has its principal place of business is in the District of Columbia.  API's members are injured by the Alaska Gap because it imposes an irrational and additional burden on

4

their Alaska operations. As discussed in more detail below, the Alaska Gap means that otherwise lawful operations in Alaska – and only in Alaska – may be subject to additional permitting burdens and/or a risk that Government agencies or private citizens will seek to enforce the provisions of ESA Section 9 against those operations. The relief the Associations request for the Alaska Gap would redress API's and its members' injuries.

7.     Plaintiff the Chamber is the world's largest business federation, representing an underlying membership of more than 3 million businesses and organizations of all sizes. The Chamber is incorporated in and has its principal place of business in the District of Columbia. The Chamber's members operate and have various businesses and interests in every sector of the economy and transact business throughout the United States, including Alaska, as well as in a large number of countries around the world. A central function of the Chamber is to represent the interests of its members in important matters such as clean air rules, climate change, and domestic energy production before the state and federal courts, legislatures, and executive branches. As discussed in more detail below, the Alaska Gap means that the Chamber's members' otherwise lawful operations in Alaska – and only in Alaska – may be subject to additional permitting burdens and/or a risk that Government agencies or private citizens will seek to enforce the provisions of ESA Section 9 against those operations. The relief the Associations request for the Alaska Gap would redress the Chamber's and its members' injuries.

8.     Plaintiff NMA is the primary national organization that represents the interests of the mining industry before Congress, the administration, federal agencies, the judiciary, and the media. NMA's principal place of business is in the District of Columbia. NMA has more than 325 member corporations who are involved in all aspects of mining including coal, metal, and industrial mineral producers, mineral processors, equipment manufacturers, state associations,

5

bulk transporters, engineering firms, consultants, financial institutions, and companies that supply goods and services to the mining industry. NMA's objective is to engage in and influence the public policy process on the most significant timely issues that impact its members' ability to locate, permit, mine, process, transport, and utilize the nation's vast coal and mineral resources. NMA members operate and hold ownership interests in various mining and mineral operations in many parts of the United States, including Alaska. As discussed in more detail below, the Alaska Gap means that NMA's members' otherwise lawful operations in Alaska – and only in Alaska – may be subject to additional permitting burdens and/or a risk that Government agencies or private citizens will seek to enforce the provisions of ESA Section 9 against those operations. The relief the Associations request for the Alaska Gap would redress NMA's and its members' injuries.

9.      Plaintiff NAM is the nation's largest industrial trade association, representing small and large manufacturers in every industrial sector and in all 50 states. NAM's principal place of business is in the District of Columbia. NAM's mission is to enhance the competitiveness of manufacturers by shaping a legislative and regulatory environment conducive to U.S. economic growth and to increase understanding among policymakers, the media, and the general public about the vital role of manufacturing to America's economic future and living standards. NAM members operate and hold ownership interests in various manufacturing sectors (such as the petroleum manufacturing sector) in many parts of the United States, including Alaska. As discussed in more detail below, the Alaska Gap means that NAM's members' otherwise lawful operations in Alaska – and only in Alaska – may be subject to additional permitting burdens and/or a risk that Government agencies or private citizens will

6

seek to enforce the provisions of ESA Section 9 against those operations. The relief the Associations request for the Alaska Gap would redress NAM's and its members' injuries.

10.     Plaintiff AISI represents the North American steel industry in the public policy arena and advances the case for steel in the marketplace. AISI's principal place of business is in the District of Columbia. AISI has approximately 28 member companies, including integrated and electric furnace steelmakers, and 138 associate and affiliate members who are suppliers to or customers of the steel industry. AISI's member companies represent approximately 75% of both U.S. and North American steel capacity. AISI's members operate and hold ownership interests in various steel manufacturing and related operations in many parts of the United States and its associate or affiliate members supply various customers and projects in the United States, including in Alaska. As discussed in more detail below, the Alaska Gap means that otherwise lawful Alaska activities or projects that AISI members supply – and only those in Alaska – may be subject to additional permitting burdens and/or a risk that Government agencies or private citizens will seek to enforce the provisions of ESA Section 9 against those activities or projects, thereby impacting the demand for steel from some AISI suppliers. The relief the Associations request for the Alaska Gap would redress AISI's and its members' injuries.

11.     Defendant Dirk Kempthorne is the Secretary of the United States Department of Interior and is being sued in his official capacity. The Secretary oversaw promulgation of the 4(d) Rule under Section 4(d) of the ESA, 16 U.S.C. § 1533(d). The Secretary signed the 4(d) Rule, which included paragraph (q)(4), and caused it to be published in the Federal Register.

12.     Defendant H. Dale Hall is the Director of the FWS and is being sued in his official capacity. The Director is responsible for the administration and implementation of the ESA.

7

13. Defendant FWS is an agency of the United States with the primary authority for implementing the ESA. FWS developed and promulgated the 4(d) Rule, including paragraph (q)(4), under the direction of the Secretary and Director.

## BACKGROUND

14. The ESA directs the Secretary to determine, by regulation, whether any species is an endangered or threatened species based on five enumerated factors. 16 U.S.C. § 1533(a)(1). The Secretary must make these determinations "solely on the basis of the best scientific and commercial data available to him . . . ." *Id.* § 1533(b). An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range . . . ." *Id.* § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

15. If a species is listed as "threatened" certain protections apply. FWS has issued regulations providing that the prohibitions for endangered species under 50 C.F.R. § 17.21 (except 50 C.F.R. § 17.21(c)(5)) also apply to threatened species unless a special rule has been promulgated under ESA Section 4(d), which contains all applicable prohibitions and exemptions. 50 C.F.R. § 17.31(a), (c). For example, parties are prohibited under Section 9 of the ESA from "taking" any endangered species. 16 U.S.C. § 1538. The term "take" "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1533(19). To overcome this blanket prohibition, a private actor may seek an "incidental take permit" from the Secretary for any taking that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B); 50 C.F.R. § 17.32(b). Further, ESA Section 7 requires that any federal agency wishing to fund or

permit an activity that may affect a listed species or its habitat must engage in a "consultation" process with FWS. 16 U.S.C. §§ 1536(a)(2), 1538.

      16.    FWS can promulgate special rules under ESA Section 4(d) that specify prohibitions and authorizations that are tailored to the particular species: "Whenever any species is listed as a threatened species pursuant to [the ESA], the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d).

      17.    On May 15, 2008, Defendants issued the Listing Rule, which listed the polar bear as a "threatened" species under the ESA. 73 Fed. Reg. 28211 (May 15, 2008).

      18.    On May 15, 2008, in conjunction with the promulgation of the Listing Rule and pursuant to its authority under ESA Section 4(d), the Secretary promulgated a 4(d) Rule for the polar bear, which amended 50 C.F.R. § 17.40 to add paragraph (q). 73 Fed. Reg. 28306 (May 15, 2008) (attached at Exhibit A). Paragraph (q) is tailored to the conservation needs of the polar bear and adopts existing conservation regulatory requirements of the Marine Mammal Protection Act and the Convention on International Trade in Endangered Species of Wild Fauna and Flora as the appropriate regulatory provisions for polar bears within the polar bear's range under certain situations. *See* 50 C.F.R. § 17.40(q); 73 Fed. Reg. at 28306.

      19.    Paragraph (q)(4) of the 4(d) Rule provides: "None of the prohibitions in § 17.31 of this part apply to any taking of polar bears that is incidental to, but not the purpose of, carrying out an otherwise lawful activity within any area subject to the jurisdiction of the United States *except Alaska*." 50 C.F.R. § 17.40(q)(4) (emphasis added); *see* 73 Fed. Reg. at 28318. Thus, the 4(d) Rule exempts activities in the lower 48 states and Hawaii – but not activities in

4976589

Alaska – from claims that an otherwise lawful activity could constitute an incidental taking of polar bears that requires an incidental take permit under the ESA.

20.     The 4(d) Rule and the Listing Rule were made effective on May 15, 2008. *See* 73 Fed. Reg. at 28306; *id.* at 28212.

## APA CLAIM

21.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 20 of this Complaint.

22.     The preamble to the 4(d)Rule provides:

> There currently is no way to determine how the emissions from a specific project under consultation both influence climate change and then subsequently affect specific listed species or critical habitat, including polar bears. As we now understand them, the best scientific data currently available do[] not draw a causal connection between [greenhouse gas] emissions resulting from a specific Federal action and effects on listed species or critical habitat by climate change, nor are there sufficient data to establish the required causal connection to the level of reasonable certainty between an action's resulting emissions and effect on species or critical habitat.

73 Fed. Reg. at 28313.

23.     During the rulemaking for the 4(d) Rule, the United States Geological Survey advised FWS that it is "beyond the scope of existing science to identify a specific source of $CO_2$ emissions and designate it as the cause of specific climate impacts at an exact location." Letter from Mark D. Myers, Director, U.S. Geological Survey, to Dale Hall, Director, Fish and Wildlife Service (May 14, 2008), *available at* http://www.fws.gov/home/feature/2008/polarbear012308/pdf/Memo_to_FWS-Polar_Bears.PDF.

24.     Based on information in the record and Defendants' recognition that the best scientific data do not demonstrate the requisite causal connection between specific actions resulting in emissions and an effect on species or critical habitat, Defendants exempted all states – except Alaska – from the otherwise applicable requirements of 50 C.F.R. § 17.31.

10

25.     FWS's own determination and all known science, establish that an emission in Anchorage has no more effect on climate change or polar ice than does an emission in Ankara. Because there is no requisite causal connection between the emissions from certain activities – regardless of location – and the effects on a species or critical habitat, there could be no basis for distinguishing between emissions from activities in all other states and emissions from activities in Alaska. The Alaska Gap therefore is arbitrary and capricious and contrary to law because it is irrational to subject Alaska operations to different and more onerous regulations concerning greenhouse gas emissions.

26.     Defendants provided no explanation for the Alaska Gap in paragraph (q)(4) and, thus, impermissibly neglected to provide a reasoned explanation for their decision to subject only activities in Alaska and in no other state to the requirements for incidental takings allegedly arising out of greenhouse gas emissions.

