

RECEIVED

SEP - 2 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF COURT
OAKLAND CALIFORNIA

*C-08-1339-CW*

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re Polar Bear Endangered Species Act Listing and § 4(d) Litigation | MDL Docket No. _____ |

## BRIEF IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS
## TO THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

## I.    INTRODUCTION

Since the May 15, 2008 decision of the U.S. Fish & Wildlife Service (the "Service")

listing the polar bear as a "threatened" species under § 4 of the federal Endangered Species Act

("ESA") ("Listing Decision"), and the Service's companion Interim Special 4(d) Rule ("Interim

4(d) Rule"), multiple lawsuits and claims have been filed in two district court jurisdictions within

the D.C. and Ninth Circuits. Additional lawsuits and claims are anticipated extending to at least

one additional district court jurisdiction. All of the pending lawsuits and claims, as well as the

anticipated additional actions, arise from a common set of facts and decisions; however, directly

conflicting and contradictory decisions and relief are sought, presenting very substantial risks of

inconsistent pretrial decisions and proceedings, inconsistent preliminary relief, inconsistent

decisions on the merits, and multiple appeals to different Courts of Appeal.

In this context, the Alaska Oil and Gas Association ("AOGA") seeks an order from the

Judicial Panel on Multidistrict Litigation (the "Panel"), pursuant to 28 U.S.C. § 1407,

transferring the actions identified in the attached Schedule of Actions (as well as any actions that may be subsequently filed asserting related or similar claims) to the United States District Court for the District of Columbia for coordinated or consolidated pretrial proceedings. In the alternative, AOGA requests transfer of the cases to the U.S. District Court for the District of Alaska.

## II.  BACKGROUND

Since May 15, 2008, four separate actions have been filed in federal district courts concerning the Service's listing of the polar bear (*Ursus maritimus*) as a "threatened" species under the ESA, 16 U.S.C. § 1531 *et seq.*, and the Service's contemporaneous Interim 4(d) Rule.[1] *See* 73 Fed. Reg. 28211-28303 (May 15, 2008) (Listing Decision); 73 Fed. Reg. 28305-28318 (May 15, 2008) (Interim 4(d) Rule).  Additional actions, and additional claims in the pending actions, regarding the listing of the polar bear under the ESA, are very likely to be filed. The core claims in the cases, all of which arise from the same set of operative facts and agency decisions, assert:  (1) either that the listing of the polar bear species is unjustified or, conversely, that the polar bear should be listed as "endangered," a more dire categorical status than its present listing as "threatened;" and/or (2) either that the limitations on take established in the Interim 4(d) Rule must be expanded to encompass activities in Alaska or, conversely, that the Interim 4(d) Rule is entirely or partially unjustified.

---

[1] The ESA establishes a wide range of protections applicable to listed species, including a broad prohibition on the "take" of such species unless authorized through a comprehensive federal permitting process.  However, the prohibition on take only applies by statute to species listed as "endangered."  Under § 4(d) of the ESA, the take prohibition may be extended by regulation to species listed as "threatened."  The polar bear species has been listed under the ESA as a "threatened" species, and accordingly the take prohibition does not categorically apply. The Interim 4(d) Rule promulgated by the Service at the same time as its Listing Decision establishes, pursuant to § 4(d) of the ESA, the circumstances under which the take prohibition shall and shall not apply to the polar bear species.

2

A.    _Center for Biological Diversity v. Kempthorne_ **(Northern District of California)**

The Center for Biological Diversity ("CBD"), the Natural Resources Defense Council ("NRDC") and Greenpeace have asserted six claims challenging the Listing Decision and the Interim 4(d) Rule pursuant to the ESA, the Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA") and the Marine Mammal Protection Act ("MMPA"). The gravamen of CBD's current claims, asserted in its Second Amended Complaint filed on July 15, 2008,[2] are (1) that the Listing Decision is invalid because polar bears should be listed as "endangered" instead of "threatened," and (2) the Interim 4(d) Rule is invalid on multiple factual, scientific, procedural and legal grounds. CBD's claims are pending in the Northern District of California Oakland Division (before the Hon. Claudia Wilken). The named defendants in CBD's claims are U.S. Department of Interior Secretary Kempthorne, the Service, and the Service's Director. CBD seeks declaratory and injunctive relief and has indicated that it may seek preliminary injunctive relief.

Two parties have obtained intervention in some of CBD's claims. Both AOGA and the Arctic Slope Regional Corporation ("ASRC") moved unopposed for intervention in all of CBD's claims; however, the district court _sua sponte_ denied AOGA and ASRC intervention in the merits of four aspects of CBD's claims. _See Ctr. for Biological Diversity v. Kempthorne,_ No. C 08-1339 CW, 2008 WL 3822948 *1 (N.D. Cal. Aug. 13, 2008). Currently, motions by the Defenders of Wildlife (to join as an Intervenor-Plaintiff, and to assert companion challenges to

---

[2] CBD's original complaint was filed in March 2008 and sought an injunction requiring the Service to issue a final listing decision. The district court did issue such an injunction and the Service timely issued both the Listing Decision and the Interim 4(d) Rule. Over the objection of the Federal Defendants, CBD was then allowed to amend its complaint to assert challenges to the Listing Decision and the Interim 4(d) Rule, instead of filing a new action on these distinct claims.

3

the Interim 4(d) Rule), the National Petrochemical and Refiners Association ("NPRA") (to join

as an Intervenor-Defendant in defense of the Service) and the Edison Electric Institute ("EEI")

(also to join as an Intervenor-Defendant in the defense of the Service) are pending. Additional

motions to intervene are anticipated.

**B.**    *State of Alaska v. Kempthorne* **(District of Columbia)**

On August 4, 2008, the State of Alaska filed an action in the U.S. District Court for the

District of Columbia against the Secretary, the Service, and the Director of the Service. The

lawsuit has been assigned to the Honorable Emmet G. Sullivan. The State of Alaska's lawsuit,

which includes claims under the ESA, APA and MMPA, is the mirror image of CBD's Listing

Decision challenge. The State of Alaska seeks declaratory and injunctive relief and contends

that the listing of polar bears as a threatened or endangered species under the ESA is not

supported by the facts, science, or applicable law. The named plaintiffs in CBD's lawsuit (i.e.,

CBD, NRDC and Greenpeace) have filed a pending motion for intervention. CBD has publicly

stated its intent to seek transfer of the State of Alaska's lawsuit to the Northern District of

California.

**C.**    *American Petroleum Institute v. Kempthorne* **(District of Columbia)**

On August 27, 2008, the American Petroleum Institute ("API"), together with the

Chamber of Commerce of the United States of America, the National Mining Association, the

National Association of Manufacturers, and the American Iron and Steel Institute, filed an action

in the U.S. District Court for the District of Columbia against the Secretary, the Service and the

Service's Director. As with the State of Alaska's case, this lawsuit has been assigned to the

Honorable Emmet G. Sullivan. The gravamen of API's litigation, which asserts a single APA

claim, is that the Service has limited application of the Interim 4(d) Rule in a manner that is

contrary to the facts, applicable science, and the law. API's claim, which in effect seeks a

4

geographic expansion of the Interim 4(d) Rule, is the mirror image of CBD's claims asserting

that all or parts of the Interim 4(d) Rule are invalid.

**D.    _Safari Club v. Kempthorne_ (District of Columbia)**

Finally, Safari Club International and Safari Club International Foundation (collectively

"Safari Club") have filed an action in the U.S. District Court for the District of Columbia against

the Secretary, the Service, and Service's Director.  As with the State of Alaska's and API's

lawsuits, this lawsuit has been assigned to the Honorable Emmet G. Sullivan.  The Safari Club

seeks declaratory and injunctive relief under the APA and the MMPA and challenges the

Service's determination under the Final Rule that the listing of the polar bear as a "threatened"

species under the ESA creates a ban on the import of sport-hunted polar bear trophies otherwise

legal under the MMPA.  More to the point, the Safari Club has served notice on the Service, and

otherwise stated publicly, that it intends to amend its claims to directly challenge the Listing

Decision.  _See_ Ex. A (Notice of Intent to Sue).  CBD, NRDC and Greenpeace, as well as the

Humane Society of the United States, International Fund for Animal Welfare, and Defenders of

Wildlife have intervened in the Safari Club's lawsuit.

**E.    Anticipated Additional Actions.**

At least one additional action concerning the Listing Decision and the 4(d) Rule is

expected to be filed.  On July 23, 2008, the Pacific Legal Foundation ("PLF") sent the Secretary

and the Director a 60-day notice of intent to sue regarding the Final Rule and the 4(d) Rule.  _See_

Ex. B.  PLF has stated publicly that it intends to file suit in the U.S. District Court for the District

of Alaska.  Similar to the State of Alaska's claims, PLF has indicated that it intends to challenge

the appropriateness of any listing of the polar bear species under the ESA.

## III.   ARGUMENT

**A.     The Pending Challenges to the Polar Bear Listing Decision and Interim 4(d) Rule Should be Transferred for Coordinated or Consolidated Pretrial Proceedings.**

The statutory scheme authorizing the Panel to transfer two or more civil cases to any district for coordinated or consolidated pretrial proceedings requires a determination that (i) the actions "involv[e] one or more common questions of fact," (ii) transfer "will be for the convenience of parties and witnesses," and (iii) transfer "will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). All of these requirements are satisfied here. Indeed, there are compelling reasons why continued maintenance of these cases in separate courts is likely to lead to disparate pretrial decisions regarding the administrative record, intervention and preliminary relief, conflicting summary judgment decisions, and multiple appeals to multiple federal Courts of Appeal.

**1.     The Actions Involve Common Questions of Fact.**

The operative facts in each of the pending actions are not only common, but essentially identical. The focus of all of the pending actions is on the Service's Listing Decision and/or the companion Interim 4(d) Rule. These decisions necessarily rise or fall on the basis of a single very large administrative record, subject to any supplementation that may be allowed by pretrial motion. All contested questions of fact in each of the pending actions relate to (i) the content of the administrative record, (ii) the adequacy of the administrative record to support the Service's decisions, and (iii) the specific facts, science, and findings of the Service in the record as they support, or conflict with, the Listing Decision and/or the Interim 4(d) Rule. Accordingly, to an extraordinary degree, resolution of each of the pending actions and claims requires identification, examination, and consideration of a common set of operative facts and related issues.

2.    **Transfer Will Be For the Convenience of Parties.**

Because three of the four pending actions already are proceeding in the District of Columbia before Judge Sullivan, transfer of the only action not currently in that district would in no way inconvenience or prejudice the parties to that action.[3]  To the contrary, given CBD's desire to move the District of Columbia cases to California, and given the federal defendants' desire to move the California case to the District of Columbia, it is apparent that all parties believe consolidation of these cases is warranted and beneficial, albeit in different jurisdictions.

First, the named federal defendants in all of the lawsuits are located in Washington, D.C., as is counsel for the federal defendants.  Moreover, the United States is expected to bring a motion to transfer CBD's litigation from the Northern District of California to Washington, D.C. Accordingly, the federal parties, which otherwise face multiple actions with a high potential for inconsistent results, clearly would benefit from and support transfer and consolidation of the polar bear listing lawsuits.

