John Briscoe (# 53223)
David Ivester (#76863)
Lawrence S. Bazel (# 114641)
Briscoe Ivester & Bazel LLP
155 Sansome Street, 7th Floor
San Francisco, CA 94104
jbriscoe@briscoelaw.net
divester@briscoelaw.net
lbazel@briscoelaw.net
Telephone:    (415) 402-2700
Facsimile:    (415) 398-5630

John C. Martin (*pro hac vice* application pending)
Duane A. Siler (*pro hac vice* application pending)
Michele L. Walter (*pro hac vice* application pending)
Patton Boggs LLP
2550 M Street N.W.
Washington, D.C. 20037
jmartin@pattonboggs.com
dsiler@pattonboggs.com
mwalter@pattonboggs.com
Telephone:    (202) 457-6000
Facsimile:    (202) 457-6315

*Attorneys for Proposed Defendant-Intervenors American Petroleum Institute, Chamber of Commerce of the United States of America, National Mining Association, National Association of Manufacturers, and American Iron and Steel Institute*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>            Plaintiffs,<br><br>       v.<br><br>DIRK KEMPTHORNE, *et al.*,<br><br>            Defendants.<br><br>AMERICAN PETROLEUM INSTITUTE, *et al.*,<br><br>            Proposed Defendant-<br>            Intervenors. | No.  C-08-1339-CW<br><br>**NOTICE OF MOTION, MOTION  TO INTERVENE AS DEFENDANTS, AND MEMORANDUM IN SUPPORT BY AMERICAN PETROLEUM  INSTITUTE, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, NATIONAL MINING ASSOCIATION, NATIONAL ASSOCIATION OF MANUFACTURERS, AND AMERICAN IRON AND STEEL INSTITUTE**<br><br>Date:  Oct. 9, 2008<br>Time:  2:00 p.m.<br>Place:  Courtroom 2, 4th Floor |

# TABLE OF CONTENTS

NOTICE OF MOTION ...................................................................................................1

INTRODUCTION AND BACKGROUND .......................................................................2

SUMMARY OF ARGUMENT ........................................................................................4

ARGUMENT ...................................................................................................................5

    I.      THE ASSOCIATIONS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT .....................................................................................................5

         A.    The Motion Is Timely. ...........................................................................6

         B.    Each Association Has Significantly Protectable Interests That Would Be Directly And Immediately Harmed By Plaintiffs' Requested Relief. ...6

         C.    The Associations Should Not Be Limited To Participation In Only The Remedy For The NEPA And APA Claims. .........................................14

         D.    The Existing Parties Do Not Adequately Represent The Associations' Interests. ..............................................................................................15

    II.     ALTERNATIVELY, THE COURT SHOULD GRANT THE ASSOCIATIONS PERMISSIVE INTERVENTION. ...................................................................17

CONCLUSION ..............................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*American Petroleum Inst. et al., v. Kempthorne, et al.*, Case No. 1:08-cv-01496 EGS (D.D.C.) 11

*Donnelly v. Glickman*, 159 F.3d 405 (9th Cir. 1998) ............................................................ 5, 14

*Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489 (9th Cir. 1995)............. 5, 16, 17

*Kleissler v. U.S. Forest Serv.*, 157 F.3d 964 (3d Cir. 1998) ........................................... 15

*Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094 (9th Cir. 2002) ............................ 14, 15, 17

*Orange County v. Air California*, 799 F.2d 535 (9th Cir. 1986) .................................... 6

*Sierra Club v. EPA*, 995 F.2d 1478 (9th Cir. 1993)....................................................... 5

*Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994) ....................................................... 15

*Southwest Ctr. for Biological Diversity v. Berg,* 268 F.3d 810 (9th Cir. 2001) ............. 5, 6, 15, 16

*State of Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317 (9th Cir. 2007)......................... 6

*United States v. Carpenter*, 298 F.3d 1122 (9th Cir. 2002)........................................... 6

*Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10 (D.D.C. 2000)..................................... 15

**Statutes**

16 U.S.C. § 1531 ...........................................................................................................2

16 U.S.C. § 1532 ...........................................................................................................8

16 U.S.C. § 1533 ................................................................................................... 2, 9, 10

16 U.S.C. § 1536 ...........................................................................................................9

16 U.S.C. § 1539 ...........................................................................................................8

16 U.S.C. § 1540 ......................................................................................................... 13

**Regulations**

73 Fed. Reg. 28211 (May 15, 2008) .................................................... 2, 3, 4, 10, 17, 19

73 Fed. Reg. 28306 (May 15, 2008) ................................ 2, 3, 4, 10, 11, 12, 13, 14, 16, 17

Fed. R. Civ. P. 24 .......................................................................... 1, 4, 5, 7, 16, 17, 19

50 C.F.R. § 17.21 ...........................................................................................................8

50 C.F.R. § 17.31 ...........................................................................................................9

