1    John Briscoe, # 53223
2    David Ivester, #76863
3    Lawrence S. Bazel, # 114641
4    Briscoe, Ivester, & Bazel, LLP
5    155 Sansome Street, 7th Floor
6    San Francisco, CA 94104
7    jbriscoe@briscoelaw.net
8    divester@briscoelaw.net
9    lbazel@briscoelaw.net
10   Telephone:    (415) 402-2700
11   Facsimile:    (415) 398-5630
12
13   John C. Martin *(pro hac vice* application pending*)*
14   Duane A. Siler *(pro hac vice* application pending*)*
15   Michele L. Walter *(pro hac vice* application pending*)*
16   Patton Boggs LLP
17   2550 M Street N.W.
18   Washington, D.C. 20037
19   jmartin@pattonboggs.com
20   dsiler@pattonboggs.com
21   mwalter@pattonboggs.com
22   Telephone:    (202) 457-6000
23   Facsimile:    (202) 457-6315
24
25   *Attorneys for Proposed Defendant-Intervenors American Petroleum Institute, Chamber of*
26   *Commerce of the United States of America, National Mining Association, National*
27   *Association of Manufacturers, and American Iron and Steel Institute*
28

29               **IN THE UNITED STATES DISTRICT COURT**
30               **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
31
32                                                        )
33   CENTER FOR BIOLOGICAL DIVERSITY, *et al.,*           )
34                                                        )
35                      Plaintiffs,                       )
36                                                        )
37              v.                                        )      Case No. 08-CV-1339-CW
38                                                        )      Assigned to:
39   DIRK KEMPTHORNE, *et al.,*                           )      Hon. Claudia Wilken
40                                                        )
41                      Defendants,                       )
42                                                        )
43              and                                       )
44                                                        )
45   AMERICAN PETROLEUM INSTITUTE,                        )

1
2       Proposed Defendant-  )
3       Intervenor      )
4
5

## DECLARATION OF DOUGLAS MORRIS OF THE AMERICAN PETROLEUM INSTITUTE IN SUPPORT OF MOTION TO INTERVENE

I, Douglas Morris, declare as follows:

1.  I am Group Director for Upstream and Industry Operations of the American Petroleum Institute ("API"). I make this declaration in support of API's Motion to Intervene under Rule 24 of the Federal Rules of Civil Procedure. I have first-hand experience with, and personal knowledge of, the facts and matters discussed in this declaration.

2.  I am a 1978 graduate of Michigan State University with a Bachelor of Sciences Degree in Chemical Engineering and I received a Juris Doctor Degree from South Texas College of Law in 1987.

3.  I have been Group Director for Upstream and Industry Operations with API since January 2007. In this capacity, I have come to know the membership of API and its activities in regulatory and policy matters. I am well aware of API's activities concerning climate change issues.

4.  API is a nationwide, non-profit trade organization, representing nearly 400 corporate members engaged in all aspects of the oil and gas industry, including exploration, production, refining, distribution, and marketing operations at locations across the United States, including Alaska.

5.  Its members include producers, refiners, suppliers, pipeline operators, and marine transporters, as well as service and supply companies that support all segments of the industry. API is incorporated in and has its principal place of business in the District of Columbia. API

4977047

1   participated in the rulemaking for the polar bear 4(d) Rule by submitting comments on July 14,

2   2008. A copy of the 4(d) Rule comments is attached as **Exhibit A.**

3        6.      API and its members have substantial interests that are directly and significantly

4   affected by resolution of the issues presented by the Plaintiffs' complaint, as further discussed

5   below.  No other party represents API or its interests.  API therefore requests to participate in

6   this case to protect its interests.  API's participation will be helpful and beneficial to the Court

7   and aid in understanding the practical consequences of the Secretary's decisions regarding the

8   polar bear and, in particular, the promulgation of the 4(d) Rule.  If API is denied intervention, it

9   and its members will have no other means of protecting their interests in this matter.

10       7.      API does not seek to delay these proceedings and will abide by the schedules that

11  the Court has set.

12       8.      API's members across the United States are devoted to efforts to develop natural

13  resources in an environmentally sound, reasonable manner that complies with applicable

14  regulatory requirements.  This includes working with the government to ensure that

15  environmental regulations and policy concerns are communicated to API members.

16       9.      The nature of API's members' operations, however, makes it impossible to

17  completely eliminate all potential interactions with polar bears from these operations.  Thus, to

18  the extent that greenhouse gas emissions are said to harm polar bears and that further regulatory

19  burdens should be imposed under the ESA, API members will suffer from these burdens.

20       10.     API's members have discrete and concrete interests in defending Plaintiffs'

21  challenges and in supporting the 4(d) Rule.

22       11.     Specifically, as to the 4(d) Rule, API's members have discrete and concrete

23  interests in three aspects of that Rule. First, API has an interest in ensuring that its members'

3

1    operations throughout the lower 48 States and Hawaii are not subjected to the requirement to

2    obtain an incidental take permit under the ESA for their otherwise lawful activities. The U.S.

3    Fish and Wildlife Service ("FWS") determined that neither climate change, nor any effect of

4    climate change, can be traced to particular activities in particular locations. Thus, under the 4(d)

5    Rule, otherwise lawful operations in the lower 48 States and Hawaii are exempted from the ESA

6    Section 9 regulatory requirement to obtain incidental take permits.

7        12.    Without this exemption, some would claim that API's members are required to

8    obtain incidental take permits for their otherwise lawful activities in the lower 48 States and

9    Hawaii, even though FWS determined that impacts on polar bears could not be traced to these, or

10   any other specific activities. Thus, API's members have a particular interest in ensuring the

11   continued validity of this exemption in the 4(d) Rule so as to assure these members will not be

12   subjected to increased costs and delays associated with obtaining incidental take permits, or to

13   defend unfounded claims that such permitting is required.

14       13.    Further, in the past, API's members have applied for and received incidental take

15   permits for certain activities. Based on this previous experience, API members could provide

16   valuable information concerning the costs and burdens associated with seeking such permits.

17       14.    Second, API and its members have a concrete and immediate interest in ensuring

18   the continued validity of the exemption under the 4(d) Rule from the requirement to obtain a

19   Section 9 take authorization under the ESA. The ESA requires a permit for activities that will

20   take an endangered or threatened species. Under the 4(d) Rule, however, FWS determined that

21   the protections of the Marine Mammal Protection Act ("MMPA") and the Convention on

22   International Trade in Endangered Species of Wild Fauna and Flora ("CITES") are fully

23   protective. Thus, if an activity complies with the take provisions of the MMPA or CITES,

4

1    additional authorizations under the ESA would not be required. Unlike the exemption from the

2    ESA Section 9 incidental take permits, the exemption from the ESA's separate take authorization

3    applies to operations throughout the United States, including those operations that API members

4    have in Alaska. Without this exemption, API's members could potentially be subject to the

5    unnecessary burden of applying for ESA take authorizations *in addition to* MMPA

6    authorizations. API members previously have applied for authorizations under the MMPA in

7    Alaska and elsewhere and could provide the Court with valuable information concerning the

8    protective measures supplied by these authorizations and why it could be unnecessary to obtain a

9    separate take authorization under the ESA. API's members therefore have particular interest in

10    ensuring the validity of this exemption.

