1  John Briscoe, # 53223
2  David Ivester, #76863
3  Lawrence S. Bazel, # 114641
4  Briscoe, Ivester, & Bazel, LLP
5  155 Sansome Street, 7th Floor
6  San Francisco, CA 94104
7  jbriscoe@briscoelaw.net
8  divester@briscoelaw.net
9  lbazel@briscoelaw.net
10 Telephone:    (415) 402-2700
11 Facsimile:    (415) 398-5630
12
13 John C. Martin *(pro hac vice* application pending*)*
14 Duane A. Siler *(pro hac vice* application pending*)*
15 Michele L. Walter *(pro hac vice* application pending*)*
16 Patton Boggs LLP
17 2550 M Street N.W.
18 Washington, D.C. 20037
19 jmartin@pattonboggs.com
20 dsiler@pattonboggs.com
21 mwalter@pattonboggs.com
22 Telephone:    (202) 457-6000
23 Facsimile:    (202) 457-6315
24
25 *Attorneys for Proposed Defendant-Intervenors American Petroleum Institute, Chamber of*
26 *Commerce of the United States of America, National Mining Association, National*
27 *Association of Manufacturers, and American Iron and Steel Institute*
28
29              **IN THE UNITED STATES DISTRICT COURT**
30              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
31
32                                                    )
33  CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,        )
34                                                    )
35                 Plaintiffs,                        )
36                                                    )
37         v.                                         )     Case No. 08-CV-1339-CW
38                                                    )     Assigned to:
39  DIRK KEMPTHORNE, *et al.*,                        )     Hon. Claudia Wilken
40                                                    )
41                 Defendants,                        )
42                                                    )
43         and                                        )
44                                                    )
45  CHAMBER OF COMMERCE OF THE UNITED                 )

1    STATES OF AMERICA,                    )
2                        Proposed Defendant-        )
3                        Intervenor            )
4    _____)

**DECLARATION OF WILLIAM KOVACS OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF MOTION TO INTERVENE**

I, William Kovacs, declare as follows:

1.     I am Vice President, Environment, Technology, and Regulatory Affairs, of the Chamber of Commerce of the United States of America ("Chamber"). I make this declaration in support of the Chamber's Motion to Intervene under Rule 24 of the Federal Rules of Civil Procedure. I have first-hand experience with, and personal knowledge of, the facts and matters discussed in this declaration.

2.     In my capacity, I have come to know the membership of the Chamber and its activities in regulatory and policy matters. I am well aware of the Chamber's activities concerning climate change issues.

3.     The Chamber is the world's largest business federation. The Chamber's members operate and have businesses and interests in every sector of the economy and transact business throughout the United States and around the world. Its various members include, *inter alia*, members of the oil and gas industry, who explore, produce, refine, distribute, and market at locations across the United States, including Alaska.

4.     The Chamber is incorporated in and has its principal place of business in the District of Columbia. The Chamber participated in the rulemaking for the polar bear 4(d) Rule by submitting comments on July 14, 2008. A copy of the 4(d) Rule comments is attached as **Exhibit A.**

5.     One of the Chamber's ongoing efforts has been to advocate on issues pertaining to clean air rules, climate change, and domestic energy production before the state and federal courts, legislatures, and executive branches. The Chamber has publicly-adopted an official policy on how global climate change concerns should be addressed. *See* **Exhibit B,** the

2

4977254

1    Chamber's Position on Climate Change, *available at*

2    http://www.uschamber.com/issues/index/environment/climatechange.htm; *see also* **Exhibit C**,

3    the Chamber's Policy Priorities for 2008 (energy—climate change), *available at*

4    http://www.uschamber.com/issues/priorities/energy_env.htm. In particular, the Chamber

5    supports a comprehensive approach to solving the economic, environmental, and security issues

6    pertaining to global climate change. Such a solution to this transnational problem will require a

7    multilateral approach with foreign partners, especially the developing world, promotion of

8    energy efficiency measures, and the acceleration of substantial investment in and deployment of

9    new technologies.

