1   John Briscoe, # 53223
2   David Ivester, #76863
3   Lawrence S. Bazel, # 114641
4   Briscoe, Ivester, & Bazel, LLP
5   155 Sansome Street, 7th Floor
6   San Francisco, CA 94104
7   jbriscoe@briscoelaw.net
8   divester@briscoelaw.net
9   lbazel@briscoelaw.net
10  Telephone:    (415) 402-2700
11  Facsimile:    (415) 398-5630
12
13  John C. Martin (*pro hac vice* application pending)
14  Duane A. Siler (*pro hac vice* application pending)
15  Michele L. Walter (*pro hac vice* application pending)
16  Patton Boggs LLP
17  2550 M Street N.W.
18  Washington, D.C. 20037
19  jmartin@pattonboggs.com
20  dsiler@pattonboggs.com
21  mwalter@pattonboggs.com
22  Telephone:    (202) 457-6000
23  Facsimile:    (202) 457-6315
24
25  *Attorneys for Proposed Defendant-Intervenors American Petroleum Institute, Chamber of*
26  *Commerce of the United States of America, National Mining Association, National*
27  *Association of Manufacturers, and American Iron and Steel Institute*
28

29          **IN THE UNITED STATES DISTRICT COURT**
30          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
31
32                                                    )
33  CENTER FOR BIOLOGICAL DIVERSITY, et al.,          )
34                                                    )
35                    Plaintiffs,                     )
36                                                    )
37          v.                                        )   Case No. 08-CV-1339-CW
38                                                    )   Assigned to:
39  DIRK KEMPTHORNE, et al.,                          )   Hon. Claudia Wilken
40                                                    )
41                    Defendants,                     )
42                                                    )
43          and                                       )
44                                                    )
45  NATIONAL MINING ASSOCIATION,                      )

*4977225*

1
2    Proposed Defendant-                )
3    Intervenor                         )
4    _____)
5
6    **DECLARATION OF BRADFORD V. FRISBY OF THE NATIONAL MINING**
7    **ASSOCIATION IN SUPPORT OF MOTION TO INTERVENE**
8

9    I, Bradford V. Frisby, declare as follows:

10    1.    I am Associate General Counsel of the National Mining Association ("NMA"). I

11    make this declaration in support of NMA's Motion to Intervene under Rule 24 of the Federal

12    Rules of Civil Procedure. I have first-hand experience with, and personal knowledge of, the

13    facts and matters discussed in this declaration.

14    2.    I am a 1991 graduate of the University of Maryland with a Bachelor of Arts

15    Degree in Economics. In 1994, I graduated from the George Washington University Law School

16    with a Juris Doctor Degree in Law.

17    3.    I have been Associate General Counsel of NMA since 1995. In this capacity, I

18    have come to know the membership of NMA and its activities in regulatory and policy matters. I

19    am well aware of NMA's activities concerning climate change issues.

20    4.    NMA is a trade organization of more than 325 companies that represents the

21    majority of the nation's producers of metals, industrial and agricultural minerals, and especially,

22    coal. NMA also represents the manufacturers of mining and mineral processing machinery and

23    equipment, as well as engineering and consulting firms, financial institutions, and other

24    companies that service the mining industry. Members have mining operations at locations across

25    the United States, including Alaska.

26    5.    NMA is incorporated in Delaware as a not-for-profit non-stock corporation and

27    has its principal place of business in the District of Columbia. NMA participated in the

*4977225*

1    rulemaking for the polar bear 4(d) Rule by submitting comments on July 14, 2008. A copy of

2    the 4(d) Rule comments is attached as **Exhibit A**.

3        6.    NMA actively participates on issues of importance to its members, including the

4    current public debate concerning global climate change. NMA has publicly-adopted an official

5    policy on how global climate change concerns should be addressed. See **Exhibit B**, NMA

6    Position on Climate Change Policies, available at

7    http://www.nma.org/pdf/073108_climate_change.pdf. In particular, NMA supports a

8    comprehensive approach to solving the economic, environmental, and social issues pertaining to

9    global climate change. Such a solution to this transnational problem will require a multilateral

10   approach with foreign partners and the acceleration of substantial investment in new

11   technologies.

