1  John Briscoe, # 53223
2  David Ivester, #76863
3  Lawrence S. Bazel, # 114641
4  Briscoe, Ivester, & Bazel, LLP
5  155 Sansome Street, 7th Floor
6  San Francisco, CA 94104
7  jbriscoe@briscoelaw.net
8  divester@briscoelaw.net
9  lbazel@briscoelaw.net
10 Telephone:    (415) 402-2700
11 Facsimile:    (415) 398-5630
12
13 John C. Martin *(pro hac vice* application pending*)*
14 Duane A. Siler *(pro hac vice* application pending*)*
15 Michele L. Walter *(pro hac vice* application pending*)*
16 Patton Boggs LLP
17 2550 M Street N.W.
18 Washington, D.C. 20037
19 jmartin@pattonboggs.com
20 dsiler@pattonboggs.com
21 mwalter@pattonboggs.com
22 Telephone:    (202) 457-6000
23 Facsimile:    (202) 457-6315
24
25 *Attorneys for Proposed Defendant-Intervenors American Petroleum Institute, Chamber of*
26 *Commerce of the United States of America, National Mining Association, National*
27 *Association of Manufacturers, and American Iron and Steel Institute*
28
29            **IN THE UNITED STATES DISTRICT COURT**
30            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
31
32                                                        )
33 CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,              )
34                                                        )
35                    Plaintiffs,                         )
36                                                        )
37       v.                                               )   Case No. 08-CV-1339-CW
38                                                        )   Assigned to:
39 DIRK KEMPTHORNE, *et al.*,                              )   Hon. Claudia Wilken
40                                                        )
41                    Defendants,                         )
42                                                        )
43       and                                              )
44                                                        )
45 NATIONAL ASSOCIATION OF MANUFACTURERS,                  )

4977242

|  |  |
|---|---|
| Proposed Defendant-Intervenor | ) ) ) ) |

### DECLARATION OF KEITH McCOY OF THE NATIONAL ASSOCIATION OF MANUFACTURERS IN SUPPORT OF MOTION TO INTERVENE

I, Keith McCoy, declare as follows:

1.  I am Vice President of Energy and Resources Policy of the National Association of Manufacturers ("NAM"). I make this declaration in support of the NAM's Motion to Intervene under Rule 24 of the Federal Rules of Civil Procedure. I have first-hand experience with, and personal knowledge of, the facts and matters discussed in this declaration.

2.  I am a 1988 graduate of the University of Massachusetts with a Bachelor of Arts Degree in Political Science.

3.  I have been with the NAM since June, 1998, and Vice President of Energy and Resources Policy since May, 2005. In this capacity, I have come to know the membership of NAM and its activities in regulatory and policy matters. I am well aware of NAM's activities concerning climate change issues.

4.  The NAM is the nation's largest industrial trade association, representing small and large manufacturers in every industrial sector and in all 50 states. Its members operate and hold ownership interests in various manufacturing sectors (such as the petroleum manufacturing sector) in many parts of the United States, including Alaska.

5.  The NAM's mission is to enhance manufacturer competitiveness by advocating for a legislative and regulatory environment conducive to U.S. economic growth. The NAM likewise seeks to foster understanding among policymakers, the media, and the general public

4977242

1   about the vital role manufacturing plays to America's economic future and living standards. The

2   NAM has its principal place of business in the District of Columbia. The NAM participated in

3   the rulemaking for the polar bear 4(d) Rule by submitting comments on July 14, 2008. A copy

4   of the 4(d) Rule comments is attached as **Exhibit A**.

5       6.      The NAM and its members have substantial interests that are directly and

6   significantly affected by resolution of the issues presented by the Plaintiffs' complaint, as further

7   discussed below. No other party represents the NAM or its interests. The NAM therefore

8   requests to participate in this case to protect its interests. The NAM's participation will be

9   helpful and beneficial to the Court and aid in understanding the practical consequences of a

10  decision on the Listing Rule and the 4(d) Rule. If the NAM is denied intervention, it and its

11  members will have no other means of protecting its interests in this matter.

12      7.      The NAM does not seek to delay these proceedings and will abide by the

13  schedules that the Court has set.

14      8.      NAM's members across the United States are committed to efforts to reduce

15  greenhouse gas emissions and to preserving natural resources in an environmentally sound,

16  reasonable manner that complies with applicable regulatory requirements. This includes

17  working with the government to make NAM members' operations compatible with

18  environmental standards and concerns.

