John Briscoe, # 53223
David Ivester, #76863
Lawrence S. Bazel, # 114641
Briscoe, Ivester, & Bazel, LLP
155 Sansome Street, 7th Floor
San Francisco, CA 94104
jbriscoe@briscoelaw.net
divester@briscoelaw.net
lbazel@briscoelaw.net
Telephone:    (415) 402-2700
Facsimile:    (415) 398-5630

John C. Martin *(pro hac vice* application pending*)*
Duane A. Siler *(pro hac vice* application pending*)*
Michele L. Walter *(pro hac vice* application pending*)*
Patton Boggs LLP
2550 M Street N.W.
Washington, D.C. 20037
jmartin@pattonboggs.com
dsiler@pattonboggs.com
mwalter@pattonboggs.com
Telephone:    (202) 457-6000
Facsimile:    (202) 457-6315

*Attorneys for Proposed Defendant-Intervenors American Petroleum Institute, Chamber of Commerce of the United States of America, National Mining Association, National Association of Manufacturers, and American Iron and Steel Institute*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 08-CV-1339-CW |
| ) | Assigned to: |
| DIRK KEMPTHORNE, *et al.*, ) | Hon. Claudia Wilken |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| AMERICAN IRON AND STEEL INSTITUTE, ) | |

4977335

|   |   |
|---|---|
| Proposed Defendant-Intervenor | ) ) ) ) |

**DECLARATION OF LAWRENCE KAVANAGH OF THE AMERICAN IRON AND STEEL INSTITUTE IN SUPPORT OF MOTION TO INTERVENE**

I, Lawrence Kavanagh, declare as follows:

1. I am Vice President of Environment and Technology of the American Iron and Steel Institute ("AISI"). I make this declaration in support of AISI's Motion to Intervene under Rule 24 of the Federal Rules of Civil Procedure. I have first-hand experience with, and personal knowledge of, the facts and matters discussed in this declaration.

2. I am a 1979 graduate of the University of Notre Dame with a Bachelor of Science degree in electrical engineering.

3. I have been Vice President with AISI since 1996. In this capacity, I have come to know the membership of AISI and its activities in regulatory and policy matters. I am well aware of AISI's activities concerning climate change issues.

4. AISI is a North American, non-profit trade organization representing the steel industry. AISI has approximately 28 member companies, including integrated and electric furnace steelmakers, and 138 associate and affiliate members who are suppliers to or customers of the steel industry. AISI's members operate and hold ownership interests in various steel manufacturing and related operations in many parts of the United States and its producer, associate and/or affiliate members supply various customers and projects in the United States, including Alaska.

5. AISI has its principal place of business in the District of Columbia.

4977335

6.    AISI advocates on behalf of the North American steel industry in the public policy arena and advances the case for steel in the marketplace. AISI has publicly-adopted an official policy on how global climate change concerns should be addressed. *See* **Exhibit A**, AISI's Position on Climate Change, *available at* http://www.steel.org/AM/Template.cfm?Section=policy_agenda&Template=/TaggedPage/TaggedPageDisplay.cfm&TPLID=78&ContentID=24629. In particular, AISI supports a global, comprehensive approach to solving the economic, environmental, and security issues pertaining to global climate change. Such a solution to this transnational problem will require a multilateral approach with foreign partners, promotion of energy efficiency measures, and the acceleration of substantial investment in and deployment of new technologies. AISI is at the forefront of developing new technologies, and the steel industry was able to decrease energy consumption per ton of steel shipped 29 percent between 1990 and 2006. The domestic steel industry is the most efficient in the world due to high recycling rates and continually improving technology, as well as its initiatives, including its $CO_2$ Breakthrough Program, a one-of-a-kind partnership with leading universities aimed at developing revolutionary new ways of making steel while emitting a minimum of greenhouse gases.

7.    AISI and its members have substantial interests that are directly and significantly affected by resolution of the issues presented by the Plaintiffs' complaint, as further discussed below. No other party represents AISI or its interests. AISI therefore requests to participate in this case to protect its interests. AISI's participation will be helpful and beneficial to the Court and aid in understanding the practical consequences of a decision on the Listing Rule and the 4(d) Rule. If AISI is denied intervention, it and its members will have no other means of protecting its interests in this matter.

4977335

8. AISI does not seek to delay these proceedings and will abide by the schedules that the Court has set.

9. AISI's North American members are devoted to efforts to limit greenhouse gas emissions and to developing natural resources in an environmentally sound, reasonable manner that complies with applicable regulatory requirements. This includes working with the government to make AISI members' operations compatible with environmental standards and concerns.