27.     Under the APA, the Alaska Gap is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §§ 706(2)(A). Under APA Section 706, the Court therefore has authority to hold the Alaska Gap unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor, and:

1.     Uphold the Listing Rule, the 4(d) Rule, and paragraph (q)(4) of the 4(d) Rule *except* for the Alaska Gap in paragraph (q)(4), which should be held unlawful, vacated, and remanded because: (a) the Alaska Gap is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under the APA; and (b) Defendants neglected to provide a reasoned explanation for the Alaska Gap in its administrative action.

11

2. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

John C. Martin, D.C. Bar # 358679
Duane A. Siler, D.C. Bar # 256339
Michele L. Walter, D.C. Bar # 487329
Patton Boggs LLP
2550 M Street N.W.
Washington, D.C. 20037
Tel: 202-457-6000
Fax: 202-457-6315
jmartin@pattonboggs.com
dsiler@pattonboggs.com
mwalter@pattonboggs.com

*Counsel for Plaintiffs,*
*American Petroleum Institute, et al.*

Harry Ng, D.C. Bar # 416604
General Counsel & Group Director
American Petroleum Institute
Office of General Counsel
1220 L. Street, NW
Washington, DC 20005
Tel: (202) 682-8260

*Counsel for the American Petroleum*
*Institute*

Robin S. Conrad, D.C. Bar # 342774
Amar D. Sarwal, D.C. Bar # 476007
National Chamber Litigation Center, Inc.
1615 H Street, NW
Washington, DC 20062
Tel: (202) 463-5337

*Counsel for the Chamber of Commerce*
*of the United States of America*

12

Tawny Bridgeford, D.C. Bar # 489432
Associate General Counsel
National Mining Association
101 Constitution Ave, NW
Suite 500 East
Washington, D.C. 20001-2133
Tel: (202) 463-2600

*Counsel for the National Mining Association*

Jan S. Amundson, D.C. Bar # 953083
Quentin Riegel, D.C. Bar # 255521
National Association of Manufacturers
1331 Pennsylvania Ave., N.W.
Washington, D.C. 20004-1790
Tel: 202-637-3000

*Counsel for the National Association of Manufacturers*

Barton Green, D.C. Bar # 329771
General Counsel
American Iron and Steel Institute
1140 Connecticut Ave., N.W.
Suite 705
Washington, D.C. 20037
Tel: 202-452-7100

*Counsel for American Iron and Steel Institute*

DATED: August 27, 2008

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Complaint

was served by hand delivery on August 27, 2008, upon the following:

DIRK KEMPTHORNE
Secretary of the United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

H. DALE HALL
Director of the United States Fish and Wildlife Service
1849 C Street, N.W.
Washington, D.C. 20240

UNITED STATES FISH AND WILDLIFE SERVICE
1849 C Street, N.W.
Washington, D.C. 20240

Young Woo

4976656

**EXHIBIT THREE**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL )<br>501 Second St., NE )<br>Washington D.C. 20002 ) | Case No. _____ |
| ) | |
| SAFARI CLUB INTERNATIONAL ) | |
| FOUNDATION ) | |
| 501 Second St., NE ) | |
| Washington D.C. 20002 ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DIRK KEMPTHORNE, in his official ) | |
| capacity; H. DALE HALL, in his official ) | |
| capacity; U.S. FISH AND WILDLIFE ) | |
| SERVICE ) | |
| 1849 C Street, NW ) | |
| Washington D.C. 20240 ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

## COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF

## I.        INTRODUCTION

1.        On May 15, 2008, the United States Secretary of the Interior ("Secretary") and

the U.S. Fish and Wildlife Service (the "Service") listed the polar bear as a threatened

species throughout its range under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-

1544.  Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout

its Range; Final Rule, 73 Fed. Reg. 28212-28303 (May 15, 2008) ("Final Rule").  As part of

the Final Rule, the FWS determined that "authorization for the import of sport-hunted

trophies would no longer be available under section 104(c)(5) of the [Marine Mammal

Protection Act ("MMPA")]." *See, e.g., id.* at 28242. Before the Final Rule and this determination, the FWS authorized the import of sport-hunted polar bear trophies from approved populations in Canada under the MMPA. 16 U.S.C. § 1374(c)(5).

2.      Plaintiffs Safari Club International ("SCI") and Safari Club International Foundation ("SCIF") (collectively "SCI and SCIF") bring this action against Defendants Dirk Kempthorne, in his official capacity as United States Secretary of the Interior; H. Dale Hall, in his official capacity as Director of the United States Fish and Wildlife Service; and the United States Fish and Wildlife Service (collectively "FWS"). This suit challenges the FWS's legal determination that the listing of the polar bear as threatened under the ESA creates a ban on the import of sport-hunted polar bear trophies otherwise legal under the MMPA, 16 U.S.C. § 1374(c)(5). SCI and SCIF bring this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA") and challenge actions taken under the MMPA.

3.      Until the recent action by the FWS detailed in this Complaint, U.S. hunters, including members of SCI, could import polar bear trophies into the United States. An amendment to the MMPA enacted in 1994, 16 U.S.C. § 1374(c)(5), authorizes such imports under certain conditions. Since 1994, over 900 U.S. hunters have relied on this provision to receive import permits and import polar bear trophies legally harvested in Canada.

4.      Including in March, April, and May of 2008, members of SCI have successfully sport-hunted polar bears from several of the six populations of polar bears in Canada approved for imports under the MMPA, 16 U.S.C. § 1374(c)(5). Many of these individuals submitted to the FWS applications to import polar bear trophies into the United States. The FWS has noticed in the Federal Register for a 30-day comment period the

2

applications of at least 11 SCI members.  73 Fed. Reg. 18808-09 (April 7, 2008); 73 Fed.

Reg. 21979-80 (April 23, 2008); 73 Fed. Reg. 21980-81 (April 23, 2008); 73 Fed. Reg.

21981-82 (April 23, 2008); 73 Fed. Reg. 23266-67 (April 29, 2008).  Other members of SCI

who also successfully hunted polar bears, including during the months of March, April and

May of 2008, have not yet submitted their applications for permits to the FWS.  On

information and belief, other members of SCI have 2009 and 2010 polar bear hunts

scheduled and paid for and for which they have not yet submitted permit applications.  On

information and belief, the FWS has informed members of SCI and others that it will not be

processing any permit applications to allow the import of polar bears now that the species is

listed as "threatened" under the ESA.

     5.     The FWS recognized in the Final Rule the benefits that U.S. sport hunting

brings to international polar bear conservation, including:

> "the important contribution to conservation that scientifically based
> sustainable use harvest programs can have";

> "the past significant benefits to polar bear management in Canada that have
> accrued as a result of the 1994 amendments to the MMPA that allow U.S.
> citizens who legally sport-harvest a polar bear from an MMPA-approved
> population to bring their trophies back into the United States";

> "income from fees collected for trophies imported into the United States are
> directed by statute to support polar bear research and conservation programs
> that have resulted in conservation benefits to polar bears in the Chukchi Sea
> region"; and

>  "hunting provides direct economic benefits to local native communities that
> derive income from supporting and guiding hunters, …."

73 Fed. Reg. at 28236.

     6.     Because polar bears, except for those within Alaska borders, are under the

jurisdiction of foreign nations, the FWS has no direct jurisdiction to advance the conservation

of these animals.  U.S. sporthunting and importation of polar bears represent one of the few if

not the only guaranteed conservation impact that the FWS/United States has on foreign

members of the species.

      7.     The FWS's determination that these imports are no longer allowed

undermines these benefits.

      8.     The FWS's determination that polar bear importation is no longer allowed is

unlawful for at least four reasons:

- the MMPA provision expressly authorizing the import of sport-hunted

  trophies from approved populations remains in effect, was enacted later than

  the import ban on depleted species, and is the more specific to polar bears and

  importation, and therefore supersedes any import ban arguably arising from

  the ESA listing;

- the FWS did not "by regulation published in the Federal Register, designate

  [the polar bear] as a depleted species or stock," as required by the provisions

  of the MMPA barring imports of depleted species, 16 U.S.C. § 1372(b)(3) and

  16 U.S.C. § 1371(a)(3)(B), and did not make the requisite finding for such a

  designation.

- if the Final Rule is deemed to have "designated" the polar bear as a "depleted"

  species under the MMPA, then the FWS failed to give adequate notice that it

  was taking this action and failed to give the public (including SCI and SCIF)

  an opportunity to comment on this designation; and

- if the Final Rule is deemed to have "designated" the polar bear as a "depleted" species under the MMPA, the import ban in the MMPA only applies to animals taken after such designation.

9.     SCI and SCIF seek relief (a) declaring the FWS's determination erroneous, (b) setting aside the portions of the Final Rule establishing an import ban, and (3) ordering the FWS to continue accepting and processing polar bear import permit applications under 16 U.S.C. § 1374(c)(5) and other applicable law.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under the APA, 5 U.S.C. § 702 (judicial review of final agency action) and 28 U.S.C. § 1331 (federal question jurisdiction). The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201, 28 U.S.C. § 2202, and 5 U.S.C. §§ 701-706.

11.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) as this action is brought against an agency of the United States and against officers of agencies of the United States in their official capacities; decisions and actions challenged here were made, at least in part, in this District; Plaintiffs SCI and SCIF maintain an office in this District; and no real property is involved.

12.     SCI and SCIF and members of SCI are currently adversely affected and aggrieved by the actions of the FWS in determining that imports of sport-hunted trophies from approved populations in Canada are no longer allowed and in refusing to further process or accept applications for such import permits.  These actions also harm SCI and SCIF's interests in polar bear conservation and management efforts supported by U.S. sport

hunters in Canada, who may abandon sport-hunting of polar bears if imports are not allowed. SCI and SCIF are entitled to judicial review of the actions challenged here under the APA.