Second, each of the plaintiffs in CBD's litigation are national or international conservation advocacy groups actively engaged in lobbying, advocacy, and federal litigation in Washington, D.C. and throughout the United States.  *See, e.g., Ctr. for Biological Diversity v.*

---

[3] The fact that every pending action except for one (i.e., CBD's lawsuit) is already pending in one district (the District of Columbia) is no obstacle to transfer.  The Panel has transferred numerous actions under 28 U.S.C. § 1407 when one action is pending in one district and more than one action is pending in another district.  *See, e.g., In re Cisco Sys., Inc. Sec. & Derivative Litig.*, 268 F. Supp. 2d 1378 (J.P.M.L. 2003) (two actions pending in separate districts transferred to one district); *In re Mosaid Tech., Inc. Patent Litig.*, 283 F. Supp. 2d 1359 (J.P.M.L. 2003) (same); *In re Cross-Florida Barge Canal Litig.*, 329 F. Supp. 543 (J.P.M.L. 1971) (same); *In re Alodex Corp. Sec. Litig.*, 380 F. Supp. 790 (J.P.M.L. 1974) (one action pending in one district transferred to district where two actions were pending); *In re Value Line Special Situations Fund Litig.*, 334 F. Supp. 999 (J.P.M.L. 1971) (same); *In re Convenient Food Mart Franchise Litig.*, 350 F. Supp. 1166 (J.P.M.L. 1972) (one action pending in one district transferred to district where three actions were pending).

*Kempthorne*, 498 F. Supp. 2d 293 (D.D.C. 2007); *Natural Res. Defense Council v. Kempthorne*, 525 F. Supp. 2d 115 (D.D.C. 2007); *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007). These national advocacy groups have already intervened in the Safari Club lawsuit, and have moved to intervene in the State of Alaska's lawsuit, both of which are pending in the District of Columbia.[4] Their presence as intervenors in polar bear litigation in the District of Columbia assures that they will benefit from, and not be inconvenienced by, transfer and consolidation. Additionally, CBD's stated intent to transfer venue of the State of Alaska's lawsuit to California is evidence that it believes consolidation would be beneficial.

Finally, the intervenors in CBD's Action, including the pending movants for intervention, would not be inconvenienced or prejudiced by a transfer to the District of Columbia. The current intervenors – AOGA and ASRC – strongly support transfer and consolidation.[5] The parties with pending motions to intervene – Defenders of Wildlife, NPRA and EEI – are all entities located in Washington, D.C. Indeed, as discussed above, Defenders of Wildlife is already an intervenor party in the Safari Club lawsuit in the District of Columbia.

### 3.    Transfer Will Promote the Just and Efficient Conduct of the Actions.

The interests of judicial economy, efficiency, and consistency very strongly support transfer and consolidation in this instance. The adjudication of the pending actions before one judge in one district will ensure that the factual and legal issues raised in this set of litigation are addressed in a consistent manner. Allowing the actions to continue without transfer for

---

[4] As of the filing of this motion, the API lawsuit is too recent for these parties to move for intervention. However, they are expected to do so.

[5] Conservation Force intervened in CBD's *original* claim, which sought to require the Service to issue a final listing decision. Conservation Force has since appealed from the district court's adverse judgment on that claim; however, it has not sought intervention in any of the claims asserted by CBD or others pertaining to the Listing Decision or the Interim 4(d) Rule.

8

consolidated or coordinated pretrial proceedings creates a great risk of inconsistent decisions

regarding pretrial matters, including the adequacy and content of the administrative record,

intervention, preliminary injunctive relief, and summary judgment on the merits of the claims

regarding the Listing Decision and the Interim 4(d) Rule.

For example, CBD contends that the Service's listing of the polar bear as "threatened" is

contrary to the record.  Instead, these parties contend, the Service must uplist the polar bear to

the more dire status of "endangered."  Conversely, on the same facts and record, the State of

Alaska now claims (and both Safari Club and PLF intend to claim) that listing the polar in any

category under the ESA is unwarranted.  These mutually exclusive claims create a spectrum of

potentially contradictory decisions ranging from a decision delisting the polar bear, to sustaining

the Service's "threatened" species listing, to uplisting the polar bear to "endangered" status.

Similarly, CBD (and Defenders of Wildlife) contend that the Service's Interim 4(d) Rule is

entirely, or partially, unwarranted and invalid, while API claims that the Interim 4(d) Rule must

be expanded.  These claims also create a spectrum of contradictory decisions, based upon the

same facts and record, ranging from invalidating all or part of the Interim 4(d) Rule, to sustaining

the Interim 4(d) Rule, to requiring expansion of the Interim 4(d) Rule.

The Panel has recognized that the interests of justice are not served by disparate decisions

in actions involving similar factual and legal issues. *See, e.g., In re Griseofulvin Antitrust Litig.*,

395 F. Supp. 1402, 1403 (J.P.M.L. 1975) (finding transfer under § 1407 would prevent

inconsistent rulings in three actions filed in three different districts with substantially identical

factual allegations); *In re Fourth Class Postage Regulations*, 298 F. Supp. 1326, 1327 (J.P.M.L.

1969) ("§ 1407 is an appropriate means of avoiding injury to like parties caused by inconsistent

judicial treatment.").  In the absence of transfer and consolidation, the polar bear listing and 4(d)

9

lawsuits present a significant risk of disparate decisions, further resulting in multiple appeals in two Courts of Appeal.

**B.    The District of Columbia is the Most Appropriate Transferee Forum.**

While it is likely that all or substantially all parties favor transfer and consolidation of the polar bear listing and 4(d) rule lawsuits, it is unlikely that the parties agree upon the appropriate forum to which the cases should be transferred.  Nevertheless, the District of Columbia is overwhelmingly the most appropriate choice for a transferee district.  The Service's decision regarding the contested issues in this litigation was made in the District of Columbia, the administrative record that will form the basis of each pending action is located there, it is the most convenient forum for all the parties, the majority of pending actions are already pending in that court before a single judge, and the court has the resources to properly conduct these actions.

**1.    The "Center of Gravity" of the Litigation is in the District of Columbia.**

First, only two districts have a genuine connection to the issues raised in this litigation: (i) the District of Alaska, which includes the only polar bear habitat located within the United States; and (ii) the District of Columbia, where the decisions regarding the Listing Decision and the Interim 4(d) Rule were made, where the administrative record regarding those rules is located, and where the parties and the majority of pending actions are already engaged in one or more of these lawsuits.

In contrast, the Northern District of California, Oakland Division, where CBD elected to file its lawsuit, has absolutely no connection to polar bears, polar bear habitats, the Service offices where the factual and scientific information and data was generated and where the regulatory decisions were made, or any of the factual issues regarding the polar bear that will be

10

addressed in the pending claims.[6]  The Panel routinely expresses preference for a transferee

district that has a substantial connection to the issues in the litigation.  *See In re Cross-Florida*

*Barge Canal Litig.*, 329 F. Supp. 543 (J.P.M.L. 1971) (finding, in an environmental case,

stronger reasons for transfer to a district where decision making occurred, where witnesses were

located, and where the subject of the litigation (a canal) was located); *In re Am. Airlines, Inc.*

*Privacy Litig.*, 342 F. Supp. 2d 1355 (J.P.M.L. 2004) (transferring litigation to a district where

evidence, parties, and witnesses are located); *In re Air Crash Disaster at Stapleton Int'l Airport*,

683 F. Supp. 266 (J.P.M.L. 1988) (same).[7]

### 2.    Most of the Polar Bear Cases Have Been Filed in the District of Columbia.

The pendency of three of the four actions in the District of Columbia favors transfer to

that forum. Hon. Emmet Sullivan is presiding over all three of the District of Columbia lawsuits.

When several actions are already pending before one judge, the Panel has not hesitated to find

that judge and district to be an appropriate transferee forum. *See In re Aftermarket Filters*

*Antitrust Litig.*, _ F. Supp. 2d _, 2008 WL 3891745 (J.P.M.L. Aug. 18, 2008) (transferring

---

[6] This is not the first time that CBD has attempted to create momentum regarding polar bear litigation in a venue with no connection to the polar bears. CBD previously challenged in the Northern District of California a rule promulgated by the Service pursuant to the MMPA regarding polar bear interactions with the Alaska oil and gas industry. The Northern District of California ordered the action transferred to the District of Alaska under 28 U.S.C. § 1404(a) because, *inter alia*, "none of the operative facts occurred within this district" and the Service's decision "is one in which Alaska and its residents have a great interest." *Ctr. For Biological Diversity v. Kempthorne*, No. C-07-0894 EDL, 2007 WL 2023515 *1, *6 (N.D. Cal. July 12, 2007).

[7] Transfer to any district other than the District of Columbia or the District of Alaska (the only two districts with a connection to this litigation) also would beg the question why a court with no connection to the polar bear is deciding issues of significant concern about its status under the ESA. *See* 15 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 3854 (2008) (noting that, especially in environmental cases, "[a]n additional reason for litigating in the forum that encompasses the locus of operative facts is the local interest in having local controversies resolved at home.").

actions to district where several actions were already pending before one judge); *In re The Bear Stearns Co. Inc. Sec., Derivative, & Employee Ret. Income Sec. Act Litig.*, _ F. Supp. 2d _, 2008 WL 3891750 (J.P.M.L. Aug. 18, 2008) (same); *In re Family Dollar Stores, Inc. Wage & Hour Employment Practices Litig.*, 545 F. Supp. 2d 1363 (J.P.M.L. 2008) (same).

### 3.   The District of Columbia Has the Resources to Properly Conduct These Actions.

The District of Columbia has the resources and experience with multidistrict litigation to properly conduct these actions.  In the 12-month period ending September 30, 2007, 59 cases under § 1407 were pending in the District of Columbia compared with 2,287 pending in the Northern District of California (where CBD's claims are currently pending).  *See* ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS, 2007 ANNUAL REPORT OF THE DIRECTOR: JUDICIAL BUSINESS OF THE UNITED STATES COURTS (2008) at Table S-19.  As of July 14, 2008, Judge Sullivan was not presiding over any multidistrict litigation, while Hon. Claudia Wilken of the Northern District of California was presiding over 81 pending actions in *In re Static Random Access Memory (SRAM) Antitrust Litig.*, MDL-1819.  *See* Distribution of Pending MDL Dockets, available at http://www.jpml.uscourts.gov/Docket_Info/Pending_Dockets/ body_pending_dockets.html.  In addition to Judge Sullivan's familiarity with the factual and legal issues raised in this litigation, these statistics illustrate that the court in which he sits is well suited to accommodate this set of multidistrict litigation.