50 C.F.R. § 17.32 ............................................................................................... 8, 12

50 C.F.R. § 17.40 ................................................................................................ 2, 11

50 C.F.R. 18.27 ...................................................................................................... 12

**Other Authorities**

6 Moore's Federal Practice § 24.03[4][a][i] ............................................................ 16

MOTION TO INTERVENE                                             No.  C08-1339 CW

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT, on October 9, 2008, at 2:00 p.m., or as soon thereafter as it may be heard, in Courtroom 2 before the Honorable Claudia Wilken, United States District Judge, 1301 Clay Street, Oakland, California, the American Petroleum Institute ("API"), Chamber of Commerce of the United States of America ("Chamber"), National Mining Association ("NMA"), National Association of Manufacturers ("NAM"), and American Iron and Steel Institute ("AISI") (collectively "the Associations") will move and hereby move this Court, pursuant to Fed. R. Civ. P. 24(a) and (b), for leave to intervene as defendants on behalf of Defendants Dirk Kempthorne, Secretary of the Department of the Interior ("Secretary"), and the United States Fish and Wildlife Service ("FWS").

For the reasons provided in the accompanying memorandum and declarations, the Associations are entitled to full intervention as a matter of right under Fed. R. Civ. P. 24(a) on Claims Two through Seven in Plaintiffs' Second Amended Complaint, filed July 16, 2008 ("Second Am. Compl."). These Claims seek relief that will directly and immediately impact each of the Associations and their respective members' *nationwide* interests, which no other party can represent. The Court therefore should grant the Associations' timely request for full intervention as a matter of right. Alternatively, the Court should grant the Associations permissive intervention under Fed. R. Civ. P. 24(b)(1)(B) because the defenses they would raise (and practical information they would bring to this case) share common questions of law or fact with Claims Two through Seven. The Associations also have attached a proposed answer to the Second Amended Complaint.

**INTRODUCTION AND BACKGROUND**

The Associations recognize that the Court is familiar with the statutory and regulatory background of the Endangered Species Act ("ESA") given the Court's history with this case and the briefs filed by other parties seeking intervention. The Associations therefore will discuss this background only as necessary in the context of their interest in this case and will briefly summarize the relevant factual background.

On May 15, 2008, in response to this Court's previous order, the Secretary and FWS issued a final rule listing the polar bear as a "threatened" species under the ESA. *See* 73 Fed. Reg. 28212 (May 15, 2008) (the "Listing Rule"). In conjunction with the Listing Rule, Defendants also published an Interim Final Special Rule under ESA Section 4(d), 16 U.S.C. § 1531, which prescribes the requirements that the Secretary deemed to be "necessary and advisable to provide for the conservation" of the polar bear and its habitat. *See Endangered and Threatened Wildlife and Plants; Special Rule for the Polar Bear; Interim Final Rule*, 73 Fed. Reg. 28306 (May 15, 2008) (the "4(d) Rule"); see also 16 U.S.C. § 1533(d). Specifically, the 4(d) Rule added a new paragraph (q) to the regulations found at 50 C.F.R. § 17.40, which tailors the existing regulatory structure to the conservation needs of the polar bear. Finally, the FWS simultaneously issued guidance interpreting the 4(d) Rule. *See* May 14, 2008, Fish and Wildlife Service Memorandum, *Expectations for Consultation on Actions that Would Emit Greenhouse Gases* ("FWS Guidance").

Plaintiffs, the Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, Inc. (collectively "CBD"), filed a seven count complaint alleging violations under the ESA, the Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA"), and the Marine Mammal Protection Act ("MMPA"), and seeking, *inter alia*, to invalidate both the Listing Rule and the 4(d) Rule. In relevant part, CBD alleges that:

- the Listing Rule violates the ESA and APA by designating the polar bear as a "threatened" rather than an "endangered" species, and violates the ESA by failing to designate a critical habitat for the polar bear, *see* Second and Third Claims for Relief;

- the 4(d) Rule violates the ESA and APA by: (i) alleviating the blanket prohibition against takes and, instead, authorizing takes when approved under the MMPA and CITES requirements for protection of polar bears; (ii) making clear that an incidental take permit for otherwise lawful greenhouse gas-emitting activities is unnecessary in the lower 48 States and Hawaii; and (iii) providing in the preamble to the 4(d) Rule that the MMPA process for obtaining incidental harassment authorizations will satisfy the Section 7 consultation requirements, *see* Fourth Claim for Relief;

- the 4(d) Rule violates the APA because the Secretary and FWS did not provide sufficient notice and/or opportunity for public comment, *see* Fifth Claim for Relief;

- the 4(d) Rule violates NEPA and the APA because FWS did not prepare an environmental impact statement or environmental assessment, *see* Sixth Claim for Relief; and

- the Secretary violated the MMPA and APA by not publishing a list of measures for the non-lethal deterrence of polar bears, *see* Seventh Claim for Relief.[1]