11         15.    Third, API and its members have a concrete and immediate interest in FWS's

12    explanation in the preamble to the 4(d) Rule concerning the application of the ESA Section 7

13    consultation requirements. Apparently, Plaintiffs would have this Court declare that consultation

14    is required in instances that FWS would be disinclined to require consultation. *See* Complaint,

15    ¶¶ 9, 122, 167; *Endangered and Threatened Wildlife and Plants; Special Rule for the Polar*

16    *Bear; Interim Final Rule*, 73 Fed. Reg. 28306, 28310-11. The May 14, 2008 H. Dale Hall FWS

17    Guidance, as well as the preamble for the 4(d) Rule, however, alleviates the potential for an

18    unnecessary and costly consultation process for greenhouse gas-emitting projects in certain

19    situations. If this Court were to accept Plaintiffs' apparent position, API's members could be

20    subject to additional cost and delay associated with the duplicative consultation process for

21    federally permitted projects that they operate or supply. Thus, API's members have a particular

22    interest in the continued validity of this explanation.

4977047

1    16.    API's members likewise have an interest in defending against the Plaintiffs' claim

2    that NEPA procedures with regard to the 4(d) Rule were improperly omitted.  If the Listing Rule

3    remains in effect, but the 4(d) Rule is subject to NEPA, an interim period would exist during

4    which API's members would be subjected to the permitting and consultation burdens discussed

5    above under Sections 7 and 9.  Consequently, for the same reasons that API members have a

6    particular interest in the application of the 4(d) Rule, they likewise have an interest in the

7    resolution of whether NEPA and its associated delays apply in the present case.

8    17.    As to the Listing Rule itself, if the polar bear's designation is elevated, the

9    Plaintiffs would claim that the 4(d) Rule can no longer be in effect, thereby raising the concerns

10    described above.  In turn, API's members would lose the benefit of the 4(d) Rule and, if

11    Plaintiffs' position were accepted, incur the harms described above.

12    18.    Moreover, with regard to FWS's purported omission to designate critical habitat

13    and to list measures for non-lethal deterrence—API's members likewise have a concrete and

14    immediate interest in these issues.  A number of API's members may operate or supply

15    operations in what may otherwise be designated critical polar bear habitat.  If critical habitat

16    were designated, then special management considerations or protections would apply, resulting

17    in additional costs and potential delay to the members' operations or to parties they supply

18    located in relevant parts of Alaska.  Similarly, API's members already implement project-

19    specific, non-lethal deterrence measures for polar bears in plans approved by the FWS in the

20    issuance of incidental harassment authorizations under the MMPA.  CBD, however, would

21    require a list of more generalized, non-project-specific measures that, depending on what they

22    prescribe, could increase the project's costs and change operational planning.

6

4977047

1    19.    The relief that Plaintiffs request would put API's members at risk of increased

2  permitting burdens and enforcement actions or citizen suits that would substantially impact API

3  members' routine operations throughout the United States and API's members' economic

4  interests in those activities.  API's members therefore have a concrete interest in defending these

5  aspects of the Listing Rule, the 4(d) Rule, and under NEPA and the MMPA, and will have no

6  other way of defending these interests if intervention is denied.

4977047

1      I declare under penalty of perjury under the laws of the United States that the foregoing

2   information is true and correct to the best of my knowledge, information, and belief.

3      DATED this 3d day of September, 2008

4

5                           Douglas Morris

4977047

# EXHIBIT A



**Harry M. Ng**
General Counsel & Group Director

**Office of the General Counsel**

1220 L Street, NW
Washington, DC  20005-4070
USA

Telephone:  202-682-8243
Fax:  202-682-8033
Email:  ng@api.org
www.api.org

July 14, 2008

VIA ELECTRONIC FILING AND FIRST CLASS MAIL
Public Comments Processing
Attn: 1018-AV79
Division of Policy and Directives Management
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive
Suite 222
Arlington, VA  22203

> Re:    Comments of the American Petroleum Institute on the May 15, 2008
>        Interim Final Special Rule for the Polar Bear (73 Fed. Reg. 28306)
>        (FWS-R7-ES-2008-0027)

Dear Sir or Madam:

The American Petroleum Institute (API) appreciates the opportunity to provide the attached comments on the Interim Final Special Rule for the Polar Bear published in the May 15, 2008 Federal Register at 73 Fed. Reg. 28306, which amended 50 C.F.R. § 17.40 by adding a new paragraph (q).  API also submits comments on the Secretary's statement, in the preamble of the Interim Final Rule, under the heading "Consultation under Section 7 of the ESA." 73 Fed. Reg. 28312-13.

The oil and natural gas industry is committed to conservation of the polar bear. Companies active in Arctic region exploration for energy resources implement polar bear mitigation and avoidance programs, and provide funding and logistical support for important polar bear studies carried out in the U.S. and in Canada.

API is a national trade association representing more than 400 member companies involved in all aspects of the oil and natural gas industry.  Those members include producers, refiners, suppliers, pipeline operators and marine transporters, as well as service and supply companies that support all segments of the industry.  API members are dedicated to meeting environmental requirements, while economically developing and supplying energy resources for consumers. API member companies are subject to the regulations of the Department of the Interior and Fish & Wildlife Service (FWS) pertaining to the conservation of species, and as

An equal opportunity employer

such, are subject to the Interim Final Rule. Therefore, API and its member companies have a direct interest in this rulemaking.

Except as otherwise specified below, API supports the Interim Final Rule and believes it should be promulgated as a final rule, in an expedited manner. As discussed in the attached comments, API believes the Secretary is correct in concluding that the scientific evidence does not establish a causal connection between individual sources of greenhouse gases (GHGs) and effects on polar bears. Accordingly, the Secretary has a reasonable basis for concluding that individual sources do not "take" the polar bear within the meaning of ESA Section 9, and that federal actions permitting such emissions will not "likely affect" the polar bear for purposes of the consultation requirement of Section 7 of the Endangered Species Act (ESA). The Secretary has discretion to interpret these terms, and the Secretary's interpretation is reasonable in light of the scientific evidence. However, API does object to Section 17.40(q)(4) to the extent that it excepts GHG emissions from sources located in Alaska. API believes this error is unreasonable in light of the balance of the Interim Final Rule. This issue is addressed in more detail in comments filed by the Alaska Oil and Gas Association (AOGA).

API's comments focus on why the FWS has discretion not to extend the "taking" prohibition of ESA Section 9 to a source based upon the emission of GHGs, and why it is reasonable not to do so. Also, the FWS has correctly determined that consultation under Section 7, with respect to the leases and individual facility permits, is not triggered merely because the lease or permit may result in GHG emissions. Finally, the FWS correctly determined that the 4(d) rule does not require completion of an Environmental Impact Statement.

If you have any questions concerning API's position, please contact Erik G. Milito, Managing Counsel, at 202-682-8273.