10          6.          The Chamber and its members have substantial interests that are directly and

11    significantly affected by resolution of the issues presented by the Plaintiffs' complaint, as further

12    discussed below. No other party represents the Chamber or its interests. The Chamber therefore

13    requests to participate in this case to protect its interests. The Chamber's participation will be

14    helpful and beneficial to the Court and aid in understanding the practical consequences of a

15    decision on the Listing Rule and the 4(d) Rule. If the Chamber is denied intervention, it and its

16    members will have no other means of protecting its interests in this matter.

17          7.          The Chamber does not seek to delay these proceedings and will abide by the

18    schedules that the Court has set.

19          8.          The nature of the Chamber's members' operations makes it commercially

20    impracticable to completely eliminate greenhouse gas emissions. Thus, to the extent that

21    greenhouse gas emissions are said to harm polar bears and that further regulatory burdens should

22    be imposed under the ESA, the Chamber's members will suffer from these burdens.

3

1    9.    The Chamber's members have discrete and concrete interest in defending

2    Plaintiffs' challenges to the Listing Rule and the 4(d) Rule.

3    10.    Specifically, as to the 4(d) Rule, the Chamber's members have discrete and

4    concrete interests in three aspects of that Rule. First, the Chamber has an interest in ensuring

5    that its members' operations throughout the lower 48 States and Hawaii are not subjected to the

6    requirement to obtain an incidental take permit under the ESA for their otherwise lawful

7    activities that may emit greenhouse gases. The U.S. Fish and Wildlife Service ("FWS")

8    determined that neither climate change, nor any effect of climate change, can be traced to

9    particular activities in particular locations. Thus, under the 4(d) Rule, otherwise lawful

10    greenhouse gas-emitting operations in the lower 48 States and Hawaii are exempted from the

11    ESA Section 9 regulatory requirement to obtain incidental take permits.

12    11.    Without this exemption, some would claim that the Chamber's members are

13    required to obtain incidental take permits for their otherwise lawful greenhouse gas-emitting

14    activities in the lower 48 States and Hawaii, even though FWS determined that impacts on polar

15    bears could not be traced to these, or any other specific activities. Thus, the Chamber's members

16    have a particular interest in ensuring the continued validity of this exemption in the 4(d) Rule so

17    as to assure these members will not be subjected to increased costs and delays associated with

18    obtaining incidental take permits, or to defend unfounded claims that such permitting is required.

19    12.    Second, the Chamber and its members have a concrete and immediate interest in

20    ensuring the continued validity of the exemption under the 4(d) Rule from the requirement to

21    obtain a Section 9 take authorization under the ESA. The ESA requires a permit for activities

22    that will take an endangered or threatened species. Under the 4(d) Rule, however, FWS

23    determined that the protections of the Marine Mammal Protection Act ("MMPA") and the

4

1    Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES")

2    are fully protective. Thus, if an activity complies with the take provisions of the MMPA or

3    CITES, additional authorizations under the ESA would not be required. Unlike the exemption

4    from the ESA Section 9 incidental take permits, the exemption from the ESA's separate take

5    authorization applies to operations throughout the United States, including those operations that

6    the Chamber's members have in Alaska. The Chamber's members therefore have particular

7    interest in ensuring the validity of this exemption.

8       13.    Third, the Chamber and its members have a concrete and immediate interest in

9    FWS's explanation in the preamble to the 4(d) Rule concerning the application of the ESA

10   Section 7 consultation requirements. Apparently, Plaintiffs would have this Court declare that

11   consultation is required in instances that FWS would be disinclined to require consultation. *See*

12   Complaint, ¶¶ 9, 122, 167; *Endangered and Threatened Wildlife and Plants: Special Rule for*

13   *the Polar Bear; Interim Final Rule*, 73 Fed. Reg. 28306, 28310-11. The May 14, 2008 H. Dale

14   Hall FWS Guidance, as well as the preamble for the 4(d) Rule, however, alleviates the potential

15   for an unnecessary and costly consultation process for greenhouse gas-emitting projects in

16   certain situations. If this Court were to accept Plaintiffs' apparent position, the Chamber's

17   members could be subject to a costly and time-consuming consultation process for federally

18   permitted projects that they operate or supply. Thus, the Chamber's members have a particular

19   interest in the continued validity of this interpretation.