12       7.    NMA and its members have substantial interests that are directly and significantly

13   affected by resolution of the issues presented by the Plaintiffs' complaint, as further discussed

14   below. No other party represents NMA or its interests. NMA therefore requests to participate in

15   this case to protect its interests. NMA's participation will be helpful and beneficial to the Court

16   and aid in understanding the practical consequences of a decision on the Listing Rule and the

17   4(d) Rule. If NMA is denied intervention, it and its members will have no other means of

18   protecting its interests in this matter.

19       8.    NMA does not seek to delay these proceedings and will abide by the schedules

20   that the Court has set.

21       9.    NMA's members across the United States work with the government to make

22   NMA members' operations compatible with environmental standards and concerns.

1    10.    All mining operations, regardless of the product they mine, emit carbon as a by-

2    product of the mining process itself, which typically uses engines and motors fueled by fossil

3    fuels.  Thus, to the extent that greenhouse gas emissions are said to harm polar bears and that

4    further regulatory burdens should be imposed under the ESA, NMA members will suffer from

5    these burdens.

6    11.    In a carbon-constrained economy, the cost and/or demand for NMA members'

7    final product, particularly coal, will be affected.  Yet, the International Energy Agency and the

8    U.S. Department of Energy's Energy Information Administration have found that worldwide

9    energy supply from all sources must increase to keep pace with demand through 2030.

10   Moreover, given an over 200-year supply of affordable domestic coal, any solution to climate

11   change will invariably require the low-cost availability of this resource to provide electricity for

12   the United States.  NMA's members therefore have discrete and concrete interest in defending

13   Plaintiffs' challenges to the Listing Rule and the 4(d) Rule.

14   12.    As to the 4(d) Rule, NMA's members have discrete and concrete interests in three

15   aspects of that Rule.  First, NMA has an interest in ensuring that its members' operations

16   throughout the lower 48 States and Hawaii are not subjected to the requirement to obtain an

17   incidental take permit under the ESA for their otherwise lawful activities that may emit

18   greenhouse gases.  The U.S. Fish and Wildlife Service ("FWS") determined that neither climate

19   change, nor any effect of climate change, can be traced to particular activities in particular

20   locations.  Thus, under the 4(d) Rule, otherwise lawful greenhouse gas-emitting operations in the

21   lower 48 States and Hawaii are exempted from the ESA Section 9 regulatory requirement to

22   obtain incidental take permits.

4

1      13.    Without this exemption, some would claim that NMA's members are required to

2    obtain incidental take permits for their otherwise lawful greenhouse gas-emitting activities in the

3    lower 48 States and Hawaii, even though the FWS determined that impacts on polar bears could

4    not be traced to these, or any other specific activities. Thus, NMA's members have a particular

5    interest in ensuring the continued validity of this exemption in the 4(d) Rule so as to assure these

6    members will not be subjected to increased costs and delays associated with obtaining incidental

7    take permits, or to defend unfounded claims that such permitting is required.

8      14.    Second, NMA and its members have a concrete and immediate interest in

9    ensuring the continued validity of the exemption under the 4(d) Rule from the requirement to

10    obtain a Section 9 take authorization under the ESA. The ESA requires a permit for activities

11    that will take an endangered or threatened species. Under the 4(d) Rule, however, FWS

12    determined that the protections of the Marine Mammal Protection Act ("MMPA") and the

13    Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES")

14    are fully protective. Thus, if an activity complies with the take provisions of the MMPA or

15    CITES, additional authorizations under the ESA would not be required. Unlike the exemption

16    from the ESA Section 9 incidental take permits, the exemption from the ESA's separate take

17    authorization applies to operations throughout the United States, including those operations that

18    NMA members have in Alaska. Without this exemption, NMA's members could potentially be

19    subject to the unnecessary burden of applying for ESA take authorizations *in addition to* MMPA

20    authorizations. NMA's members therefore have a particular interest in ensuring the validity of

21    this exemption.