19      9.      The nature of NAM's members' operations, however, makes it impossible to

20  completely eliminate greenhouse gas emissions. Use of oil, gas, and coal from NAM members'

21  manufacturing operations gives rise to greenhouse gas emissions. Moreover, ownership interests

22  in the petroleum manufacturing sector rely on the sale of products which will emit carbon. Thus,

23  to the extent that greenhouse gas emissions are said to cause conditions that may harm polar

4977242

1  bears and that further regulatory burdens should be imposed under the ESA, NAM members will
2  suffer from these burdens.
3     10.   NAM's members have discrete and concrete interests in defending Plaintiffs'
4  challenges to the Listing Rule and the 4(d) Rule.
5     11.   Specifically, as to the 4(d) Rule, NAM's members have discrete and concrete
6  interests in three aspects of that Rule. First, the NAM has an interest in ensuring that its
7  members' operations and ownership interests throughout the lower 48 States and Hawaii are not
8  subjected to the requirement to obtain an incidental take permit under the ESA for their
9  otherwise lawful activities that may emit greenhouse gases. The U.S. Fish and Wildlife Service
10 ("FWS") determined that neither climate change, nor any effect of climate change, can be traced
11 to particular activities in particular locations. Thus, under the 4(d) Rule, otherwise lawful
12 greenhouse gas-emitting operations in the lower 48 States and Hawaii are exempted from the
13 ESA Section 9 regulatory requirement to obtain incidental take permits.
14    12.   Without this exemption, some would claim that NAM's members are required to
15 obtain incidental take permits for their otherwise lawful greenhouse gas-emitting activities in the
16 lower 48 States and Hawaii, even though FWS determined that impacts on polar bears could not
17 be traced to these, or any other specific activities. Thus, NAM's members have a particular
18 interest in ensuring the continued validity of this exemption in the 4(d) Rule so as to assure these
19 members will not be subjected to increased costs and delays associated with obtaining incidental
20 take permits, or to defend unfounded claims that such permitting is required.
21    13.   Second, the NAM and its members have a concrete and immediate interest in
22 ensuring the continued validity of the exemption under the 4(d) Rule from the requirement to
23 obtain a Section 9 take authorization under the ESA. The ESA requires a permit for activities

4977242

that will take an endangered or threatened species. Under the 4(d) Rule, however, FWS determined that the protections of the Marine Mammal Protection Act ("MMPA") and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") are fully protective. Thus, if an activity complies with the take provisions of the MMPA or CITES, additional authorizations under the ESA would not be required. Unlike the exemption from the ESA Section 9 incidental take permits, the exemption from the ESA's separate take authorization applies to operations throughout the United States, including those operations that NAM members have in Alaska. Without this exemption, NAM's members may be subject to the unnecessary burden of applying for ESA take authorizations. NAM's members therefore have particular interest in ensuring the validity of this exemption.

14.   Third, the NAM and its members have a concrete and immediate interest in FWS's explanation in the preamble to the 4(d) Rule concerning the application of the ESA Section 7 consultation requirements. Apparently, Plaintiffs would have this Court declare that consultation is required in instances that FWS would be disinclined to require consultation. *See* Complaint, ¶¶ 9, 122, 167; *Endangered and Threatened Wildlife and Plants; Special Rule for the Polar Bear; Interim Final Rule*, 73 Fed. Reg. 28306, 28310-11. The May 14, 2008 H. Dale Hall FWS Guidance, as well as the preamble for the 4(d) Rule, however, alleviates the potential for an unnecessary and costly consultation process for greenhouse gas-emitting projects in certain situations. If this Court were to accept Plaintiffs' apparent position, NAM's members could be subject to additional cost and delay associated with the consultation process for federally permitted projects that they operate, supply or own. Thus, NAM's members have a particular interest in the continued validity of this explanation.

15. NAM's members likewise have an interest in defending against the Plaintiffs' claim that NEPA procedures with regard to the 4(d) Rule were improperly omitted. If the Listing Rule remains in effect, but the 4(d) Rule is subject to NEPA, an interim period would exist during which NAM's members would be subjected to the permitting and consultation burdens discussed above under Sections 7 and 9. Consequently, for the same reasons that NAM members have a particular interest in the application of the 4(d) Rule, they likewise have an interest in the resolution of whether NEPA, and its associated delays apply in the present case.