10. The nature of AISI's members' operations, however, makes it impossible to completely eliminate greenhouse gas emissions. Steel production is an energy-intensive process, and fuel amounts to approximately 20% of the cost of finished steel. Use of such fuels in AISI members' operations gives rise to greenhouse gas emissions.

11. Moreover, AISI members supply steel to companies involved in carbon-based fuels exploration or production, such as pipelines, or such steel is used to build machinery which consumes carbon as a fuel—such as cars. In any event, limits on carbon emissions may affect the demand for domestic steel, and the cost of its production. Thus, to the extent that greenhouse gas emissions are said to harm polar bears and that further regulatory burdens should be imposed under the ESA, AISI members will suffer from these burdens.

12. AISI's members have discrete and concrete interest in defending Plaintiffs' challenges to the Listing Rule and the 4(d) Rule.

13. Specifically, as to the 4(d) Rule, AISI's members have discrete and concrete interests in three aspects of that Rule. First, AISI has an interest in ensuring that its members' operations throughout the lower 48 States and Hawaii are not subjected to the requirement to obtain an incidental take permit under the ESA for their otherwise lawful activities that may emit

1  greenhouse gases. The U.S. Fish and Wildlife Service ("FWS") determined that neither climate

2  change, nor any effect of climate change, can be traced to particular activities in particular

3  locations. Thus, under the 4(d) Rule, otherwise lawful greenhouse gas-emitting operations in the

4  lower 48 States and Hawaii are exempted from the ESA Section 9 regulatory requirement to

5  obtain incidental take permits.

6       14.    Without this exemption, some would claim that AISI's members are required to

7  obtain incidental take permits for their otherwise lawful greenhouse gas-emitting activities in the

8  lower 48 States and Hawaii, even though FWS determined that impacts on polar bears could not

9  be traced to these, or any other specific activities. Thus, AISI's members have a particular

10 interest in ensuring the continued validity of this exemption in the 4(d) Rule so as to assure these

11 members will not be subjected to increased costs and delays associated with obtaining incidental

12 take permits, or to defend unfounded claims that such permitting is required.

13      15.    Second, AISI and its members have a concrete and immediate interest in ensuring

14 the continued validity of the exemption under the 4(d) Rule from the requirement to obtain a

15 Section 9 take authorization under the ESA. The ESA requires a permit for activities that will

16 take an endangered or threatened species. Under the 4(d) Rule, however, FWS determined that

17 the protections of the Marine Mammal Protection Act ("MMPA") and the Convention on

18 International Trade in Endangered Species of Wild Fauna and Flora ("CITES") are fully

19 protective. Thus, if an activity complies with the take provisions of the MMPA or CITES,

20 additional authorizations under the ESA would not be required. Unlike the exemption from the

21 ESA Section 9 incidental take permits, the exemption from the ESA's separate take authorization

22 applies to operations throughout the United States, including AISI's customers' operations that

23 AISI members may supply in Alaska. Without this exemption, AISI's members' customers

4977335

could be subject to the unnecessary burden of applying for ESA take authorizations ***in addition to*** the protections afforded by the MMPA, thereby potentially delaying the projects that AISI members supply. AISI's members therefore have a particular interest in ensuring the validity of this exemption.

16. Third, AISI and its members have a concrete and immediate interest in FWS's explanation in the preamble to the 4(d) Rule concerning the application of the ESA Section 7 consultation requirements. Apparently, Plaintiffs would have this Court declare that consultation is required in instances that FWS would be disinclined to require consultation. *See* Complaint, ¶¶ 9, 122, 167; *Endangered and Threatened Wildlife and Plants: Special Rule for the Polar Bear; Interim Final Rule*, 73 Fed. Reg. 28306, 28310-11. The May 14, 2008 H. Dale Hall FWS Guidance, as well as the preamble for the 4(d) Rule, however, alleviates the potential for an unnecessary and costly consultation process for greenhouse gas-emitting projects in certain situations. If this Court were to accept Plaintiffs' apparent position, AISI's members could be subject to a costly and time-consuming consultation process for federally permitted projects that they operate or supply. Thus, AISI's members have a particular interest in the continued validity of this interpretation.

17. AISI's members likewise have an interest in defending against the Plaintiffs' claim that NEPA procedures with regard to the 4(d) Rule were improperly omitted. If the Listing Rule remains in effect, but the 4(d) Rule is subject to NEPA, an interim period would exist during which AISI's members or its customers could be subjected to the permitting and consultation burdens discussed above under Sections 7 and 9. Consequently, for the same reasons that AISI members have a particular interest in the application of the 4(d) Rule, they

4977335

likewise have an interest in the resolution of whether NEPA, and its associated delays apply in the present case.