13.     SCI and SCIF have standing to bring this action.

14.     The judicial review provisions of the APA waive the Federal government's sovereign immunity.  5 U.S.C. § 702.

## III.     PARTIES

15.     Safari Club International is a nonprofit corporation incorporated in the State of Arizona, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and place of business in Tucson, Arizona.  SCI maintains an office in Washington D.C.  Its membership includes approximately 53,000 individuals from the United States and many of the countries around the world.  Its missions are the conservation of wildlife, protection of the hunter, and education of the public concerning hunting and its use as a conservation tool. Members of SCI have hunted polar bears in the past, including recently, and intend to hunt polar bears in the future.  All or most of them desire to import the trophy of any polar bear they have harvested or will harvest into the United States as a trophy.

16.     SCI carries out its conservation mission through its sister organization, Safari Club International Foundation.  SCIF is a non-profit corporation, incorporated in the State of Nevada, operating under § 501(c)(3) of the Internal Revenue Code, with principal offices and place of business in Tucson, Arizona.  SCIF maintains an office in Washington D.C.  Its missions are conservation of wildlife, education of the public concerning hunting and its use as a conservation tool, and humanitarian services.  The conservation mission of SCIF is: (a) to support the conservation of the various species and populations of game animals and other wildlife and the habitats on which they depend, and (b) to demonstrate the importance of

hunting as a conservation and management tool in the development, funding and operation of wildlife conservation programs.

17.    SCI and SCIF are organizations that promote the principle and practice of sustainable use conservation. SCI and SCIF's and SCI members' interests include the sound management and conservation of polar bears and SCI members' ability to import polar bear trophies into the United States from Canada, as was allowed under the law before the listing of the polar bear as threatened under the ESA on May 15, 2008. SCI and SCIF possess sufficient interests in the subject matter of this litigation to establish standing.

18.    SCI and SCIF commented at every available opportunity for public comments on the proposed listing. SCI and SCIF submitted extensive written comments in April 2006, April 2007, and October 2007. In March 2007, SCI and SCIF presented oral testimony on the proposed listing at a hearing in Washington D.C.

19.    SCI and SCIF intend, shortly after the filing of this Complaint, to submit a 60-day notice letter to the Secretary and the Service regarding violations of the ESA in adopting the Final Rule, as required by the citizen suit provision of the ESA. 16 U.S.C. § 1540(g). After the expiration of the 60 days, if the Secretary and the FWS have not remedied the violations, SCI and SCIF may bring an action in this Court through the supplementation of this Complaint.

20.    Defendant Dirk Kempthorne is the Secretary of the Interior and has ultimate responsibility for the administration of the ESA and MMPA within the United States Department of the Interior. He signed the Final Rule. He is sued in his official capacity.

21.    Defendant H. Dale Hall is the Director of the Fish and Wildlife Service. He has responsibility for the administration and implementation of the ESA and MMPA,

including with regard to the listing of the polar bear and issuance of polar bear import

permits.  He is sued in his official capacity.

22.     Defendant U.S. Fish and Wildlife Service is an agency within the Department

of the Interior and is authorized to administer and implement the ESA and MMPA.  The

Secretary of the Interior has delegated authority to the Service in regard to issuing permits for

the importation of polar bears from Canada.

## IV.     LEGAL BACKGROUND

### A.     The Endangered Species Act

23.     The purposes of the ESA "are to provide a means whereby the ecosystems

upon which endangered species and threatened species depend may be conserved, to provide

a program for the conservation of such endangered species and threatened species, and to

take such steps as may be appropriate to achieve the purposes of the treaties and conventions

set forth in subsection (a) of this section."  16 U.S.C. § 1531(b).

24.     Among other things, the ESA provides for the listing and de-listing of species

as either endangered or threatened.  *Id.* § 1533.  A species is "endangered" if the agency

determines it "is in danger of extinction throughout all or a significant portion of its range

…."  *Id.* § 1532(6).  A species is "threatened" if the agency determines it "is likely to become

an endangered species within the foreseeable future throughout all or a significant portion of

its range."  *Id.* § 1532(20).  In the Final Rule, the FWS determined that the polar bear was

"threatened" throughout its range.

25.     The ESA provides protection to "endangered" species, subject to exceptions.

*See, e.g.,* 16 U.S.C. § 1538.  The ESA authorizes the Secretary (and the Service by

delegation) to issue regulations to protect a "threatened" species when it is listed under

8

Section 4 of the ESA.  16 U.S.C. § 1533(d).  The Secretary has promulgated regulations that make most of the prohibitions of Section 9 (by statute only applicable to "endangered" species) also applicable to "threatened" species.  50 C.F.R. § 17.31.  Thus, the general ESA prohibition on imports of "threatened" species is based on regulation and not statute.

26.     The ESA expressly provides that the import of "threatened" species shall be presumed to not be in violation of the ESA or any regulation issued under the ESA if certain conditions are met.  16 U.S.C. § 1538(c)(2).  The conditions include that the species is listed in Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora, signed on March 3, 1973 ("CITES"), the taking and exportation complies with CITES, certain provisions of ESA Section 9 are complied with, and the importation is not in the course of a commercial activity.  16 U.S.C. § 1538(c)(2).  The polar bear is listed on Appendix II of CITES and thus an importation of a polar bear in compliance with 16 U.S.C. § 1538(c)(2) would not violate the ESA.  *See* Final Rule, 73 Fed. Reg. at 28242.

### B.     The Marine Mammal Protection Act

27.     Subject to numerous and broad exceptions, the MMPA prohibits the take and importation of all marine mammals.  The polar bear is considered a marine mammal.  16 U.S.C. § 1362(6).

28.     Pursuant to amendments adopted by Congress in 1994, the MMPA expressly authorizes the issuance of permits "for the importation of polar bear parts (other than internal organs) taken in sport hunts in Canada to an applicant which submits with its permit application proof that the polar bear was legally harvested in Canada by the applicant."  *Id.* § 1374(c)(5)(A).  The Secretary (and by delegation the Service) "shall" issue such a permit if the Service finds that:

9

(i) Canada has a monitored and enforced sport hunting program consistent
with the purposes of the Agreement on the Conservation of Polar Bears;
(ii) Canada has a sport hunting program based on scientifically sound quotas
ensuring the maintenance of the affected population stock at a sustainable
level;
(iii) the export and subsequent import are consistent with the provisions of
the Convention on International Trade in Endangered Species of Wild Fauna
and Flora and other international agreements and conventions; and
(iv) the export and subsequent import are not likely to contribute to illegal
trade in bear parts.

*Id.* The Service has made these findings for six populations of polar bear in Canada.

http://www.fws.gov/international/pdf/polarbearsporthunted.pdf.

29.     The MMPA requires that the recipient of any import permit for sport-hunted

polar bear trophies pay $1,000 for "use in developing and implementing cooperative research

and management programs for the conservation of polar bears in Alaska and Russia …."  16

U.S.C. § 1374(c)(5)(B); see also

http://www.fws.gov/international/pdf/polarbearsporthunted.pdf.

30.     Since 1994, the FWS has issued over 900 permits for the import of sport-

hunted trophies into the United States.  The issuance of these permits has generated over

$900,000 for polar bear research and management programs.

31.     The MMPA, as enacted in 1972, provides for certain prohibitions in regard to

species or stocks that are "depleted."  For purposes of the MMPA, "the term 'depletion' or

'depleted' means any case in which –

**(A)** the Secretary, after consultation with the Marine Mammal Commission and
the Committee of Scientific Advisors on Marine Mammals established under
subchapter III of this chapter, determines that a species or population stock is
below its optimum sustainable population;
**(B**) a State, to which authority for the conservation and management of a
species or population stock is transferred under section 1379 of this title,
determines that such species or stock is below its optimum sustainable
population; or

10

(C) a species or population stock is listed as an endangered species or a threatened species under the Endangered Species Act of 1973 [16 U.S.C. 1531 et seq.].

16 U.S.C. § 1362(1). The MMPA defines the term "optimum sustainable population." *Id.* § 1362(9). The MMPA establishes that the designation of a "depleted" species or stock under 16 U.S.C. § 1362(1)(A) specifically must be made by notice in the Federal Register and through rulemaking. In explaining the nonapplicability of certain prohibitions, the MMPA discusses the "date on which the Secretary publishes notice in the Federal Register of his proposed rulemaking with respect to the designation of the species or stock concerned as depleted." *Id.* § 1372(d)(1).

32. In the Final Rule, the FWS did not make a "depleted" finding (regarding the species being above or below "optimum sustainable population") or designate the polar bear as a "depleted" species under 16 U.S.C. § 1362(1)(A). In the Final Rule, and the proposed rule and rulemaking leading to the Final Rule, the FWS did not give the public notice that it was proposing to make a "depleted" finding, to designate the polar bear as "depleted" under 16 U.S.C. § 1362(1)(A), or to ban the import of sport-hunted polar bear trophies under the MMPA. The FWS did not give the public an opportunity to comment on any of these actions. Instead, in the Final Rule, the FWS merely noted that "under the MMPA, the polar bear will be considered a 'depleted' species on the effective date of this listing." 73 Fed. Reg. at 28236.

33. The MMPA prohibits the importation of any marine mammal if such mammal was "taken from a species or population stock which the Secretary has, by regulation published in the Federal Register, designated as a depleted species or stock;…." 16 U.S.C. § 1372(b); *see also id.* § 1371(a)(3)(B) (no import permit for any

species "designated by the Secretary as depleted").   The Secretary has not designated

the polar bear as "depleted" in a regulation published in the Federal Register.

### C.   The Administrative Procedure Act

34.   The APA provides for judicial review of final agency action by persons

"aggrieved" by the action.  5 U.S.C. § 702.

35.   It also provides standards applicable when a Federal agency proposes and

adopts final rules and regulations.   5 U.S.C. § 553; *id.* § 551(4).

36.   Under the APA, Federal agencies must provide "general notice" of any

"proposed rule making" to the public through publication in the Federal Register.  That

notice must include "(1) a statement of the time, place, and nature of the public rule making

proceedings; (2) reference to the legal authority under which the rule is proposed; and (3)

either the terms and substance of the proposed rule or a description of the subjects and issues

involved."  *Id.*  § 553(b).