### C.   Alternatively, the District of Alaska is the Appropriate Forum.

In the alternative, AOGA requests transfer and consolidation of all the polar bear Listing Decision and Interim 4(d) Rule cases to the U.S. District Court for the District of Alaska.  In contrast to Oakland, California – a forum with no nexus to the operative facts, the decision

12

agency and the decision-makers, and no particular interest in the subject matter of the challenged

decisions, other than the general interests shared by residents of the United States as a whole –

Alaska is the only jurisdiction within the United States located within polar bear habitat. Thus,

in contrast to the attenuated relationship between polar bears and Oakland, California, the polar

bear Listing Decision and the Interim 4(d) Rule, have a direct, specific, and uniquely close

factual nexus to Alaska whose people and industries necessarily live and operate among polar

bears. *See, e.g., National Wildlife Federation v. Harvey*, 437 F. Supp.2d 42 (D.D.C. 2006)

(transferring case concerning Florida endangered species and federal management measures to

Florida district court); *McCrary v. Gutierrez*, 2006 WL 1748410 at *3 (E.D.Cal. 2006)

(transferring case to district where species were located and where affected interests resided);

*Ctr. for Biological Diversity v. Kempthorne*, 2007 WL 2023515 (N.D.Cal. 2007) (transferring

MMPA polar bear litigation to Alaska because none of the operative facts occurred in the

district, and because of the "great interests" of Alaska and its residents in the operative facts).

## IV. <u>CONCLUSION</u>

For the foregoing reasons, AOGA respectfully requests the Panel grant the motion and

issue an order transferring the actions identified in the Schedule of Actions (as well as any

actions that may be subsequently filed asserting related or similar claims) to the United States

District Court for the District of Columbia for coordinated or consolidated pretrial proceedings.

In the alternative, AOGA requests the Panel order the identified actions transferred to the United

States District Court for the District of Alaska.

13

DATED:  August 29, 2008                STOEL RIVES LLP


_____
Jeffrey W. Leppo (D.C. Bar # 493482)
600 University Street, Suite 3600
Seattle, WA 98101
(206) 624-0900

*Attorneys for JPML Movant*
*Alaska Oil and Gas Association*

14

# Exhibit A



June 12, 2008

**By First Class Certified Mail and Facsimile**

Dirk Kempthorne
Secretary, Department of the Interior
1849 C Street, N.W.
Washington DC 20240
Fax: 202-208-5048

H. Dale Hall
Director, Fish and Wildlife Service
1849 C Street, N.W.
Washington DC 20240
Fax: 202-219-2428

      Re:    **Sixty-day Notice of Intent to Sue Under Endangered Species Act Regarding the Listing of the Polar Bear as a Threatened Species, 73 Fed. Reg. 28212-28303 (May 15, 2008)**

Dear Secretary Kempthorne and Director Hall:

On behalf of Safari Club International, Safari Club International Foundation, and members of Safari Club International ("SCI and SCIF"), this letter informs you of our intent to file a lawsuit, or amend an existing lawsuit, to bring claims against the Secretary of the Interior, the Department of the Interior, the Director of the Fish and Wildlife Service, and the Fish and Wildlife Service (collectively the "Service") over the listing of the polar bear as threatened throughout its range. 73 Fed. Reg. 28212-28303 (May 15, 2008) ("Final Rule"). This action violates the Endangered Species Act ("ESA") 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706. SCI and SCIF submit this letter in compliance with the 60-day notice requirement of Section 11(g)(2) of the ESA, 16 U.S.C. § 1540(g)(2). Unless the Service takes action to correct the violations outlined below within 60 days of receipt of this letter, SCI and SCIF intend to file suit in federal court or amend a complaint in a pending lawsuit to add claims discussed in this 60-day Notice Letter.

**Ex. A pg. 1 of 17**

Letter to Kempthorne/Hall
June 12, 2008
Page 2 of 17

## I.    Summary of Claims

SCI and SCIF intend to bring claims related to the following issues:

- Incorrect or inadequate standard for determining when a species is "threatened."
- Erroneous adoption of 45 years as the "foreseeable future."
- Invalid listing decision.
- Failure to account for future reductions in greenhouse gas emissions and sea-ice loss.
- Failure to establish distinct population segments ("DPSs"), failure to assess the listing status of each of these DPSs individually, and failure to make a determination not to list some DPSs.
- Failure to assess properly the status of polar bear populations within different portions of the species' range and failure to make a determination not to list the polar bears within portions of its range.
- Incorrect adoption of speculative projections as establishment of "fact" in 45 years.
- Failure to apply the "best available science."
- Failure to account for the benefit of sport hunting and importation of polar bear trophies as a factor against listing the polar bear.

In addition to what is presented below, SCI and SCIF attached their comments on the polar bear listing rulemaking (April 9, 2007 comments and October 22, 2007 comments, without attachments) to this 60-day notice and incorporate those comments here by reference. They further explain and present the claims SCI and SCIF intend to bring if the Service does not correct the violations.

## II.    The Endangered Species Act

The purposes of the ESA "are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section." 16 U.S.C. § 1531(b).

Among other things, the ESA provides for the listing and de-listing of species as either endangered or threatened. *Id.* § 1533. A species is "endangered" if the FWS determines it "is in danger of extinction throughout all or a significant portion of its range ...." *Id.* § 1532(6). A species is "threatened" if the FWS determines it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The Service can make a listing determination on the species, subspecies, distinct population segment, or range level. *Id.* § 1532(15); DPS Policy, 61 Fed. Reg. 4722 (February 7, 1996); Memorandum (M-37013), "The Meaning of 'In Danger of Extinction Throughout All or a Significant Portion of its Range,'" U.S. Department of the Interior Solicitor (March 16, 2007).

Letter to Kempthorne/Hall
June 12, 2008
Page 3 of 17

The ESA spells out the criteria for a listing decision.

> The Secretary shall make determinations required by subsection (a)(1)
> solely on the basis of the best scientific and commercial data available to
> him after conducting a review of the status of the species and after taking
> into account those efforts, if any, being made by any State or foreign
> nation, or any political subdivision of a State or foreign nation, to protect
> such species, whether by predator control, protection of habitat and food
> supply, or other conservation practices, within any area under its
> jurisdiction, or on the high seas.

16 U.S.C. § 1533(b)(1)(A).

> The Secretary shall by regulation promulgated in accordance with subsection (b)
> determine whether any species is an endangered species or a threatened species
> because of any of the following factors:
>> (A) the present or threatened destruction, modification, or curtailment of
>> its habitat or range;
>> (B) overutilization for commercial, recreational, scientific, or educational
>> purposes;
>> (C) disease or predation;
>> (D) the inadequacy of existing regulatory mechanisms;
>> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). In the Final Rule, the FWS determined that the polar bear was
"threatened" throughout its range.

## III.    Interests of SCI and SCIF

Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has approximately
53,000 members worldwide, including many who legally hunt polar bears in Canada, and
in doing so, contribute to the conservation of this species. Its missions include the
conservation of wildlife, protection of the hunter, and education of the public concerning
hunting and its use as a conservation tool. Safari Club International Foundation is a
nonprofit IRC § 501(c)(3) corporation. Its missions include the conservation of wildlife,
education of the public concerning hunting and its use as a conservation tool, and
humanitarian services. More specifically, the conservation mission of SCIF is: (a) to
support the conservation of the various species and populations of game animals and
other wildlife and the habitats on which they depend, and (b) to demonstrate the
importance of hunting as a conservation and management tool in the development,
funding and operation of wildlife conservation programs. SCI and SCIF, SCI's members,
and SCI chapters have supported polar bear research, conservation and management
efforts.

**Ex. A pg. 3 of 17**

Letter to Kempthorne/Hall
June 12, 2008
Page 4 of 17

Members of SCI have submitted or wish to submit applications to the FWS for the import of polar bear trophies hunted from approved populations in Canada. Other members of SCI had definite plans to hunt polar bear from approved populations in Canada in the future and planned to submit import permit applications at the appropriate time. The FWS has taken the position that it cannot process these applications since the effective date of the listing of the polar bear as threatened. This position, arising as a result of the ESA threatened listing, harms the interests of members of SCI and thus SCI and SCIF. SCI and SCIF have filed a lawsuit in the U.S. District Court for the District of Columbia, under the Marine Mammal Protection Act ("MMPA") and the APA, challenging the FWS's position that polar bear imports are no longer allowed. *Safari Club International et al. v. Kempthorne et al.,* No. 08-881 (D.D.C.).

SCI and SCIF submitted extensive written comments in opposition to the proposed listing of the polar bear as threatened. SCI and SCIF filed comments on April 10, 2006; April 9, 2007; and October 22, 2007. In addition, a representative of SCI and SCIF testified orally at a hearing in Washington D.C. on March 6, 2007. In those comments, SCI addressed or raised most of the issues underlying the claims presented in this 60-day notice letter.

## IV.    Claims

### 1.    Incorrect "Threatened" Standard

The Service did not properly establish the standard for assessing the best available scientific and commercial data about the threats to the polar bear. A "threatened" listing requires a high level of certainty about future impacts and threats that is not present with the polar bear listing. The ESA does not define what is meant by the terms "likely" and "foreseeable future" as used in the definition of "threatened":

> The term "threatened species" means any species which is *likely* to become an endangered species within the *foreseeable future* throughout all or a significant portion of its range.

16 U.S.C. § 1532(19) (emphasis added). When Congress is silent as to the meaning of the words it uses, the agency and courts should assign the words their ordinary meaning. *See United States v. James,* 478 U.S. 597, 604 (1986).

#### a.    The Service Did Not Establish or Correctly Apply the "Likely" Standard

The FWS failed to articulate any standard or meaning for the term "likely," as used in the "threatened" definition. To the extent the FWS did establish a standard or meaning, it was not reasonable. The word "likely" describes something "having a high probability of occurring or being true; very probable." Merriam Webster OnLine, http://www.m-w.com/dictionary/likely; see also Cambridge Advanced Learner's Dictionary, "likely …

Letter to Kempthorne/Hall
June 12, 2008
Page 5 of 17

describes something that will probably happen or is expected,"
http://dictionary.cambridge.org/define.asp?key=46199&dict=CALD. Instead, the FWS
simply concluded that the polar bear was likely to be in danger of extinction in the
foreseeable future without establishing or at least explaining the standard that applied to
reach this conclusion.

While the case law does not appear to expressly define the word as applied under the
ESA, at least one court has determined that even a small amount of doubt can avoid the
need for a "threatened" listing. The Oregon federal district court upheld a FWS decision
not to list a species as threatened (*i.e.,* likely to become extinct in the foreseeable future)
based on, among other things, the conclusion of one expert involved in the decision (and
agreed to by others) that the scientific uncertainty surrounding the issue and other
information "created a significant 'shadow of a doubt' in [his] own mind regarding the
proposed listing." *Center for Biological Diversity v. U.S.F.W.S.,* 402 F. Supp. 2d 1198,
1205-06 (D. Or. 2005). Other courts, interpreting other statutes, have defined "likely" to
mean "highly probable" or "probable." *In Re Leon,* 204 Ariz. 15, 23 (2002) (collecting
cases on meaning of "likely"); *Nippon Steel Corp. v. United States,* 26 C.I.T. 1416, 1420,
2002 WL 31873457 **3 (Court of Int'l Trade 2002) (citing Merriam-Webster definition
of "highly probable").