Several private entities have sought to intervene on Defendants' behalf. First, the Alaska Oil and Gas Association ("AOGA") and the Arctic Slope Regional Corporation ("ASRC") moved for full intervention, which this Court subsequently granted in part, limiting their intervention to: (i) the remedy phase only on the NEPA and APA claims and (ii) issues in which the Court found that they have a concrete interest, *i.e.*, issues pertaining to operations in Alaska, on the ESA and MMPA claims. Order Granting in Part Motions for Leave to Intervene by Alaska Oil and Gas Association and Arctic Slope Regional Corporation, dated Aug. 13, 2008 ("AOGA/ASRC Order"), at 7-8. Thus,

---

[1] CBD also alleges in its First Claim for Relief that the government failed to make a timely final listing determination for the polar bear. The Associations do not challenge this Claim and, at any rate, believe that it is moot because the Secretary has already issued its final Listing Rule.

AOGA and ASRC were not allowed to "defend the portion of the section 4(d) rule that exempts all activities outside of Alaska from the ESA's take prohibitions or the portion of the rule that exempts greenhouse gas emissions from section 7 of the ESA."[2]  *Id.* at 8.  In addition, the National Petrochemical Refiners Association ("NPRA") and Edison Electric Institute each have filed motions for leave to intervene on which the Court has not ruled as of this date.[3]

Finally, this case has not progressed beyond the filing of the Second Amended Complaint and the intervention motions, and the Secretary and FWS are not required to file their answer to the Second Amended Complaint and administrative record until September 15 and 29, 2008, respectively.

## SUMMARY OF ARGUMENT

The Associations timely seek full intervention as a matter of right under Fed. R. Civ. P. 24(a) for the purpose of defending against Claims Two through Seven of the Second Amended Complaint. The Court should allow these five Associations to fully participate in the merits and remedy phases of these Claims because they have significantly protectable *nationwide* interests – not just in Alaska – by way of either their members companies' own operations or projects that those companies supply that may emit greenhouse gases, thereby potentially triggering the requirements that flow from the Listing Rule and 4(d) Rule.  These operations or projects could be subject to additional costly and time-consuming ESA requirements (in addition to MMPA requirements) or be subject to governmental enforcement actions or citizen suits if the Court grants Plaintiffs' requested relief.

---

[2] AOGA and ASRC each filed motions for reconsideration of the Court's order regarding their intervention.  *See* [Proposed] Notice for Motion of Intervenor-Defendant Alaska Oil and Gas Association for Reconsideration of August 13, 2008 Order on Intervention, filed Aug. 21, 2008; [Proposed] Notice of Motion and Motion of Intervenor-Defendant Arctic Slope Regional Corporation for Reconsideration of August 13, 2008 Order on Intervention, filed Aug. 26, 2008.  As of this date, the Court has not ruled on those motions.

[3] *See* Notice of Motion and Motion of National Petrochemical and Refiners Association to Intervene: Memorandum of Points and Authorities in Support Thereof, filed August 27, 2008; Notice of Motion and Motion for Leave to Intervene as Defendant: Memorandum of Points and Authorities in Support Thereof, filed August 28, 2008 by Edison Electric Institute.

None of the other parties, including AOGA and ASRC, can represent the Associations' nationwide,

private interests.

Alternatively, the Court should grant full permissive intervention under Fed. R. Civ. P. 24(b)(1)(B) on Claims Two through Seven. The Associations' defense of these Rules will raise

questions of fact or law that are in common with CBD's Claims. Moreover, the Associations'

participation can contribute to an efficient resolution of this case because they can offer a broad,

nationwide perspective concerning the implementation of the measures that the government selected.

<strong>ARGUMENT</strong>

**I.    The Associations Are Entitled To Intervene As A Matter Of Right**

Rule 24(a) provides for intervention as of right:

> [u]pon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a)(2).

As this Court recently recognized, the Ninth Circuit has established a four-part test for

intervention as of right:

> (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

*Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1493 (9th Cir. 1995) (quoting

*Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993); *see* AOGA/ASRC Order at 4 (quoting

same). The Ninth Circuit construes Rule 24(a) liberally in favor of potential intervenors. *See, e.g.*,

*Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998). A "court is required to accept as true the

non-conclusory allegations made in support of an intervention motion," including statements set

forth in well-supported declarations. *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810,

819-20 (9th Cir. 2001).  The Associations each have satisfied the requirements for intervention as a matter of right.

### A.     The Motion Is Timely.

The Ninth Circuit considers three factors to determine whether an applicant's motion is timely:  (1) the stage of the proceedings; (2) the prejudice to the existing parties; and (3) the reasons for and length of the delay, if any.  *State of Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1319 (9th Cir. 2007).  The Associations' motion is timely because the governmental Defendants have not yet filed either the answer to the Second Amended Complaint or the administrative record, which are due September 15 and 29, 2008, respectively.  *See United States v. Carpenter*, 298 F.3d 1122, 1125 (9th Cir. 2002); *Orange County v. Air California*, 799 F.2d 535, 537 (9th Cir. 1986).  Further, the Associations have attached to their motion to intervene a proposed answer to the Second Amended Complaint, and stipulate that they will abide by the briefing schedule currently in place, or any other schedule that the Court sets.[4]  Thus, the Associations' motion is timely, will not impose any burden or prejudice on the existing parties, and will not cause any further delay.