Sincerely,

Attachment

cc:     Erik Milito, API

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 1

## COMMENTS OF THE AMERICAN PETROLEUM INSTITUTE
## ON THE MAY 15, 2008 INTERIM FINAL SPECIAL RULE FOR THE POLAR BEAR
### (73 FED. REG. 28306)

### <u>Summary of Comments</u>

Except as otherwise specified below, API supports the Interim Final Rule and believes it should be promulgated as a final rule in an expedited manner. API believes the Secretary is correct in concluding that the scientific evidence does not establish a causal connection between individual sources of greenhouse gases ("GHGs") and effects on polar bears. Accordingly, the Secretary has a reasonable basis for concluding that individual sources do not "take" the polar bear within the meaning of Endangered Species Act ("ESA") section 9, and that federal actions permitting such emissions will not "likely affect" the polar bear for purposes of the consultation requirement of section 7 of the ESA. The Secretary has discretion to interpret these terms, and the Secretary's interpretation is reasonable in light of the scientific evidence.

Moreover, any contrary interpretation would convert the Fish and Wildlife Service ("FWS") into an overarching energy policy body with comprehensive jurisdiction to review the production and use of fossil fuel in this country. The Service would be required to issue incidental take permits to any activity or facility in the country producing or consuming fossil fuels. This jurisdiction would extend to industrial, commercial and even residential facilities as well as animal feedlots. In that connection, the Service would have to determine whether there are "reasonable and prudent measures" to minimize the impacts of the proposed facility's method of generating or utilizing energy. Such an interpretation would, in effect, make the Service an "energy czar," giving it jurisdiction over every energy-using activity throughout the economy -- a comprehensive and intrusive jurisdiction going far beyond the scope or intent of the ESA.

In section 17.40(q)(4) of its Interim Final Rule, the Service provides that none of the prohibitions of 50 C.F.R. § 17.31 applies to any taking of polar bears that is incidental to, but not the purpose of, carrying out an otherwise lawful activity within the United States except for Alaska. Section 17.31 applies the provisions of section 17.21 (including the prohibition in ESA section 9 against taking endangered species) to threatened species, with some exceptions. In the context of listing the polar bear as a threatened species, we understand section 17.40(q)(4) to mean that the Secretary will not extend the "taking" prohibition of ESA section 9 to a source on the basis of its emission of GHGs. API objects, however, to section 17.40(q)(4) to the extent it excepts GHG emissions from sources located in Alaska. API believes this is unreasonable in light of the balance of the Interim Final Rule. This issue is addressed in more detail in comments filed by the Alaska Oil and Gas Association ("AOGA").

In *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687 (1995), the Supreme Court held that the Secretary has broad discretion to interpret the scope of the "take" prohibition in ESA Section 9. Section 17.40(q)(4) is a reasonable exercise of that discretion. Its reasonableness is confirmed by the Supreme Court's decision in *Sweet Home* that

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 2

the "take" prohibition implies a chain of proximate causation between the action of the alleged "taker" and its alleged effects on the listed species. *Sweet Home,* 515 U.S. at 696 n. 9. Proximate causation, which is the test for tort liability, is clearly not present here; it is inconceivable that individual GHG emitters (including every user of fossil fuel) could be held liable in damages for harm to the polar bear (or any other harm alleged to result from global warming).

The Secretary's decision is also supported by the scientific evidence. As the Secretary pointed out in the preamble's discussion of the consultation requirement under section 7 of ESA, "the best scientific data currently available does not draw a causal connection between GHG emissions resulting from a specific Federal action and effects on listed species or critical habitat by climate change." 73 Fed. Reg. 28313. That reasoning was also reiterated in the Director's guidance memo of May 15, 2008 (the "Hall Memo"). This same reasoning supports the conclusion there is no proof of proximate causation to support an argument that individual GHG emitters "take" polar bears.

Notwithstanding API's position that section 17.40(q)(4) should also apply to Alaska, section 17.40(q)(4) is a reasonable exercise of the Service's authority under the second sentence of ESA section 4(d) to determine whether and to what extent the ESA prohibition against "taking" endangered species should apply to threatened species.[1]

For all these same reasons, the Secretary's conclusion that GHG emissions do not provide a basis for invoking the consultation requirement of ESA section 7 is a reasonable interpretation of the statute.

Finally, these comments also explain why the Secretary is correct in concluding that the Interim Final Rule (as well as any subsequent final rule) does not require an environmental impact statement ("EIS"). In addition to the reasons set forth in the preamble, the decision not to prepare an EIS is supported by the Secretary's conclusion that there is not sufficient proof of causation between individual GHG sources and the alleged adverse effects on the polar bear. The National Environmental Policy Act ("NEPA") requires an environmental impact statement only for major federal actions "significantly affecting" the environment. 42 USC §4332(2)(C). The Supreme Court has explained that "NEPA requires a 'reasonably close relationship' between the environmental effect and the alleged cause." *Department of Transportation v. Public Citizen,* 541 US 752, 767 (2004), quoting *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 774 (1983). There is no showing here that these requirements have been met.

---

[1] Given the absence of scientific evidence and proximate causation, the Secretary may reasonably determine that individual sources of otherwise lawful GHG emissions do not "take" the polar bear. In light of that determination, it is not strictly necessary for the Secretary to issue a section 4(d) rule. Notwithstanding, the 4(d) rule is a reasonable exercise of the Secretary's discretion and has the advantage of providing greater certainty and uniformity throughout the country. Thus, the Secretary should include section 17.40(q) in the final rule.

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 3

## Background

The Service's listing of the polar bear as a threatened species is based to a large extent on models predicting "increasing global temperatures," which the Service believes will contribute to melting sea ice and thereby affect the polar bears' habitat. 73 Fed. Reg. 28212, 28228-30. Predictions of global warming in turn rely on an increase in the emissions of greenhouse gases ("GHGs") since the time of the industrial revolution.[2] GHGs, which include carbon dioxide ($CO_2$), methane, nitrous oxide, and other gases (including water vapor), "occur naturally and are necessary to keep our atmosphere stable."[3] The increase in GHG emissions resulting from human activity, however, is alleged to exacerbate the natural warming of the planet.[4]

$CO_2$ accounts for by far the greatest amount of GHGs emitted into the atmosphere by man.[5] GHGs, including $CO_2$, uniformly mix into the atmosphere and have long lifetimes.[6] Thus it does not matter where the gases are released into the atmosphere.[7] For example, "a ton of greenhouse gases emitted in the United States has the same impact as a ton emitted in Malaysia."[8] And a ton of GHGs emitted in India or China -- where $CO_2$ emissions are rising at the fastest rate and the carbon intensity (the tons of $CO_2$ emissions per thousand dollars of GDP) is higher than in the United States[9] -- has the same impact on global GHG emissions (and thus on global warming) as a ton emitted in the United States. In these circumstances, the USGS advised the Service that it is "beyond the scope of existing science to identify a specific source of $CO_2$ emissions and designate it as the cause of specific climate impacts at an exact location."[10]

Furthermore, the sheer scale of global GHG emissions suggests that any one source -- even the largest emitter -- has a *de minimis* impact on global GHG emissions and thus on global warming. In 2004, for instance, there were an estimated 26,922 million metric tons of $CO_2$

---

[2] *See* Pew Center on Global Climate Change & Pew Center on the States, Climate Change 101: Overview 1, *available at* http://www.pewclimate.org/docUploads/1114_OverviewFinal.pdf. [hereinafter *Pew Center Overview]*

[3] National Energy Technology Laboratory, Carbon Sequestration, www.netl.doe.gov/technooogies/carbon_seq/FAQs/greenhouse-gas.html

[4] *Pew Center Overview* at 1.