20      14.    The Chamber's members likewise have an interest in defending against the

21   Plaintiffs' claim that NEPA procedures with regard to the 4(d) Rule were improperly omitted. If

22   the Listing Rule remains in effect, but the 4(d) Rule is subject to NEPA, an interim period would

23   exist during which the Chamber's members could be subject to the permitting and consultation

5

1    burdens discussed above under Sections 7 and 9. Consequently, for the same reasons that the

2    Chamber's members have a particular interest in the application of the 4(d) Rule, they likewise

3    have an interest in the resolution of whether NEPA and its associated delays apply in the present

4    case.

5          15.    As to the Listing Rule itself, the Chamber's members have a concrete and

6    immediate interest in defending the polar bear's designation as a threatened species. If polar

7    bears are listed as endangered, rather than threatened, the permitting and consultation

8    requirements of the ESA discussed above will apply. Thus, if Plaintiffs were to prevail, the

9    Chamber's members throughout the United States, including in Alaska, could be required to: (i)

10   obtain a take authorization under Section 9 of the ESA in addition to any authorizations they may

11   have obtained under the MMPA, or, obtain an incidental take authorization for their otherwise

12   lawful greenhouse gas-emitting activities; and (ii) subject their federally-permitted greenhouse

13   gas-emitting activities to the consultation process required under Section 7. These increased

14   permitting and consultation burdens necessarily will lead to significant additional costs and delay

15   for the Chamber's members.

16         16.    Moreover, with regard to FWS's purported omission to designate critical habitat

17   and to list measures for non-lethal deterrence – the Chamber's members likewise have a concrete

18   and immediate interest in these issues. A number of the Chamber's members may operate or

19   supply operations in what may otherwise be designated critical polar bear habitat. If critical

20   habitat were designated, then special management considerations or protections would apply,

21   resulting in additional costs and potential delay to the members' operations or to parties they

22   supply located in relevant parts of Alaska. Similarly, CBD would require generalized, non-

4977254

1   project-specific non-lethal deterrence measures that, depending on what they prescribe, could

2   increase the project's costs and operational planning.

3        17.    The relief that Plaintiffs request for the Listing Rule, the 4(d) Rule, and under

4   NEPA and the MMPA, would put the Chamber's members at risk of increased permitting

5   burdens and enforcement actions or citizen suits.  The Chamber's members therefore have a

6   concrete interest in defending these aspects of the Listing Rule, the 4(d) Rule, and under NEPA

7   and the MMPA, and will have no other way of defending these interests if intervention is denied.

8

9   I declare under penalty of perjury under the laws of the United States that the foregoing

10  information is true and correct to the best of my knowledge, information, and belief.

11

12      DATED this 4th day of September, 2008

13
14                                          William Kovacs

# EXHIBIT A

# CHAMBER OF COMMERCE
## OF THE
# UNITED STATES OF AMERICA

**WILLIAM L. KOVACS**
VICE PRESIDENT
ENVIRONMENT, TECHNOLOGY &
REGULATORY AFFAIRS

1615 H STREET, N.W.
WASHINGTON, D.C. 20062
(202) 463-5457

July 14, 2008

Public Comments Processing
Attn: 1018-AV79
Division of Policy and Directives Management
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, Suite 222
Arlington, VA 22203

**Re: Special Rule for the Polar Bear, Section 4(d) of the Endangered Species Act**

The U.S. Chamber of Commerce, the world's largest business federation representing more than three million businesses and organizations of every size, sector, and region, submits these comments on the Interim Final Rule issued by the U.S. Fish and Wildlife Service (FWS) amending the regulations at 50 CFR part 17 to create a special rule under Section 4(d) of the Endangered Species Act (ESA), 16 U.S.C. § 1533(d) (the "4(d) Rule"). The 4(d) Rule addresses the activities covered by section 1538(a) of the ESA that are prohibited due to their impacts on the polar bear, now that it has been listed as a "threatened" species under the ESA.