22      15.    Third, NMA and its members have a concrete and immediate interest in FWS's

23    explanation in the preamble to the 4(d) Rule concerning the application of the ESA Section 7

1   consultation requirements. Apparently, Plaintiffs would have this Court declare that consultation

2   is required in instances that FWS would be disinclined to require consultation. See Second

3   Amended Complaint, ¶¶ 9, 122, 167; Endangered and Threatened Wildlife and Plants; Special

4   Rule for the Polar Bear; Interim Final Rule, 73 Fed. Reg. 28306, 28310-11. The May 14, 2008

5   H. Dale Hall FWS Guidance, as well as the preamble for the 4(d) Rule, however, may alleviate

6   the potential for an unnecessary and costly consultation process for greenhouse gas-emitting

7   projects in certain situations. If this Court were to accept Plaintiffs' apparent position, NMA's

8   members could be subject to additional cost and delay associated with the consultation process

9   for federally permitted projects that they operate or supply. Thus, NMA's members have a

10  particular interest in the continued validity of this explanation.

11          16.     NMA's members likewise have an interest in defending against the Plaintiffs'

12  claim that NEPA procedures with regard to the 4(d) Rule were improperly omitted. If the

13  Listing Rule remains in effect, but the 4(d) Rule is subject to NEPA, an interim period would

14  exist during which NMA's members could be subjected to the permitting and consultation

15  burdens discussed above under Sections 7 and 9. Consequently, for the same reasons that NMA

16  members have a particular interest in the application of the 4(d) Rule, they likewise have an

17  interest in the resolution of whether NEPA, and its associated delays apply in the present case.

18          17.     As to the Listing Rule itself, NMA's members have a concrete and immediate

19  interest in defending the polar bear's designation as a threatened species. If polar bears are listed

20  as endangered, rather than threatened, the permitting and consultation requirements of the ESA

21  discussed above will apply. Thus, if Plaintiffs were to prevail, NMA's members throughout the

22  United States, including in Alaska, could be required to: (i) obtain a take authorization under

23  Section 9 of the ESA in addition to any authorizations they may have obtained under the MMPA,

1    or, obtain an incidental take authorization for their otherwise lawful greenhouse gas-emitting

2    activities; and (ii) subject their federally-permitted greenhouse gas-emitting activities to the

3    consultation process required under Section 7.  These increased permitting and consultation

4    burdens necessarily will lead to significant additional costs and delay for NMA's members.

5        18.    Moreover, with regard to FWS's purported omission to designate critical habitat

6    and to list measures for non-lethal deterrence—NMA's members likewise have a concrete and

7    immediate interest in these issues.  If critical habitat were designated, which included NMA

8    member company operations in Alaska, then special management considerations or protections

9    would apply, resulting in additional costs and potential delay to the members' operations or to

10   operations they supply located in relevant parts of Alaska.  Similarly, CBD would require

11   generalized, non-project-specific non-lethal deterrence measures that, depending on what they

12   prescribe, could increase the project's costs and operational planning.

13       19.    The relief that Plaintiffs request for the Listing Rule, the 4(d) Rule, and under

14   NEPA and the MMPA would put NMA's members at risk of increased permitting burdens and

15   enforcement actions or citizen suits that would substantially impact NMA members' routine

16   operations throughout the United States and their economic interests in those activities.  Even a

17   delay in a permit authorization can involve significant costs due to the size and nature of the

18   projects.  NMA's members therefore have a concrete interest in defending these aspects of the

19   Listing Rule, the 4(d) Rule, and under NEPA and the MMPA, and will have no other way of

20   defending these interests if intervention is denied.

1    or, obtain an incidental take authorization for their otherwise lawful greenhouse gas-emitting

2    activities; and (ii) subject their federally-permitted greenhouse gas-emitting activities to the

3    consultation process required under Section 7. These increased permitting and consultation

4    burdens necessarily will lead to significant additional costs and delay for NMA's members.