16. As to the Listing Rule itself, NAM's members have a concrete and immediate interest in defending the polar bear's designation as a threatened species. If polar bears are listed as endangered, rather than threatened, the permitting and consultation requirements of the ESA discussed above will apply. Thus, if Plaintiffs were to prevail, NAM's members throughout the United States, including in Alaska, could be required to: (i) obtain a take authorization under Section 9 of the ESA in addition to any authorizations they may have obtained under the MMPA, or, obtain an incidental take authorization for their otherwise lawful greenhouse gas-emitting activities; and (ii) subject their federally-permitted greenhouse gas-emitting activities to the consultation process required under Section 7. These increased permitting and consultation burdens necessarily will lead to significant additional costs and delay for NAM's members.

17. Moreover, with regard to FWS's purported omission to designate critical habitat and to list measures for non-lethal deterrence—NAM's members likewise have a concrete and immediate interest in these issues. A number of NAM's members may operate or supply operations in what may otherwise be designated critical polar bear habitat. If critical habitat were designated, then special management considerations or protections would apply, resulting in additional costs and potential delay to the members' operations or to parties they supply

4977242

1 located in relevant parts of Alaska. Similarly, CBD would require generalized, non-project-
2 specific non-lethal deterrence measures that, depending on what they prescribe, could increase
3 the project's costs and operational planning.
4     18.    The relief that Plaintiffs request for the Listing Rule, the 4(d) Rule, and under
5 NEPA and the MMPA would put NAM's members at risk of increased permitting burdens and
6 enforcement actions or citizen suits that would substantially impact NAM members'
7 manufacturing throughout the United States and NAM's members' economic interests in
8 activities which produce carbon. NAM's members therefore have a concrete interest in
9 defending these aspects of the Listing Rule, the 4(d) Rule, and under NEPA and the MMPA, and
10 will have no other way of defending these interests if intervention is denied.

4977242

1   I declare under penalty of perjury under the laws of the United States that the foregoing
2   information is true and correct to the best of my knowledge, information, and belief.
3
4   DATED this 3rd day of September, 2008
5
6                                            _____
                                             Keith McCoy

8

4977242

# EXHIBIT A



*Keith W. McCoy*

*Vice President*
*Energy and Resources Policy*

July 14, 2008

Public Comments Processing
Attn: 1018-AV79
Division of Policy and Directives Management
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, Suite 222
Arlington, VA 22203

Dear Sir or Madam:

      On behalf of the National Association of Manufacturers (NAM), the country's largest industrial trade association with members in all 50 states, I urge you to take steps to confirm that greenhouse gas (GHG) emissions are exempt from the purview of the Endangered Species Act (ESA), especially with respect to the current debate surrounding the appropriate classification of the polar bear pursuant to the statute.

      The NAM's mission is to enhance the competitiveness of manufacturers and improve American living standards by shaping a legislative and regulatory environment conducive to U.S. economic growth. As a general matter, the NAM is supportive of regulations that are designed to provide real net benefits to environmental quality. Conversely, the NAM opposes policies that would impose more compliance costs on the manufacturing sector, especially those that do not demonstrate environmental or health benefits through thorough scientific study. While the NAM continues to have concerns with classification of the polar bear as "threatened" under the ESA, we believe that the Department of the Interior (DOI) can remedy possible, future inappropriate application of the ESA by issuing a strengthened Section 4(d) rule that makes clear that GHG emissions activities are not subject to the purview of the ESA.

      As you know, this action resulted from environmental litigation that had as one of its purported objectives regulating GHG emissions by means of the ESA. The NAM rejects any policy that would use this statute as a means of addressing an issue that requires congressional action. The listing of the polar bear as "threatened" constitutes the first time that a species has been listed due to a threat from global warming. The ESA was not designed to address such a complex global concern.

**Background**
In June the U.S. District Court for the Northern District of California ordered the DOI to make a final decision on whether to list the polar bear as a threatened species under the ESA by May 15, 2008. The District Court's order also mandated that DOI's decision would take effect immediately, bypassing the typical 30-day waiting period for such actions.