18. As to the Listing Rule itself, AISI's members have a concrete and immediate interest in defending the polar bear's designation as a threatened species. If polar bears are listed as endangered, rather than threatened, the permitting and consultation requirements of the ESA discussed above will apply. Thus, if Plaintiffs were to prevail, AISI's members or the customers they supply throughout the United States, including in Alaska, could be required to: (i) obtain a take authorization under Section 9 of the ESA in addition to any authorization they may have obtained under the MMPA, or, obtain an incidental take authorization for their otherwise lawful greenhouse gas-emitting activities; and (ii) subject their federally-permitted greenhouse gas-emitting activities to the consultation process required under Section 7. These increased permitting and consultation burdens necessarily will lead to significant additional costs and delay for AISI's members.

19. Moreover, with regard to FWS's purported omission to designate critical habitat and to list measures for non-lethal deterrence – AISI's members likewise have a concrete and immediate interest in these issues. A number of AISI's members may supply operations in what may otherwise be designated critical polar bear habitat. If critical habitat were designated, then special management considerations or protections would apply, resulting in additional costs and potential delay to the operations they supply located in relevant parts in Alaska. Similarly, CBD would require generalized, non-project-specific non-lethal deterrence measures that, depending on what they prescribe, could increase the project's costs and operational planning.

20. The relief that Plaintiffs request for the Listing Rule, the 4(d) Rule, and under NEPA and the MMPA, would put AISI's members at risk of increased permitting burdens and

4977335

1 | enforcement actions or citizen suits that would substantially impact the economic interests of
2 | AISI members' routine operations throughout the United States. AISI's members therefore have
3 | a concrete interest in defending these aspects of the Listing Rule, the 4(d) Rule, and under NEPA
4 | and the MMPA, and will have no other way of defending these interests if intervention is denied.

4977335

1      I declare under penalty of perjury under the laws of the United States that the foregoing

2   information is true and correct to the best of my knowledge, information, and belief.

3

4      DATED this 4th day of September, 2008

5
6                                              LAWRENCE KAVANAGH
7

4977673

# EXHIBIT A




About AISI | Media Center | AISI Events | Learning Center | Shop AISI

>> Login/Logout | New guest? Start here

Home —> Steelworks Home

**Steel Markets**
- Automotive
- Construction
- Cans & Containers
- Other Markets

**Steel Industry**
- Statistics
- Public Policy
- Manufacturing
- Environment

**Consumer Resources**
- Steel in Your Life
- Steel Recycling
- Steel Q & A

**Members Only**

**SIGN UP to receive AISI's FREE e-news!** Read the latest.
Email:
Name:
[Join]

# American Iron and Steel Institute

# CLIMATE CHANGE

### Background

Energy costs represent about 20 percent of the steel. As a result of this dependence, the industry places a high priority on energy efficiency and conservation. The American steel industry has demonstrated that significant reductions in energy and corresponding greenhouse gas emissions (GHG) can be achieved through voluntary efforts and programs. For instance, through investments in new technology, energy consumption per ton of steel shipped has decreased 29 percent between 1999 and 2006. The domestic steel industry has become the most efficient in the world due to high recycling rates and continually improving technology.

### Cap-and-Trade

The steel industry believes that a mandatory cap-and-trade program could have an adverse impact on the economy, would be detrimental to the competitiveness and viability of the domestic steel industry, and would compromise national security unless safeguards are included to prevent these unfavorable consequences. Instead, AISI endorses the Global Steel Sectoral Approach.

### Global Commitment

Any program must be a truly global approach involving all major GHG emitting countries and must be verifiable and enforceable. To ensure a global approach and protect the competitiveness of domestic products, legislation should include a requirement that all products sold in the U.S. meet a carbon intensity performance standard and should also recognize the role of and progress achieved by effective voluntary programs all ready in place, such as Climate VISON, the Asia-Pacific Partnership, and USEPA's Climate Leaders Program.

### Alternative Approaches

AISI supports both short and long term research and development, funded jointly with government favorable tax incentives and financial policies that encourage the development of new and transformational energy alternatives. Global GHG emissions are best addressed through a sector based approach for energy-intensive industries, increased research, development and deployment of next generation steelmaking technologies. AISI's $CO_2$ Breakthrough Program and the Department of Energy's Industrial Technologies Program (ITP) are two examples.

[ Download entire Public Policy Agenda (PDF) ]

**Public Policy Agenda**

Home

Public Policy Staff

Trade
- International
- Domestic
- China
- Pro-Manufacturing

Climate Change

Energy Resources

Market Development
- U.S. Infrastructure
- New Vehicles
- Recycling

Manufacturing and Technology
- Energy Funding
- Metals Initiative

> > Back to Policy Resources





About | Search | Site Map | Contact | Shop | Privacy Policy
Copyright 2008, American Iron and Steel Institute