37.   The APA requires that the agency "give interested persons an opportunity to

participate in the rule making through submission of written data, views, or arguments with

or without opportunity for oral presentation.  After consideration of the relevant matter

presented, the agency shall incorporate in the rules adopted a concise general statement of

their basis and purpose."  *Id.* § 553(c).

## V.   FACTUAL BACKGROUND

38.   The FWS, in the Final Rule, signed by Defendant Dirk Kempthorne, listed the

polar bear as a "threatened species" under the ESA, effective on May 15, 2008.

39.   The Final Rule repeatedly stated that imports of polar bears taken in sport

hunts in Canada would no longer be allowed.  *See, e.g.,* 73 Fed. Reg. at 28242, 28302.

40.     Members of SCI and others have sported hunted polar bear from approved populations in Canada, including in March, April, and May of 2008, and desire to import their trophies.  On information and belief, the Service has informed at least some of these individuals that it will no longer be processing import permit applications because of the listing of the polar bear as a threatened species.  On information and belief, other SCI members have 2009 and 2010 polar bear hunts scheduled and paid for.  On information and belief, the Service has stopped processing applications for polar bear import permits as of May 15, 2008.  Without an import permit from the Service, these individuals cannot import their legally hunted polar bear trophies into the United States.

41.     The sport-hunting and importation of polar bears benefits polar bear conservation and management in a number of ways.  As noted above, each issued import permit requires the payment of $1,000 to the Service for polar bear research and management in Alaska and Russia.

42.     U.S. hunters in particular pay upwards of $40,000-50,000 per polar bear hunt.  A large percentage of those funds go to the local native communities, who provide guiding services, goods, and other services to the foreign hunters.  This infusion of cash into the cash-strapped native communities provides another incentive for these people to accept the Western-based science and management that facilitates polar bear conservation and that is required before the Service will approve a population for import.  The local people who co-exist with the polar bear can help ensure that harvest of polar bears falls within established quotas and, by whatever means, is done in a sustainable way.  As noted above, the FWS, in the Final Rule and elsewhere, has recognized the benefits of sport hunting of polar bears.

43.     Sport hunting by U.S. and other foreign hunters in Canada does not increase polar bear mortality in any given year.  Canadian authorities establish quotas for polar bear populations.  These quotas are assigned to the local communities.  The local communities use the majority of their quota (provided as "tags" representing the number of bears that can be taken, by whatever means, by that community) for subsistence and management purposes.  The communities sell a number of the tags to sport hunters.  In most cases, the meat and other non-trophy portions of the harvested polar bear remain with the native communities to be used for subsistence purposes.  If U.S. hunters did not purchase these tags because of the FWS-imposed ban on imports, the native communities will sell them to other foreign hunters or use the tags themselves for subsistence purposes.   If U.S. hunters do not purchase the tags, the value of the individual polar bears to the residents of the native communities are likely to diminish, as are the incentives for community residents to strictly accept the quota system and the science behind it.

## VI.     CLAIMS FOR RELIEF

### First Claim for Relief
### (Import Ban Contrary to Express Authorization of Imports)
### Violation of the APA and MMPA

44.     SCI and SCIF reallege and incorporate by reference all the allegations of this Complaint, as though fully set forth below.

45.     The FWS's determination that the import of polar bear trophies legally hunted in Canada is prohibited by the MMPA is arbitrary and capricious and contrary to law.  A provision of the MMPA, 16 U.S.C. § 1374(c)(5)(A), enacted in 1994, expressly authorizes the issuance of polar bear import permits and mandates their issuance if certain conditions are met.  The conditions have been met in general and have been or could be met for the

14

members of SCI who have applications before the FWS. The 1994 amendment to the

MMPA was enacted later in time and is more specific to polar bears than the general

prohibition against importing depleted species, enacted in 1972. The import authorization of

16 U.S.C. § 1374(c)(5)(A) controls instead of any conflicting provision barring the import of

species designated as "depleted."

46. Any regulation that purports to ban the import of polar bears if they are

deemed "depleted" under the MMPA or listed under the ESA is contrary to the statutory

authorization and mandate to permit the import of sport-hunted polar bear trophies if certain

conditions are met.

47. Until the FWS's import ban determination became effective on May 15, 2008,

individuals could import polar bear trophies into the United States if they complied with 16

U.S.C. § 1374(c)(5)(A) and other applicable law.

48. SCI and SCIF and members of SCI are harmed and aggrieved by this final

action because members of SCI cannot import legally harvested polar bears from Canada.

Further, lost will be the conservation benefits of the sport hunting that will no longer occur if

an import ban is in place. No other remedy at law exists.

49. These actions by the Secretary constitute a violation of the MMPA and the

APA. 5 U.S.C. § 706(2).

50. The remedies requested in this Complaint would remedy SCI and SCIF's and

SCI's members' injuries, as outlined in this Complaint.

**Second Claim for Relief**
**(Import Ban Not Supported by Designation of Polar Bear as Depleted)**
**Violation of the APA and MMPA**

51.     SCI and SCIF reallege and incorporate by reference all the allegations of this Complaint, as though fully set forth below.

52.     The FWS's determination that the import of polar bear trophies legally hunted in Canada is prohibited by the MMPA is arbitrary and capricious and contrary to law.  The provisions of the MMPA that prohibit the importation of "depleted" species only applies to species for which the Secretary of the Interior, Defendant Kempthorne, "has, by regulation published in the Federal Register, designated as a depleted species or stock."  16 U.S.C. § 1372(b)(3); *id.* § 1371(a)(3)(B).

53.     The Secretary has not designated the polar bear as a "depleted species" and has not published any such designation in the Federal Register.

54.     The listing of the polar bear as a threatened species under the ESA, which was done through a regulation published in the Federal Register, does not constitute a "designation" of the polar bear as a depleted species under the MMPA.  The ESA listing only establishes the polar bear as a depleted species by definition.  *See id.* § 1362(1)(C).  The listing of the polar bear as threatened under the ESA does not establish that the polar bear is "below its optimum sustainable population," as required for the designation of the species as "depleted."  The finding required to list a species as threatened under the ESA does not match the finding required to designate a species as depleted under the MMPA.  Compare 16 U.S.C. §§ 1533(a)(1), 1532(20) with 16 U.S.C. § 1362(1), (9).  The FWS listed the polar bear as threatened based on projections of population status and threats in 45 years, not on current overall population numbers.

55.     The FWS never made the finding required under the MMPA for designating a species as "depleted" and never gave the public notice that it was considering such a finding or that it was considering "designating" the polar bear as a depleted species.  On information and belief, the FWS could not find that the polar bear is currently below its "optimum sustainable population," as defined in the MMPA.

56.     Until the FWS's import ban determination became effective on May 15, 2008, individuals could import polar bear trophies into the United States if they complied with 16 U.S.C. § 1374(c)(5) and other applicable law.

57.     SCI and SCIF and members of SCI are harmed and aggrieved by this final action because members of SCI cannot import legally harvested polar bears from Canada. Further, lost will be the conservation benefits of the sport hunting that will no longer occur if an import ban is in place.  No other remedy at law exists.

58.     These actions by the Secretary constitute a violation of the MMPA and the APA.  5 U.S.C. § 706(2).

59.     The remedies requested in this Complaint would remedy SCI and SCIF's and SCI's members' injuries, as outlined in this Complaint.

**Third Claim for Relief**
**(No Rulemaking Occurred For "Depleted" Designation)**
**Violation of the APA**

60.     SCI and SCIF reallege and incorporate by reference all the allegations of this Complaint, as though fully set forth below.

61.     The FWS's determination that the import of polar bear trophies legally hunted in Canada is prohibited by the MMPA is arbitrary and capricious, failed to observe proper procedure, and is contrary to law.  The provisions of the MMPA that prohibit the importing

of "depleted" species only apply to species for which the Secretary of the Interior, Defendant Kempthorne, "has, by regulation published in the Federal Register, designated as a depleted species or stock." 16 U.S.C. § 1372(b)(3); *Id.* § 1371(a)(3)(B).

62.     If the Final Rule is deemed to be a "designation" of the polar bear as a "depleted species," the FWS failed to give the public adequate notice and an opportunity to comment on this aspect of the Final Rule. This "designation" is not a logical outgrowth of the proposed rule, was not sought as a part of the original petition to list the species, and was not commented on by the public or explained in the Final Rule.

63.     The FWS did not ask for comments on and the rulemaking did not consider whether the polar bear is "below its optimum sustainable population," as required for the designation of a species as "depleted."

64.     Until the FWS's import ban determination became effective on May 15, 2008, individuals could import polar bear trophies into the United States if they complied with 16 U.S.C. § 1374(c)(5) and other applicable law.

65.     SCI and SCIF and members of SCI are harmed and aggrieved by this final action because members of SCI cannot import legally harvested polar bears from Canada. Further, lost will be the conservation benefits of the sport hunting that will no longer occur if an import ban is in place. No other remedy at law exists.

66.     These actions by the Secretary constitute a violation of the MMPA and the APA. 5 U.S.C. §§ 706(2), 553.

67.     The remedies requested in this Complaint would remedy SCI and SCIF's and SCI's members' injuries, as outlined in this Complaint.

**Fourth Claim for Relief**
**(MMPA Import Ban Only Applies to Animals Taken While**
**Designated a "Depleted Species")**
**Violation of the APA and MMPA**

68.     SCI and SCIF reallege and incorporate by reference all the allegations of this

Complaint, as though fully set forth below.

69.     The FWS's determination that the importation of polar bear trophies legally

hunted in Canada is prohibited by the MMPA and the application of this prohibition to the

import of polar bears hunted before the polar bear was deemed a "depleted species" is

arbitrary and capricious and is contrary to law.  The provisions of the MMPA that prohibit

the importation of "depleted" species only applies to particular animals "taken from a species

or population stock which the Secretary has, by regulation published in the Federal Register,

designated as a depleted species or stock."  16 U.S.C. § 1372(b)(3); *Id.* § 1371(a)(3)(B).  This

prohibition does not apply to individual polar bears (i.e., trophies) harvested before the FWS

listed the polar bear as threatened on May 15, 2008, and, under the FWS's position, deemed

"depleted" under the MMPA as of that date.