Finally, scientific bodies on which the FWS has heavily relied in this rulemaking should
have further guided the FWS's understanding of the meaning of likely. They define
"likely" in the range of a 66-89% certainty of happening. Climate Change 2007: The
Physical Science Basis, *Summary for Policymakers,* Intergovernmental Panel on Climate
Change, at 4 n.6 ("In this Summary for Policymakers, the following terms have been
used to indicate the assessed likelihood, using expert judgment, of an outcome or a result:
... *Very likely > 90%, Likely >66% ....*"); ACIA, *Impacts of a Warming Arctic: Arctic
Climate Impact Assessment,* Cambridge University Press, 2004, Preface ("Likely"
denoted in 65-85% range).

In determining that the polar bear should be listed as "threatened," the FWS relied on
conclusions about occurrences and impacts that are possible or could potentially happen.
Such speculation does not satisfy the statutory requirement that it is "likely" the species
will "become an endangered species within the foreseeable future." The Service needed
to affirmatively determine with a high degree of certainty and probability that the species
will become endangered in the "foreseeable future" time period, here a period of 45 years
that the Service ultimately designated for polar bears. At the very least, the FWS should
have defined or articulated the standard it applied to satisfy the "likely" requirement.

## b.    The Service Did Not Correctly Establish or Apply the "Foreseeable Future" Standard

Similarly, the FWS erred in adopting 45 years as the "foreseeable future" into which it
peered to ascertain whether the polar bear would become endangered. As with the term
"likely," the ESA does not define the phrase "foreseeable future" as used in the definition

Letter to Kempthorne/Hall
June 12, 2008
Page 6 of 17

of a "threatened" species. The ordinary meaning of the phrase establishes that it should be short enough that the agency can determine the future state of things with a relatively high degree of certainty. As one guide to standard English describes it, "foreseeable future" is "that part of the future near enough to us for sensible predictions to be made about it." Kenneth G. Wilson, The Columbia Guide to Standard American English, 1993, http://www.bartley.com/68/98/2598.html. Dictionary definitions of foreseeable and foresee echo this meaning. To foresee is "to have prescience of; to know in advance; foreknow." *Dictionary.com Unabridged (v 1.1)*. Random House, Inc., http://dictionary.reference.com/browse/foreseeable>. "Foreseeable" means "able to be understood in advance." Cambridge Dictionary of American English, http://dictionary.cambridge.org/define.asp?key=foresee*1+0&dict=A.

Thus, the foreseeable future into which the agency must assess the potential threats to the polar bear is that time period within which the agency can actually predict the future state of things with a high degree of certainty or probability. It should not be based primarily on the length of a species' generation or any other biological factor. Congress did not define the "future" into which the FWS must peer as biologically or scientifically based. Instead, it used "foreseeable," which dictates the certainty with which the agency can "see" or predict the future. If that future is not seeable or predictable with some high level of certainty, it is not foreseeable and the agency must pick a shorter period of time to represent the foreseeable future.

In the Final Rule, but not in its discussion in the proposed rule, the FWS claims that 45 years is a reasonably foreseeable future because the data they reviewed regarding projected conditions in this time period is more reliable than data concerning time periods beyond 45 years. 73 Fed. Reg. at 28239. This proves nothing except that the FWS believes in general that nearer-term projections are more reliable than further-term projections. It does not establish a meaning or standard for foreseeable future or that 45 years is a reasonable or allowable "foreseeable future."

In addition, the extent and impact of social and political changes underway related to global climate change make the future in 45 years less foreseeable. As the nature and extent of those changes, and what they mean in terms of global climate change and impacts on the polar bear, cannot be known with sufficient certainty now, the FWS has proposed a "foreseeable future" that is too long.

As the FWS must be able to conclude that there are "likely" to be future threats to the species and that those threats will put the species in danger of extinction, the more complex and uncertain the set of factors affecting the species, the shorter the future time period must be. When the issue is as complex and uncertain as the nature, extent, and impact of future global climate change, the FWS cannot conclude with any degree of certainty that an affected species, particularly a currently healthy species, is going to be in danger of extinction within 45 years.

**Ex. A pg. 6 of 17**

Letter to Kempthorne/Hall
June 12, 2008
Page 7 of 17

Either the FWS should have shortened the foreseeable future to a more reasonable time period within which the agency can assess the status of the species with a high degree of certainty, or it should determine that it cannot know with the required certainty or likelihood that the polar bear is going to be in danger of extinction throughout all or a significant portion of its range within the next 45 years.

## 2.    Invalid Listing Decision

The listing of the polar bear was not warranted at this time due to scientific uncertainty about the nature and extent of any future global climate change, and the impact of any climate change on the arctic ecosystem and the polar bear. Because of the complexity of the issue and the inherent uncertainty involved in predicting the future of complex systems with unknown future parameters, a great deal of scientific uncertainty continues to surround this issue. This uncertainty prevents the FWS from making the affirmative determination the ESA requires.

For example, one of the nine United States Geological Survey ("USGS") Reports issued in September 2007 discusses in detail the uncertainty inherent in the types of projections contained in the other reports. The USGS Report entitled "Uncertainty in Climate Model Projections of Arctic Sea Ice Decline: An Evaluation Relevant to Polar Bears," DeWeaver (2007) ("Uncertainty Report"), addresses the uncertainty of the climate and sea ice models. This report confirms there is significant uncertainty surrounding this crucial underlying scientific information:

> A key point in the discussion is that the inherent climate sensitivity of sea ice leads inevitably to uncertainty in simulations of sea ice decline. [page 1]
> ...
> I describe the kinds of uncertainty inherent in climate models, particularly those uncertainties that directly affect the reliability of their projection of future Arctic sea ice conditions. [page 1]
> ...
> While most aspects of climate simulations have some degree of uncertainty, uncertainty in projections of Arctic climate change is relatively high (Randall et al. 2007, Section 8.3). To some extent, the high level of uncertainty is a simple consequence of the small spatial scale of the Arctic, since climate simulations are reckoned to be more reliable at continental and larger scales (Meehl et al. 2007, Section 105.4.3; Randall et al. 2007). The uncertainty is also a consequence of the complex processes that control the ice, and the difficulty of representing these processes in climate models. [page 2]
> ...
> In assessing Arctic sea ice simulations, two prominent sources of uncertainty should be considered. First, uncertainties in the construction of climate models should be identified. While all models are constructed using the same physical laws, different approximations and simplifications are used in different models, and these differences lead to different sea ice simulation outcomes. Second, the

Letter to Kempthorne/Hall
June 12, 2008
Page 8 of 17

> degree of uncertainty due to unpredictable natural variability of the climate
> system should be examined. The atmosphere, ocean, and sea ice comprise a
> nonlinear chaotic system with a high level of natural variability unrelated to
> external climate forcing. Even if climate models contained a perfect
> representation of all climate system physics and dynamics, inherent
> unpredictability would prevent us from issuing detailed forecasts of climate
> change beyond about a decade. ... In principle, intermodel sea ice variations are
> attributable to differences in model construction, but attempts to relate simulation
> differences to specific model differences generally have not been successful (e.g.,
> Flato et al. 2004). [pages 2-3]
>
> ...
>
> Uncertainty does not arise because the models are bad, but because the climate
> system is sensitive. The most dramatic forms of climate change, sea ice decline in
> particular, will always be the most difficult to simulate. [page 22]

In particular, two of the USGS Reports rely on these models for establishing the status of
the polar bear and its habitat at certain time periods in the future. "Forecasting the
Range-wide Status of Polar Bears at Selected Times in the 21st Century," Amstrup et al.,
at 8, 10, 23-24 (2007) ("Forecasting Report"); "Predicting the Future Distribution of
Polar Bear Habitat in the Polar Basin from Resource Functions Applied to 21st Century
General Circulation Model Projections of Sea Ice," Durner et al., at 1, 5-6 (2007)
("Habitat Report"). The modeling in the Forecasting Report not only relies on
speculative sea-ice conditions at the 45, 75, and 100 year time points, but itself attempts
to make predictions about the future of polar bears based on mathematical modeling that
cannot replicate natural variable conditions in such a complex and incompletely
understood system, and relies on "interpretation of data," and the expert judgment of only
one polar bear expert. *Id.* at 16.[1]    The Forecasting Report acknowledges that using a
single expert is undesirable and was done only because of the deadline by which the FWS
had to make a final determination. *Id.* The report also acknowledges that the Bayesian
Network model the authors devised is only a "prototype" that needs significant
refinement. *Id.*

In addition, in the Range-Wide Status Review of the Polar Bear (USFWS 2006) ("Status
Review"), the FWS itself acknowledges that there is a "large degree of uncertainty" about
the actual increase in global temperatures and the "future of the Arctic sea ice." Status
Review at 67. The scientific documents on which the FWS chiefly relies also readily
acknowledge this scientific uncertainty and unpredictability. For example, the IPCC's
Special Report on Emissions Scenarios, states:

> Scenarios help in the assessment of future developments in complex
> systems that are either *inherently unpredictable*, or that *have high scientific*

---

[1] The Uncertainty Report does not address the uncertainty inherent in any Bayesian
Network or carrying capacity modeling, including that used in the Forecasting Report.
SCI and SCIF's October 22, 2007 Comments addressed this issue.

*uncertainties.* In all stages of the scenario-building process, uncertainties of different nature are encountered. A large *uncertainty surrounds future emissions* and the possible evolution of their underlying driving forces, as reflected in a wide range of future emissions paths in the literature. The uncertainty is further compounded in going from emissions paths to climate change, from climate change to possible impacts and finally from these driving forces to formulating adaptation and mitigation measures and policies. The uncertainties range from inadequate scientific understanding of the problems, data gaps and general lack of data to inherent uncertainties of future events in general. Hence the use of alternative scenarios to describe the range of *possible future emissions.*

Section 1.2, Box 1-1: Uncertainties and Scenario Analysis (emphasis added), http://grida.no/climate/ipcc/emission/025.htm, attached in Appendix I at 8. The Arctic Climate Impact Assessment (ACIA), Scientific Report,[2] similarly acknowledges the uncertainties:

> *Uncertainties in climate change scenarios based on AOGCM simulations*
> Uncertainties in future GHG and aerosol emissions, their conversion to atmospheric concentrations, and their contribution to radiative forcing of the climate. Different assumptions about future social and economic development, and hence future GHG and aerosol emissions, comprise one of the major uncertainties in the climate change scenarios. For example, the IPCC Special Report on Emissions Scenarios (NakiSenovis and Swart, 2000; see also section 4.4.1) presents 40 different emissions scenarios. Uncertainty is also associated with the conversion of emissions into atmospheric GHG and aerosol concentrations. Additional uncertainty arises from the calculation of radiative forcing associated with given concentrations, which occurs implicitly within AOGCMs, but is problematic in particular for aerosols.

Page 120 (Box 4.3), http://www.acia.uaf.edu/PDFs/ACIA_Science_Chapters_Final/ACIA_Ch04_Final.pdf, Appendix I at 1. As the ACIA Synthesis Report explains in regard to "Projecting Future Climate":

> When information from several methods converges, it offers greater condition in the results. Still, there will always be uncertainties and surprises in projecting future changes in climate.