### B.     Each Association Has Significantly Protectable Interests That Would Be Directly And Immediately Harmed By Plaintiffs' Requested Relief.

The Associations also satisfy the second and third prongs for intervention as a matter of right. For the second prong (a significantly protectable interest), the Associations must demonstrate that "the injunctive relief sought by the plaintiffs will have direct, immediate, and harmful effects upon [their] legally protectable interest."  *Southwest Ctr. for Biological Diversity*, 268 F.3d at 818 (citation and internal quotation marks omitted).  "Whether an applicant for intervention demonstrates sufficient interest in an action is a practical, threshold inquiry.  No specific legal or equitable interest need be established."  *Forest Conserv. Council*, 66 F.3d at 1493 (internal quotation marks and

---

[4] The Associations request to have the same page limits on their summary judgment brief as granted to other Defendant-Intervenors by the Court upon ruling on AOGA and ASRC's motions for reconsideration.

6

citation omitted). Moreover, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Southwest Ctr. for Biological Diversity*, 268 F.3d at 822 (quoting Fed. R. Civ. P. 24 advisory committee's notes) (internal quotation marks omitted). As more fully discussed below and in the attached declarations, the Associations have a direct and immediate interest in defending against CBD's challenges because CBD's requested relief will have a nationwide impact on the operations, planning efforts, and economic interests of the Associations' respective members.

**The Second Claim for Relief:** Each of the five Associations is a *nationwide* association whose members either have operations at various locations *throughout the United States* that may emit greenhouse gases, or supply projects at various locations *throughout the United States* that may emit greenhouse gas emissions. See Declaration of Douglas Morris of the American Petroleum Institute in Support of Motion to Intervene ("API Decl."), ¶¶ 4,5 (API is a nationwide, non-profit trade organization representing nearly 400 corporate members engaged in all aspects of the oil and gas industry, including production, refining, distribution, and marketing *throughout* the United States, including in Alaska); Declaration of William Kovacs of the Chamber of Commerce of the United States of America in Support of Motion to Intervene ("Chamber Decl."), ¶ 4 (Chamber is the world's largest business federation, representing businesses and organizations in every sector of the economy who transact business throughout the United States, including Alaska); Declaration of Bradford V. Frisby of the National Mining Association in Support of Motion to Intervene ("NMA Decl."), ¶ 4 (NMA is a trade organization of more than 325 companies representing the interests of the nation's producers of metals, industrial and agricultural minerals, and coal with operations across the United States); Declaration of Keith McCoy of the National Association of Manufacturers ("NAM Decl."), ¶ 4 (NAM is the largest industrial trade association, representing small and large manufactures in every industrial sector and in all 50 states who operate and hold ownership interests

in various manufacturing sectors, such as the petroleum manufacturing sector, all over the United States, including Alaska); Declaration of Larry Kavanagh of the American Iron and Steel Institute in Support of Motion to Intervene ("AISI Decl."), ¶ 4 (AISI represents approximately 28 member iron and steel companies, and 138 associate and affiliate members who are suppliers to or customers of the steel industry; these members operate and hold ownership interests in various steel manufacturing and related operations across the United States and its producer, associate and/or affiliate members supply various customers and projects in the United States, including Alaska).

Although these Associations' members seek to play a constructive role in developing a sound national approach to the challenge of climate change – including energy efficiency, conservation, reducing greenhouse gas emissions and avoiding impacts on polar bears and their habitat in their Arctic operations – the nature of their varied nationwide activities makes it impossible to completely eliminate such emissions. API Decl. ¶¶ 8-9; Chamber Decl. ¶¶ 6-9; NMA Decl. ¶¶ 6, 9-11; NAM Decl. ¶¶ 8,9; AISI Decl. ¶¶ 6, 9-10.  If the polar bear's designation is elevated (as CBD requests), CBD likely would claim that such operations trigger certain ESA requirements.  These members therefore have a significant interest in defending the decision to designate the polar bear as "threatened" rather than "endangered" because the former designation, unlike the latter, allowed the Secretary to exercise his discretion in determining whether certain additional and costly ESA constraints should apply.