[5] *See* Energy Information Administration, Emissions of Greenhouse Gases in the United States 2006 1 (Energy Information Administration 2007), *available at* ftp://ftp.eia.doe.gov/pub/oiaf/1605/cdrom/pdf/ggrpt/057306.pdf [hereinafter *U.S. Emissions*] ($CO_2$ represents 83.8% of all U.S. GHG emissions in 2006).

[6] Robert R. Nordhaus & Kyle W. Danish, Designing a Mandatory Greenhouse Gas Reduction Program for the U.S. 2 (Pew Center on Global Climate Change 2003), *available at* http://www.vnf.com/assets/attachments/pewreportghgreduction2003.pdf.

[7] *Id.*

[8] *Id.*

[9] *See* Pew Center on Global Climate Change & Pew Center on the States, Climate Change Overview: International Action at 2, *available at* http://www.pewclimate.org/docUploads/PEW_Climate%20101%20Intl.pdf. [hereinafter *Pew Center International Action*].

[10] Letter from Mark D. Myers, Director, U.S. Geological Survey, to Dale Hall, Director, Fish and Wildlife Service (May 14, 2008), *available at* http://www.fws.gov/home/feature/2008/polarbear012308/pdf/Memo_to_FWS-Polar_Bears.PDF.

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 4

emissions worldwide.[11] EPA data show that the average $CO_2$ emissions from a coal-fired power plant in 2004 is approximately 1.44 million metric tons of $CO_2$,[12] which is 0.00534 percent of annual global anthropogenic $CO_2$ emissions.[13] The mean oil-fired power plant only contributed 114,513 metric tons of $CO_2$ in 2004,[14] which is 0.000425 percent of annual global anthropogenic $CO_2$ emissions.[15]

Even when considering a source's lifetime GHG emissions, the ratio of a single source's GHG emissions to global emissions will remain minuscule because it must be computed on the basis of global GHG emissions during the same time period. Because these percentages of one source's emissions remain so trivial as compared to the worldwide emissions of $CO_2$, whether measured annually or over the source's lifetime, any attempt to determine how one emitter's emissions affect the polar bear would be extremely speculative.

Further complicating any attempt to attach causation of global warming to an individual emitter is that eliminating or reducing a source's GHG emissions could have negative secondary effects. For instance, prohibition of a new source in this country could lead to use of alternative sources overseas, with no net impact on GHG emissions, or even a net increase if the overseas sources are less efficient or less well controlled. Alternatively, it may lead to use of substitute fuels which also impact GHG emissions (*e.g.* biofuels) or implicate other environmental concerns (*e.g.* nuclear power). Also, reduced oil production in the United States could encourage greater energy production outside of the United States, negating any negligible reductions in domestic GHG emissions.[16]

Finally, determining a "proper" or "safe" amount of GHG emissions for one particular source is particularly problematic. Some level of anthropogenic GHG emissions in combination with natural GHG emissions can be absorbed by the environment,[17] so there is no certainty about what a "safe" level of emissions might be, especially when examining an individual source's emissions.

In addition to all the problems involved in tracing global warming to individual GHG sources, the Service's own explanation of why it listed the polar bear raises additional problems in connecting individual sources to potential threats to the polar bear. The Service concluded that global warming is only one factor in the decline of Arctic sea ice, the other factors being

---

[11] *U.S. Emissions* at 6.

[12] These data were gathered from the Emissions & Generation Resource Integration Database (eGRID) collected in a spreadsheet by the U.S. Environmental Protection Agency. The spreadsheet is available for download at http://www.epa.gov/cleanenergy/energy-resources/egrid/index.html. [hereinafter "eGRID") Because information was provided in short tons rather than metric tons, short tons were converted to metric tons by multiplying by .907.

[13] 1.44 million metric tons / 26,922 million metric tons.

[14] eGRID.

[15] 114,513 metric tons / 26,922,000,000 metric tons.

[16] *See* Posting of Prof. Gary Becker to The Becker-Posner Blog, http://www.becker-posner-blog.com (June 22, 2008).

[17] Energy Information Administration, Greenhouse Gases, Climate Change, and Energy, http://www.eia.doe.gov/oiaf/1605/ggccebro/chapter1.html (last visited June 25, 2008) (claiming nature can deal with about half of anthropogenic $CO_2$ emitted into the atmosphere).

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 5

"changes in atmospheric circulation, and changes in oceanic circulation." 73 Fed. Reg. at 28225. The Service concluded that warming resulting from GHGs "has contributed" to and "is a factor" in sea ice decline, but also found there were other causes. *Id.* Thus, even a source that makes a .005 percent contribution to anthropogenic GHG emissions, without impacting atmospheric or oceanic circulation, would necessarily have made a smaller contribution (if any) to loss of sea ice, which in turn is only one factor affecting polar bear habitat.

The Service noted other factors that compound this uncertainty, such as the inherent uncertainty in the modeling of future climate changes, particularly in the relatively small area in which the polar bear is found. As the Service explained, "while most aspects of climate simulations have some degree of uncertainty, projections of Arctic climate change have relatively higher uncertainty." 73 Fed. Reg. at 28228. "[T]his higher level of uncertainty is, to some extent, a consequence of the smaller spatial scale of the Arctic, since climate simulations are believed to be more reliable at continental and larger scales." *Id.* (citations omitted). "The uncertainty is also a consequence of the complex processes that control the sea ice, and the difficulty of representing these processes in climate models." *Id.*

The Service's discussion of the polar bear listing also noted another complication. The Service stated that "increases in GHG have lag effects on climate," so that the major impact of GHG emission reductions may not occur for years. 73 Fed. Reg. at 28244, 28253, 28288. For example, the Service utilized projections based on SRES[18] emission scenarios that posited differing levels of GHG emissions. 73 Fed. Reg. 28226-27. In one projection utilizing the "three most commonly-used scenarios for current-generation modeling" -- the "low," "middle" and "high" scenarios[19] -- the Service found that "temperature increases over the next 40-50 years *are relatively insensitive to the SRES emissions scenario used to model the projected change.*" 73 Fed. Reg. at 28253 (emphasis added). It was only "beyond 40-50 years [that] the [temperature] trend lines diverge from one another due to differences among SRES emissions scenarios." *Id.*[20] In short, even if an individual emissions source made a significant contribution to the global GHG total (and there is no showing that any individual source does), the Service's conclusions indicate that this might not translate into a contribution to global warming -- let alone sea ice decline -- until 40 to 50 years hence. Notably, this is at the very edge of the 45-year period that the Service considers to be the "foreseeable future" for determining whether the polar bear is threatened or endangered. 73 Fed. Reg. at 28254.