## I.     The 4(d) special rule properly implements the ESA.

These comments pertain specifically to the 4(d) Rule and its application to the polar bear. However, there is a larger issue at play here: many of the groups seeking to list the polar bear as "threatened" see the ESA as a backdoor mechanism for regulating greenhouse gas emissions. In fact, this battle is hardly even about the polar bear, whose population is actually increasing.[1] The true goal of those seeking to list the polar bear as a threatened species is to put a stop to all greenhouse gas emissions, even if it means halting construction in the United States. Activists are in the midst of a well-coordinated effort to force regulation of greenhouse gases by shoehorning such regulation into decades-old, incompatible environmental statutes such as the Clean Air Act, Clean Water Act, National Environmental Policy Act, and, here, the Endangered Species Act.

---

[1] According to the Alaska Department of Fish and Game, the global polar bear population is between 20,000 and 25,000, up from 8,000 to 10,000 in the 1960s. In fact, the Alaska Department of Fish and Game sent a letter to DOI on April 9, 2007, formally opposing the listing of the polar bear as threatened under the ESA.

U.S. Fish and Wildlife Service
July 14, 2008
Page 2 of 3

The Chamber therefore applauds FWS for issuing the 4(d) Rule, as it is necessary to prevent adverse impacts to American jobs and the economy. Such adverse impacts would come in two forms: (1) Section 7 consultations and the administrative delays resulting therefrom, and (2) citizen suits alleging a Section 9 "taking" of the polar bear.

The 4(d) Rule makes clear that listing the polar bear as a threatened species under the ESA is not an action that is intended to result in dramatic and widespread delays to almost every federal activity in the United States. Section 7(a)(2) of the ESA requires each federal agency to consult with the Secretary of the Interior to ensure that any federal action not jeopardize the continued existence of the threatened species or result in the destruction or adverse modification of the habitat of such species. 16 U.S.C. § 1536(a)(2). Without the 4(d) Rule, some environmental groups may argue that any federal action resulting in greenhouse gas emissions—such as a permit issued by a federal agency under the Clean Air Act, Clean Water Act, or other statute—would require a Section 7 consultation between the permitting agency and DOI, significantly slowing an already time-consuming and onerous process. Such arguments could effectively halt government activities for months or even years while the agencies review individual permitting actions and arguments regarding whether issuance of the permit will jeopardize the polar bear or adversely affect the Arctic ice that makes up the polar bear's habitat.

Similarly, under Section 11 of the ESA, any person may bring a private right of action (i.e., a citizen suit) against any other person, including the government of the United States, alleged to be in violation of the provisions of the ESA. The 4(d) rule makes clear that there is no basis for a litany of citizen suits alleging a Section 9 "taking" of the polar bear. *See* 16 U.S.C. §§ 1538, 1540. According to certain activists, these suits could theoretically be brought against any business that emits greenhouse gases, provided the complainant provides a legally justifiable causal connection. In fact, under Section 11 of the ESA, a lawsuit could even be brought against the entire federal government alleging that its lawful operations threaten the habitat of the polar bear, and the U.S. government could be enjoined of all operations until it finishes its consultations.

The 4(d) Rule is therefore fully consistent with the ESA and appropriate to prevent unwarranted application of the ESA to greenhouse gases. Without it, environmental groups will seek to force thousands (and perhaps even millions) of businesses, both large and small, to incur additional expense and delay while determining if their emissions affect polar bears or the Arctic ice. Activists would likely claim that local emissions contribute to rising global temperatures, thereby leading to a melting of Arctic ice that is the polar bear's habitat. Under this logic, any emitter of greenhouse gases in any one of the fifty states, for example, potentially contributes to the destruction of polar bear habitat. A manufacturer in Florida should not be required to wait an extra year under the Section 7 consultation process to determine if its operations impact the polar bear, nor should it be the victim of a citizen suit alleging a "take" of the polar bear for its lawful operations.