5        18.    Moreover, with regard to FWS's purported omission to designate critical habitat

6    and to list measures for non-lethal deterrence—NMA's members likewise have a concrete and

7    immediate interest in these issues. If critical habitat were designated, which included NMA

8    member company operations in Alaska, then special management considerations or protections

9    would apply, resulting in additional costs and potential delay to the members' operations or to

10   operations they supply located in relevant parts of Alaska. Similarly, CBD would require

11   generalized, non-project-specific non-lethal deterrence measures that, depending on what they

12   prescribe, could increase the project's costs and operational planning.

13       19.    The relief that Plaintiffs request for the Listing Rule, the 4(d) Rule, and under

14   NEPA and the MMPA would put NMA's members at risk of increased permitting burdens and

15   enforcement actions or citizen suits that would substantially impact NMA members' routine

16   operations throughout the United States and their economic interests in those activities. Even a

17   delay in a permit authorization can involve significant costs due to the size and nature of the

18   projects. NMA's members therefore have a concrete interest in defending these aspects of the

19   Listing Rule, the 4(d) Rule, and under NEPA and the MMPA, and will have no other way of

20   defending these interests if intervention is denied.

21       20.    I declare under penalty of perjury under the laws of the United States that the

22   foregoing information is true and correct to the best of my knowledge, information, and belief.

1          DATED this 3rd day of September, 2008

2                                                *Bradford V. Frisby*

3                                                Bradford V. Frisby

8

4977225

# EXHIBIT A



July 14, 2008

Mr. Kurt Johnson
Division of Conservation and Classification
U.S. Fish & Wildlife Service
4401 North Fairfax Drive, Room 420
Arlington, VA  22203

Public Comments Processing
Attn:  1018-AV79
Division of Policy and Directives Management
U.S. Fish and Wildlife Service
Arlington, Virginia 22203

**Re:    Comments of the National Mining Association on the Interim
Final Rule for Endangered and Threatened Wildlife and Plants;
Special Rule for the Polar Bear; 73 Fed. Reg. 28,305-28,318
(May 15, 2008).**

Dear Mr. Johnson:

The National Mining Association (NMA) appreciates the opportunity to provide
comments on the U.S. Fish & Wildlife Service's (FWS) Special Interim Final
Rule for the polar bear.  NMA is a national trade association that includes the
producers of most of the nation's coal, metals, industrial and agricultural
minerals; the manufacturers of mining and mineral processing machinery,
equipment and supplies; and the engineering and consulting firms, financial
institutions and other firms serving the mining industry.  NMA member
companies mine coal and minerals across the nation, including in the state of
Alaska.

Although NMA strongly opposed (and continues to oppose) the listing of the
polar bear as a threatened species, NMA supports the FWS decision to issue a
special rule under authority of section 4(d) of the Endangered Species Act
(ESA) to protect the polar bear.  The rule exempts from all regulatory
prohibitions any activities in compliance with the Marine Mammal Protection
Act of 1972 and the Convention on International Trade in Endangered
Species of Wild Fauna and Flora.  NMA agrees with this exemption.  In
addition, as suggested in our original comment submission on the listing of
the polar bear, NMA agrees with the agency's decision to limit the scope of
the rule such that:  "None of the prohibitions in § 17.31 of this part apply to

-2 -

any taking of polar bears that is incidental to, but not the purpose of, carrying out an otherwise lawful activity within the any area subject to the jurisdiction of the United States except Alaska." 73 Fed. Reg. 28,318.

Although we support this limitation, the agency must further limit this exemption to more precisely coincide with the polar bear's range. We recommend that the agency amend the exception language as follows (amended language appears in **bold**):

> "None of the prohibitions in § 17.31 of this part apply to any taking of polar bears that is incidental to, but not the purpose of, carrying out an otherwise lawful activity within any area subject to the jurisdiction of the United States **except for designated critical polar bear habitat within the State of Alaska**."

This would appropriately limit the application of § 17.31 to those areas occupied by the polar bear. There is no justifiable reason to limit the exemption in the entire state of Alaska when only part of the state is used by the polar bear for its habitat. Modifying the exemption in this manner will ensure that lawful activities in Alaska, such as mining, that are outside of the bears' habitat will not be unnecessarily impeded by this rule.