Environmental activists seek to dramatically expand the jurisdiction of the ESA by using the listing provisions as a means to address individual sources of GHG emissions. According to environmental activists, this could occur through prohibitions on any activity in the United States that might in some way contribute to GHG emissions, which in turn might impact Arctic ice, which is the polar bear's

*Manufacturing Makes America Strong*

1331 Pennsylvania Avenue, NW, Washington, DC 20004-1790 · (202) 637-3175 · Fax (202) 637-3182

Page 2

natural habitat. Inappropriate application of the listing in accordance with this theory would mean that all U.S. emissions of greenhouse gases from any source—cars, power plants, homes, factories—might be deemed harmful to the habitat and therefore subject the entire nation to the order of the District Court enforcing the ESA provisions. *1 Center for Biological Diversity v. Kempthorne*, 2008 U.S. Dist. LEXIS 34753 (N.D. Cal. Apr. 28, 2008).

The threat to the habitat of most ESA-protected species is generally a local one. For the polar bear, however, proponents of the listing argue that *global* greenhouse gas emissions cause rising temperatures, thereby leading to a melting of Arctic ice that is the polar bear's habitat. Under this logic, any emitter of greenhouse gases in any state might have an impact on the polar bear's habitat. The NAM believes that the Court's ruling is misguided and will continue to promote congressional action for the following reasons:

**More Bureaucratic Barriers Will Impede Routine Federal Actions**
Under the theory being advanced by certain activists, listing the polar bear as a threatened species under the ESA could result in drastic and widespread delays to almost every federal activity in the United States. Consider that Section 7 of the ESA requires each federal agency to consult with the Secretary of the Interior to ensure that any federal action carried out by that agency not jeopardize the continued existence of the threatened species or result in the destruction or adverse modification of the habitat of such species. Secondly, if the polar bear is listed as threatened, under this extreme theory of the ESA, *any federal action*—such as a permit issued by a federal agency under the Clean Air Act, Clean Water Act, National Environmental Policy Act or other statute—could require a Section 7 consultation between the permitting agency and DOI, significantly slowing an already time-consuming process. It would effectively halt government activities for months or even years while the agencies determine if issuance of the permit will jeopardize the Arctic ice that makes up the polar bear's habitat.

**Increased Litigation**
The decision to list the polar bear as threatened will dramatically increase litigation. Under Section 11(g) of the ESA, any person may bring a private right of action (i.e., a citizen suit) against any other person, including the government of the United States, alleged to be in violation of the provisions of the ESA. The activists' theory described above could lead to a litany of citizen suits against businesses that emit greenhouse gases—which includes just about every business, large and small—alleging that their lawful operations threaten the habitat of the polar bear. Under Section11(g) of the ESA, a lawsuit could be brought against the entire federal government alleging that its lawful operations threaten the habitat of the polar bear, and the U.S. government could be enjoined of all operations until it finishes its consultations.

**DOI Must Leave the Door Open for an Appropriate Classification of the Polar Bear**
The DOI must allow itself the flexibility to revisit the current classification. According to the Alaska Department of Fish and Game, the global polar bear population is between 20,000 and 25,000, up from 8,000 to 10,000 in the 1960s. In fact, the Alaska Department of Fish and Game sent a letter to DOI on April 9, 2007, formally opposing the listing of the polar bear as threatened under the ESA.

**An Appropriate Rule 4(d) Rule Can Mitigate Expansion of the ESA, Provide Flexibility**
Despite the adverse impacts that a polar bear listing could have on the economy, there is a relatively easy way to alleviate the problems we cite above: the "4(d) rule." Under Section 4(d) of the ESA, the

Page 3

Secretary of the Interior is not mandated by statute to apply any specific restrictions to a species listed as "threatened," and has broad authority to issue a rule to addressing the activities to which any prohibitions or restrictions regarding the threatened wildlife species will apply.

Because of the avalanche of economic and regulatory consequences that may follow in the wake of a "threatened" classification, NAM encourages you to make a final decision rejecting such a listing. In the alternative, however, the NAM encourages you to closely examine your authority to issue a "special rule" under Section 4(d) of the ESA, including making clear that GHG emissions activities are not subject to the restrictions and prohibitions of the ESA, and thereby allow this issue to be resolved through the legislative process, while protecting American jobs and the economy.

Sincerely,


Keith McCoy
Vice President
Energy and Resources Policy