70.     If the Final Rule is deemed to be a "designation" of the polar bear as a

"depleted species," the import ban triggered by such "designation" does not apply to animals

taken before such designation on May 15, 2008.  These animals were "taken from" a species

that was not deemed or designated as "depleted" at the time of the taking.

71.     On information and belief, the FWS is refusing to process or accept

applications for polar bear import permits, even if the applicant harvested the animal before

May 15, 2008.

72.     Until the FWS's import ban determination became effective on May 15, 2008, individuals who harvested before May 15, 2008, could import polar bear trophies into the United States if they complied with 16 U.S.C. § 1374(c)(5) and other applicable law.

73.     SCI and SCIF and members of SCI are harmed and aggrieved by this final action because members of SCI cannot import from Canada polar bears legally harvested before May 15, 2008, and the conservation benefits of that sport hunting will be lost.  No other remedy at law exists.

74.     These actions by the Secretary constitute a violation of the MMPA and the APA.  5 U.S.C. § 706(2).

75.     The remedies requested in this Complaint would remedy SCI and SCIF's and SCI's members' injuries, as outlined in this Complaint.

## VII.   PRAYER FOR RELIEF

For the reasons stated above, SCI and SCIF respectfully request that the Court grant the following relief:

1.     Declare that the listing of the polar bear as threatened under the ESA does not create a bar to the import of sport-hunted polar bear trophies into the United States if otherwise legal under applicable law;

2.     Declare that the import prohibition contained in the MMPA, if it is deemed to apply generally because the FWS listed the polar bear as "threatened" on May 15, 2008, does not apply to applicants who harvested a polar bear before May 15, 2008, as these polar bears were not "taken" from a species that was deemed "depleted" at the time of the taking.

3.   Set aside those portions of the Final Rule declaring or establishing that by virtue of the listing of the polar bear as a threatened species under the ESA, sport-hunted polar bear trophies cannot be imported into the United States under the MMPA.

4.   Set aside those portions of the Final Rule declaring or establishing that by virtue of the listing of the polar bear as a threatened species under the ESA, sport-hunted polar bear trophies harvested before May 15, 2008, cannot be imported into the United States under the MMPA.

5.   Enjoin the FWS from refusing to process polar bear import applications due to the listing of the polar bear as a threatened species under the ESA and order the FWS to continue to process such applications;

6.   Award SCI and SCIF the costs of litigation, including reasonable attorneys fees;

7.   Award SCI and SCIF such other relief that is just and proper.

Dated this 23rd day of May, 2008.

Respectfully submitted,


_/s/ Douglas S. Burdin_____
Douglas S. Burdin
(D.C. Bar No. 434107)
Anna M. Seidman
(D.C. Bar No. 417091)
Safari Club International
501 2nd Street N.E.
Washington, D. C.  20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
dburdin@safariclub.org
aseidman@safariclub.org


Counsel for
Safari Club International and
Safari Club International Foundation

# EXHIBIT FOUR

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF ALASKA** | Civil Action No. 1:08-cv-01352 EGS |
| **Plaintiff,** | |
| **vs.** | |
| **DIRK KEMPTHORNE, et al.,** | |
| **Defendants,** | |
| **and** | |
| **CENTER FOR BIOLOGICAL DIVERSITY,** 1333 N. Oracle Rd. Tucson, AZ 85705 | |
| **NATURAL RESOURCES DEFENSE COUNCIL,** 40 West 20th Street New York, NY 10011 | |
| **GREENPEACE, Inc.,** 75 Arkansas St. San Francisco, CA 94107 | |
| **Intervenor-Defendant –Applicants.** | |

### INTERVENOR-CONSERVATION GROUPS' MOTION TO INTERVENE
### AS DEFENDANTS AND MEMORANDUM IN SUPPORT

Pursuant to Federal Rule of Civil Procedure 24 and Local Civil Rule 7(j), the

Center for Biological Diversity ("Center"), Natural Resources Defense Council

("NRDC") and Greenpeace, Inc. ("Greenpeace") (collectively, "Conservation Groups")

hereby move this Court to intervene as of right as Defendants in this case, or, in the

alternative, for permissive intervention. Counsel consulted with counsel for Defendants

and Plaintiffs and determined that Defendants take no position on Conservation Groups'

motion and counsel for Plaintiffs indicated that they will take no position on

Conservation Groups' motion pending review of this motion and memorandum.

**BACKGROUND**

In this case, Plaintiff State of Alaska ("Alaska") challenges the final rule classifying polar bears as a threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, et seq.  *See* Endangered and Threatened Wildlife and Plants, Determination of Threatened Status for the Polar Bear (*Ursus maritimus*) Throughout its Range, 73 Fed. Reg. 28,212, 28,214 (May 15, 2008) ("Final Listing Rule").[1]

The road to protection for the polar bear under the ESA has been a long one.  The Conservation Groups seeking intervention in this case set the polar bear on that road through the filing of a February 2005 petition with the Secretary of Interior and the U.S. Fish and Wildlife Service (collectively, "the Secretary") to list the polar bear under the ESA.  Due to the Secretary's delay in responding to the petition, the Conservation Groups were forced to file two lawsuits to compel his compliance with the mandatory deadlines for action established by the ESA's listing process.  The second of these two cases, Center for Biological Diversity v. Kempthorne, 2008 WL 1902703 (N.D. Cal. Apr. 28, 2008) (No. 08-1339) ("Center for Biological Diversity II"), resulted in the court order requiring the Secretary to issue the final listing rule for the polar bear challenged here.  The Center for Biological Diversity II case is still ongoing in the Northern District of California, as the Conservation Groups have challenged the Secretary's failure to designate the polar bear as an endangered species and to designate critical habitat for the

---

[1] The Background Section of this brief may be familiar to the court as many of these facts were described in Conservation Groups' motion to intervene in a related case, Safari Club International v. Kempthorne, No. 08-881, (D.D.C. May 23, 2008) (Dkt. # 11).  The Court granted Conservation Groups motion to intervene on June 10, 2008.

polar bear, as well as other aspects of the final listing rule and special rule issued by the
Secretary, both of which unlawfully reduce protection to the species.

Because Alaska's lawsuit directly threatens Conservation Groups' and its
members' interest in protecting polar bears, and threatens to undue years of successful
administrative and legal advocacy, Conservation Groups now move to intervene as of
right in this matter or in the alternative for permissive intervention.  As detailed below,
Conservation Groups easily meet the four-part test for intervention as of right in this
action and should be granted intervention in order to protect their interests in the survival
and recovery of the polar bear and its habitat.

### A.      Events Leading to the Listing of the Polar Bear

In 2005, Conservation Groups petitioned the Secretary to list the polar bear as a
threatened or endangered species throughout its range.  *See* Endangered and Threatened
Wildlife and Plants; 12-Month Petition Finding and Proposed Rule To List the Polar Bear
(*Ursus maritimus*) as Threatened Throughout Its Range Proposed Rule and Notice of 12-
month Finding, 72 Fed. Reg. 1064 (Jan. 9, 2007).  The polar bear, a marine mammal
completely dependent on the Arctic sea ice for survival, is poised to become one of the
first species to fall victim to global warming.  Arctic sea ice is the polar bear's primary
habitat, the platform from which they hunt and on which they breed.  Endangered and
Threatened Wildlife and Plants, Determination of Threatened Status for the Polar Bear
(*Ursus maritimus*) Throughout its Range, 73 Fed. Reg. 28,212, 28,214 (May 15, 2008)
("Final Listing Rule").  The polar bear's Arctic sea-ice habitat is quite literally melting
away.  As noted in the Final Listing Rule, even under relatively optimistic scenarios,
scientists expect that the Arctic's summer sea ice will largely vanish by mid-century;

under increasingly likely scenarios, the seasonal ice upon which the polar bear depends will be gone in less than a decade.  73 Fed. Reg. 28,233.  Without sea ice, polar bears cannot survive.  73 Fed. Reg. 28,262.   In addition, polar bear populations are also threatened by oil and gas exploration and development, poaching in Russia, overhunting in Canada and Greenland, and widespread toxic contamination.  See, e.g., 73 Fed. Reg. 28,256 (recognizing the variety of threats facing polar bears today and acknowledging that the cumulative effects of these "multiple stressors" and the "rapid rate of climate change today create a unique and unprecedented challenge for present-day polar bears").

Under the ESA, the Secretary of the Interior has 90 days "to the maximum extent practicable," to make a finding as to whether a petition to list a species "presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1).  If the Secretary answers this question in the affirmative, he then has 12 months from the date the petition was filed to decide whether to grant the petition and, if so, issue a proposed rule listing the species.  16 U.S.C. § 1533(b).

In the case of the polar bear, however, the Secretary did not make any findings in responding to Conservation Groups' petition to list the bear ten months after it had been filed.  Accordingly, on December 15, 2005, Conservation Groups filed suit to compel action.  Complaint for Declaratory and Injunctive Relief, Center for Biological Diversity v. Kempthorne, No. 05-5191 (N.D. Cal. dismissed due to Consent Decree dated Jan. 11, 2007) ("Center for Biological Diversity I"); 72 Fed. Reg. 1065.

In response to Conservation Groups' suit, on February 9, 2006, the Secretary issued a 90-day finding on the Petition to list the polar bear.  Endangered and Threatened

Wildlife and Plants; Petition To List the Polar Bear as Threatened Notice of 90-day

Petition Finding and Initiation of Status Review, 71 Fed. Reg. 6745 (Feb. 9, 2006).  The

Secretary found that the Petition presented substantial information showing that listing of

the polar bear may be warranted under the ESA, initiated a status review for the species,

and solicited public comment for a period of 60 days.  Id.