Page 26, http://amap.no/acia.

---

[2] The "Scientific Report" is the 1,042-page report. The Impacts of a Warming Arctic, Arctic Climate Impact Assessment, "Synthesis Report," Cambridge University Press (2004) cited below is a 146-page summary document.

Letter to Kempthorne/Hall
June 12, 2008
Page 10 of 17

These reports also echo the Uncertainty Report's concern over the greater uncertainty regarding the potential impacts of global climate change at the "sub-region" level. For example, the ACIA Synthesis Report states:

> In a region as large and diverse as the Arctic, there are significant sub-regional variations in climate. ... In assessing future impacts in the sub-regions, projected changes in climate were primarily derived from global scale climate models. As regional scale climate models improve and become more widely available, future assessments may be capable of more precisely detailing the local and regional patterns of change. For this assessment, the patterns of climate change and their impacts should be viewed at a fairly broad regional scale, as they become less certain and less specific at smaller scales.

Page 18, http://amap.no/acia. Understanding impacts at the sub-region level may be particularly important for assessing possible impacts on the various populations of polar bears around the world.

As the documents discussed above and others demonstrate, the science of predicting climate change on a global scale, and for projections reaching out 45 or more years, is full of uncertainty and speculation. This level of uncertainty does not allow the FWS to make the affirmative determination that a currently healthy species is "likely" to become extinct in the "foreseeable future," here arbitrarily determined to be the next 45 years.

### 5. Failure to Consider Impacts of Efforts to Reduce any Climate Change Predicted to Occur

As the definition of a "threatened species" in Section 3 of the ESA requires the FWS to predict that the polar bear is likely to become in danger of extinction within the next 45 years (or some more appropriate foreseeable future), the FWS should have taken account or better account of current and future events. Failing to do so means that the FWS made predictions about the future without the benefit of all available relevant information. In fact, a failure to account for this information means that the FWS predicted what will happen over the next 45 years based on what is in place today. At the same time, in the Final Rule, the FWS states that it "remain[s] optimistic that the future can be a bright one for the polar bear" and that "[w]ith the world community acting in concert, we are confident the future of the polar bear can be secured." 73 Fed. Reg. at 28302. This optimism went unaccounted for in the Final Rule.

It is certain that the governments of the world will supplement the regulatory forces at work today with additional ones in the coming years. The current widespread and massive attention being paid to this issue assures that the response will be significant and will affect future climate change, and possible impacts on the arctic ecosystem and the polar bear. Considering the definition of a "threatened species" in Section 3, it was arbitrary and capricious for the FWS to ignore this development.

Letter to Kempthorne/Hall
June 12, 2008
Page 11 of 17

In addition, two of the listing factors of Section 4 of the ESA require the FWS to consider these future actions. Under the first factor, the FWS must consider the threatened destruction of the polar bear's habitat or range. 16 U.S.C. § 1533(a)(1)(A). As the concern is the reduction of arctic sea ice caused by future warming, the FWS must analyze the causes of any future warming. Thus, the FWS must analyze all the factors that might cause or not cause warming to occur and to what degree. Certainly, mandated reductions in greenhouse gases (and other actions taken to address global climate change) in the next 5, 10, 20 years and beyond will impact the extent of any future warming. *See* Status Review at 67 ("Hansen et al. (2005) suggest that the warming trend would change considerably if actions were taken soon enough to keep the atmospheric gases from increasing.").

Under the fifth factor, the FWS must consider any "other natural or manmade factors affecting [the species'] continued existence." 16 U.S.C. § 1533(a)(1)(E). The projected human response, in all its varied forms, to the issue of global climate change certainly is a factor that will affect the extent and nature of future climate change and sea ice changes and, consequently, (in the FWS's own view) the continued existence of the polar bear. See SCI and SCIF's April 9, 2007 Comments. That the fourth factor, as interpreted by the courts, restricts the agency's consideration of "existing regulatory mechanisms" to those currently being implemented does not affect the analysis the agency must conduct under other listing factors.

Finally, until it is more certain that the human race will not effectively respond to global climate change, and how any warming will affect the arctic environment and, more importantly for present purposes, polar bear populations, the FWS should not have made assumptions that led to a premature listing of a currently healthy species.

6.      **Failure to Establish Distinct Population Segments or Portions of Range and Not List Some of Those as Threatened**

SCI and SCIF continue to oppose the listing of polar bears at all and, for the reasons identified in this 60-day Notice Letter and their previous Comments, the best available science does not demonstrate the requisite certainty for listing the species as threatened under the ESA. However, since the FWS has listed the polar bear, it at least should have established DPSs and not listed some of those DPSs. It also should have not listed portions of the range of the polar bear.

Letter to Kempthorne/Hall
June 12, 2008
Page 12 of 17

a.    **The ESA Allows DPSs and Range Designations**

The ESA and FWS policy allow the establishment of DPSs and listing or not listing them separately. "Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act" 61 Fed. Reg. 4722 (February 7, 1996) ("DPS Policy"). The Final Rule to list the polar bear as threatened recognizes that the species occurs in 19 relatively discrete populations throughout the Arctic. 73 Fed. Reg. at 28215. The Proposed Rule noted that the boundaries between the 19 populations are "sufficiently discrete to manage the populations independently." 72 Fed. Reg. 1064, 1068 (January 9, 2007). To justify its decision not to establish any DPSs, the FWS went out of its way to note that "relatively discrete populations" did not equate to DPSs. 73 Fed. Reg. at 28215. But as indicated in the DPS Policy, the standard for designating DPSs "does not require absolute separation of a DPS from other members of its species" such that the existence of interaction between these populations should not defeat the designations. 61 Fed. Reg. at 4724.

An alternative to designating individual DPSs would be to list portions of the polar bear's range differently. *See* U.S. Department of the Interior Solicitor, Memorandum (M-37013), "The Meaning of 'In Danger of Extinction Throughout All or a Significant Portion of its Range.'" (March 16, 2007). In that memorandum, the Solicitor examined the legislative history of the ESA to reveal that the drafters of the law intended to give the FWS the authority and discretion to list or not list the animals in portions of the species' range. The Solicitor also referenced *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1146 (9th Cir. 2001), in which the Court implied that different portions of a species' range may require different degrees of protection. Thus, the FWS has the authority to list or choose not to list less than the entire species (whether "species" is defined as species as a whole, subspecies or distinct population segment) and can choose not to list certain portions of the polar bear's range.

As the FWS determined (incorrectly) that it could not establish DPSs for the polar bear, it never even considered whether certain DPSs might *not* warrant a threatened listing. Final Rule, 73 Fed. Reg. at 28248. In addition, while the FWS considered whether to list different portions of the polar bear's range differently, it only considered whether to list some portions of its range as endangered rather than threatened. *Id.* The FWS failed to consider whether to *not* list certain portions of the range at all (*i.e.*, maintain a not-listed status in those portions of the range in which the FWS cannot affirmatively establish that the polar bear will be at risk of extinction in the foreseeable future). These acts and failures were arbitrary and capricious and contrary to law.

b.    **The USGS Reports and Other Science Support Separate**
       **Listing Determinations Based on DPSs or Range**

The available science, including the USGS Reports, support distinguishing population segments or range areas for different listing status. Because the USGS Reports are a major source of the scientific information driving the listing decision, the FWS should

have reviewed them to analyze the predicted status of each population or eco-region. These Reports indicate that many populations, for example those in the Archipelago and Convergent Ice regions, do not even appear to be in danger of extinction within 45 years (this conclusion would be even stronger if the FWS had established a shorter time period for "foreseeable future," as SCI and SCIF has suggested). The Forecasting Report concludes that the "[d]ominant outcomes of the BN model were for extinction of the polar bear population[] ... in the Polar Basin Convergent Ecoregion by 75 years from present." Page 1. The carrying capacity model does not predict extinction in this ecoregion at all and, in fact, only predicted potential extinction in the Polar Basin Divergent Ecoregion by year 45 or 75, depending on whether the minimal or maximal ice level predictions was used. *Id.*[3]

Not listing certain DPSs or the animals within certain ranges of the polar bear is consistent with limitations Congress necessarily built into the ESA in recognition of the draconian consequences on other human activities of a threatened or endangered listing. *See Bennett v. Spear,* 520 U.S. 154, 176 (1997) (objective of the best scientific and commercial data available standard was to "avoid needless economic dislocation"). When the impact to the species' survival will not occur until far into the future (where the likelihood of that impact occurring is less certain), the balance tips toward not listing at this time.

Under the science it has accepted as sufficiently certain to establish a threatened status, the FWS should establish DPSs or portions of the polar bears range and determine which should not be listed at all.

> c. **Sustainable Use Conservation Provides one Factor to Establish Separate Listing Units**

Two interrelated factors that create distinction between the populations or animals with a particular portion of the overall range are how the listing will affect the population and whether the population is currently hunted (particularly by U.S. hunters who would then import their trophies into the United States). These factors relate to the regulatory mechanisms applicable to the populations. The Service's DPS Policy notes that "international boundaries" are a factor in determining discreteness because of differences between foreign nations' "management, status, or exploitation of a species." 61 Fed. Reg. at 4723. Management of the various polar bear populations includes regulation of hunting and authorization of hunting tags being made available to native hunters and to non-native hunters who intend to import their take into the United States. In the six

---

[3] The ultimate prediction in the new USGS Reports is that, if current speculative sea ice loss predictions are realized, by 2050 2/3 of the current polar bear worldwide population will be lost. If estimates of current worldwide population are reasonably accurate, that would mean that the FWS/USGS are projecting that 6,500-8,000 polar bears would remain in 2050.

Letter to Kempthorne/Hall
June 12, 2008
Page 14 of 17

populations in Canada (Nunavut and the Northwest Territories) from which U.S. hunters could, before the listing decision, import any trophies taken into the United States, the regulatory authorities have established quotas for the numbers of polar bears that may be taken by hunters. The governmental authorities assign the tags to local communities and the communities assign some portion of the tags issued pursuant to the quota to non-native hunters, most of whom are U.S. hunters.

The fees paid by the foreign hunters and the money brought into the local economies by these foreign hunters raise the value of the polar bears within the native communities. The value of the animals discourages poaching and encourages further acceptance by native hunters of quotas based not only on traditional knowledge but also largely on western scientific management principles (e.g., sustainable use conservation). Consequently, the higher value of polar bears introduced by sport hunting helps the regulatory authorities maintain a controlled take of the species. See Comments of Dr. Mitchell K. Taylor, Manager, Wildlife Research, Department of Environment, Government of Nunavut, April 6, 2006; Comments of Milton M.R. Freeman, Senior Research Scholar, Canadian Circumpolar Institute, University of Alberta, April 5, 2007; Comments of the Canadian Polar Bear Administration, at 8-9, June 16, 2006. In addition, each polar bear import permit generates fees that currently fund polar bear research. See SCI and SCIF April 2007 Comments at 3.