For example, ESA Section 9 and 50 C.F.R. § 17.21(c) prohibit the "taking" of any endangered species.[5]  A private entity can overcome this blanket prohibition by seeking an "incidental take permit" from the Secretary for any taking that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  16 U.S.C. § 1539(a)(1)(B); 50 C.F.R. §

---

[5] The term "take" "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

1    17.32(b).  Also, ESA Section 7 prescribes that any federal agency seeking to fund or permit an

2    activity that may affect an endangered species must engage in a "consultation" process with the

3    FWS.  16 U.S.C. §§ 1536(a)(2), 1538.

4        Under the FWS regulations, these requirements under Sections 7 and 9 for endangered

5    species also apply to threatened species unless the Secretary adopts a rule under ESA Section 4(d)

6    that tailors the prohibitions and authorizations for that species to those that are "necessary and

7    advisable for the conservation" of that species.  *See* 50 C.F.R. § 17.31; 16 U.S.C. § 1533(d).  Thus,

8    while the Section 9 take prohibition and the Section 7 consultation requirement apply to endangered

9    species, the Secretary has discretion to determine that such prohibitions and requirements should not

10   apply to a particular threatened species – a determination that has clear-cut economic consequences

11   for the Associations' respective  members.

12       If, for example, the polar bear is listed as "endangered" (as Plaintiffs' Claim Two alleges

13   should be done), CBD would undoubtedly argue that API, Chamber, NMA, NAM, and AISI

14   members who have greenhouse gas-emitting operations are prohibited under Section 9 from

15   engaging in operations that, according to CBD, would "take" polar bears by virtue of these

16   emissions, unless those members obtain an incidental take permit.  API Decl. ¶ 17; Chamber Decl. ¶

17   16; NMA Decl. ¶17; NAM Decl. ¶ 6; AISI Decl. ¶ 18.  If CBD's arguments were accepted, projects

18   that the Association's respective members conduct or supply could be delayed or stopped altogether

19   by the litigation that such an alleged requirement would spawn, as well as the Section 7 consultation

20   process that CBD also would seek to impose on the federal permitting of greenhouse gas-emitting

21   activities.  API Decl. ¶¶ 11-15, 17; Chamber Decl. ¶¶ 11-14,16; NMA Decl. ¶¶ 12-15,17; NAM

22   Decl. ¶¶ 11-14, 16; AISI Decl. ¶¶ 13-16, 18.  The Associations therefore have significantly

23   protectable nationwide interests that will be directly and immediately impacted if the Listing Rule is

24   invalidated and the polar bear is designated as an endangered species.

**Third Claim for Relief:**  CBD's Third Claim seeks to require the federal Defendants to designate "critical habitat" for the polar bear.  Second Am. Compl., ¶¶ 155-160.  A critical habitat designation "may require special management considerations or protections" for the areas occupied by the species, or other requirements for areas outside the geographic area occupied by the species.[6] If the Court grants CBD's requested relief and directs the Secretary and FWS to designate critical habitat for polar bears, there will be immediate economic consequences for the Associations' members.  In particular, if critical polar bear habitat is designated in parts of Alaska, the imposition of special management considerations or protections will add costs and potential delay to the members' operations or operations that they supply that are located in this geographic area.  API Decl. ¶ 18; Chamber Decl. ¶ 17; NMA Decl. ¶ 18; NAM Decl. ¶ 17; AISI Decl. ¶ 19.

**Fourth and Fifth Claims for Relief:**  CBD's requested invalidation of the 4(d) Rule on either substantive or procedural grounds instantly could trigger additional obligations for the Associations' members for their greenhouse gas-emitting activities throughout the United States, or enforcement actions or citizen suits to enforce those purported obligations.

First, the 4(d) Rule alleviates the ESA's otherwise applicable blanket prohibition in Section 9 on the taking of threatened species *so long as* the activity is "conducted in a manner that is consistent with the requirements of the Marine Mammal Protection Act (MMPA) . . . and the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), provided that the person carrying out the activity has complied with all terms and conditions that apply to that activity

---

[6] "Critical habitat" means:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protections; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5).

under the MMPA and CITES and their implementing regulations."  50 C.F.R. § 17.40(q)(2); 73 Fed.

Reg. at 28306 ("Section (q)(2) Exemption").[7]  Thus, if an activity is compliant with MMPA or

CITES provisions for polar bears – which FWS found to be protective of the species – the FWS will

not require any ***additional*** authorizations under the ESA – a determination that has significant

favorable economic implications for the regulated community.  API Dec. ¶ 14; Chamber Decl. ¶ 13;

NMA Decl. ¶ 14; NAM Decl. ¶ 13; AISI Decl. ¶ 15.

Second, for activities in the lower 48 States and Hawaii, the 4(d) Rule also alleviates the

potential requirement that a private entity obtain an incidental take permit for its otherwise lawful

greenhouse gas-emitting activities if it wants an exemption from the Section 9 blanket take

prohibition – which, according to CBD, would otherwise apply to such emitting activities.  *See* 50

C.F.R. § 17.40(q)(4) ("Section (q)(4) Exemption").  This Section (q)(4) Exemption is important in

the situation where a company may not qualify for the Section (q)(2) Exemption discussed above.