The inability to trace predicted global climate change to any one source does not mean that some regulatory scheme addressing the issue might not be appropriate under other legislation specifically addressed to global warming. API takes no position in these comments as to whether regulation under other legislation might or might not be appropriate. Those are

---

[18] "SRES" refers to the IPCC's Special Report on Emissions Scenarios. 73 Fed. Reg. at 28227.

[19] The "low" scenario assumed $CO_2$ concentration of around 549 ppm by the end of the century, the "medium" scenario 717 ppm, and the "high" scenario 846 ppm. 73 Fed. Reg. at 28227.

[20] Even if the assumption were made that "all GHG emissions [were] stabilized at 2000 levels" (which would be below the "low" SRES scenario), one researcher cited by the Service concluded that "the global climate system would already be committed to 0.40 degree C more warming by the end of the 21st century." 73 Fed. Reg. at 28230.

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 6

separate issues, involving different standards of proof, different tests of causation, and other issues not involved here. For present purposes, the only issue is whether individual sources of GHG emissions violate the "taking" prohibition of section 9 of the ESA, or are "likely to jeopardize" the polar bear for purposes of consultation under section 7. The Service correctly concluded that they do not.

## Discussion

I.    **The Secretary's Determination That Individual GHG Sources Do Not Violate the "Taking" Prohibition of section 9 Was a Reasonable Exercise of His Discretion to Interpret section 9 and Is Supported by the Record.**

A.    **The Secretary has discretion to interpret the scope of section 9's "taking" prohibition.**

In *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687 (1995), the Supreme Court sustained the Secretary's regulation defining the scope of the "taking" prohibition of section 9. The Court concluded that the regulation addressed an issue as to which Congress did not "unambiguously manifest its intent," and adopted a "reasonable interpretation" of the statute. 515 U.S. at 703-4. Similarly here, Congress did not "unambiguously manifest" an intent to extend the "taking" prohibition of section 9 to individual GHG sources responsible for only a minuscule portion of total GHG emissions, particularly in view of the evidence that current science cannot draw a connection between individual sources and global warming impacts.[21]

The Secretary's discretion to interpret the term "take" is reinforced by his broad authority under the Marine Mammal Protection Act to issue regulations necessary and appropriate to carry out the Act. 16 U.S.C. § 1382(a). A regulation interpreting the scope of the MMPA's "taking" prohibition is well within such authority. This issue is addressed further in the comments submitted by AOGA.

The reasonableness of the Secretary's interpretation is enhanced by the Supreme Court's statements in *Sweet Home* that the ESA may be read to "incorporate ordinary requirements of proximate causation and foreseeability." 515 U.S. at 696 n. 9. See also 515 U.S. at 700 n. 13 ("ordinary requirements of proximate causation and foreseeability"). The Supreme Court also characterized as "strong" the argument that "activities that cause minimal or unforeseeable harm will not violate the Act." 515 U.S. at 699. In light of these statements, it may be argued that the ESA *requires* the Secretary's interpretation that ESA section 9 does not extend to individual sources of GHGs. In any event, the interpretation is certainly reasonable.

---

[21] Letter from Mark D. Myers, Director, U.S. Geological Survey, to Dale Hall, Director, Fish and Wildlife Service (May 14, 2008), *available at* http://www.fws.gov/home/feature/2008/polarbear012308/pdf/Memo_to_FWS-Polar_Bears.PDF

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 7

The Secretary's interpretation is also supported by the basic rule of proximate causation in tort cases that "the [defendant's] act or omission must be a substantial factor in bringing about the [plaintiff's] harm." *Restatement of Torts (Second)*, § 9. Where there are several contributing factors to the plaintiff's harm, "their combined effect may, as it were, so dilute the effects of the actor's negligence as to prevent it from being a substantial factor." *Id.,* § 4333 cmt. (d).

For example, in citizen suits involving multiple sources of pollution, the courts have held that a plaintiff cannot show his injuries were "traceable" to the defendant unless the defendant "discharged some pollutant in concentrations *greater than that allowed by its permit.*" *Public Interest Research Group of New Jersey v. Powell Duffryn Terminals*, 913 F.2d 64, 72 (3d Cir. 1990) (emphasis added), followed in *Sierra Club v. Cedar Point Oil Company*, 73 F.3d 546, 557-58 (5th Cir. 1996). This "traceability" requirement -- which must be met to establish plaintiff's standing -- is not as rigorous as the requirement of tort causation applicable to section 9 of the ESA. *Powell Duffryn*, 913 F.2d at 72. And yet even the less stringent "traceability" requirement could not be met here, if only because all of the GHG emissions the Service is exempting by rule from section 9 liability are otherwise fully lawful.

### B.    The Secretary's exercise of discretion was reasonable.

Whether one utilizes the "substantial factor" test for proximate causation in tort law, or the less rigorous "traceability" requirement for standing analysis in cases of multiple pollution sources, even the largest individual GHG sources do not come close to a "taking" of the polar bear under section 9 of the ESA. Even the largest individual source is only a minuscule portion of the global GHG emissions alleged to cause global warming. Moreover, global warming is only one element in the decline of the polar bear's Arctic sea ice habitat, and the amount of warming projected for the next 40-50 years (the period the Service deems to be the "foreseeable future" for predicting the polar bear's fate) is largely insensitive to an increase in GHG emissions occurring now. There is no precedent for imposing a finding of proximate causation in such circumstances. The Service was clearly correct in concluding that sources of GHG emissions do not "take" the polar bear.

Nor is there a "taking" based on an argument that the cumulative impact of all individual sources subject to the "taking" prohibition of section 9 would allegedly be sufficient to damage the polar bear's sea ice habitat. In other situations, such arguments have been crafted based on the Ninth Circuit's holding that NEPA required the National Highway Traffic Safety Administration to consider not only the regulatory action before it (national fuel economy standards), but also other foreseeable regulatory actions, in determining whether proposed regulations had a sufficient impact on global warming to require an environmental impact statement. *Center for Biological Diversity v. National Highway Traffic Safety Administration,* 508 F.3d 508, 545- (9th Cir. 2007). In that case, however, the Ninth Circuit made it clear that "NHTSA does not dispute that the [fuel economy] standard will have an effect on global warming due to an increase in greenhouse gas emissions." 508 F.3d at 549. By contrast, in this case the Service has found that it is "beyond the scope of existing science to identify a specific source of $CO_2$ emissions and designate it as the cause of specific climate impacts at an exact

A/72576488.8

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 8

location."[22] The Supreme Court has held that a "cumulative impacts" analysis is not sufficient to make up for lack of proof of a causal connection between the federal action under consideration and its alleged adverse environmental effects. *Department of Transportation v. Public Citizen*, 541 U.S. 752, 769-770 (2004).