U.S. Fish and Wildlife Service
July 14, 2008
Page 3 of 3

**II.     Aspects of the 4(d) Rule can be stronger.**

Recognizing that the true goal of proponents of listing the polar bear as threatened is backdoor regulation of greenhouse gases, the Chamber is concerned that the 4(d) Rule does not fully and completely protect American businesses against frivolous and unnecessary consultations and litigation resulting from misapplication of the ESA's provisions.  For instance, the 4(d) Rule concludes that "the best scientific data currently available does not draw a causal connection between GHG emissions resulting from a specific Federal action and effects on listed species or critical habitat from climate change, nor are there sufficient data to establish the required causal connection to the level of reasonably certainty between an action's resulting emissions and effect on species or critical habitat."  4(d) Rule at 28313.  To implement the clear intent of FWS, the Chamber therefore encourage FWS to codify, in the final 4(d) Rule, a complete exemption for greenhouse gas emissions from coverage under the ESA.

**III.     Conclusion**

The Chamber strongly believes FWS should not allow the polar bear to impede current legislative and regulatory processes relating to greenhouse gases.  Secretary Kempthorne said it best when he stated the following:

> "Listing the polar bear as threatened can reduce avoidable losses of polar bears. But it should not open the door to use of the ESA to regulate greenhouse gas emissions from automobiles, power plants, and other sources.  That would be a wholly inappropriate use of the ESA law.  The ESA is not the right tool to set U.S. climate policy."

The Chamber applauds FWS for drafting the 4(d) Rule, and suggest strengthening the language in order to remove greenhouse gas emissions from the purview of the Endangered Species Act.

Sincerely,

William L. Kovacs

# EXHIBIT B

HOME | SMALL BUSINESS | ISSUES | MEDIA | CHAPTERS | ASSOCIATIONS | MEMBERS


### U.S. Chamber of Commerce
**Fighting For Your Business®**

Member Login  | Join the Chamber

Search

**ISSUES**

Accomplishments
Chamber Testimony
Grassroots Alerts
Index of Issues
Letters to Congress
Members of Congress
Policy Priorities
Regulatory Comments
State Resources
Litigation Center


The Chamber understands your needs and protects your interests and livelihood as if they are our own. You've got a voice.
**JOIN TODAY**
and be heard.

About the U.S. Chamber of Commerce
Careers
Events Calendar
FAQs
Programs
Publications

SPONSORED LINKS

**FedEx**

**monster**

**YELLOW**

Issues Center > Index of Issues > Environment

# Climate Change

### Objective

Promote long-term financing, development, and deployment of cost-effective, innovative energy technologies that can be utilized when and where needed to address energy, security, and climate change challenges as well as long-range sustainability objectives, while at the same time assuring that what is done is not economically disruptive.

### Summary of the Issue

Along with world economic growth, global greenhouse gas emissions are increasing. Regardless what this means for climate change, the private sector and Congress have expressed a very important common point of view, specifically: measures taken to address any stated climate change challenge—such as limiting greenhouse gas emissions to no more than double what they were in pre-industrial times—must not harm the United States economy.

If this key point of agreement continues to prevail in forthcoming Congressional debates, informed discussion may lead to an appreciation of the economic benefits and consequences of various proposed legislative courses of action. The U.S. Chamber of Commerce aims to help frame these discussions, and on behalf of business and industry, is working to discourage ill-conceived climate change policies and measures that could severely damage the security and economy of the United States. At the same time, the U.S. Chamber encourages positive measures, such as long-term technological innovation and long-term clean technology deployment.

### U.S. Chamber Strategy

- Defeat proposed measures that are economically disruptive of business and industry activities.
- Resist ill-conceived legislation that creates regulatory and legislative obstacles to development and deployment of affordable, innovative energy technologies.
- Encourage measures that foster long-term technological innovation aimed at addressing energy, security, and climate change challenges as well as long-range sustainability objectives.
- Resist ill-conceived climate change policies and measures that could severely damage the security and economy of the United States.