Section 4(d) of the ESA delegates broad discretionary authority to the Secretary to issue, or not to issue, regulations prohibiting acts under section 9 of the ESA regarding threatened species. Such authority was properly used by the Secretary in the case of the polar bear. The D.C. Circuit has interpreted section 4(d) as representing two grants of authority, one to apply any or all of the section 9 prohibitions to threatened species, and the other containing a necessary and advisable requirement whenever the Secretary issues other regulations beyond those contained in section 9. The court explained that:

> [T]he two sentences of [§ 4(d)] represent separate grants of authority. The second sentence gives the [FWS] discretion to apply any or all of the § 1538(a)(1) prohibitions to threatened species without obligating it to support such actions with findings of necessity. Only the first sentence of § [4(d)] contains the 'necessary and advisable' language that mandates formal individualized findings. This sentence requires the [FWS] to issue whatever other regulations are 'necessary and advisable,' including regulations that impose protective measures beyond those contained in § 1538(a)(1).

*Sweet Home Chapter of Communities for a Great Oregon v. Babbitt*, 1 F.3d 1, 7-8 (D.C. Cir. 1993), *rev'd on other grounds on reh'g* 17 F.3d 1463 (D.C. Cir. 1994), *rev'd on other grounds*, 515 U.S. 687 (1995).

-3-

It is clear from the statutory language that the ESA does not require the application of any of the section 9 prohibitions (including the take prohibition) to any threatened species. Instead of automatically affording such protections, the ESA confers broad discretion upon the Secretary to decide through rulemaking whether to apply any of the statutory prohibitions to a particular threatened species. *See* 16 U.S.C. § 1533(d) (stating that the Secretary *may* by regulation prohibit any act prohibited under section 9). Even though the Department of the Interior has a general rule which extends section 9 prohibitions to all threatened species, the Secretary always retains the statutory authority to amend those regulations for a specific species, and has exercised that authority with regard to the polar bear. In addition to the clarity of this statutory provision on its face, the agency enjoys broad and substantial deference in interpreting its governing statute, even if such provisions are found to be ambiguous. *See generally Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

Indeed, one could argue that it would be arbitrary to impose prohibitions or limitations on lawful activities that cannot be shown to be the proximate cause of either killing or injuring polar bears in another remote location. In this regard, the Secretary's decision is strongly supported by the case law. For example, the Ninth Circuit has recognized that section 9 prohibitions cannot be applied unless there is evidence that the activity has actually killed or injured a threatened species. The court explained that:

> The word "actually" before the word "kills or injures" ... makes it clear that habitat modification or degradation, standing alone, is not a taking pursuant to section 9. To be subject to section 9, the modification or degradation must be significant, must significantly impair essential behavioral patterns, and must result in actual injury to a protected wildlife species.

*Arizona Cattle Growers' Association v. U.S. Fish & Wildlife Service,* 273 F.3d 1229, 1247 (9th Cir. 2001).

In sum, the Secretary was correct to exempt lawful activities in non-polar bear habitat that may result in the release of greenhouse gas emissions from the prohibitions in section 9 of the ESA. This is because the best available scientific and commercial data available is insufficient to support the necessary "but for" causation between a permitting action in the lower 48 states and the taking of a polar bear in the Arctic. The Secretary's conclusions are further supported by the Director of the U.S. Geological Survey, who found that: "...current science and models cannot link individual actions that contribute to atmospheric carbon levels to specific responses of species, including polar bears." Such action is a reasonable interpretation of the ESA, and is entitled to deference in reviewing such action.

-4-

NMA appreciates the opportunity to share our views with the agency.  Should you have any questions, please feel free to contact me at (202) 463-2643 or via email at bfrisby@nma.org.

Sincerely,

Bradford V. Frisby

Bradford V. Frisby
Associate General Counsel
National Mining Association

**National Mining Association** 101 Constitution Avenue, NW • Suite 500 East • Washington, DC 20001 • (202) 463-2600

# EXHIBIT B



**National Mining Association (NMA)**
**Position on Climate Change Policies**

The National Mining Association (NMA) is committed to playing a constructive role in the development and adoption of policy measures and technologies to address global climate change concerns and the inextricably linked issues of domestic and global energy supply and security, economic growth and development, and other environmental and social issues.