Because the Secretary delayed the 90-day finding until nearly one year had passed

from receipt of the Petition, the Secretary also failed to meet the deadline for issuance of

the 12-month finding.  As a result, a consent decree was entered in Center for Biological

Diversity I that required the Secretary to issue the required 12-month finding by

December 27, 2006.

On December 27, 2006, the Secretary announced a proposed rule to list the polar

bear as a threatened species throughout its range.  The proposed rule was published in the

Federal Register on January 9, 2007.  72 Fed. Reg. 1064.  After a species is formally

proposed for addition to the list of threatened and endangered species, the ESA requires,

except in narrow circumstances not present here, that the Secretary make a final decision

on the proposed listing within a year. 16 U.S.C. § 1533(b)(6).  Thus, under the ESA, the

Secretary was required to publish his final listing determination and critical habitat

designation by January 9, 2008.  The Secretary, however, missed this deadline as well.

As a result, Conservation Groups again filed suit on March 10, 2008 to compel the

issuance of a final rule.  Complaint for Declaratory and Injunctive Relief, Center for

Biological Diversity II (No. 08-1339, Dkt. # 1).  Conservation Groups moved for

summary judgment on April 2, 2008, and requested that the Court order a final

determination to be made no later than May 15, 2008 and, if that determination was positive, that the listing of the polar bear become immediately effective.

On April 28, 2008, the District Court for the Northern District of California granted Conservation Groups' Motion for Summary Judgment, finding the Secretary and the Service in violation of the ESA for failing to publish a final listing decision for the polar bear by January 9, 2008. Center for Biological Diversity II, WL 1902703, at *2. The Court ordered the Secretary and the Service to publish a final listing determination for the polar bear by May 15, 2008, and to make any final regulation effective upon publication pursuant to 5 U.S.C. § 553(d)(3). Center for Biological Diversity II, 2008 WL 1902703, at *3-*4.

### B. The Final Listing Rule Challenged in this Action

On May 15, 2008, the Secretary published the Final Rule, listing the polar bear as a threatened species throughout its range due to the rapid warming of the Arctic and melting of the bear's sea-ice habitat. In the Final Listing Rule, the Secretary found that, due to global warming, two-thirds of the world's bears are likely to be extinct by the middle of this century and cautioned that even this projection may be overly optimistic due to the more rapid than predicted melting of the sea ice. 73 Fed. Reg. 28,274. The Secretary further concluded "polar bears today contend with harvest, contaminants, oil and gas development, and additional interactions with humans that they did not experience in [the past]….Thus, both the cumulative effects of multiple stressors and the rapid rate of climate change today create a unique and unprecedented challenge for present-day polar bears…." 73 Fed. Reg. 28256.

Concurrently with the final listing rule, the Secretary issued a regulation pursuant to Section 4(d) of the ESA, which authorizes activities that harm polar bears and would otherwise be prohibited by Section 9 of the ESA and its implementing regulations. Endangered and Threatened Wildlife and Plants, Special Rule for the Polar Bear, 73 Fed. Reg. 28,306 (May 15, 2008) ("4(d) Rule"); 40 C.F.R. § 17.40(q).

### C. Current Ongoing Litigation Concerning the Polar Bear Listing Rule and 4(d) Regulation

Immediately following the listing decision, the Conservation Groups filed an amended Complaint in the Northern District of California, adding challenges to the legal validity of the 4(d) Rule under the Administrative Procedures Act ("APA") and the National Environmental Protection Act ("NEPA"). First Amended Complaint, Center for Biological Diversity II, No. 08-1339 (Dkt. # 76). In addition, on May 15, 2008, the Conservation Groups filed a notice of intent to sue pursuant to the citizen suit provisions of the ESA, 16 U.S.C. § 1540(g), which detailed the Secretary's violations of the ESA by failing to use the best available science in determining that polar bears were "threatened" rather than "endangered" in all or parts of their range; failing to designate critical habitat for the polar bear concurrently with the Final Listing Rule, 16 U.S.C. § 1533(a)(3)(A)(i); and issuing the 4(d) Rule in contravention of ESA requirements, 16 U.S.C. § 1533(d).

Pursuant to a Joint Case Management Statement filed in Center for Biological Diversity II, Conservation Groups then filed a Second Amended Complaint incorporating these claims. Center for Biological Diversity II, No. 08-1339 (Dkt. # 126). In the Joint Case Management Statement, the parties also agreed that the case before the Northern District of California shall be resolved on cross motions for summary judgment. Center for Biological Diversity II, No. 08-1339 (Dkt. # 102). Under the briefing schedule issued

by the court in <u>Center for Biological Diversity II</u>, Conservation Groups must submit their motion for summary judgment and opening brief on Oct. 30, 2008, Defendants must file any opposition and cross motion by Nov. 26, 2008, and the final hearing on these motions and replies to these motions will occur on Jan. 8, 2009.  Stipulation Re Filing of Second Amended Complaint, <u>Center for Biological Diversity II</u>, No. 08-1339 (Dkt. # 113); See also August 13, 2008 Order at 9 (Dkt. # 139).

Litigation over the Final Listing Rule began in this Court on May 23, 2008 when Safari Club International and Safari Club International Foundation (collectively "Safari Club") filed a complaint challenging the Secretary's listing decision.  <u>Safari Club International v. Kempthorne</u>, No. 08-881, (D.D.C. May 23, 2008).  The Safari Club complaint challenges the ban on the import of trophy-hunted polar bear parts under the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 <u>et seq.</u> ("MMPA"), which was triggered by the polar bear's ESA listing.  <u>Safari Club</u>, No. 08-881 (Dkt. # 1).  Currently, Safari Club's claims are brought solely pursuant to the MMPA and the APA, but it has filed a sixty-day notice letter with Secretary under ESA and its Complaint also stated its intention to bring additional claims pursuant to the ESA.  <u>See</u> <u>id.</u> at ¶ 19.

Given the Conservation Groups' interest in protecting the polar bear, as evidenced by their present and historical advocacy, they filed a Motion to Intervene in Safari Club's action.  <u>Safari Club,</u> No. 08-881, (Dkt. # 11).  On July 10, 2008, the Court granted Conservation Groups' permissive intervention as defendants.  On August 5, 2008, the Court issued an order setting a timeframe for the parties to conference and to present a meet and confer statement.

On August 4, 2008, Alaska filed this action.  Alaska's case currently consists of eight claims for relief.  These claims allege that the listing of the polar bear as threatened violates the procedural and substantive mandates of the ESA, the MMPA and the APA. Complaint, Dkt. # 1.  Given Conservation Groups' extensive involvement in gaining protections for the polar bear, they now seek to intervene as of right in Alaska's suit challenging the Final Listing Rule.

### D.  The Movant Conservation Organizations

The Center for Biological Diversity is a national nonprofit conservation organization with 160,000 members and supporting online activists.  Declaration of Kieran Suckling in Support of Motion to Intervene ("Suckling Decl.") ¶ 9 (attached hereto as Exhibit A).  The Center's primary mission is the protection of imperiled species, such as the polar bear, and their habitats.  Id. ¶ 2.  Additionally, the Climate, Air and Energy Program ("Climate Program") within the Center, focuses its work and advocacy efforts on curbing global warming and limiting its damaging effects on endangered species and their habitats.  Id. ¶ 3.  Obtaining protection of the polar bear is one of the Climate Program's leading campaigns to protect species most imperiled by global warming.  Id. ¶ 4.

The Natural Resources Defense Council ("NRDC") is a national nonprofit environmental organization with approximately 421,550 members nationwide.  NRDC uses law, science and the support of its members to ensure a safe and healthy environment for all living things.  Declaration of Gina Trujillo in Support of Motion to Intervene ("Trujillo Decl.") ¶ 4 (attached hereto as Exhibit B).  One of NRDC's top

priorities is the protection of threatened and endangered species such as the polar bear. Id. ¶ 9.

Greenpeace, Inc. is an international nonprofit environmental organization with about 250,000 members in the United States. (Declaration of Melanie Duchin in Support of Motion to Intervene ("Duchin Decl.") ¶ 2 (attached hereto as Exhibit C). Greenpeace's mission is to raise public awareness of environmental problems and promote changes that are essential to a green and peaceful future. Id. For the past decade, Greenpeace has worked to raise awareness of the effects of global warming in the Arctic, including the impacts on polar bears and other species who are threatened by continued global warming. Id.

As discussed further below, the Conservation Groups and their members have significant professional and personal interests in the polar bear, its habitat, and its protection. Suckling Decl., Lopez Decl., Duchin Decl., Declaration of Jack Lentfer in Support of Motion to Intervene (attached hereto as Exhibit D), Declaration of Jenny Ross in Support of Motion to Intervene (attached hereto as Exhibit E).

## ARGUMENT

## I.    CONSERVATION GROUPS ARE ENTITLED TO INTERVENE AS OF RIGHT

The D.C. Circuit uses the following four-part test to evaluate motions to intervene as of right: "(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests." S.E.C. v. Prudential Sec., Inc., 136 F.3d 153, 156 (D.C. Cir. 1998); see also Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1074 (D.C. Cir. 1998). Rule

24(a) is construed liberally in favor of granting intervention. <u>Nuesse v. Camp</u>, 385 F.2d

694, 702 (D.C. Cir. 1967); <u>see also</u> <u>The Wilderness Soc'y v. Babbitt</u>, 104 F. Supp.2d 10,

18 (D.D.C. 2000) (noting that "the D.C. Circuit has taken a liberal approach to

intervention") (citing <u>NRDC v. Costle</u>, 561 F.2d 904, 910-911 (D.C. Cir. 1977)).

Following its liberal application of Rule 24, this Court and the D.C. Circuit routinely

grant conservation organizations' motions to intervene where they have an interest in

pending litigation.[2]

### A. The Motion to Intervene is Timely

The timeliness of a motion to intervene depends on "consideration of all of the

circumstances, especially weighing the factors of time elapsed since the inception of the

suit, the purpose for which intervention is sought, the need for intervention as a means of

preserving the applicant's rights, and the probability of prejudice to those already parties

to the case." <u>United States v. AT&T Co.</u>, 642 F.2d 1285, 1295 (D.C. Cir. 1980).