The regulatory mechanisms that differentiate between hunted and importable vs. non-hunted or non-importable populations provided a mechanism that the Service should have used to designate DPSs or portions of range as *not* threatened while maintaining the threatened status for other populations or portions of range. The Service's failure to do so was arbitrary and capricious and contrary to law.

### 7.    The Service Erred in Adopting Uncertain and Speculative Predictions as the Accepted Conditions in 45 Years

The ESA requires the FWS to base its listing determination solely on the "best available scientific and commercial information" (after taking account of conservation programs in foreign nations). 16 U.S.C. § 1533(b)(1)(A). But this mandate does not mean that the FWS must accept as "fact" speculative and uncertain predictions about the habitat and population status of the species in 45 years for purposes of making the listing determination today. A prediction or projection is just that, an uncertain statement of the way someone thinks things might be in the future. The best available science mandate of the ESA does not convert a prediction into something the FWS must accept as true or certain to happen. Whether it is "best" or not, a prediction remains uncertain.

In addition, the FWS should have read the best available science directive in conjunction with the standard for listing a species as threatened. SCI and SCIF discussed this standard at length above and in their April 2007 Comments, at 6, 10-11 and October 22, 2007 Comments. In short, the statutory standard requires some high level of certainty that the species will be in danger of extinction within the "foreseeable future," -- that

**Ex. A pg. 14 of 17**

Letter to Kempthorne/Hall
June 12, 2008
Page 15 of 17

period of time into which the agency can peer and ascertain the status of the species, again, with some high level of certainty. Here, the best available science only can indicate that the species may be in danger of extinction in some portion of its range in 45 years (the chosen foreseeable future) if certain speculative predictions about climate change and sea ice loss, and the polar bear's inability to respond to a changing environment, come true. It cannot establish the high level of certainty the statute requires. Thus, the best available science establishes that the FWS *should not* have listed the species, regardless of "predictions" that the species may be in danger of extinction (at least in some portion of its range) in the chosen foreseeable future.

The FWS erred by treating the nine new USGS Reports, and other uncertain predictions about climate change and impacts on sea ice and polar bears, as the best available science and by assuming that these "predictions" meet the listing standard for threatened species. In other words, even assuming the information is the best available and it *predicts* extinction (at least for certain populations) within the 45-year foreseeable future, it does not necessarily meet the "likely" – high degree of certainty of occurring – standard demanded by Sections 3 and 4 of the ESA. The conclusions in the Reports must meet this standard regardless of whether the Reports constitute the best available science. The FWS erred by according too much weight to these predictions.

### 8.    Failure to Properly Apply Best Available Science

Several factors undermine the USGS Reports' status as the "best available" scientific information, or at least suggest that the FWS should have lessened the weight accorded these reports. The reports in general, but the Forecasting Report in particular, appear designed to rebut criticisms of the state of the science before the USGS Reports came out. While this may be acceptable in some cases, with the high level of subjective input involved in the Bayesian Network modeling, this situation is ripe for bias and result-driven information to creep into the analysis. For example, the authors used "input nodes" involving four of the five ESA listing factors. All this indicates that these reports do not always represent science done for science's sake.

Although the ESA does not itself define the meaning of "best available science," FWS policy requires a critical evaluation of all information and data the FWS may consider in a listing decision:

a. To require biologists to evaluate all scientific and other information that will be used to … (b) support listing actions; … . This review will be conducted to ensure that any information used by the Services to implement the Act is reliable, credible, and represents the best scientific and commercial data available.

b. To gather and impartially evaluate biological, ecological, and other information that disputes official positions, decisions, and actions proposed or taken by the Services during their implementation of the Act.

**Ex. A pg. 15 of 17**

Letter to Kempthorne/Hall
June 12, 2008
Page 16 of 17

> c. To require biologists to document their evaluation of information that supports
> or does not support a position being proposed as an official agency position on a
> status review, listing action, recovery plan or action, interagency consultation, or
> permitting action.

Endangered and Threatened Wildlife and Plants: Notice of Interagency Cooperative
Policy on Information Standards Under the Endangered Species Act, 59 Fed. Reg. 34271
(July 1, 1994). Consequently, the apparent presence of unavoidable bias in the nine
USGS Reports at least undermines reliance on these studies as the "best available
science."

### 9.    The FWS Failed to Properly Account for the Positive Conservation Benefit of Sport Hunting in Making the Listing Decision

In the Final Rule, the FWS recognized the benefits of polar bear sport-hunting in and
importation from Canada, but concluded that it could not consider them under the listing
factors and that the benefits did not offset or reduce the overall threats to the species. 73
Fed. Reg. at 28242. The FWS:

> acknowledge[s] the important contribution to conservation from
> scientifically-based sustainable use programs. Significant benefits to
> polar bear management in Canada have accrued as a result of the 1994
> amendments to the MMPA that allow U.S. citizens who legally sport-
> harvest a polar bear from an MMPA-approved population in Canada to
> bring their trophies back into the United States. These benefits include
> economic revenues to native hunters and communities; enhanced funding
> a[nd] support for research; a United States conservation fund derived from
> permit fees that is usesd primarily on the Chukchi Sea population; and
> increased local support of scientifically-based conservation programs.
> Without this program, there would be a loss of funds derived from import
> fess; loss of economic incentives that promote habitat protection and
> maintain sustainable harvest levels in Canada and loss of research
> opportunities in Canada and Russia, which are funded through sport-
> hunting revenue.

*Id.*

Two provisions guiding the listing process direct and allow the FWS to consider these
issues. Before the Service even considers the five listing factors, it must "tak[e] into
account those efforts, if any, being made by any State or foreign nation, or any political
subdivision of a State or foreign nation, to protect such species, whether by predator
control, protection of habitat and food supply, or other conservation practices, within any
area within its jurisdiction." 16 U.S.C. § 1533(b)(1)(A). In addition, the fifth listing
factor requires the Service to consider "other natural or manmade factors affecting its
continued existence." *Id.* § 1533(a)(1)(E).

Letter to Kempthorne/Hall
June 12, 2008
Page 17 of 17

The sport-hunting of polar bears in Canada and subsequent importation into the United States is both an effort by Canada and its political subdivisions to conserve and manage the polar bear and a manmade factor that positively affects the polar bear's continued existence overall. The Service further determined that the benefits of this program and activity did not offset or even reduce the overall threat to the polar bear. 73 Fed. Reg. at 28242. All of these actions were arbitrary and capricious and violated the ESA and the APA.

## V.    Conclusion

The Service's violations of the ESA frustrate the purposes of the Act, which include focusing resources on those species and habitats most in need of protection. An unwarranted listing affects human activities, including the importation of sport-hunted polar bears from approved populations in Canada, which supports and advances polar bear conservation and management. It also diverts the resources of the FWS, the regulated public, and other government entities away from currently needy species. SCI and SCIF, and members of SCI, are harmed by the listing of the polar bear. Those harms will be remedied if the Secretary reverses the listing of the polar bear.

This letter serves as notice under the ESA that SCI and SCIF intend to take legal action if these violations of the law are not remedied. Thank you for your attention to this important matter. If we can provide any further information at this time, please contact Doug Burdin, Litigation Counsel for SCI at 202-543-8733 or dburdin@safariclub.org.

Sincerely,

Dennis Anderson
President,
Safari Club International
Safari Club International Foundation

Exhibit B



# PACIFIC LEGAL FOUNDATION

July 23, 2008

Secretary Dirk Kempthorne                         **VIA FEDERAL EXPRESS**
Secretary of the Interior
1849 C Street, N.W.
Washington, DC 20240

Director Dale Hall                                 **VIA FEDERAL EXPRESS**
United States Fish and Wildlife Service
1849 C Street, N.W., Room 3256
Washington, DC 20240

Re:    60-Day Notice of Intent To Sue for Violations of Section 4 of the Endangered Species
       Act in Connection with: *Determination of Threatened Status for the Polar Bear*
       *(Ursus maritimus) Throughout Its Range; Final Rule,* 73 Fed. Reg. 28,212 (May 15, 2008)

Dear Secretary Kempthorne and Director Hall:

This notice is submitted under sections 11(g)(1)(C) and 11(g)(2)(C) of the Endangered Species Act
(ESA), 16 U.S.C. § 1540(g)(1)(C) and (g)(2)(C), on behalf of the California Cattlemen's
Association, the California Forestry Association, and the Congress of Racial Equality to apprise you
that the listing of the polar bear as a threatened species violates the Endangered Species Act and the
Administrative Procedure Act for the reasons set forth below. You are advised immediately to
withdraw the Final Rule as unlawful and unwarranted. Failure to do so will result in legal action to
invalidate the Final Rule.

The California Cattlemen's Association is a nonprofit trade association that represents California's
ranchers and beef producers in legislative matters. The association also engages in litigation to
advance the interests of its members in such areas as food safety, endangered species, wildlife
management, air quality, conservation, wetlands, and federal land grazing regulations. The EPA has
identified livestock grazing as a major source of greenhouse gas emissions in the United States.

Headquarters: 3900 Lennane Drive, Suite 200 • Sacramento, CA 95834 • (916) 419-7111 • Fax: (916) 419-7747
Alaska: 121 West Fireweed Lane, Suite 250 • Anchorage, AK 99503 • (907) 278-1731 • Fax: (907) 276-3887
Atlantic: 1002 SE Monterey Commons Blvd., Suite 102 • Stuart, FL 34996 • (772) 781-7787 • Fax: (772) 781-7785
Hawaii: P.O. Box 3619 • Honolulu, HI 96811 • (808) 733-3373 • Fax: (808) 733-3374 • Oregon: (503) 241-8179
Washington: 10940 NE 33rd Place, Suite 210 • Bellevue, WA 98004 • (425) 576-0484 • Fax: (425) 576-9565
E-mail: plf@pacificlegal.org • Web Site: www.pacificlegal.org

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 2

The California Forestry Association is also a nonprofit association. Its diversified membership includes biomass energy producers, environmental consultants, financial institutions, forest land owners, forest products producers, loggers, registered professional foresters, wholesalers and retailers, wood products manufacturers, and others who are interested in responsible forest policies. Association members are committed to staying abreast of the issues facing the forest products profession, and taking an active role in protecting and enhancing California's forests. Forest management has been predicted both to affect and to be affected by global warming trends.

The Congress of Racial Equality (CORE) is a philanthropic human rights organization established to fight discrimination and encourage the economic and social independence of the poor and minorities. CORE was the first civil rights organization in this country to receive nongovernmental consultative (NGO) status at the United Nations. CORE is assigned to two of the UN's most prestigious departments—the United Nations Department of Public Information (UNDPI) and the United Nations Economic and Social Council (UNESCO). Environmental regulation that drives up the cost of energy, housing, transportation, and food disproportionately harms low-income minorities.

**Legal Background**

The ESA authorizes the Secretary to list "threatened" or "endangered" species. 16 U.S.C. § 1533(a)(1), (c). The term "threatened species" means "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The term "endangered species" means "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). The Act prohibits the unauthorized "taking" of an endangered species. *Id.* § 1538(a)(1)(B). The "taking" of a species is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The United States Fish and Wildlife Service has extended the Act's "take" prohibition to threatened species. 50 C.F.R. § 17.31(a).