For example, it is not clear that an oil refinery or power plant located outside the polar bear's Arctic

habitat could obtain an IHA under MMPA to cover the CBD-alleged effects of those emissions on

global climate and, thus, qualify for the Section (q)(2) exemption.  In the absence of this MMPA-

equivalent authorization under the Section (q)(2) Exemption, it could be alleged that (if the 4(d)

Rule, including Section (q)(4) Exemption, were invalidated) such a facility would need to obtain an

incidental take authorization under Section 9.[8]   As a result of this provision of the 4(d) Rule, private

---

[7] "[I]f incidental take has been authorized under section 101(a)(5) of the MMPA, either by the
issuance of an Incidental Harassment Authorization (IHA) or through incidental take regulations,
[FWS] will not require an incidental take permit issued in accordance with 50 C.F.R. 17.32(b)."  73
Fed. Reg. 28310.

[8] The Secretary did not extend the Section (q)(4) Exemption to cover otherwise lawful greenhouse
gas-emitting activities in Alaska, resulting in an "Alaska Gap" in its coverage.  Although the
Associations support the Section 9 exemption for the lower 48 States and Hawaii, they have filed a
lawsuit in the District Court for the District of Columbia under the Administrative Procedure Act
("APA") challenging the carve-out of Alaska from this exemption.  *See American Petroleum Inst. et
al., v. Kempthorne, et al.*, Case No. 1:08-cv-01496 EGS (D.D.C.) (filed Aug. 27, 2008).  The
Associations are not challenging the Section 9 exemption in paragraph (q)(4) for the other 49 States
and Hawaii, the remainder of the 4(d) Rule, the Listing Rule, or the FWS guidance issued to

1   entities with greenhouse gas emitting operations in all States except Alaska will not be subject to the

2   additional costs and delay associated with obtaining an incidental take permit simply because their

3   greenhouse gas emissions allegedly would somehow effect a "take" of polar bears in the Arctic.  API

4   Decl. ¶¶ 11-12; Chamber Decl. ¶¶ 11-12; NMA Decl. ¶¶ 12-13; NAM Decl. ¶¶ 11-12; AISI Decl. ¶¶

5   13-14.

6          Third, the preamble to the 4(d) Rule states that the FWS does not anticipate that "any entity

7   holding incidental take authorization under the MMPA and in compliance with all mitigation

8   measures under that authorization would be required to implement further measures under the ESA

9   Section 7 [consultation] process."  73 Fed. Reg. at 28311.  Thus, if private entities have obtained an

10  IHA under the MMPA for activities for which such approval is available – a process that results in

11  an authorization with a greater level of protection for the polar bear than that provided by the ESA[9]

12  – the Section 7 consultation process and required finding would be duplicative.  API Decl. ¶ 15;

13  Chamber Decl. ¶ 14; NMA Decl. ¶ 15; NAM Decl. ¶ 14; AISI Decl. ¶ 16.

14         Dissatisfied with these tailored conservation measures, CBD asks the Court to invalidate the

15  entire 4(d) Rule on both substantive and procedural grounds under the ESA and APA.  If, however,

16  the "threatened" designation for the polar bear remains in effect, it is critical that the 4(d) Rule

17  remain in place without interruption.  Otherwise, the full range of ESA requirements for

18  "endangered" species will apply because of the polar bear's "threatened" designation.  Invalidation

19  of the 4(d) Rule could have immediate and substantial consequences on the operations, planning

---

implement the Listing Rule.  The Associations' discrete challenge in that case alleges that the Alaska
Gap is an irrational exercise of agency authority that discriminates against Alaska operations and,
thus, is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law under
the APA.

[9] *See* 73 Fed. Reg. 28311 (the IHA "standards under the MMPA currently provide a greater level of
protection for the polar bear than adoption of the standards under 50 C.F.R. 17.32.  Negligible
impact [under the MMPA], as defined at 50 C.F.R. 18.27(c), is an impact that cannot be reasonably
likely to, adversely affect the species through effects on annual rates of recruitment or survival.  This
is a *more protective* standard than 50 C.F.R. 17.32's requirement to minimize and mitigate, to the
maximum extent practicable, the impact of any takings") (emphasis added).

efforts, and economic interests of the Associations' members on a *nationwide* level.

In particular, companies would be immediately subject to Section 9's blanket prohibition on activities that cause a taking of the polar bear, which CBD and others would contend include the greenhouse gas emissions that are ubiquitous in virtually all economic activity, no matter where these emissions occur. API Decl. ¶ 14; Chamber Decl. ¶ 13; NMA Decl. ¶14; NAM Decl. ¶ 13; AISI Decl. ¶ 15. Otherwise, the members could be subject to federal enforcement actions or citizen suits to enforce the taking prohibitions against those operations. See 16 U.S.C. § 1540(e), (g). Alternatively, CBD would allege that the Associations' member companies (or the projects they supply) would be required to obtain incidental take permits for these operations – a process that results in added cost and delay, which must be factored into the members' operational planning. API Decl. ¶¶ 11-12; Chamber Decl. ¶¶ 11-12; NMA Decl. ¶¶ 12-13; NAM Decl. ¶¶ 11-12; AISI Decl. ¶¶ 13-14. Moreover, if CBD succeeds in its request to have the Section 7 consultation process imposed – despite the protections afforded by the MMPA process for obtaining an IHA – the Associations' members could face a costly and potentially prohibitive consultation process (*on top of* the MMPA process) for any federally-permitted operations for which they obtain IHAs.