Moreover, NEPA cannot supply an agency with jurisdiction it does not otherwise have. *Department of Transportation v. Public Citizen*, 541 U.S. at 769. In holding that NHTSA had to do an environmental impact statement for its fuel economy standards, the Ninth Circuit made it clear that NHTSA had jurisdiction to consider global warming in establishing these standards. *Center for Biological Diversity*, 508 F.3d at 545-58. By contrast, the Service cannot assert jurisdiction over an individual source of GHG emissions for "taking" the polar bear if that source's emissions cannot be shown to have adversely affected the polar bear's habitat, even if such a showing were made for the cumulative GHG emissions from that source and several million others. For example, an individual motorist who drives to work does not require a federal "incidental take" permit, even if it could be shown that the cumulative total GHG emissions of the millions of commuting motorists might have a significant impact. Such a conclusion would go far beyond the meaning of a statutory "taking" prohibition that the Supreme Court read to "incorporate ordinary requirements of proximate causation and foreseeability." *Sweet Home*, 515 U.S. at 696 n. 9.

      **C.**     **Any other reading of the "taking" prohibition would confer pervasive jurisdiction on the Service to regulate all generation and use of fossil fuel, far beyond the scope of the ESA.**

A reading of section 9's "taking" prohibition to include individual sources of GHG emissions would convert the ESA into a vehicle for comprehensive regulation of this country's energy usage. EPA reports that "[a]s the largest source of U.S. greenhouse gas emissions, $CO_2$ from fossil fuel combustion has accounted for approximately 79 percent of GWP [global warming potential]-weighted anthropogenic (human-related) emissions since 1990."[23] U.S. fossil fuel users include the transportation sector (33 percent of $CO_2$ emissions from fossil fuel combustion in 2006), industry (28 percent), residential use (20 percent), and commercial use (18 percent).[24] If every source of GHG gases commits a "taking" under section 9, then every source requires an incidental take permit from the Service, in which the Service would have to determine, among other things, whether the applicant will "to the maximum extent practicable, minimize and mitigate the impacts of such taking." 16 U.S.C. § 1539(B)(ii). In the GHG context, that would mean at a minimum that the Service would have to determine whether the

---

    [22] Letter from Mark D. Myers, Director, U.S. Geological Survey, to Dale Hall, Director, Fish and Wildlife Service (May 14, 2008), *available at* http://www.fws.gov/home/feature/2008/polarbear012308/pdf/Memo_to_FWS-Polar_Bears.PDF.

    [23] Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2006 (April 2008), Executive Summary, ES-7, USEPA #430-R-08-005, *available at* http://epa.gov/climatechange/emissions/usinventoryreport.html (last visited June 25, 2008).

    [24] *Id.,* at ES 8-9. For purposes of this calculation, EPA attributed the emissions from electric power generations to the end-users of the power.

A/72576488.8

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 9

applicant was minimizing its use of fossil fuel "to the maximum extent practicable." And that
determination would have to be made for literally every transportation, industrial, residential and
commercial use of fossil fuels. The Service should reasonably conclude that the ESA was not
designed to confer on it such sweeping and comprehensive regulatory authority over the entire
economy.

Beyond regulation of every activity using fossil fuel, a definition of "take" that covered
any GHG-emitting activity also would reach, for example, into regulation of agricultural
activities. EPA has stated that "[g]lobally, livestock are the largest source of methane from
human-related activities -- and in the U.S., the third largest source."
http://www.epa.gov/rlep/index.html (last visited June 25, 2008). EPA explains that "[l]ivestock
production can also result in emissions of nitrous oxide, a very potent greenhouse gas, and
carbon dioxide, the most abundant greenhouse gas." *Id.* Methane and other greenhouse gases
are emitted from animal containment buildings, manure piles and lagoons, and land application
of waste materials.[25] EPA and the U.S. Department of Agriculture have a Ruminant Livestock
Efficiency Program designed to "help livestock managers voluntarily reduce emissions of
methane and other greenhouse gases through the adoption of improved management practices."[26]
Any definition of "take" that included individual sources of GHGs would require every livestock
feedlot to get an "incidental take" permit from the Service. In addition, some animal feedlots
require federal permits from EPA; in those instances, section 7 consultation also would be
required.[27] Once again, the Service should reasonably conclude that the ESA was not intended
to be a vehicle for comprehensive regulation of animal feedlot operations.

>    **D.    The Secretary has discretion under section 4(d) of the ESA to determine
>            whether or to what extent the "taking" prohibition of section 9 applies to
>            threatened species.**

Section 9 of the ESA prohibits the taking of *endangered* species. 16 U.S.C. §
1538(a)(1)(C). The polar bear has been listed as threatened, not endangered. With respect to
threatened species, the first sentence of section 4(d) provides that the Secretary "shall issue such
regulations as he deems necessary and advisable to provide for the conservation of such species."
16 U.S.C. § 1533(d). The second sentence of section 4(d) adds that the Secretary "may by
regulation prohibit with respect to any threatened species any act prohibited under section

---

[25] *See, e.g.,* Michigan Department of Environmental Quality Toxics Steering Group, CAFOs: Chemicals
Associated with Air Emissions 1-2 (May 10, 2006), *available at* http://www.michigan.gov/documents/ CAFOs-
Chemicals_Associated_with_Air_ Emissions_5-10-06_158862_7.pdf.

[26] http://yosemite.epa.gov/oar/globalwarming.nsf/WebSearchResultsALL?OpenForm&start=90 (last
visited June 25, 2008).

[27] Concentrated Animal Feeding Operations ("CAFOs") are certain feedlots, as defined by EPA. 40 C.F.R.
§ 122.23(b). CAFOs require permits under the National Pollutant Discharge Elimination System ("NPDES"). For
states that have not been delegated permitting authority, EPA must issue the permit. 68 Fed. Reg. 7,175 (Feb. 12,
2003). EPA is the CAFO permitting authority for Alaska, Idaho, Massachusetts, New Mexico, and Oklahoma.
EPA, Producers' Compliance Guide for CAFOs, EPA 821-R-03-010 (Nov. 2003)at A-1, *available at*
http://www.epa.gov/npdes/pubs/cafo_prod_guide_entire_doc.pdf; Animal Feeding Operations State Contacts,
*available at* http://www.epa.gov/npdes/cafo/statecontacts.

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 10

1539(a)(1) [which includes the prohibition of taking endangered species]." As the D.C. Circuit explained, the statute may reasonably be read to mean that "[t]he second sentence gives the FWS discretion to apply any or all of the § 1538(a)(1) prohibitions to threatened species without obligating it to support such actions with findings of necessity." *Sweet Home Chapter of Communities for a Greater Oregon v. Babbitt,* 1 F.3d 1, 7-8 (D.C. Cir. 1993), *rev'd on other grounds on reh'g* 17 F.3d 1463 (D.C. Cir. 1994), *rev'd on other grounds* 515 U.S. 687 (1995).