### Staff Contact Information
Environment, Technology & Regulatory Affairs Division
(202) 463-5533
environment@uschamber.com

---

**Related**

**Take Action Now!**

- Become a member
- Contribute to our efforts
- Write to Congress
- Join the Grassroots Team

**See Related Content**

 **RSS Issue Feed**

**Resources**

Reality Check: Straight Talk About the Kyoto Protocol

# EXHIBIT C




Fighting For Your Business®

Member Login Ⓜ    Join the Chamber

Search

Issues Center > Policy Priorities

☑ **Share This Page**

ISSUES
Accomplishments
Chamber Testimony
Grassroots Alerts
Index of Issues
Letters to Congress
Members of Congress
Policy Priorities
Regulatory Comments
State Resources
Litigation Center

The Chamber
understands your
needs and protects
your interests and
livelihood as if they
are our own.
You've got a voice.
**JOIN ⊕ TODAY**
and be heard.

About the U.S. Chamber
of Commerce
Careers
Events Calendar
FAQs
Programs
Publications

SPONSORED LINKS


# Energy and the Environment

## Policy Priorities for 2008

### Clean Air Rules

- Ensure that regulation of air emissions is based on sound science and focuses on performance and market-based programs, rather than on command-and-control mandates.
- Participate in all major rulemakings on air quality, including, but not limited to, ozone, particulate matter, and greenhouse gases.
- Support fair implementation of air quality standards.
- Urge the federal government to take into account the growing impact of pollution from outside the United States regarding compliance with domestic air quality regulations.

### Climate Change

- Urge Congress to carefully review the climate change issue before taking further action. Ensure that any climate change policies do not place unreasonable burdens on businesses and the economy.
- Oppose proposed legislation and regulations that fail to satisfy the Chamber's five core principles: the legislation and regulations must (1) address the international nature of global climate change, (2) promote accelerated technology development and deployment, (3) preserve American jobs and the economy, (4) reduce barriers to development of climate-friendly energy sources, and (5) promote energy efficiency measures.
- Champion efforts by industry to develop energy-efficient technologies and export them to the developing world, where the bulk of new greenhouse gas emissions originate.
- Ensure that developing nations share responsibility for addressing climate change.

### Domestic Energy Production

- Urge Congress to authorize environmentally compatible exploration for oil and natural gas in the Arctic National Wildlife Refuge (ANWR), on other federal lands, and in portions of the Outer Continental Shelf now closed to drilling.
- Advocate for the construction and operation of renewable energy projects, such as wind energy facilities.

### Energy Policy Act of 2005

- Advocate for full funding and implementation (primarily the innovative energy technologies provisions) of the Energy Policy Act of 2005 (EPAct) while preventing its repeal, rollback, or defunding.

### Energy Technology

- Increase public education and the accessibility of information concerning innovative energy technology developments that underpin policy negotiations related to ensuring adequate energy supply here and in international markets where U.S. business and industry operate.

### Law of the Sea Treaty

- Support ratification by the United States of the United Nations Convention on the Law of the Sea and thus be bound by its provisions. The treaty provides certainty in access to resources in the Arctic and

Antarctic and could ultimately enable American businesses to explore the vast natural resources contained in the seabeds in those areas.

**Outdated Environmental Laws**

- Modernize the National Environmental Policy Act to streamline and enhance public participation in the review and permitting process.
- Revitalize the Endangered Species Act to improve success in recovering species and promote cooperative partnerships between the federal government and landowners to reduce the law's burden on local economies.

**Water Issues**

- Educate Chamber members and policymakers about the tremendous local, national, and global economic implications of water policy and promote the use of sound science in setting policy.
- Monitor water supply, ownership, and quality concerns, including recent enforcement efforts targeting storm water discharges.

**Yucca Mountain Implementation Plan**

- Continue to work with the nuclear industry in support of a final permit for Yucca Mountain and for full funding of the project as a repository for nuclear waste.

Return to the index of priorities

Join | Login | Search | Sitemap | Contact Us | Terms & Conditions | Privacy Policy

Copyright © 2008 U.S. Chamber of Commerce 1615 H St NW Washington DC 20062-2000 All Rights Reserved
*Advancing human progress through an economic, political and social system based on individual freedom, incentive, initiative, opportunity, and responsibility.*