The International Energy Agency and the U.S. Department of Energy's Energy Information Administration concluded that worldwide energy supply from all sources will need to be increased to keep up with demand through 2030. Coal is a prime source of energy throughout the world today and will inevitably remain so as worldwide energy demand continues to rise. It currently fuels more than 50 percent of all electricity generation in the United States. As a low-cost fuel and our nation's most abundant domestic energy resource, coal is uniquely positioned to help America meet its future energy needs and reduce its dependence on foreign sources of energy, particularly greater use of foreign-sourced liquefied natural gas. Beyond the United States, access to plentiful reserves of affordable coal also make its increased use around the globe certain for decades to come, particularly within many of the world's fastest-growing developing economies.

Any meaningful effort to achieve long-term, sustainable reductions in global greenhouse gas emissions will depend on the development and deployment of new energy technologies, including advanced clean coal technologies and carbon capture and storage (CCS). The rapid development, demonstration and widespread deployment of such technologies are of paramount importance in any reasoned and effective effort to address climate change concerns.

At a time when energy prices are already escalating rapidly and electric capacity margins are dangerously thin in many regions of our nation the need to address U.S. climate and energy policies and to move forward aggressively toward the broad, worldwide commercial deployment of CCS and other advanced clean-coal technologies is both urgent and imperative.

Consistent with this imperative, NMA supports the following principles:

- Climate change and energy policies are inextricably linked with each other and with other economic, environmental and social issues. None can be properly or successfully addressed in isolation, nor without consideration given to their direct and indirect costs and benefits.

- Domestic and global energy security requires the preservation of a diverse mix of fuels – coal, natural gas, nuclear, petroleum and renewables – for electricity generation, transportation and industrial uses, as well as the promotion of conservation and energy efficiency, in both generation and end-use.

- Maintaining the reliability and adequacy of U.S. electricity supply is an inviolable public policy requisite.

- A strong commitment to the development and deployment of new and advanced technologies, requiring significant public and private investment, is essential to addressing global climate change concerns and to meeting current and future domestic and global energy challenges.

- Addressing climate change concerns is a global challenge requiring global solutions.

Consistent with these principles, NMA supports the timely adoption of comprehensive federal legislation that incorporates the following priorities:

- **Provides sufficient funding and incentives to accelerate the development, demonstration and broad commercial deployment of affordable advanced carbon management technologies** – Significant near- and long-term funding and incentives must be dedicated to accelerating the development, demonstration and commercial deployment of a cost-effective suite of advanced clean coal technologies, including CCS and beneficial use technologies, and FutureGen. Such funding must be stable and secure, not subject to annual appropriations, sufficient to bring the suite of advanced technologies into widespread commercial deployment as quickly as possible, and should be administered by an independent, government-sanctioned entity.

- **Establishes a legal framework for CCS** – The establishment of a uniform national legal framework for long-term carbon storage, including requirements for site selection, permitting and monitoring of storage sites is essential for the development and deployment of CCS technologies. The framework must address liability, indemnification and transfer of title to the government after a facility has completed carbon injection and has been certified.

- **Contains costs and provides economic and energy security** – Legislation must be harmonized with the availability of commercially cost-effective emissions control technologies to avoid unnecessary economic and power supply disruptions. Cost containment measures must be included to protect against volatile or excessively high carbon prices.

- **Prohibits duplicative and conflicting frameworks for greenhouse gas emissions** – Accelerated investments in and deployment of vital emissions reduction technologies rely on a clear, non-duplicative regulatory regime. Any new framework must stipulate that neither the Clean Air Act nor relevant state or local laws can provide duplicative or contradictory authorities to regulate greenhouse gases.

2

- **Maintains global competitiveness of U.S. industries** – Mineral and metal products are essential in applications to improve energy efficiency and for low-carbon technologies. Energy- and greenhouse gas-intensive industries, including metals and minerals, that compete in a global market are particularly susceptible to competitive disadvantage from increased costs of a domestic climate change policy. Adequate measures should be put in place to maintain the global economic competitiveness of these industries.