Here, Alaska filed its complaint on August 4, 2008. Less than two weeks has

elapsed, Defendants have not yet answered Plaintiff's Complaint, no dispositive motions

have been filed, and no discovery has been taken. Because Conservation Groups have

filed at the very inception of the case, their motion is clearly timely. <u>Fund for Animals,</u>

<u>Inc. v. Norton</u>, 322 F.3d 728, 735 (D.C. Cir. 2003) (finding motion timely where it was

---

2 <u>See</u>, <u>e.g.</u> <u>George E. Warren Corp. v. EPA</u>, 159 F.3d 616 (D.C. Cir. 1998), <u>amended by</u> 164 F.3d 676
(D.C. Cir. 1999) (three environmental groups authorized to intervene on EPA's behalf in industry challenge
to EPA air rules); <u>Wilderness Soc'y v. Morton</u>, 463 F.2d 1261 (D.C. Cir. 1972) (Canadian environmental
group allowed to intervene in U.S. environmental group's challenge to Interior Department's compliance
with environmental procedures); <u>Nat'l Coal Ass'n v. Uram</u>, 39 Env't Rep. Cas. (BNA) 1624 & n.2, 1994
U.S. Dist. LEXIS 16404, * 1 & n.2 (D.D.C. 1994) (environmental group authorized to intervene in industry
challenge to environmental rules, and to act as plaintiff in challenging other aspects of those rules); <u>Kerr-</u>
<u>McGee Corp. v. Hodel</u>, 630 F. Supp. 621 (D.D.C. 1986), <u>vacated on other grounds</u> 840 F.2d 68 (D.C. Cir.
1988) (environmental group authorized to intervene in industry litigation challenged alleged government
inaction on mining leases).

filed "less than two months after plaintiffs filed their complaint and before the defendant's answer was filed").

> **B.** **Conservation Groups Have a Significant Protected Interest in the Polar Bear**

Conservation Groups satisfy the second requirement on Fed. R. Civ. P. 24(a) because they have a significant protected interest in the polar bear, the subject matter of this litigation. Rule 24(a)(2) requires that an intervenor have an interest that is related "to the property or transaction which is the subject of the action." When assessing the interest requirement, the D.C. Circuit has adopted a liberal approach, looking to the "policies behind the 'interest' requirement" in the rule, and viewing the rule as a "practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." Nuesse v. Camp, 385 F.2d at 700; see also Foster v. Gueory, 655 F.2d 1319, 1324 (D.C. Cir. 1981). This Circuit has observed that "[t]he right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." Hodgson v. United Mine Workers of America, 473 F.2d 118, 130 (D.C. Cir. 1972).

As is apparent from the procedural history described above, Conservation Groups and their members have a clear and legally cognizable interest in this action. Conservation Groups' initial petition to the Secretary commenced the polar bear listing process. 72 Fed. Reg. at 1065. Conservation Groups were then required to file two lawsuits to compel the Secretary to follow his obligations under the ESA after he missed the ESA's mandatory deadlines. Id., 73 Fed. Reg. 28,212. The second of these suits is currently ongoing in the Northern District of California, and Conservation Groups are

litigating the same Final Listing Rule challenged here, as well as defending aspects of the

protections secured by the listing in the related Safari Club case.

     Conservation Groups also have a substantial interest because, as briefly described

above, their missions encompass the protection of imperiled species and their members

have a specific interest in the survival and conservation of the polar bear and marine

mammals, in general.  The organizational mission of the Center for Biological Diversity

is to "secure a future for animals and plants hovering on the brink of extinction, for the

wilderness they need to survive, and by extension, for the spiritual welfare of generations

to come."  Suckling Decl. ¶ 2.  One organizational purpose of NRDC is "[t]o preserve,

protect, and defend natural resources, wildlife and the environment against

encroachment, misuse and destruction."  Trujillo Decl. ¶ 4.  The organizational purpose

of Greenpeace is to raise public awareness of environmental problems and promote

changes that are essential to a green and peaceful future, and Greenpeace has campaigned

for the protection of the Arctic and Arctic wildlife like the polar bear for many years.

Duchin Decl. ¶ 2.

     Individual members of the Conservation Groups also have diverse personal and

professional interests in the protection of polar bears and their habitat.  See Suckling,

Lentfer, Ross and Duchin Decls.  Moreover, in Center for Biological Diversity II, no

party questioned Conservation Groups' standing and, in ruling in Conservation Groups'

favor, the court implicitly affirmed Conservation Groups' standing.  This circuit has also

implicitly affirmed Conservation Groups' standing in its order granting them permissive

intervention in Safari Club's action currently pending before this Court.  See Fund for

Animals, 322 F.3d at 735 (holding that finding of constitutional standing "is alone sufficient to establish that" intervenor satisfies Rule 24's interest requirement).

In sum, the Conservation Groups and their members have demonstrated a long-standing interest in the protection of the polar bear, which easily provides a basis for intervention in this case. See, e.g., Idaho Farm Bureau Fed'n. v. Babbitt, 58 F.3d 1392, 1397 (9th Cir. 1995) ("[a] public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it had supported."); Coalition of Arizona/New Mexico Counties for Stable Econ. Growth v. Dep't of the Interior, 100 F.3d 837, 841-44 (10th Cir. 1996) (individual's involvement with a species through his activities as a photographer, amateur biologist, naturalist, and conservation advocate amounted to sufficient interest for purpose of intervention in litigation covering the species' listing under the ESA); Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 526 (9th Cir. 1983) (environmental groups' "environmental, conservation and wildlife interests" were sufficient for intervention as a matter of right).

In addition to satisfying the "protected interest" and "impairment" prongs of Rule 24(a), the foregoing discussion shows that Conservation Groups also have standing to defend the final polar bear listing decision from Plaintiff's challenge. Specifically, Conservation Groups and their members can demonstrate injury-in-fact, causation, and redressability. See Fund for Animals, 322 F.3d at 733 (requiring that prospective intervenors demonstrate standing).

As noted, Conservation Groups are environmental organizations whose missions include the protection of imperiled species. Suckling Decl. ¶¶ 1-2; Duchin Decl. ¶ 2; Trujillo Decl. ¶¶ 4, 9. Likewise, Conservation Groups' members have significant

professional and personal interests in the polar bear, its habitat, and its protection. <u>See</u> Duchin, Lentfer, Ross and Suckling Decls. Conservation Groups' interests are among those interests that the Supreme Court has found sufficient to establish standing. <u>See</u>, <u>e.g.</u>, <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.</u>, 528 U.S. 167, 181-82 (2000) (harm to recreation opportunities constitutes injury in fact for purposes of standing); <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 562-63 (1992) ("desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing").

Alaska's case threatens to harm Conservation Groups' interests because Plaintiff seeks to remove protections currently afforded to this gravely imperiled species by the Final Listing Rule. If Plaintiff is successful, polar bears will no longer be provided the protections of the Endangered Species Act even as they continue to face threats to their survival, including oil, gas and other development activities in critical habitat; loss of sea ice habitat resulting from unabated greenhouse gas emissions and global warming; increased shipping and other industrial activities in critical habitat; increased human-bear interactions and hunting. This makes it far more likely the polar bear will continue to decline and become extinct, obviously harming the Conservation Groups' interests in the survival and recovery of the species. In addition, if Plaintiff were to obtain a favorable decision, it would become more difficult for Conservation Groups to achieve their objective of providing the polar bear even stronger levels of protection, such as being listed as endangered and requiring consideration of greenhouse gas emissions and global warming in making polar bear management decisions. In short, Plaintiff's claims challenge the very protections Conservation Groups have fought for years to obtain and

relate directly to claims Conservation Groups are currently litigating in the Northern District of California.

Moreover, a ruling in Alaska's favor could set a precedent that would harm Conservation Groups' interests in protecting other imperiled marine mammals. Among Plaintiff's claims is one that calls on the Court to decide whether or not a species listed as threatened or endangered under the ESA is also automatically considered a "depleted" species under the MMPA. Currently there are 27 marine mammal stocks recognized as depleted by FWS. Of these, only 9 are listed as depleted as a result of a separate rulemaking under the MMPA, rather than purely as a consequence of ESA listing. Thus, if Plaintiff prevailed on its claim that a separate rulemaking under the MMPA is necessary, over twenty species of marine mammals, including most listed whales, and all ESA-listed marine mammals under FWS jurisdiction, could lose their MMPA "depleted status" protections. Similarly, a ruling in favor of Plaintiff on this claim would also prevent other threatened marine mammals from being automatically considered depleted under the MMPA when those species are listed under the ESA. Such results would clearly harm Conservation Groups' interests in protecting other marine mammals and are also the same results Conservation Groups seek to avoid with their participation in Safari Club's action pending before this Court.

Finally, the harm Conservation Groups face can be redressed by a decision that does not compromise either the protections currently afforded the polar bear or Conservation Groups' claims that the species requires additional protections. Accordingly, Conservation Groups have standing in this case.

**C.     This Action Threatens to Impair Conservation Groups' Interests**

Rule 24(a)'s "impairment" requirement concerns whether, as a practical matter, the denial of intervention will impede the prospective intervenor's ability to protect its interests in the subject of the action. As the Advisory Committee Notes for the 1966 amendments to Rule 24(a) explain, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene."  In keeping with this directive, the D.C. Circuit has observed that the rule's emphasis on "practical disadvantage" was "designed to liberalize the right to intervene in federal actions." Nuesse, 385 F.2d at 701-02.