In determining whether a species is "threatened" or "endangered," the Secretary is required to consider five factors:

> (A)  the present or threatened destruction, modification, or curtailment of its habitat or range;

> (B)  overutilization for commercial, recreational, scientific, or educational purposes;

> (C)  disease or predation;

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 3

> (D)   the inadequacy of existing regulatory mechanisms; or

> (E)   other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).

The Secretary must make the listing determination

> solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

*Id.* § 1533(b)(1)(A).  In the courts, the review of a final agency action is governed by the Administrative Procedure Act under an "arbitrary or capricious" standard; thus an agency's decision should be overturned if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401 (9th Cir. 1995).

**Factual Background**

On February 16, 2005, the Center for Biological Diversity (CBD) petitioned the United States Fish and Wildlife Service to list the polar bear under the Endangered Species Act. 72 Fed. Reg. 1064, 1065 (Jan. 9, 2007). On July 5, 2005, the Natural Resources Defense Council and Greenpeace, Inc., joined in the petition with CBD. *Id.* On January 9, 2007, the Department of the Interior issued a proposed rule to list the polar bear as "threatened" throughout its entire range (much of the Arctic Circle). *Id.* On May 15, 2008, the Department issued a Final Rule listing the polar bear as "threatened." 73 Fed. Reg. 28,212. The following facts are known.

1)   The "prediction" that 2/3 of the polar bear population will be lost by mid-century, touted by the popular press, is incorrect. That estimate is the guesswork of one man and is based on a qualitative "prototype" model that the Department warns is only preliminary and not to be taken as final. 73 Fed. Reg. at 28,273-74.

**Ex. B pg. 3 of 13**

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 4

2)    Contrary to (1) above, the Intergovernmental Panel on Climate Change (or IPCC) models actually relied on by the Department predict that **3/4 of the polar bear population will survive into the foreseeable future** (45 years). These models forecast only a 10-22% range-wide decline in seasonal sea ice during that period. 73 Fed. Reg. at 28,273.

3)    Of the 19 polar bear populations worldwide, only two are subject to the regulatory control of the United States. The majority (14 populations) are found in Canada. Others are located in Greenland, Russia, and Norway. 73 Fed. Reg. at 28,212-18.

4)    Only two polar bear populations (one in the U.S. and one in Canada) are declining due to melting sea ice. *See* Dr. Mitchell Taylor & Dr. Martha Dowsley, *Demographic and Ecological Perspectives on the Status of Polar Bears* (2008), *available at* http://scienceandpublicpolicy.org/images/stories/papers/reprint/taylor_polar_bears.pdf (last visited July 22, 2008) (Taylor & Dowsley (2008)).

5)    Almost 3/4 of the 19 populations are stable, increasing, or indeterminate in number. 73 Fed. Reg. at 28,217.

6)    As temperatures have increased over the past 40-50 years, the polar bear population has increased to the highest levels in recorded history. The current population is approximately 25,000, up from an estimated low of 5,000-10,000 in the 50's and 60's. 73 Fed. Reg. at 28,215; U.S. Senate Environment and Public Works Committee, *U.S. Senate Report Debunks Polar Bear Extinction Fears*, Jan. 30, 2008, *available at* http://epw.senate.gov/public/index.cfm?FuseAction=PressRoom.Facts&ContentRecord_id=cb2faa9c-802a-23ad-4bcc-29bb94ceb993 (last visited July 22, 2008).

7)    The Department considers the polar bear "threatened" because computer models forecast a declining trend in sea ice. 73 Fed. Reg. at 28,225, 28,275-76.

8)    The Department admits that Arctic climate models are highly uncertain. 73 Fed. Reg. at 28,227-28.

9)    Researchers from Wharton and Harvard have found that none of the models relied on meets accepted scientific standards. *See* J. Scott Armstrong, et al., *Polar Bear Population Forecasts: A Public-Policy Forecasting Audit* (2008), *available at* http://forecastingprinciples.com/Public_Policy/PolBears.pdf (last visited July 22, 2008) (Armstrong, et al. (2008)).

10)   The sea ice models relied on by the Department assume a one-to-one correlation between sea ice reduction and population declines. They do not account for temperature variability (such

**Ex. B pg. 4 of 13**

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 5

as the fact that global temperatures have not increased in the last decade), or polar bear adaptability, or changes in global influences. 73 Fed. Reg. at 28,272-74.

11)   IPCC models do not predict the complete loss of sea ice. Taylor & Dowsley (2008).

12)   Polar bears have survived previous global warming periods with higher temperatures than today and with a severe reduction in sea ice. 73 Fed. Reg. at 28,255-56.

13)   Polar bears are already protected from direct harm through national and international laws and treaties. 73 Fed. Reg. at 28,281-88.

14)   The Department has not determined what constitutes a viable polar bear population.

15)   The Department has not articulated a standard for determining "threatened" or "endangered" status.

16)   According to the Secretary of the Interior, the ESA listing will not provide any additional protections to the polar bear because the 4(d) rule will authorize any activity that is already permissible under the Marine Mammal Protection Act. *See* U.S. Dep't of the Interior, Remarks by Secretary Kempthorne, Press Conference on Polar Bear Listing, May 14, 2008, *available at* http://www.doi.gov/secretary/speeches/081405_speech.html (last visited July 22, 2008).

17)   According to the Secretary of the Interior, the ESA listing will not address the risk that is the basis for the listing (*i.e.*, "this listing will not stop global climate change or prevent any sea ice from melting" in the Arctic.). *Id.*

**Threatened Status Is Not Supported by Sea Ice Models**

The only reason given for the polar bear listing is the Secretary's reliance on sea ice forecasting models that do not meet the standard for "best available science." It is axiomatic that computer models are not the equivalent of observations in the field. No climate model has accurately replicated observed climate conditions, either retrospectively or prospectively, over the period defined by the Secretary as the "foreseeable future." "Foreseeable future" is defined by the Final Rule as three generations or 45 years. This time line, however, is inconsistent with international protocols (*e.g.*, IUCN Redbook and COSEWIC) which give a mean generation time of 12 years instead of 15 for a foreseeable range of 36 years, not 45 years. Use of a proper generation time would greatly reduce the projected risks to polar bears. But this is not the only problem.

**Ex. B pg. 5 of 13**

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 6

Although the United States Geological Survey (USGS) praises the efforts of climate modelers, the agency acknowledged, as it must, that the ice flow models relied on by the Secretary either overstate or understate actual climatic conditions, some by a wide margin, because of the "sensitivity" of climate systems. DeWeaver (2007) states:

> [W]hile most aspects of climate simulations have some degree of uncertainty, projections of Arctic climate change have relatively higher uncertainty. This higher level of uncertainty is, to some extent, a consequence of the smaller spatial scale of the Arctic, since climate simulations are believed to be more reliable at continental and larger scales (Meehl et al. 2007, IPCC 2007, both cited in DeWeaver 2007). The uncertainty is also a consequence of the complex processes that control the sea ice, and the difficulty of representing these processes in climate models. The same processes which make Arctic sea ice highly sensitive to climate change, the ice-albedo feedback in particular, also make sea ice simulations sensitive to uncertainties in model physics.

73 Fed. Reg. at 28,228.

In other words, because the factors which affect sea ice in the Arctic are unknown, and probably unknowable, due to their high degree of complexity and variability, they cannot be reproduced by any known modeling system. DeWeaver concludes:

> Thus, even if climate models perfectly represented all climate system physics and dynamics [which they don't], inherent climate unpredictability would limit our ability to issue highly detailed forecasts of climate change, particularly at regional and local spatial scales, into the middle and distant future.

*Id.*

Armstrong, et al. (2008), took this analysis a step further and conducted an audit of the models relied on by the Department to project polar bear population trends. The following abstract summarizes their findings.

> Calls to list the polar bears as a threatened species under the U.S. Endangered Species Act are based on forecasts of substantial long-term declines in their population. Nine government [USGS] reports were [issued] to inform the U.S. Fish and Wildlife Service decision on whether or not to list polar bears as threatened under the Endangered Species Act. We assessed these reports in light of evidence-based (scientific) forecasting principles. None of the reports referred to works on

**Ex. B pg. 6 of 13**

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 7

> scientific forecasting methodology. Of the nine, Amstrup, Marcot and Douglas (2007) and Hunter et al. (2007) were the most relevant to the listing decision. Their forecasts were products of complex sets of assumptions. The first in both cases was the erroneous assumption that General Circulation Models provide valid forecasts of summer sea ice in the regions inhabited by polar bears. We nevertheless audited their conditional forecasts of what would happen to the polar bear population *assuming*, as the authors did, that the extent of summer sea ice would decrease substantially over the coming decades. We found that Amstrup et al. properly applied only 15% of relevant forecasting principles and Hunter et al. only 10%, while 46% were clearly contravened and 23% were apparently contravened. As a consequence their forecasts are unscientific and of no consequence to decision makers. We recommend that *all* relevant principles be properly applied when important public policy decisions depend on accurate forecasts.

Armstrong, et al. (2008).

Notwithstanding this damning assessment of climate models generally, and of the Arctic sea ice models specifically, the listing relies on these models. The Final Rule singles out two model types—the Carrying Capacity Model (CM) and the Bayesian Network Model (BM). As to the first, CM, we are assured that although there is a wide variation in forecasts, this is ameliorated by averaging the results to lessen the impact of extreme outcomes. But this approach does not address the fundamental flaw in these models; whether taken at face value or viewed in the mean, they are speculative. Moreover, they are skewed by inaccurate assumptions. The most blatant inaccuracy is the researchers' conclusion that there is a one-to-one correspondence between ice flow decline and population decline. Table 1 appears to equate sea ice levels (represented as "carrying capacity") with population levels. 73 Fed. Reg. at 28,273. This cannot be squared with observed population trends which show some populations as currently stable or increasing while other populations (two) are showing signs of decline. Each of the 19 polar bear populations has responded differently to changing sea ice conditions and will continue to do so. There is no straight-line correlation between sea ice levels and population numbers. Therefore, the CM modeling is not a conservative estimate of future conditions, but bald speculation on a worst-case scenario.

More importantly, the Carrying Capacity Model does not predict that the polar bear will be at risk of extinction within the foreseeable future:

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 8

> Although the pattern of projected carrying capacity varied greatly among regions, the
> summary finding was for a range-wide decline in polar bear carrying capacity of
> between 10 and 22 percent by year 45 . . . .

73 Fed. Reg. at 28,273.

This means a predicted survival rate of between 78% and 90% in the foreseeable future. Under
accepted norms, a 10-22% decline in "carrying capacity," habitat, or even actual bear population,
does not constitute a threat of endangerment in the foreseeable future (*i.e.*, 36-45 years). This is
especially true when the polar bear population is the highest in recorded history. Population levels
in the 50's and 60's were well below the levels predicted by CM over the next 45 or even 75 years.

The Bayesian Network Model (BM) provides even less support for the listing decision.

Although the Final Rule cites the extraordinary claim that changes in sea ice "could result" in a loss
of 2/3 of the world's polar bear population by the mid-21st century, the Final Rule also reveals how
insupportable this claim is. According to the Department, the Bayesian Model is only preliminary
and cannot be taken as final.