**<u>Sixth Claim for Relief</u>:** Again, assuming that the polar bear's "threatened" designation remains in effect, CBD's NEPA claim would delay the immediate implementation of the 4(d) Rule's carefully-tailored conservation requirements. CBD seeks to force the Secretary and FWS to prepare either an environmental impact statement or environmental assessment under NEPA before the 4(d) Rule can be implemented – a process that can take months even in the most accelerated scenario. In the interim, the 4(d) Rule would have no effect (while the "threatened" listing would remain in effect), triggering the panoply of ESA requirements discussed above. The Associations' members therefore could be forced to unnecessarily comply with these requirements or risk governmental enforcement actions or citizen suits, until the NEPA process is completed for the 4(d) Rule. API

13

Decl. ¶ 16; Chamber Decl. ¶ 15; NMA Decl. ¶ 16; NAM Decl. ¶ 15; AISI Decl. ¶ 17.  Again, this would result in significant delay in the Associations' members' operations or in the projects they supply, thereby imposing additional costs and burdens by virtue of the Section 9 take prohibition, the requirement to obtain an incidental take permit, and the Section 7 consultation requirements. Accordingly, the Associations have a keen interest in defending against a moratorium on the implementation of the 4(d) Rule for the purpose of conducting a NEPA analysis, which is not required for such rulemakings in any event.

**Seventh Claim for Relief:**  Lastly, CBD would require the Secretary to implement a general list of guidelines for non-lethal deterrence measures for the polar bear under the MMPA.  Second Am. Compl. ¶¶ 180-85.  Whatever measures Plaintiffs would like to see imposed would be generalized, non-project-specific measures that would increase costs and operational planning in the relevant areas in Alaska where such measures would be imposed.  API Decl. ¶ 18; Chamber Decl. ¶ 17; NMA Decl. ¶ 18; NAM Decl. ¶ 17; AISI Decl. ¶ 19.  Whatever measures Plaintiffs would like to see imposed on these members under the MMPA, such measures necessarily will result in additional costs and delay for the members in their operations, and may be unreasonable and inappropriate, depending on what they prescribe.

Based on all of the above considerations, each Association has members with *nationwide* interests that are directly related to the subject matter of this action.  Granting Plaintiffs' request to invalidate the 4(d) Rule for the polar bear "actually will affect" API's members.  *Donnelly¸* 159 F.3d at 410 (interest is "related" to the subject of the action when "the resolution of the plaintiff's claims actually will affect the applicant").

### C.    The Associations Should Not Be Limited To Participation In Only The Remedy For The NEPA And APA Claims.

The Associations recognize that under the Ninth Circuit decision in *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1108 (9th Cir. 2002), private parties may not intervene in federal district

court under Fed. R. Civ. P. 24(a) as a matter of right in the merits of a NEPA case, and that this Court extended that rationale to prevent AOGA and ASRC from intervening on the merits of CBD's APA claims. AOGA/ASRC Order at 5-6. The Associations, however, respectfully submit that this rationale should not apply here.

First, the Associations have demonstrated direct and concrete interests in all aspects of Claims Two through Seven, including in the merits of the APA and NEPA claims and, if they are excluded from participating in the litigation of the merits of those claims, they will be "substantially affected in a practical sense by the determination made" regarding those claims. *Southwest Ctr. for Biological Diversity*, 268 F.3d at 822 (quoting Fed. R. Civ. P. 24 advisory committee's notes) (internal quotation marks omitted). Second, the better view is that adopted by courts in other NEPA cases allowing intervention as a matter of right on the merits of NEPA claims. *See, e.g., Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 971 (3d Cir. 1998); *Sierra Club v. Espy*, 18 F.3d 1202, 1208 (5th Cir. 1994).

Finally, even if the Court applies the rule in *Kootenai Tribe*, it only impacts the Associations' involvement in litigating the merits of the Fifth Claim (which relies solely on the APA) and the Sixth Claim (which relies solely on NEPA and the APA). The other claims arise under either the ESA or MMPA exclusively or in conjunction with the APA claims and, therefore, the Associations should be allowed full intervention to defend against those ESA and MMPA claims in the Second, Third, Fourth, and Seventh Claims.

### D.    The Existing Parties Do Not Adequately Represent The Associations' Interests.

"The applicant-intervenor's burden in showing inadequate representation is minimal: it is sufficient to show that representation **may** be inadequate." *Forest Conserv. Council*, 66 F.3d at 1498 (emphasis in original). The Ninth Circuit considers the following factors in making this determination:

1

2
(1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect.