In short, the first sentence of section 4(d) requires the Secretary to issue regulations he deems "necessary and advisable" to conserve threatened species," while the second sentence gives the Secretary discretion to determine whether or to what extent the "taking" prohibition should apply to threatened species. These are separate grants of authority. A rule issued under the first sentence requires a "necessary and advisable" finding, while a rule issued under the second sentence does not.[28]

The American alligator (*Alligator mississippiensis*) was reclassified from an endangered to a threatened species in Florida and in coastal parts of Louisiana, Georgia, South Carolina, and Texas. Reclassification of American Alligator to Threatened Status in Certain Parts of its Range, 42 Fed. Reg. 2071, 2076 (Jan. 10, 1977). Notwithstanding the threatened species listing, the Service used its authority under section 4(d) to allow for the sale of alligator meat within the state where the taking occurred. *See* Changes to the Special Rule Concerning the American Alligator, 44 Fed. Reg. 59,080, 59,083 (Oct. 12, 1979). The Service based its decision not on a "necessary and advisable finding," but rather on Louisiana's having imposed its own licensing and recordkeeping requirements. *See* Proposed Reclassification of the American Alligator in Louisiana, and proposed Changes to Special Rules Concerning the Alligator, 43 Fed. Reg. 45,513, 45,515 (proposed Oct. 2, 1978).

Similarly, the Louisiana black bear was listed as a threatened species in 1992. *See* Endangered and Threatened Wildlife and Plants; Threatened Status for the Louisiana Black Bear and Related Rules, 57 Fed. Reg. 588, 595 (Jan. 7, 1992). Nonetheless, in the same rule, the Service enacted a special rule "exempting certain forest management activities that could be construed by some, although not the [Service], to constitute "harm" to the Louisiana black bear." *Id.* at 593. Even more telling, the Service enacted this rule and explicitly stated it was not doing so under a "necessary and advisable" finding under rule 4(d), but rather pursuant to the "latitude for threatened species afforded by the [ESA] and 50 C.F.R. § 17.31(c)." *Id.*

Nearly all of the fish listed as a threatened species have an exception that they can be taken in accordance with state law. *See* 50 C.F.R. § 17.44. As an example, the greenback cutthroat trout (*Salmo clarki stomias*) was listed as a threatened species in 1978, but a special regulation "allow[ed] 'tak[ings]' of the species in accordance with State laws." Listing of the Greenback Cutthroat Trout as a Threatened Species, 43 Fed. Reg. 16343, 16,344-45 (April 18, 1978). This representative exception did not include a "necessary and advisable" finding; indeed,

---

[28] We note that the Secretary made a "necessary and advisable" finding, which is sufficient to sustain the Interim Rule under Section 4(d). 73 Fed. Reg. 28315. Nevertheless, the finding was not needed, for the reasons explained in the text.

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 11

the lack of any statement about any necessary authority to make this special rule suggests the Service found the power unexceptional and uncontroversial.

As one commentator has noted, the Service has moved beyond "plain vanilla" 4(d) prohibitions, and now uses its "regulatory authority to adopt more tailored 4(d) rules." Madeline June Kass, *Threatened Extinction of Plain Vanilla 4(d) Rules*, 16-FALL Nat. Resources & Env't 78, 78 (2001). These more tailored 4(d) rules have, in fact, been used throughout the modern history of the ESA, so section 17.40(q)(4) is not an exceptional regulation but rather a quite common exercise of the Service's regulatory authority.

As noted, section 4(d) provides that the Secretary "shall issue such regulations as he deems necessary and advisable to provide for the conservation of [threatened] species." 16 U.S.C. § 1533(d). That cannot mean that extension of the "taking" prohibition to threatened species would *always* be "necessary and advisable." If that were Congress' intent, it would have extended section 9's "taking" prohibition to threatened species itself. It did not do so. An interpretation requiring the Secretary to extend the "taking" prohibition to threatened species would rewrite the statutory language. Section 17.40(q)(4) of the Interim Rule is a reasonable exercise of the Secretary's authority under the second sentence of section 4(d). Section 17.40(q)(4) is fully consistent with prior section 4(d) rules for threatened species. The Service has frequently announced other special rules allowing various exceptions to the prohibition against taking, without making an independent finding under the first sentence of section 4(d) that the special rule is "necessary and advisable."[29]

Nor can it be concluded that, as a matter of law, it is "necessary and advisable" to apply the taking prohibition to all emitters of GHGs. The Secretary could reasonably conclude that individual, case-by-case "takings" adjudications applicable to every user of fossil fuel in the American economy are not a "necessary and advisable" regulatory mechanism for addressing whatever problems may be presented by GHG emissions.[30]

---

[29] In contrast to the Secretary of the Interior's approach, the Secretary of Commerce's regulations implementing this same provision of the ESA does not apply to section 9's "take" prohibition to threatened species, unless a determination is made to do so on a case-by-case basis in conjunction with the listing. *See, e.g.*, 50 C.F.R. §223.201(a) (applying section 9 "take" prohibition to Guadalupe fur seal).

[30] *Sierra Club v. Clark*, 755 F.2d 608 (8th Cir. 1985), in a case involving a rule allowing the sport trapping of a threatened species, held that the Secretary's rules under section 4(d) could permit the taking of a threatened species only in the limited circumstances that conform to the definition of "conservation" in ESA Section 3(3). *Sierra Club v. Clark* is inconsistent with the D.C. Circuit's decision in *Sweet Home Chapter of Communities for a Greater Oregon v. Babbitt*, and should not be followed. In any event, here the Secretary correctly found that individual GHG emissions do not involve a "taking" and are not inconsistent with conservation of the polar bear. Thus *Sierra Club v. Clark*, which indisputably involved a "taking," does not apply.

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 12

II.     **The Service Has Correctly Determined that Consultation under Section 7 with Respect to Leases and Individual Facility Permits Is Not Triggered Merely Because the Lease or Permit May Result in GHG Emissions.**

Section 7(a)(2) requires a federal agency to consult with the Secretary to ensure that any action it authorizes "is not likely to jeopardize" the continued existence of any threatened or endangered species "or result in the destruction or adverse modification" of such species' critical habitat. 16 U.S.C. § 1536(a)(2). With specific reference to federal permitting or licensing actions, consultation is required if there is reason to believe that the action "will likely affect" a listed species present in the area affected by the project. 16 U.S.C. § 1536(a)(3).[31] In the preamble to the Interim Final Rule, the Service stated that the determination whether consultation is triggered must focus on "the discrete effect of the proposed agency action." 73 Fed. Reg. at 28312/3. Accordingly, the Service explained, the federal agency must determine "if there is a causal connection between the proposed action and a discernible effect to the species or critical habitat that is reasonably certain to occur." *Id.* Applying that test, the Service correctly concluded that "the best scientific data currently available does not draw a causal connection between GHG emissions resulting from a specific Federal action and effects on listed species or critical habitat by climate change, nor are there sufficient data to establish the required causal connection to the level of reasonable certainty between an action's resulting emissions and effect on species or critical habitat." 73 Fed. Reg. at 28313/1.

Consistent with the Service's conclusion, the Director, in a May 14, 2008 memorandum to the Regional Directors, stated that "the Service does not anticipate that the mere fact that a Federal agency authorizes a project that is likely to emit GHG will require the initiation of section 7 consultation." The Director's conclusion was based on a memorandum from the U.S. Geological Survey, which concluded that "current science and models cannot link individual actions that contribute to atmospheric carbon levels to specific responses of species, including polar bears."