There is no question that the disposition of Plaintiff's claims has the potential to impair Conservation Groups' interests. Plaintiff challenges the Secretary's decision to list the polar bear as a threatened species throughout its range, claiming that the decision violates the ESA, MMPA and APA. Compl. ¶¶ 48-83.  For example, Plaintiff challenges the scientific data on which the Secretary based his final listing decision, alleging that it does not warrant listing the polar bear under the ESA.  Compl. ¶¶ 48-51.  If Plaintiff succeeded in this claim, it would not only strip the polar bear of needed and warranted protections, as explained in the Final Listing Rule, but could also affect Conservation Groups' claim that the science supports an endangered, rather than threatened listing. This is a claim currently being litigated in the Northern District of California.  Second Amended Complaint for Declaratory Judgment and Injunctive Relief, Center for Biological Diversity II, No. 08-1339 (Dkt. # 126).   A ruling in favor of Plaintiff on this claim would also affect Conservation Groups' overall efforts to protect other Arctic species threatened by global warming, loss of sea ice habitat and oil, gas and other industrial development.  Put simply, if Plaintiff is successful in overturning or weakening

17

the Final Listing Rule, polar bears will be far more vulnerable to further decline and

extinction, which clearly harms the Conservations Groups' interest in protecting the

species.  Suckling Decl. ¶ 12, Lentfer Decl. ¶ 18.  Moreover, any decision in Plaintiff's

favor could also set a precedent that would further weaken the existing protections the

Secretary has put in place for the polar bear and make it harder to establish additional

protections Conservation Groups are currently working to secure for the species.

     As in the <u>Safari Club</u> case now before this Court, a court ruling in Plaintiff's favor

here would also harm the procedural and informational interests of the Conservation

Groups and their members, who have an interest in seeing the protections of the ESA and

MMPA properly applied.  Suckling Decl. ¶ 14, Lentfer Decl. ¶ 17.  The Conservation

Groups' interests would be harmed should Plaintiff succeed in forcing a separate

rulemaking procedure under the MMPA for polar bears to obtain the same level of

protection that they currently enjoy, because the results of such a rulemaking are

uncertain, and potentially less protective of the polar bear.  Suckling Decl. ¶ 14.  That is,

a finding in Alaska's favor could set a precedent reducing the protection available not just

to polar bears, but to all other marine mammals treated as "depleted" under the MMPA

by virtue of being listed as endangered or threatened under the ESA.  Suckling Decl. ¶

13; <u>see</u> <u>Nuesse</u>, 385 F.2d at 319 (recognizing that "*stare decisis* principles may in some

cases supply the practical disadvantage that warrants intervention as of right").

     Courts have repeatedly found environmental organizations' interests of sufficient

risk of impairment to sustain intervention for environmental groups in suits such as this.

In <u>Idaho Farm Bureau Federation</u>, for example, the Ninth Circuit held that a disposition

of the action in favor of plaintiffs resulting in the delisting of the Bruneau Hot Springs

Snail "would impair [intervenor's] ability to protect their interest in the Springs Snail and

its habitat." 58 F.3d at 1398. In Coalition of Arizona/New Mexico Counties for Stable

Economic Growth, the Tenth Circuit held that intervenor's interest in the protection of

the Mexican spotted-owl would, "as a practical matter," be impaired by a ruling in favor

of the plaintiffs to delist the owl "by the stare decisis effect of the district court's

decision, not to mention the direct effect of a possible permanent injunction." 100 F.3d at

844; see also Nuesse, 385 F.2d at 319 (recognizing "*stare decisis* principles" as basis for

intervention).

> **D.** **Conservation Groups' Interests Are Not Adequately Represented by the Existing Parties**

The Supreme Court has explained that the "inadequate representation"

requirement of Rule 24(a) "is satisfied if the applicant shows that representation of his

interest 'may be' inadequate; and the burden of making that showing should be treated as

minimal." Trbovich v. United Mine Workers of America, 404 U.S. 528, 538 n.10 and

acc. text (1972) (citation omitted). Under this lenient approach, representation may be

inadequate where the interests of the party seeking intervention and those of the existing

party are "different," even if they are not "wholly 'adverse,'" Nuesse, 385 F.2d at 703, or

where they are "similar but not identical." American Tel. & Tel. Co., 642 F.2d 1285,

1293 (D.C. Cir. 1980). Indeed, "the [D.C. Circuit] Court of Appeals has stated that 'the

burden is on those opposing intervention to show that representation for the absentee will

be adequate.'" Alexander v. FBI, 186 F.R.D. 21, 31 (D.D.C. 1998) (quoting American

Tel. & Tel., 642 F.2d at 1293).

This standard is met here because the Defendants do not represent Conservation

Groups' interests in this case. The D.C. Circuit has frequently recognized that

governmental representation of private intervenors may be inadequate, particularly where

the private intervenors can be expected to make different arguments from their

governmental counter-parts. Fund for Animals, 322 F.3d at 736; Dimond, 792 F.2d at

193. In this case, there can be little doubt that the government will not represent

Conservation Groups' interests given the past and continuing litigation between

Conservation Groups and the Defendants over the polar bear listing. See, e.g., Idaho

Farm Bureau Fed'n, 58 F.3d at 1398 (noting that the FWS was unlikely to adequately

represent Conservation Groups who had "compelled FWS to make a final decision by

filing a lawsuit").

For these reasons, this Court should not hesitate to grant intervention as of right

pursuant Rule 24(a).

## II.     IN THE ALTERNATIVE TO INTERVENTION OF RIGHT, PERMISSIVE INTERVENTION IS WARRANTED

Should this Court find that Conservation Groups are not entitled to intervene as of

right under Rule 24(a), Conservation Groups move that this Court grant permission to

intervene pursuant to Federal Rule of Civil Procedure 24(b). Rule 24(b)(2) provides that:

> Upon timely application anyone may be permitted to intervene in an action . . .
> when an applicant's claim or defense and the main action have a question of law
> or fact in common. . . . In exercising its discretion the court shall consider whether
> the intervention will unduly delay or prejudice the adjudication of the rights of the
> original parties.

The D.C. Circuit has stated that permissive intervention may be granted in the

court's discretion if the proposed Intervenor presents "(1) an independent ground for

subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a

question of law or fact in common with the main action." E.E.O.C. v. Nat'l Children's

Ctr., Inc., 146 F.3d 1042, 1046 (D.C. Cir. 1998). Additionally, permissive intervention

must not "delay or prejudice the adjudication of the rights of the original parties." Fed.

R. Civ. P. 24(b)(2). Like intervention of right, permissive intervention is to be granted

liberally. E.E.O.C., 146 F.3d at 1045 (permissive intervention granted where intervenor

has substantial interest at stake even if no common claim or defense claimed; "flexible

interpretations" of rule appropriate in favor of intervention); Nuesse, 385 F.2d at 704-06

(D.C. Circuit eschews strict reading of rules to advance policy favoring liberal allowance

of permissive intervention).

      Conservation Groups easily meet all of these requirements. As discussed above

in the context of intervention as of right, Conservation Groups' motion is timely and

existing parties will not be prejudiced. The Court has jurisdiction over Conservation

Groups and their defenses, as they all involve issues of federal law in defending against

the Plaintiff's claims under federal law. Lastly, Conservation Groups' defenses are in

common with Plaintiff's claims both in law and fact, as they address the exact matter

raised by Plaintiffs – the legality of the Final Listing Rule and the implications of listing

of the polar bear under the ESA.

## CONCLUSION

      Conservation Groups respectfully request that, as this Court did in Safari Club,

No 08-881, this Court grant their motion to intervene.

Respectfully submitted,

_____/s/ Benjamin Longstreth\_\_\_\_\_
Benjamin Longstreth (DC Bar # 974015)
Andrew Wetzler
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
Telephone: 202-289-6868

Facsimile: 202-289-1060
blongstreth@nrdc.org
awetzler@nrdc.org

Michael Senatore (DC Bar # 453116)
Center for Biological Diversity
1601 Connecticut Avenue, N.W., Suite 701
Washington, D.C.  20009
Telephone:  202-232-1216
Facsimile:  202-232-1217
msenatore@biologicaldiversity.org

Brendan Cummings
Kassia Siegel
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Telephone:  760-366-2232
Facsimile:  760-366-2669
bcummings@biologicaldiversity.org

ksiegel@biologicaldiversity.org

Dated: August 15, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on this date, August 15, 2008, I caused to be served a true and correct copy of the following documents:

> Intervenor-Conservation Groups' Motion to Intervene as Defendants and Memorandum in Support, declarations in support, proposed order, and Corporate Disclosure Statement.

> [Proposed] Answer of Intervenor Defendants Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, Inc. to Plaintiffs' Complaint

> Motion for Leave to Appear Pro Hac Vice By Kassia R. Siegel, Declaration of Kassia R. Siegel, Proposed Order.

by first-class mail on the following counsel:

Craig D. Galli
Holland & Hart
60 E. South Temple, Suite 2000
Salt Lake City, UT 84111-1031
Email: cgalli@hollandhart.com

William G. Myers III
Holland & Hart
101 S. Capitol Boulevard, Suite 14.00
Boise. Idaho 83702-2527
Email: wmyers@hollandhart.com

Bradley E. Meyen
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Email: brad.meyen@alaska.gov

Attorneys for Plaintiff State of Alaska

Kristen Byrnes Floom
U.S. DEPARTMENT OF JUSTICE
601 D Street, NW
3rd Floor
Washington, DC 20004

Attorney for Defendant Department of the Interior

*/s/ Benjamin Longstreth*
Benjamin Longstreth

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL, <u>et al.</u>, | Case No. C-08-1339 (CW) |
| Plaintiffs, | |
| v. | |
| DIRK KEMPTHORNE, <u>et al.</u>, | **[PROPOSED] ORDER** |
| Defendants, | |
| and | |
| HUMANE SOCIETY OF THE UNITED STATES, <u>et al.</u>, | |
| Defendant-Intervenors | |
| and | |
| CENTER FOR BIOLOGICAL DIVERSITY, <u>et al.</u>, | |
| Defendant-Intervenors. | |

This Court, having considered Federal Defendants' Motion to Transfer, hereby GRANTS

the motion and ORDERS that captioned case shall be transferred to the U.S. District Court for the

District of Columbia pursuant to 28 U.S.C. § 1404(a).

Dated: _____        _____
                                    Hon. Claudia Wilken
                                    United States District Judge