> We reiterate the caveat that a BM combines expert judgment and interpretation with
> quantitative and qualitative empirical information, therefore necessitating inputs from
> multiple experts (if available) before it can be considered final.

73 Fed. Reg. at 28,274.

In this case, multiple experts were inexplicably not available and the Bayesian Model only included
the unverified and subjective assumptions of one researcher.

> We note again that because the BM presented in Amstrup et al. (2007) incorporates
> the input of a single polar bear expert, it should be viewed as a first-generation
> prototype . . . .

*Id.*

This is a gross understatement. Rather than garner 1-1/2 pages of substantive discussion in the Final
Rule, this qualitative "prototype" should not have been mentioned at all. It is evident that the
Bayesian Model does not satisfy even minimal scientific standards. Therefore, this model cannot
remotely be classified as "best available" scientific data. Reliance on this putative model is a clear
violation of the ESA. It provides, in effect, no data at all. The claim that 2/3 of the polar bear

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 9

population will be lost by the mid-21st century is the guesswork of one man and is not supported by credible scientific information. Repeating the same exercise with more realistic assumptions that the climate will fluctuate (as currently observed) or that polar bears can adapt (to a greater or lesser extent) to changing conditions (as currently observed) would result in an entirely different prediction. This is the conclusion the Secretary should have reached rather than tout this unsubstantiated claim as a basis for the listing.

Given that polar bear populations are hypothetically predicted to decline by only 10% to 22% over the next 45 years (i.e., that 78% to 90% will survive) and that the effect of sea ice decline will vary by population, it is not rational to conclude that polar bears are at risk of extinction within the foreseeable future.

**Threatened Status Is Not Supported by Current Polar Bear Demographics**

The Polar Bear Specialist Group status report (Aars, et al., 2006) indicates that approximately 3/4 of the 19 polar bear populations worldwide are either increasing, stable, or indeterminate. Of the 5 populations identified as declining, only 2, the Western Hudson Bay (WH) and Southern Beaufort Sea (SB) populations, are deemed in decline due to reduced ice conditions. The other 3 populations—Baffin Bay, Kane Basin, and Norwegian Bay—are identified as declining solely due to over-harvest, not climate change effects. Taylor & Dowlsey (2008). And yet, the Secretary determined that over-harvest did not support listing. Instead, the Secretary found "that overutilization does not currently threaten the polar bear throughout all or a significant portion of its range." 73 Fed. Reg. at 28,280.

According to the Final Rule, changes in ringed seal distribution and abundance "will likely be the most important factor determining effects on polar bear populations." 73 Fed. Reg. at 28,261. Climate models predict decreasing seal populations. *Id.* The Final Rule, however, fails to document actual declines in ringed seal distribution and abundance, which, like the polar bear itself, are at an all time high: "The most recent population estimates of ringed seals, the preferred prey of most polar bear populations, range to about 4 million or more, making them one of the most abundant seal species in the world." *Id.*

Moreover, melting sea ice will improve access to seal prey for some populations. The Norwegian Bay population (a declining population) is characterized by predominantly heavy multi-year ice which limits accessibility to seals. The polar bear population in this area would likely benefit from increased abundance and accessibility to seals due to more open seas caused by climate warming. *See* Taylor & Dowsley (2008).

**Ex. B pg. 9 of 13**

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 10

Although global temperatures (including the Arctic region) have risen over the past 40+ years (with the exception of the past ten years which show *no increase in temperatures*), it is universally accepted that polar bear populations have increased range-wide. They now number approximately 25,000 today, whereas they only numbered an estimated low of 5,000 fifty years ago. This increase has been attributed to the 1973 International Agreement for the Conservation of Polar Bears, which resulted in better polar bear conservation. 73 Fed. Reg. at 28,277.

Seven polar bear populations have been surveyed relatively recently: Viscount Melville Sound in 1992 (Taylor, et al., 2002), Lancaster Sound in 1997 (Taylor, et al., 2008), Norwegian Bay in 1997 (Taylor, et al., 2008), Kane Basin in 1997 (Taylor, et al., 2008), Baffin Bay in 1997 (Taylor, et al., 2005), McClintock Channel in 2000 (Taylor, et al., 2006), and Gulf of Boothia in 2000 (Taylor, et al., 2008). These surveys demonstrate birth and survival rates sufficient to increase current numbers with no harvest or to maintain current populations indefinitely with a sustainable harvest rate. Taylor & Dowsley (2008) at 16.

In addition, polar bears have already survived previous warming periods with higher temperatures than exist today and with significant reductions in sea ice. 73 Fed. Reg. at 28,255. The scientific literature shows that polar bears have historically maintained viable populations even in seasonally ice-free areas, as with the Western Hudson Bay, Southern Hudson Bay, Davis Strait, Baffin Bay, and Foxe Basin populations. With the exception of the Western Hudson Bay population, researchers believe that these populations remained stable or increased during the most recent period of climate warming. *See* Taylor & Dowsley (2008).

Although this information suggests the need for ongoing management of polar bear populations, it does not support a conclusion that polar bears as a species are "threatened" within the foreseeable future (whether in 36 or 45 years). Based on current data, the listing was arbitrary and capricious.

**Anecdotal Information Is Not Best Available Scientific Data**

The Department's citation of anecdotal evidence of polar bear drowning, cannibalism, and apparent starvation as proof of dire stresses on the polar bear population—without any critical evaluation—is emblematic of the Department's preference for speculation over scientific fact in the listing process.

The Final Rule does not disclose that four drowned bears were observed only after a severe storm event, or that cannibalism has been observed in healthy populations. *See* Taylor & Dowsley (2008). While the Final Rule calls the death of four bears an incident of "apparent" starvation, it quickly abandons the modifier as if the cause of death were now an established fact. *See* 73 Fed. Reg. at 28,268. No examination to determine actual cause of death was undertaken, and no evidence established that other members of the same population were suffering from starvation. Rather than

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 11

provide additional scientific data supporting the need for listing, the Department's uncritical acceptance of any and all claims of harm to polar bears simply feeds the popular but inaccurate perception that polar bears, which are at the highest population levels in recorded history, are barely hanging on.

One picture of an emaciated polar bear has found its way into the media and has been widely cited by activists as suggestive of the current status of polar bear populations. But nothing could be further from the truth. That picture does not reveal the age or health of the bear (whether diseased or injured), yet speculation about the bear's fate is taken as fact. The observation of local Inuit who were surprised to see such a skinny bear among a healthy population is never mentioned. *See* Taylor & Dowsley (2008) at 24. According to those who engage in routine tagging of bears in the area, that picture was taken of a bear in the Davis Strait population, which is not declining but is healthy and stable. *Id.*

These anecdotes are completely consistent with the *natural* mortality associated with polar bear populations. It is surprising they are not observed more often. "Natural mortality can occur from a number of causes (e.g., disease, injury, intra-specific predation (cannibalism), drowning, and starvation). *Id.* Most demographic studies show rates of mortality for adult bears of about 4-5% a year, with higher rates for younger bears. *Id.* at 23. For the current range-wide population of close to 25,000, a mortality rate of polar bears of all ages and genders could reach 1,500 bears a year. *Id.* at 23-24. "Incidental observation of natural mortality does not mean the population from which the observation was taken, or polar bears as a species, have become non-viable. Mortalities are as natural as births." *Id.* at 24.

**Because the ESA Listing Does Not Provide Additional Protections the Listing Was Arbitrary**

With the listing of the polar bear as a threatened species, the Secretary of the Interior announced the release of a proposed 4(d) rule that, he declared, would permit any activity under the Endangered Species Act that is already permissible under the Marine Mammal Protection Act. *See* http://www.doi.gov/secretary/speeches/081405_speech.html (last visited July 22, 2008). Dale Hall, Director of the United States Fish and Wildlife Service, made a similar statement when testifying to Congress about the delay in the listing decision. These admissions that the ESA listing would provide no additional protections to the polar bear—standing alone—reveal the listing as an arbitrary act. But there is more.

The Secretary also admitted, as he must, that "this listing will not stop global climate change or prevent any sea ice from melting." *Id.* Which is to say, the listing will not address the very risk that formed the basis for the listing.

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 12

Moreover, the Secretary determined that the polar bear is already protected from direct harm "through international agreements, national, State, Provincial or Territorial legislation, and other regulatory mechanisms." 73 Fed. Reg. at 28,288. This is significant not only because the Secretary must take into account the conservation efforts of the States and foreign nations, but also because there are only two polar bear populations subject to federal regulation under the ESA. At no time did the Secretary make a determination that the entire species would be at risk of extinction if these two populations declined (or where extirpated) or that the area used by these two populations constituted a "significant portion" of the polar bear's world-wide range. This was a violation of the Act.

If the ESA listing does not provide additional protections—either because existing regulatory mechanisms are adequate, within the realm of practicality, as the Secretary found in this case, or because the ESA does not allow the regulation of activities with uncertain global influences, as the Secretary believed in this case—the listing was nonsensical and irrational. The law does not authorize, let alone compel, an empty gesture.

**Declining Trends Do Not Constitute a Threat of Endangerment**

The Final Rule repeatedly admonishes that forecasted population numbers and estimated future time periods are not to be taken at face value, ostensibly because they are inherently uncertain. Instead, the Rule states that the trend is worrisome and that the listing is warranted essentially because melting sea ice will negatively affect polar bear populations, perhaps resulting in a steady decline in abundance. 73 Fed. Reg. at 28,275-77. But given that the current data do not show a steady decline in abundance, this worry does not justify a listing at this time.

Observed trends may someday correspond with predicted trends, but that correspondence has not yet arrived. Until it does, the ESA does not authorize a listing. As noted above, the term "threatened species" means "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The term "endangered species" means "any species which is in danger of extinction throughout all or a significant portion of its range." Id. § 1532(6). Other than citing expected declines in habitat and population, the Secretary has not articulated any standard that would indicate when the polar bear is "threatened" or "endangered." Is it when the habitat or population has declined by 10%? Or 20%? Or 75%? Without defining when a species is in danger of extinction, no objective test of "threatened" or "endangered" can be applied. It is not enough that the Secretary identify a trend downward without ascertaining whether we are at the front or back end of that trend and when the trend reaches "a point of no return." In short, the Secretary must determine when the polar bear will no longer be a viable species and articulate an objective standard for "threatened" status. Even the

Secretary Dirk Kempthorne
Director Dale Hall
July 23, 2008
Page 13

worst case predictions cited in the Final Rule do not predict the complete extirpation of the polar bear.

The mere itemization of risks to the polar bear, with the implication that "we know a threatened species when we see it," does not satisfy the legal standard for rational decisionmaking under the Administrative Procedure Act. The Secretary must "articulate[] a rational connection between the facts found and the choice made." *Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989).

For the foregoing reasons, the listing should be revoked.

Sincerely,

M. REED HOPPER
DAMIEN M. SCHIFF
Attorneys for California Cattlemen's
Association, the California Forestry Association,
and the Congress of Racial Equality