3
*Southwest Ctr. for Biological Diversity*, 268 F.3d at 822 (citation omitted).  Any doubt regarding the

4
adequacy of representation should be resolved in favor of the would-be intervenor.  6 Moore's

5
Federal Practice § 24.03[4][a][i] at 24-42.

6

7
As the Court noted in ruling on AOGA's and ASRC's motions to intervene, the interests of

8
the government are disparate from those of private parties – indeed, the Associations' interests are

9
not ones that belong to the general public and, thus, the Secretary's and FWS's representation of the

10
Associations necessarily would be inadequate.  *See* AOGA/ASRC Order at 7; *Forest Conserv.*

11
*Council*, 66 F.3d at 1499.  Further, the Associations' interests are sufficiently different from those of

12
AOGA and ASRC, to both of whom the Court granted limited intervention.  Unlike AOGA and

13
ASRC, the Associations have *nationwide* – not just Alaska – interests that are directly impacted by

14
CBD's claims.  For example, as discussed above, each Association's members either have or supply

15
operations all over the United States (not just in Alaska) that may emit greenhouse gases and,

16
according to CBD, be subject to the Section 9 prohibition on takes, require an incidental take permit,

17
and be subject to the Section 7 consultation requirements.  Also, each Association has members that

18
have or supply operations, *throughout the United States* (not just in Alaska) that, according to CBD,

19
would be subject to and rendered more costly by the full spectrum of ESA requirements for

20
endangered species if the threatened designation  for the polar bear is invalidated and superseded by

21
an endangered designation, or if the 4(d) Rule is invalidated.

22

23
Finally, in contrast to AOGA and ASRC, at least one Association's members (API) have

24
*nationwide* experience with obtaining incidental take permits under the ESA, as well as IHA's under

25
the MMPA, and engaging in the Section 7 consultation process.  API Decl. ¶ 13.  This experience

26
would "bring[] to the court's attention valuable information not available to or provide[d] by the

27

28

1    [existing] parties." *Forest Conserv. Council*, 66 F.3d at 1499 n.9.

2    **II.    Alternatively, The Court Should Grant The Associations Permissive Intervention.**

3            As an alternative to intervention as a matter of right, the Court should grant the Associations

4    permissive intervention as Defendants with full party status as to Claims Two through Seven.  Fed.

5    R. Civ. P. 24(b)(1)(B) provides, in part, that: "[u]pon timely application, anyone may be permitted to

6    intervene in an action . . . when an applicant's claim or defense and the main action have a question

7    of law or fact in common."  Fed. R. Civ. P. 24(b)(1)(B).  Permissive intervention is within the sound

8    discretion of the Court and is granted liberally.  *Kootenai Tribe*, 313 F.3d at 1110.  Further, the

9

10   Ninth Circuit has explained:

11       Unlike Rule 24(a), a "significant protectable interest" is not required by Rule 24(b) for
         intervention; all that is necessary for permissive intervention is that intervenor's "claim or
12       defense and the main action have a question of law or fact in common."  Fed. R. Civ. P. 24(b).
         Rule 24(b) "plainly dispenses with any requirement that the intervenor shall have a direct
13       personal or pecuniary interest in the subject of the litigation."  SEC v. U.S. Realty &
         Improvement Co., 310 U.S. 434, 459, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).
14
     *Kootenai Tribe*, 313 F.3d at 1108.

15           As discussed above, the Associations' motion is timely.  Moreover, the Associations seek to
16
     assert defenses that will have questions of law or fact in common with CBD's claims, such as
17
     whether the existing regulatory requirements under the MMPA are sufficiently protective of the
18
     polar bear so as to justify the Secretary's decision to exempt otherwise lawful activities in all States
19
     except Alaska from the requirement to obtain an incidental take permit.  The Associations also will
20
     bring to bear practical information on the impact of the Section 9 prohibition on takings, the process
21
     for seeking an incidental take permit, the impacts of the Section 7 consultation process, the potential
22
23   impacts of additional regulatory and permit burdens, and the delay and costs associated with

24   undergoing the NEPA process.  Thus, the Associations' defenses share commonalities with CBD's

25   claims concerning the adequacy of the protections afforded by FWS in the Listing Rule and 4(d)

26

27   Rule.  Because permissive intervention is liberally granted, the Court should grant the Associations'

28

request for full intervention on this alternative ground.

## CONCLUSION

For the foregoing reasons, the Associations respectfully request that the Court grant full intervention either as a matter of right or permissively on Claims Two through Seven.

DATED:  September 4, 2008

John C. Martin
Duane A. Siler
Michele L. Walter
Patton Boggs LLP

John Briscoe
David Ivester
Lawrence S. Bazel
Briscoe Ivester & Bazel LLP

By: _____
Lawrence S. Bazel

*Attorneys for Proposed Defendant-Intervenors*
*American Petroleum Institute, Chamber of*
*Commerce of the United States of America,*
*National Mining Association, National*
*Association of Manufacturers, and American*
*Iron and Steel Institute*