The Director's conclusion is based on "the best scientific . . . data available," as required by section 7(a)(2). As the USGS explained in its memorandum to the Director, models regarding climate change and its subsequent impacts (including global warming-related sea ice loss) have primarily been developed at "global to continental scales." The USGS concluded that "[i]t is currently beyond the scope of existing science to identify a specific source of CO2 emissions and designate it as the cause of specific climate impacts at an exact location."

---

[31] The Secretary's regulations require consultation if the action "may affect" listed species or critical habitat. 50 C.F.R. § 402.14(a). That is apparently a more lenient standard than the "likely affect" standard of the statute. However, the regulations provide an exception to further consultation if, as a result of informal consultation, the action agency determines, with the written concurrence of the Director, that the proposed action is not "likely to adversely affect" any listed species or critical habitat -- which is the statutory standard for consultation. 50 C.F.R.§ 402.14(b). We understand the Secretary's statement in the preamble of the Interim Final Rule regarding Consultation under Section 7 of the ESA as either the Service's advance written concurrence with respect to any proposed action involving GHG emissions, or a generic determination of no effect or no adverse effect, thus giving the action agency authority to make a unilateral decision against consultation.

A/72576488.8

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 13

As discussed in an earlier section, the de minimis contribution made by any individual GHG source to global GHG emissions does not constitute a "taking" for purposes of section 9. The Ninth Circuit has also held that section 7 authorizes incidental take statements following agency consultation only if there is a "take" within the meaning of section 9. *Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife et al.*, 273 F.3d 1229, 1239-40 (9th Cir. 2001). Absent proof that the agency action caused the alleged harm to the species, there is no "take." *Id.* Even the "likely affect" standard for triggering consultation under section 7(a)(2) implies *some* proof of causation. And, as the USGS memo explains, such proof is "currently beyond the scope of existing science."

Moreover, section 7(a)(2) requires consultation on a federal permit if a listed species "may be present in the area affected by [the permitted] project" and implementation "will likely affect" the species. That language indicates that Congress had in mind the direct local effects of a project, rather than the more indirect and speculative world-wide effects.

If section 7 consultation results in a finding of adverse impact, the Service must then consider whether there are "reasonable and prudent measures . . . necessary or appropriate to minimize such impact." 50 C.F.R. § 402.14(i)(ii). If an individual facility's GHG emissions renders any federal permit subject to section 7 consultation, the Service would be required to consider whether there are "reasonable and prudent measures" available to minimize the effects of the proposed facility's method of generating or utilizing energy. Such an interpretation would, in effect, make the Service an "energy czar," giving it jurisdiction over energy use throughout the economy and going far beyond the scope or intent of the ESA. In *Arizona Cattlegrowers,* the Ninth Circuit rejected an interpretation of section 7 that "would allow the Fish and Wildlife Service to engage in widespread land regulation even where no section 9 liability could be imposed." *Arizona Cattle Growers,* 273 F.3d at 1240. The courts will also reject an interpretation of section 7 that would confer on the Service an even broader regulatory jurisdiction over every sector of the economy that generates or uses fossil fuels or that otherwise results in GHG emissions. (*e.g.,* agriculture).

### III.    The Service's Determination Did Not Require an Environmental Impact Statement.

NEPA requires an EIS only for major federal actions "significantly affecting" the environment. 42 USC §4332(2)(C). As discussed above, an individual GHG source, representing a minuscule portion of total global GHG emissions, does not "significantly affect" global warming -- if, indeed, such an individual source affects global warming at all. The Supreme Court has explained that, even if an action is shown to be a "but-for" cause of an environmental effect (and there is no such showing here), that is not sufficient. In addition, "NEPA requires a 'reasonably close relationship' between the environmental effect and the alleged cause." *Department of Transportation v. Public Citizen,* 541 US 752, 767 (2004), quoting *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 774 (1983). The Court "analogized this requirement to the 'familiar doctrine of proximate cause from tort law.'" *Id. See also City of Shoreacres v. Waterworth,* 420 F.3d 440 (5th Cir. 2005) ("a plaintiff mounting a NEPA challenge must establish that an alleged effect will ensue as a 'proximate

API Comments
FWS-R7-ES-2008-0027
July 14, 2008
Page 14

cause,' in the sense meant by tort law."). As the Service correctly concluded, based on advice from the USGS, the best scientific evidence does not even come close to establishing a "reasonably close relationship" between the emissions from an individual GHG source and global warming. Likewise, the current state of the science does not establish the kind of proximate causation that could form the basis for liability under tort law.

Proponents of NEPA review might argue that, while individual GHG sources would not "significantly affect" global warming, there might be a significant effect if the Service decided to do a GHG review of every GHG source in the country that needed a federal permit. However, "[t]he agency need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant impacts of the proposed action." *DuBois v. U.S. Dep't of Agriculture*, 102 F.3d 1273, 1286 (1st Cir. 1996). It would be sheer speculation, and beyond the realm of reasonable foreseeability, to suppose that the Service could possibly conduct a NEPA review of enough GHG sources to make a discernible difference in total global GHG emissions.

Moreover, "[t]he Supreme Court has held that NEPA was not intended to repeal by implication any other statute and thereby create powers not created in the agency's enabling legislation." *Pacific Legal Foundation v. Andrus*, 657 F.2d 829, 836 (6th Cir. 1981), citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519. 548 (1978) and *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 692-94 (1973). On that basis, the Sixth Circuit held that the Service was not required to do an environmental impact statement for the listing of a species as endangered, because the ESA required listing on the basis of five factors, and did not allow the FWS to take into account the broader range of considerations that NEPA would require. *Pacific Legal Foundation*, 657 F.2d at 835-36. For the same reason, section 4(d) rules are exempt from NEPA procedures. *Ctr. for Biological Diversity v. FWS*, No. C04-04324, 2005 WL 2000928, *11 (N.D. Cal. 2005).

Similarly here, section 9 of the ESA, as supplemented by the Secretary's regulations, makes private actions unlawful only if they constitute an unpermitted "taking" of a listed species, and section 7 of the ESA requires federal agency consultation only if their actions "will likely affect" such species. Once the Secretary has determined that a facility's GHG emissions do not "take" the polar bear, and that the scientific evidence does not show that they will "likely affect" the polar bear within the meaning of the ESA, that is the end of the matter. NEPA cannot be read to require the Secretary to consider a broader range of potential effects than those that would meet the requirements of sections 7 and 9, because NEPA does not "create powers not created by" sections 7 and 9 of ESA. *Pacific Legal Foundation*, 657 F.2d at 836.[32]

---

[32] *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996), does not require a different result. In that case, the Ninth Circuit held that the Service was required to comply with NEPA in connection with issuing an incidental take statement allowing the killing of Chinook salmon, a listed species. But in that case there was clearly a taking that, without the incidental take statement, would have been unlawful. Here, by contrast, the Service has correctly determined that there is no "taking," and thus the threshold for ESA jurisdiction is not reached, and NEPA does not allow the agency to expand its jurisdiction. *Ctr. for Biological Diversity v. FWS*, No. C04-04324, 2005 WL 2000928, *11 (N.D. Cal. 2005).